# Marquette Law Review

Volume 108
Issue 2 *Winter*                                                         Article 8

2024

## Railroading Interstate Corporations: Personal Jurisdiction and Dormant Commerce After Mallory V. Norfolk Southern Railway Co.

Abigail Nilsson

Follow this and additional works at: https://scholarship.law.marquette.edu/mulr

Part of the Civil Procedure Commons, Conflict of Laws Commons, and the Constitutional Law Commons

### Repository Citation

Abigail Nilsson, *Railroading Interstate Corporations: Personal Jurisdiction and Dormant Commerce After Mallory V. Norfolk Southern Railway Co.*, 108 Marq. L. Rev. 583 (2024).
Available at: https://scholarship.law.marquette.edu/mulr/vol108/iss2/8

This Response or Comment is brought to you for free and open access by the Journals at Marquette Law Scholarly Commons. It has been accepted for inclusion in Marquette Law Review by an authorized editor of Marquette Law Scholarly Commons. For more information, please contact elana.olson@marquette.edu.

# RAILROADING INTERSTATE CORPORATIONS: PERSONAL JURISDICTION AND DORMANT COMMERCE AFTER *MALLORY V. NORFOLK SOUTHERN RAILWAY CO.*

*In* Mallory v. Norfolk Southern Railway Co., *the Supreme Court resurrected a long-dormant theory of personal jurisdiction: that by registering to do business in a state, a corporation consents to general jurisdiction. This Comment critiques the* Mallory *plurality's reliance on pre-*International Shoe *caselaw, arguing that the decision unnecessarily sidesteps decades of precedent, mistakes coercion for consent, and inaptly analogizes registration-jurisdiction statutes to tag jurisdiction on individuals. It further explores Justice Alito's concurring concern that such statutes may violate the Dormant Commerce Clause by imposing disproportionate burdens on out-of-state corporations without corresponding state benefits. Finally, the Comment uses Wisconsin as a case study to explore whether states should adopt similar statutes, concluding that the costs of doing so, including court congestion and promoting forum shopping, far outweigh any potential advantages. After the Court cabined general jurisdiction over the past several decades,* Mallory *opens a controversial back door that courts and legislatures should approach with caution.*

I. INTRODUCTION ........................................................................................ 584
II. A BRIEF HISTORY OF PERSONAL JURISDICTION ..................................... 586
    A. *Pennoyer v. Neff*: The Genesis of Due Process Restraints on
        Personal Jurisdiction .................................................................. 586
    B. The Seminal *International Shoe* Decision .................................... 587
    C. Developments in General Personal Jurisdiction
        Post-*International Shoe* .............................................................. 588
III. THE *MALLORY* DECISION ...................................................................... 592
    A. Robert Mallory's Case .............................................................. 592
    B. The Plurality Sidesteps Precedent (in the Name of
        Originalism) ............................................................................... 594
IV. THE PROBLEMS WITH THE *MALLORY* PLURALITY'S DUE PROCESS
    ANALYSIS ....................................................................................... 596
    A. The History of Registration-Jurisdiction Statutes ........................ 597

*MARQUETTE LAW REVIEW*                    [108:583

    B.  "Consent" Is Not Coercion, and Registration-Jurisdiction
        Statutes Coerce ........................................................................ 600
    C.  Tag Jurisdiction and Consent-to-Jurisdiction Statutes Are
        Distinct .................................................................................... 603
V.  IS JUSTICE ALITO CORRECT? DO CONSENT-TO-JURISDICTION
    STATUTES VIOLATE THE CONSTITUTION'S DORMANT COMMERCE
    CLAUSE? ............................................................................................ 606
VI.  SHOULD OTHER STATES FOLLOW PENNSYLVANIA'S LEAD AND
    ADOPT CONSENT-TO-JURISDICTION STATUTES? ............................... 612
VII.  CONCLUSION ......................................................................................... 619

## I. INTRODUCTION

Over the last eight decades, and beginning with the seminal *International Shoe Co. v. Washington* decision, the Supreme Court has outlined two primary methods of obtaining personal jurisdiction over a corporate defendant: specific and general personal jurisdiction.[1] Regarding general jurisdiction, the Supreme Court, especially in recent years, has significantly narrowed the doctrine by adopting the "at home" test in *Goodyear Dunlop Tires Operations, S.A. v. Brown*[2] and *Daimler AG v. Bauman*.[3] Under that test, a corporation can be sued only where its contacts with the forum state are substantial enough to render it essentially "at home" in that state.[4] In practice, and barring extreme circumstances, a corporation is "at home" in only two places: the state in which the business is incorporated and the state in which it is headquartered.[5]

However, with its recent and surprising decision in *Mallory v. Norfolk Southern Railway Co.*, the Supreme Court has opened a wide exception to the "at home" test: consent-to-jurisdiction statutes.[6] A corporation can now also be subject to general jurisdiction in any state in which it is registered to do business, provided that the state has a statute deeming registering to do business within its borders as consent to general jurisdiction.[7] A four-one-four plurality with interesting bedfellows—Justices Gorsuch, Thomas, Sotomayor, and

---

1. *See generally* 326 U.S. 310 (1945).
2. 564 U.S. 915, 919 (2011).
3. 571 U.S. 117, 122 (2014).
4. *Id.* at 127.
5. *Id.* at 139 n.19.
6. 143 S. Ct. 2028 (2023) (plurality opinion).
7. *Id.* at 2037.

Jackson, with Justice Alito concurring in part and concurring in the judgment—declined to hold that such statutes were unconstitutional.[8]

Instead, the Court looked back to a 1917 decision that predated *International Shoe* and its progeny. That case, *Pennsylvania Fire Insurance Co. of Philadelphia v. Gold Issue Mining & Milling Co.*, upheld the constitutionality of a statute requiring insurance companies to appoint a registered agent for service of process and deem any lawsuits served on that agent as proper.[9] The Court held that, despite the narrowing of general jurisdiction over time, *Pennsylvania Fire* governed.[10] In her concurrence, Justice Jackson discussed the consent-to-jurisdiction statute in terms of waiver, finding that the statute was a constitutionally valid waiver of personal jurisdiction.[11]

The dissent—a similarly eclectic bunch, with Justices Barrett, Roberts, Kagan, and Kavanaugh—decried the Court's departure from *International Shoe* and its progeny.[12] But perhaps more interestingly, in his partial concurrence, Justice Alito saw no due process issues with consent-to-jurisdiction statutes.[13] Instead, he was concerned with the statute's Dormant Commerce Clause implications.[14] A state law violates the Dormant Commerce Clause when it either discriminates against or imposes an undue burden on interstate commerce.[15] Therefore, Justice Alito urged Norfolk Southern on remand to argue that Pennsylvania's consent-to-jurisdiction statute violates the Dormant Commerce Clause.[16]

Part II of this Comment outlines the history of personal jurisdiction law. Personal jurisdiction has a long history of decisions related to due process. It is important to trace that history to truly understand the departure the Court takes from that lineage in *Mallory*. Part III discusses the plurality's *Mallory* decision and traces its reasoning. Part IV then discusses the problems with that reasoning. Next, Part V examines the constitutional doctrine that Justice Alito suggests is implicated by consent-to-jurisdiction statutes: the Dormant Commerce Clause. Part V evaluates the argument that statutes like Pennsylvania's consent-to-jurisdiction law would impose an undue and

---

8.  *Id.* at 2032, 2045.

9.  243 U.S. 93, 95 (1917).

10.  *Mallory*, 143 S. Ct. at 2037.

11.  *Id.* at 2045 (Jackson, J., concurring).

12.  *Id.* at 2055 (Barrett, J., dissenting).

13.  *Id.* at 2047 (Alito, J., concurring in part and concurring in judgment).

14.  *Id.*

15.  South Dakota v. Wayfair, Inc., 138 S. Ct. 2080, 2091 (2018).

16.  *Mallory*, 143 S. Ct. at 2047 (Alito, J., concurring in part and concurring in judgment).

*MARQUETTE LAW REVIEW*                      [108:583

therefore unconstitutional burden on interstate commerce. Finally, in the event that no renewed challenge to such statutes succeeds, Part VI examines whether other states should follow Pennsylvania's lead and adopt their own consent-to-jurisdiction statutes. Using Wisconsin as a thought experiment, this Comment provides a framework for the considerations a state should weigh when determining whether to adopt such a statute.

## II.  A BRIEF HISTORY OF PERSONAL JURISDICTION

### A.  Pennoyer v. Neff: *The Genesis of Due Process Restraints on Personal Jurisdiction*

To understand *Mallory*, it is useful to track the development of personal jurisdiction, a doctrine dating back at least a century and a half. The foundational personal jurisdiction case was *Pennoyer v. Neff*.[17] In *Pennoyer*, an attorney sued Neff for unpaid attorney's fees, notified him via publication out of state, and received a default judgment.[18] Neff then purchased land, but the land was seized and sold to Pennoyer to pay off the judgment.[19] Neff then sued Pennoyer for title to the land, alleging that the judgment granting title was based on faulty service.[20]

The Court constitutionalized the concept of personal jurisdiction by deeming insufficient personal jurisdiction a violation of due process.[21] Specifically, the Court held that a state court could exercise personal jurisdiction over a non-resident defendant only if (1) the defendant was personally served with process while he was present in the state, or (2) the defendant consented to the court's jurisdiction and personally appeared in the case.[22] Substitute service was insufficient.[23]

The Court also established that a state court could exercise in rem jurisdiction[24] over property located in the state to decide the liability of a non-resident owner of that property only if the court seized that property at the outset

---

17. 95 U.S. 714 (1878), *overruled by* Shaffer v. Heitner, 433 U.S. 186 (1977).

18. *Id.* at 719–20.

19. *Id.* at 720.

20. *Id.* at 719.

21. *Id.* at 734.

22. *Id.* at 728–29.

23. *Id.* at 741.

24. In rem jurisdiction describes "[a] court's power to adjudicate the rights to a given piece of property, including the power to seize and hold it." *In Rem Jurisdiction*, BLACK'S LAW DICTIONARY (12th ed. 2024); *see also Pennoyer*, 95 U.S. at 734. This Comment examines personal jurisdiction, which is far more common.

of the litigation.[25] If jurisdiction were exercised over an individual but the above conditions were not met, then the exercise of that jurisdiction would violate the Fourteenth Amendment's Due Process Clause.[26] In essence, a court would be depriving an individual of life, liberty, or property without adequate due process of law. And finally, the Court held that a judgment based on an exercise of jurisdiction in violation of the Due Process Clause is not entitled to respect from another state's courts under the Full Faith and Credit Clause.[27]

*Pennoyer* is no longer good law.[28] But it is worth examining why. First, this 1877 case focused largely on the concept of territory.[29] This no longer makes sense in the modern, connected world. Furthermore, and relevant to *Mallory*, "presence" can be difficult to define for non-human business entities. The sole location a human being is "present" at any time is much easier to conceptualize than where an entity is present.

### B. *The Seminal* International Shoe *Decision*

The Court addressed these concerns with *Pennoyer* almost fifty years later in *International Shoe*,[30] a case the Court has since deemed "transformative,"[31] "the classic expression of the criterion [of personal jurisdiction],"[32] "'canonical', 'seminal,' 'pathmarking,' and even 'momentous.'"[33] In *International Shoe*, a shoe company was incorporated in Delaware and headquartered in Missouri but had traveling salesmen employees in Washington.[34] Washington imposed a tax on employers to contribute to its unemployment fund, which the shoe company refused to pay.[35] The state served notice to the company via mail in Missouri and personally served an in-state Washington employee.[36]

---

25. *Pennoyer*, 95 U.S. at 734.

26. *Id.*

27. *Id.* at 731.

28. *See* Shaffer v. Heitner, 433 U.S. 186, 212 n.39 (1977).

29. *Pennoyer*, 95 U.S. at 741.

30. Int'l Shoe Co. v. Washington, 326 U.S. 310 (1945).

31. BNSF Ry. Co. v. Tyrell, 137 S. Ct. 1549, 1157 (2017).

32. Burnham v. Superior Ct., 495 U.S. 604, 609 (1990) (plurality opinion).

33. Mallory v. Norfolk S. Ry. Co., 143 S. Ct. 2028, 2063 (2023) (Barrett, J., dissenting) (quoting Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct., 141 S. Ct. 1017, 1024 (2021) ("canonical"); Bristol-Myers Squibb Co. v. Superior Ct., 137 S. Ct. 1773, 1779 (2017) ("seminal"); Goodyear Dunlop Tires Operations, S.A. v. Brown, 564 U.S. 915, 919 (2011) ("pathmarking"); Daimler AG v. Bauman, 571 U.S. 117, 128 (2014) ("momentous")).

34. 326 U.S. at 313.

35. *See id.* at 311–13.

36. *Id.* at 312.

In *International Shoe*, the Court held that it was constitutional for a state to exercise personal jurisdiction over a non-resident defendant if the defendant has had minimum contacts with the state such that maintenance of the suit did not offend "traditional notions of fair play and substantial justice."[37] The test for personal jurisdiction traditionally associated with *International Shoe* has three elements: (1) minimum contacts,[38] (2) relatedness of those contacts with the state to the claim,[39] and (3) reasonableness, by which the Court meant that the contacts with the forum state were sufficient to make enforcement fair and just.[40]

The test from *International Shoe* remains good law and has been elaborated on in subsequent precedent.[41] But most notably, two branches of personal jurisdiction emerged post-*International Shoe*: specific personal jurisdiction[42] and general personal jurisdiction,[43] the latter being the subject matter of *Mallory*.

### C. Developments in General Personal Jurisdiction Post-International Shoe

The Supreme Court first significantly considered general personal jurisdiction in a case presenting rather extreme circumstances.[44] During World War II, the president of a Philippine company, Benguet, sought refuge in Ohio during Japanese occupation of his country.[45] Therefore, the president conducted much of his company's business in Ohio.[46] Thus, when a plaintiff wished to sue the company for unpaid stock certificates and dividends, she filed suit in Ohio.[47] The Court held that general jurisdiction over a foreign corporation was permissible if the company has "continuous and systematic" contacts with the

---

37.  *Id.* at 316.

38.  *Id.*

39.  Bristol-Myers Squibb Co. v. Superior Ct., 137 S. Ct. 1773, 1780 (2017).

40.  *See Int'l Shoe Co.*, 326 U.S. at 316, 320.

41.  David W. Ichel, *Has Shoe Run Its Course? The Legacy of* International Shoe *and the Future of Complex Litigation*, 103 JUDICATURE 64, 65–66 (2019).

42.  Specific personal jurisdiction grants a court authority to hear a claim based on "minimum contacts with the forum state when the claim arises out of or is related to those contacts." *Specific Personal Jurisdiction*, BLACK'S LAW DICTIONARY (12th ed. 2024); *see also, e.g.*, Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472–73 (1985).

43.  General personal jurisdiction, conversely, grants a court authority to hear a claim in the absence of relation between a person's minimum contacts with a forum state and the claim. *General Personal Jurisdiction*, BLACK'S LAW DICTIONARY (12th ed. 2024); *see also infra* Section II.C.

44.  Perkins v. Benguet Consol. Mining Co., 342 U.S. 437 (1952).

45.  *Id.* at 447–48.

46.  *Id.*

47.  *Id.* at 438–39.

forum state.[48] For Benguet, its contacts with the forum state were both qualitatively and quantitatively continuous and systematic—high-level decisions were regularly made in the forum state for an extended period of time.[49]

"Continuous and systematic" contacts quickly became a fact-intensive inquiry. For example, in *Helicopteros Nacionales de Colombia, S.A. v. Hall*, a Colombian helicopter company working with a Peruvian oil pipeline employed four Texans who died in a helicopter crash in South America.[50] The plaintiffs, their survivors, sued in Texas.[51] Their theory of "continuous and systematic" contacts relied on the fact that the helicopter company had a meeting in Texas, signed contracts there, purchased its helicopters there, and even trained employees in the forum state.[52] The Supreme Court, however, held that general jurisdiction over the company was impermissible.[53] Although there were contacts with the forum state, there was not a sufficient volume or quality of contacts to be considered "continuous and systematic."[54]

Decades later, the Roberts Court significantly narrowed the scope of general jurisdiction in the span of only a few years. First, in *Goodyear*, the Court signaled with a phrase that it would limit general jurisdiction.[55] In *Goodyear*, two North Carolina children were killed on a bus in Paris, France, when the bus tires—manufactured by Goodyear—blew out.[56] The children's parents sued three foreign subsidiaries in North Carolina.[57]

Perhaps unsurprisingly, the Court held that the three foreign subsidiaries of Goodyear did not have "continuous and systematic" contact with North Carolina.[58] However, *Goodyear*'s importance lay in a seemingly innocuous phrase Justice Ginsberg employed in stating the rule of general jurisdiction.[59] Justice Ginsberg wrote, "A court may assert general jurisdiction over foreign (sister-state or foreign-country) corporations to hear any and all claims against

---

48. *Id.* at 445.

49. *Id.* at 448.

50. 466 U.S. 408, 409–10 (1984).

51. *Id.* at 409.

52. *Id.* at 411.

53. *Id.* at 418–19.

54. *Id.* at 416.

55. Goodyear Dunlop Tires Operations, S.A. v. Brown, 564 U.S. 915, 919 (2011).

56. *Id.* at 918.

57. *Id.*

58. *Id.* at 920.

59. *Id.* at 919.

them when their affiliations with the State are so 'continuous and systematic' as to render them essentially at home in the forum State."[60]

That phrase—"at home"—officially became the test for general jurisdiction just three years later in *Daimler*.[61] In *Daimler*, a foreign subsidiary of Daimler AG assisted Argentinian police in torture and murder during the "Dirty War."[62] The plaintiffs sued the parent company, Daimler AG, in the United States under the Alien Tort Statute,[63] which grants original jurisdiction over torts that violate United States treaties or the law of nations.[64] Plaintiffs argued that the contacts of American subsidiaries of Daimler AG could be imputed to the foreign parent company to create general personal jurisdiction over it.[65] The Court disagreed.[66] Instead, Justice Ginsberg and a unanimous Court (with one concurrence in judgment) doubled down on the "at home" test.[67] The Court explained: "[T]he inquiry under *Goodyear* is not whether a foreign corporation's in-forum contacts can be said to be in some sense 'continuous and systematic,' it is whether that corporation's 'affiliations with the State are so "continuous and systematic" as to render [it] essentially at home in the forum State.'"[68] The Court elaborated in a footnote:

> We do not foreclose the possibility that in an exceptional case, see, *e.g.*, *Perkins*, . . . a corporation's operations in a forum other than its formal place of incorporation or principal place of business may be so substantial and of such a nature as to render the corporation at home in that State. But this case presents no occasion to explore that question . . . . It is one thing to hold a corporation answerable for operations in the forum State, . . . quite another to expose it to suit on claims having no connection whatever to the forum State.[69]

Therefore, following *Daimler*, a corporation is subject to general personal jurisdiction in only two places barring an "exceptional case": (1) the state in which it is incorporated, and (2) its principal place of business.[70]

---

60.  *Id.* (emphasis added) (citing Int'l Shoe Co. v. Washington, 326 U.S. 310, 317 (1945)).

61.  Daimler AG v. Bauman, 571 U.S. 117, 122 (2014).

62.  *Id.* at 121.

63.  *Id.* at 122.

64.  28 U.S.C. § 1350.

65.  *Daimler*, 571 U.S. at 134.

66.  *Id.* at 135.

67.  *Id.* at 138–39.

68.  *Id.* (quoting Goodyear Dunlop Tires Operations, S.A. v. Brown, 564 U.S. 915, 919 (2011)).

69.  *Id.* at 139 n.19.

70.  *Id.*

The Court has explained a few of these "exceptional cases" in which general personal jurisdiction would be appropriate. First, as the Court indicated, the rather extreme facts of *Perkins* demonstrate that a foreign crisis necessitating refuge in the United States would make general personal jurisdiction appropriate in a United States court.[71] Second, although the Court held in *Daimler* that the plaintiffs' imputation theory was insufficient in their case, the Court did not reject out of hand the possibility that imputation in other circumstances could justify general personal jurisdiction over a corporation.[72] Perhaps, for example, a case where a parent company has ownership or complete control over a subsidiary would constitute an "exceptional case" for the Court.

Finally, the Court has indicated that, at some point, an excessive proportion of business done in one state could render that state a third "home" for a corporation.[73] In the most recent general personal jurisdiction case before *Mallory*, the Supreme Court considered a lawsuit with "remarkably similar facts" to those it would consider in *Mallory*.[74] The plaintiffs brought suit in Montana for wrongful death and personal injury claims for losses that did not occur in Montana.[75] The plaintiffs did not reside in Montana, but the defendant corporation did some business in Montana.[76] Namely, of the 32,500 miles of railroad track BNSF operated, 2,061 miles—or about 6% of its tracks—were in the state.[77] BNSF employed less than 5% of its workforce in Montana.[78] Under 10% of its revenue came from Montana, and it "maintain[ed] only one of its 24 automotive facilities in Montana."[79]

The Court held that the defendant corporation was not "at home" in Montana, and therefore, the state did not have personal jurisdiction over it.[80] However, the Court did not indicate that the proportionality argument would never carry weight.[81] This leaves open the possibility that a particularly overwhelming proportion of business in one state would make that state a proper forum for suit.

---

71.  Perkins v. Benguet Consol. Mining Co., 342 U.S. 437, 447–48 (1952).

72.  *Daimler*, 571 U.S. at 135.

73.  *See* BNSF Ry. Co. v. Tyrrell, 137 S. Ct. 1549, 1558 (2017).

74.  Mallory v. Norfolk S. Ry. Co., 143 S. Ct. 2028, 2056 (2023) (Barrett, J., dissenting).

75.  *BNSF Ry. Co.*, 137 S. Ct. at 1553.

76.  *Id.*

77.  *Id.* at 1554.

78.  *Id.*

79.  *Id.*

80.  *Id.* at 1559.

81.  *See id.*

In sum, the Court spent a decade creating a narrow, corporate-friendly test for general personal jurisdiction over corporations.[82] A corporation could no longer be sued solely because they were "doing business" in a jurisdiction.[83] Lower court decisions quickly followed and illustrated the shift.[84] One commentator called the abandonment of such test a "sea change."[85] Other commentators decried the Roberts Court's limitations on general jurisdiction because of the test's corporate-friendliness.[86]

Then came a new "sea change."[87] What seemed to be the next brick in the "at home" test's wall instead opened a new door to pro-plaintiff states wishing to encourage suits filed in their courts. In *Mallory*, the Supreme Court changed course from *International Shoe* and its progeny.[88] Instead, the Court looked back a century and followed what previously seemed to be obsolete precedent.[89]

### III. The *MALLORY* Decision

#### A. Robert Mallory's Case

Plaintiff Robert Mallory worked for Defendant Norfolk Southern for approximately twenty years in Ohio and Virginia.[90] Mallory alleged that he developed cancer from his hazardous work environment in those states.[91] Norfolk Southern was headquartered and incorporated in Virginia.[92] But Mallory did not sue in Ohio, where his injuries may have derived, or in Virginia, where both his injuries may have been caused and the company was

---

82. *See* Robert Ellis Stengel, *Boeing, Boeing, Gone: General Jurisdiction over Corporations, Principal Place of Business, and a Second Look at the Total Activities Test*, 88 BROOK. L. REV. 275, 276–77 (2022).

83. *See* Tanya J. Monestier, *Where Is Home Depot "At Home"?:* Daimler v. Bauman *and the End of Doing Business Jurisdiction*, 66 HASTINGS L.J. 233, 265–66 (2014).

84. *See, e.g.*, Brown v. Lockheed Martin Corp., 814 F.3d 619, 628–29 (2d Cir. 2016).

85. D.E. Wagner, Note, *Hertz So Good: Amazon, General Jurisdiction's Principal Place of Business, and Contacts Plus as the Future of the Exceptional Case*, 104 CORNELL L. REV. 1085, 1099 (2019).

86. *See* Polina Pristupa, Note, *Too Big for Personal Jurisdiction? A Proposal to Hold Corporations Accountable for In-State Conduct in Accordance with Due Process Principles*, 40 CARDOZO L. REV. 1367, 1369 (2019).

87. Mallory v. Norfolk S. Ry. Co., 143 S. Ct. 2028, 2065 (2023) (Barrett, J., dissenting).

88. *Id.* at 2032.

89. *See* Pa. Fire Ins. Co. of Philadelphia v. Gold Issue Mining and Milling Co., 243 U.S. 93, 93 (1917).

90. *Mallory*, 143 S. Ct. at 2032.

91. *Id.* at 2033.

92. *Id.*

incorporated and headquartered.[93] Instead, Mallory filed his Federal Employers Liability Act claim in Pennsylvania, a jurisdiction with no ties to his claim.[94]

Having been sued in neither the state of incorporation nor headquarters, Norfolk Southern challenged personal jurisdiction.[95] Under the "at home" test recently developed by the Court, Norfolk Southern pointed out it could not be subject to general jurisdiction anywhere but in Virginia.[96] Indeed, were the "at home" test to apply to Norfolk Southern, its contacts with Pennsylvania would in no way measure up to the standards outlined in *Daimler* and *BNSF Railway Co. v. Tyrell*.[97] Norfolk Southern's contacts with Pennsylvania were limited to it (1) maintaining three locomotive repair shops in Pennsylvania, (2) operating eleven rail yards, (3) managing over 2,200 miles of railroad tracks, and (4) employing almost 5,000 people in the state.[98] These contacts would not constitute the "exceptional circumstances" that the Court has indicated would constitute a third corporate "home."[99] And because the injuries underlying the action allegedly occurred in either Ohio or Virginia, Pennsylvania also lacked specific personal jurisdiction over Norfolk Southern, meaning the suit should be dismissed for want of personal jurisdiction.[100]

However, Mallory relied on a Pennsylvania statute to argue that Norfolk Southern consented to general personal jurisdiction by registering to do business in the state.[101] The Pennsylvania statute provides that any registered foreign company in Pennsylvania, and any company that "carr[ies] on . . . a continuous and systematic part of its general business"[102] in the state, gives Pennsylvania "a sufficient basis of jurisdiction to enable the tribunals of [Pennsylvania] to exercise general personal jurisdiction over" it.[103]

Norfolk Southern argued that the Pennsylvania statute violated the Due Process Clause.[104] In its brief, Norfolk Southern in part argued that subjecting it to jurisdiction "would expand general jurisdiction by gutting *Goodyear* and

---

93. *Id.* at 2032.

94. *Id.*

95. *Id.* at 2033.

96. *Id.* at 2056.

97. *See* Daimler AG v. Bauman, 571 U.S. 117, 138–39 (2014); BNSF Ry. Co. v. Tyrell, 137 S. Ct. 1549, 1559 (2017).

98. Brief for the Petitioner at 5, *Mallory*, 143 S. Ct. 2028 (No. 21-1168), 2022 WL 2612372; *Mallory*, 143 S. Ct. at 2042.

99. *Daimler*, 571 U.S. at 139 & n.19.

100. *See* Int'l Shoe Co. v. Washington, 326 U.S. 310 (1945).

101. *Mallory*, 143 S. Ct. at 2033.

102. 42 PA. CONS. STAT. § 5301(a)(2)(i), (iii) (2024).

103. *Id.* § 5301(a).

104. *Mallory*, 143 S. Ct. at 2033.

*Daimler*."[105] But instead of following the *Goodyear–Daimler* framework, the Court looked back a century to a seemingly obscure case: *Pennsylvania Fire Insurance Co. of Philadelphia v. Gold Issue Mining & Milling Co*.[106]

### B. The Plurality Sidesteps Precedent (in the Name of Originalism)

In 1917, in *Pennsylvania Fire*, a Missouri statute required out-of-state insurance companies wishing to do business in the state to appoint a registered agent for service of process.[107] More importantly, any suit served on that agent was considered valid.[108] An Arizona corporation then sued Pennsylvania Fire in Missouri for an insurance claim relating to property in Colorado and arising from a policy of insurance issued in Colorado.[109] The Court held that the Missouri statute did not violate due process because, by registering to do business in Missouri, the insurance company agreed to be sued in the state.[110] Looking back at this precedent from over a century ago, Justice Gorsuch stated simply, "*Pennsylvania Fire* controls this case."[111]

To sidestep the reasoning of *International Shoe* and its progeny, the plurality stated that those cases provided two "additional" methods of jurisdiction.[112] But where consent is present, Justice Gorsuch reasoned, the precedent had no value.[113] The plurality frames this as a straightforward case in which Norfolk Southern wanted the Court to "pluck out and overrule just one longstanding precedent that it happens to dislike."[114] In fact, Justice Gorsuch framed *Pennsylvania Fire* as one in a line of cases affirming that consent, even by registering to do business in a state, is a basis for jurisdiction.[115]

The plurality also analogized registration-as-consent to "'tag' jurisdiction," a method of obtaining personal jurisdiction over a natural, flesh-and-blood person.[116] A state has "tag jurisdiction" over a natural person if that person is served with process while physically present in that state.[117] For example, a man

---

105. Respondent's Brief at 13, *Mallory*, 143 S. Ct. 2028 (No. 21-1168), 2022 WL 3925010.

106. 243 U.S. 93 (1917).

107. *Id.* at 94 (discussing MO. REV. STAT. § 7042 (1909)).

108. *Id.*

109. *Id.*

110. *Id.* at 95.

111. Mallory v. Norfolk S. Ry. Co., 143 S. Ct. 2028, 2037 (2023).

112. *Id.* at 2039 (emphasis omitted).

113. *Id.*

114. *Id.* at 2044.

115. *Id.* at 2039 (citing Ins. Corp. of Ir. v. Compagnie des Bauxites de Guinee, 456 U.S. 694, 703 (1982)).

116. *Id.* at 2034.

117. Burnham v. Superior Ct., 495 U.S. 604, 629 n.1 (1990) (Brennan, J., concurring).

who married and resided in New Jersey but traveled to California for business, could be haled to California's courts for divorce proceedings if his estranged wife served him with process while he was physically present in California.[118]

Justice Gorsuch noted that in the nineteenth century, "[T]he question arose how to adapt the traditional rule about transitory actions for individuals to artificial persons created by law."[119] He and the plurality concluded that consent-to-jurisdiction statutes, which proliferated mainly post-*Pennoyer* and entirely pre-*International Shoe*, were lawmakers' way of applying tag jurisdiction to corporations.[120] Using a statutory appendix that Mallory's counsel compiled,[121] the plurality cited nineteenth-century statutes from New York,[122] Wisconsin,[123] Maryland[124], North Carolina,[125] Iowa,[126] Texas,[127] Michigan,[128] Nevada,[129] South Carolina,[130] Connecticut,[131] Virginia,[132] Ohio,[133] Illinois,[134] Arkansas,[135] Missouri,[136] and Pennsylvania,[137] the only state to still have a statute producing similar effects. These statutes sought to address a *Pennoyer*-era problem of corporations attempting to "hide behind their foreign character" when sued in various fora and "deny their presence to defeat the court's jurisdiction."[138]

The plurality broadly categorizes these statutes as "requiring out-of-state corporations to consent to in-state suits in exchange for the rights to exploit the local market and to receive the full range of benefits enjoyed by in-state

118.  *Id.* at 607–08.

119.  *Mallory*, 143 S. Ct. at 2034.

120.  *Id.* at 2035.

121.  Brief for the Petitioner, *supra* note 98, at 2a–274a.

122.  N.Y. CODE PROC. tit. 8, ch. 1, § 427 (1849).

123.  Actions Against Corporations—How Commenced, ch. 86, § 1, 1866 Wis. Gen. Laws 102.

124.  MD. CODE pt. 1, art. 26, § 211 (1868).

125.  N.C. PUB. STAT. ch. 17, tit. 7, § 82(1) (1873).

126.  IOWA CODE § 101.1705 (1851).

127.  Act of Apr. 17, 1874, ch. 87, 1874 Tex. Gen. Laws 107.

128.  Where Suits May be Commenced, No. 256, § 1, 1881 Mich. Pub. Acts 348, 348.

129.  Agent to Reside in the State, ch. 44, § 1, 1889 Nev. Stat. 47, 47.

130.  S.C. REV. STAT. tit. 7, ch. 45, § 1466 (1894).

131.  CONN. GEN. STAT. § 3931 (1895).

132.  Same Rights and Privileges Granted to, and Same Pains and Penalties Imposed on Company in Virginia as in Maryland, ch. 74, § 23, 1827 Va. Acts 77, 84.

133.  Directors Residents of This State § 1, 1854 Ohio Laws 91.

134.  112 ILL. COMP. STAT. § 68 (1855).

135.  ARK. STAT. ch. 76, § 3561 (1873).

136.  MO. REV. STAT., ch. 119, art. 4, § 6013 (1879).

137.  Power to Extend Road Thro Susquehanna Co., No. 17, § 1, 1841 Pa. Laws 28, 29.

138.  Mallory v. Norfolk S. Ry. Co., 143 S. Ct. 2028, 2034 (2023).

corporations,"[139] though the Court acknowledges that "[t]hese statutes varied."[140] These statutes are discussed in more depth below.[141]

Justice Gorsuch also mentioned nineteenth-century case law supporting waiver as a basis for jurisdiction.[142] This thread, however, is explored more deeply in Justice Jackson's concurring opinion. Justice Jackson, too, saw the case as straightforward.[143] But instead of relying on *Pennsylvania Fire*, Justice Jackson reasoned that statutory consent to be sued was akin to waiver, which she reasoned was "a critical feature of the personal-jurisdiction analysis."[144] Justice Jackson cited *Insurance Corp. of Ireland* and wrote that "[w]hen a defendant chooses to engage in behavior that 'amount[s] to a legal submission to the jurisdiction of the court,' the Due Process Clause poses no barrier to the court's exercise of personal jurisdiction."[145] Therefore, by registering to do business in Pennsylvania, Norfolk Southern waived any challenges to personal jurisdiction.[146]

## IV. THE PROBLEMS WITH THE *MALLORY* PLURALITY'S DUE PROCESS ANALYSIS

Before, during, and after the *Mallory* decision, Pennsylvania's statute drew criticism. Various individuals and entities—from civil procedure and conflicts-of-law professors,[147] to pro-business and pro-defense advocacy organizations,[148] and even the United States—submitted amicus briefs

---

139. *Id.* at 2035.

140. *Id.*

141. *See infra* Section IV.A.

142. *Mallory*, 143 S. Ct. at 2044 (citing York v. Texas, 137 U.S. 15, 19–21 (1890)).

143. *Id.* at 2045 (Jackson, J., concurring).

144. *Id.*

145. *Id.* at 2046 (quoting Ins. Corp. of Ir. v. Compagnie des Bauxites de Guinee, 456 U.S. 694, 704–05 (1982)).

146. *Id.*

147. *See* Brief of Amicus Curiae Professor Lea Brilmayer in Support of Respondent, *Mallory*, 143 S. Ct. 2028 (No. 21-1168), 2022 WL 4109392; Brief Amicus Curiae of Professor Tanya Monestier in Support of Respondent, *Mallory*, 143 S. Ct. 2028 (No. 21-1168), 2022 WL 4109393.

148. *See* Brief of the Chamber of Com. of the U.S. et al. as Amici Curiae in Support of Respondent, *Mallory*, 143 S. Ct. 2028 (No. 21-1168), 2022 WL 4110516; Brief of Amici Curiae the Nat'l Ass'n of Mfrs. & Prod. Liab. Advisory Council, Inc. in Support of Respondent, *Mallory*, 143 S. Ct. 2028 (No. 21-1168), 2022 WL 4110515; Brief of Atl. Legal Found. as Amicus Curiae in Support of Respondent, *Mallory*, 143 S. Ct. 2028 (No. 21-1168), 2022 WL 3999792; Brief of DRI Ctr. for L. & Pub. Pol'y & the Int'l Ass'n of Def. Couns. as Amici Curiae in Support of Respondent, *Mallory*, 143 S. Ct. 2028 (No. 21-1168), 2022 WL 4096708; Brief of Wash. Legal Found. as Amicus Curiae Supporting Respondent, *Mallory*, 143 S. Ct. 2028 (No. 21-1168), 2022 WL 4110514; Brief of the Ass'n of Am. R.Rs. as Amicus Curiae in Support of Respondent, *Mallory*, 143 S. Ct. 2028 (No. 21-

advocating in favor of Norfolk Southern's position.[149] Since the decision was handed down, commentators have decried the potential consequences of the decision, including that "plaintiffs' lawyers will capitalize on the [*Mallory*] ruling by filing cases for out-of-state claimants in plaintiffs-friendly Philadelphia courts."[150] As the most obvious critics of the plurality, Justice Barrett and the other dissenters decried the Court's departure from decades of precedent from *International Shoe* to the present.[151] Part IV first addresses the plurality's reasoning piece by piece, then highlights additional arguments against the plurality's due process analysis.

### A. The History of Registration-Jurisdiction Statutes

The Court concluded that the registration-jurisdiction statutes that proliferated post-*Pennoyer* and pre-*International Shoe* demonstrate a history and tradition that warrants protecting Pennsylvania's statutory scheme.[152] Justice Gorsuch cites to sixteen nineteenth-century statutes that provided consent to jurisdiction to varying extents.[153] He divides these into four categories: (1) those where "out-of-state corporate defendants were required to agree to answer suits brought by in-state plaintiffs";[154] (2) those where "corporations were required to consent to suit if the plaintiff's cause of action arose within the State, even if the plaintiff happened to reside elsewhere";[155] (3) those that "required all out-of-state corporations that registered to do business in the forum to agree to defend themselves there against any manner of suit";[156]

---

1168), 2022 WL 4109394; Brief of Amici Curiae Pa. Coal. for Civ. Just. Reform and Pa. Mfrs.' Ass'n in Support of Respondent, *Mallory*, 143 S. Ct. 2028 (No. 21-1168), 2022 WL 4080617.

149.  *See* Brief for the U.S. as Amicus Curiae Supporting Respondent, *Mallory*, 143 S. Ct. 2028 (No. 21-1168), 2022 WL 4080618.

150.  Alison Frankel, *US Supreme Court Clears Path for Plaintiffs to Pick Where to Sue Corporations*, REUTERS, https://www.reuters.com/legal/government/column-us-supreme-court-clears-path-plaintiffs-pick-where-sue-corporations-2023-06-28/ [https://perma.cc/F8QF-GQK9] (June 28, 2023, 4:06 PM).

151.  *Mallory*, 143 S. Ct. at 2055 (Barrett, J., dissenting).

152.  *See id.* at 2037.

153.  *Id.* at 2035.

154.  *Id.* (citing Actions Against Foreign Corporations, N.Y. CODE PROC. tit. 8, ch. 1, § 427 (1849); Actions Against Corporations—How Commenced, ch. 86, § 1, 1866 Wis. Gen. Laws 102; MD. CODE pt. 1, art. 26, § 211 (1868); N.C. PUB. STAT. ch. 17, tit. 7, § 82(1) (1873).

155.  *Id.* (citing IOWA CODE § 101.1705 (1851); Act of Apr. 17, 1874, ch. 87, 1874 Tex. Gen. Laws 107; Where Suits May be Commenced, No. 256, § 1, 1881 Mich. Pub. Acts 348, 348).

156.  *Id.* (citing Act of Feb. 22, 1867, 14 Stat. 404; Agent to Reside in the State, ch. 44, § 1, 1889 Nev. Stat. 47, 47; S.C. REV. STAT. tit. 7, ch. 45, § 1466 (1894); CONN. GEN. STAT. § 3931 (1895)).

and (4) those that "applied this all-purpose-jurisdiction rule to a subset of corporate defendants, like railroads and insurance companies."[157]

Of those categories, only the third—statutes requiring all out-of-state corporations to defend against all lawsuits, even those with no connection to the forum state—is comparable to Pennsylvania's. Accordingly, the three statutes cited in this category could have operated similarly to Pennsylvania's. Were Robert Mallory bringing his suit in the late nineteenth century, he could have sued Norfolk Southern if they were registered to do business in Nevada,[158] South Carolina,[159] or Connecticut.[160]

As for the other thirteen statutes Justice Gorsuch cites, only one of those statutes may have allowed for general personal jurisdiction in Mallory's case.[161] New York's 1849 statute allowed a non-resident to sue a foreign corporation only if "the cause of action shall have arisen, or the subject of the action shall be situated within this state."[162] Wisconsin's 1866 statute allowed service on a foreign corporation "only when it ha[d] property within this State, or the causes of action arose therein, or where the cause of action exist[ed] in favor of a resident of this state."[163] Similarly, Maryland's statute only applied to non-resident plaintiffs "when the cause of action ha[d] arisen, or the subject of the action shall be situate[d] in this state."[164] Iowa's 1851 statute,[165] Texas's 1874 statute,[166] and Michigan's 1881 statute[167] all required consent to suits brought for causes of action arising in-state.[168] Ohio's 1854 statute,[169] Illinois's 1855 statute,[170] Arkansas's 1873 statute,[171] and Missouri's 1879 statute[172] applied

---

157. *Id.* (citing Same Rights and Privileges Granted to, and Same Pains and Penalties Imposed on Company in Virginia as in Maryland, ch. 74, § 23, 1827 Va. Acts 77, 84; Power to Extend Road Thro Susquehanna Co., No. 17, § 1, 1841 Pa. Laws 28, 29, Directors Residents of This State, § 1, 1854 Ohio Laws 91; 112 ILL. COMP. STAT. § 68 (1855); ARK. STAT. ch. 76, § 3561 (1873); MO. REV. STAT., ch. 119, art. 4, § 6013 (1879)).

158. § 1, 1889 Nev. Stat. at 47.

159. S.C. REV. STAT. tit. 7, ch. 45, § 1466 (1894).

160. CONN. GEN. STAT. § 3931 (1895).

161. *Mallory*, 143 S. Ct. at 2037.

162. N.Y. CODE PROC. tit. 8, ch. 1, § 427 (1849).

163. Actions Against Corporations—How Commenced, ch. 86, § 1, 1866 Wis. Gen. Laws 102.

164. MD. CODE pt. 1, art. 26, § 211 (1868).

165. IOWA CODE § 101.1705 (1851).

166. Act of Apr. 17, 1874, ch. 87, 1874 Tex. Gen. Laws 107.

167. Where Suits May be Commenced, No. 256, § 1, 1881 Mich. Pub. Acts 348, 348.

168. IOWA CODE § 101.1705 (1851); ch. 87, 1874 Tex. Gen. Laws 107.

169. Directors Residents of This State § 1, 1854 Ohio Laws 91.

170. 112 ILL. COMP. STAT. § 68 (1855).

171. ARK. STAT. ch. 76, § 3561 (1873).

172. MO. REV. STAT., ch. 119, art. 4, § 6013 (1879).

only to insurance companies. Finally, Virginia's 1827 statute[173] and Pennsylvania's 1841 statute[174] each applied to specific railroad companies.[175]

Standing alone in this list is North Carolina's 1873 statute, which allowed for service of process on a foreign corporation if "it ha[d] property within the State, or the cause of action arose therein, or where the plaintiff reside[d] in the State, or where such service [could] be made within this State personally upon the President, Treasurer, or Secretary thereof."[176] Norfolk Southern owns property within the state, so North Carolina's statute would have allowed for Mallory's suit.[177] Only one-quarter of the statutes cited by Justice Gorsuch, then, would even allow for jurisdiction over a lawsuit involving out-of-state injuries and out-of-state parties like Robert Mallory's claim.

The plurality found persuasive the fact that "both before and after the Fourteenth Amendment's ratification, [lawmakers] adopted" these varying consent-to-jurisdiction statutes.[178] But this is hardly convincing evidence of comporting with due process when, of these sixteen statutes, eight were enacted before the Fourteenth Amendment was ratified.[179] Accordingly, half of these statutes predate the application of the due process guarantee to the states.[180] What is more, eleven of the statutes predated *Pennoyer*, when the Court

---

173.  Same Rights and Privileges Granted to, and Same Pains and Penalties Imposed on Company in Virginia as in Maryland, ch. 74, § 23, 1827 Va. Acts 77, 84.

174.  Power to Extend Road Thro Susquehanna Co., No. 17, § 1, 1841 Pa. Laws 28, 29

175.  *See* Brief for the Petitioner, *supra* note 98, at 19–20 (citing Balt. & Ohio R.R. Co. v. Harris, 79 U.S. (12 Wall.) 65 (1871), and Fithian, Jones & Co. v. N.Y & Erie R.R. Co., 31 Pa. 114, 115–16 (1857)).

176.  N.C. PUB. STAT. ch. 17, tit. 7, § 82(1) (1873).

177.  Brief for the Petitioner, *supra* note 98, at 5; Mallory v. Norfolk S. Ry. Co., 143 S. Ct. 2028, 2042 (2023) (citing NORFOLK SOUTHERN CORP., STATE FACT SHEETS–PENNSYLVANIA (2018), https://nscorp.com/content/dam/nscorp/get-to-know-ns/about-ns/state-fact-sheets/pa-state-fact-sheet.pdf [https://perma.cc/F2YU-4XWJ]).

178.  *Mallory*, 143 S. Ct. at 2035.

179.  *See* N.Y. CODE PROC. tit. 8, ch. 1, § 427 (1849); Actions Against Corporations—How Commenced, ch. 86, § 1, 1866 Wis. Gen. Laws 102; MD. CODE pt. 1, art. 26, § 211 (1868); IOWA CODE § 101.1705 (1851); Same Rights and Privileges Granted to, and Same Pains and Penalties Imposed on Company in Virginia as in Maryland, ch. 74, § 23, 1827 Va. Acts 77, 84; Power to Extend Road Thro Susquehanna Co., No. 17, § 1, 1841 Pa. Laws 28, 29; Directors Residents of This State § 1, 1854 Ohio Laws 91; 112 ILL. COMP. STAT. § 68 (1855). Maryland's 1868 statute would have been enacted during Maryland's 1868 session (session 280), which took place from January 1 to March 30 of 1868. *See Archives of Maryland Online*, MD. STATE ARCHIVES, https://msa.maryland.gov/megafile/msa/speccol/sc2900/sc2908/html/laws3.html [https://perma.cc/S7 X2-MJ89] (last visited Nov. 27, 2024). The Fourteenth Amendment was ratified on July 28, 1868. *See* U.S. CONST. amend. XIV.

180.  U.S. CONST. amend. XIV.

constitutionalized personal jurisdiction by connecting it to due process rights.[181] And all predated the *International Shoe* decision by at least fifty years.[182]

### B. *"Consent" Is Not Coercion, and Registration-Jurisdiction Statutes Coerce*

No matter, says Justice Gorsuch. The Court sees this as a simple case in which a defendant consents to being sued, and thus no further analysis of general personal jurisdiction is necessary.[183] The *International Shoe* line of cases need not apply, according to the plurality.[184] But Pennsylvania's scheme does not truly involve businesses consenting to jurisdiction.

In the decades prior to *Mallory*, the Court considered several avenues through which an individual may expressly or impliedly consent to personal jurisdiction—including forum-selection clauses,[185] stipulations,[186] and failure to waive "[a] defense of lack of jurisdiction over the person."[187] But as others have pointed out, these methods of consent are far more circumscribed than a consent-to-jurisdiction statute.[188] This is because each of these methods of providing consent is case-specific, meaning the Court has permitted consent to specific personal jurisdiction rather than general personal jurisdiction.[189] The consequences of consenting to specific jurisdiction are more limited than consenting to general jurisdiction for this reason: consent in those circumstances is discrete, limited to a singular legal dispute.

By contrast, Pennsylvania's consent-to-jurisdiction statute purports to create consent to general jurisdiction.[190] To do business in the state of

---

181. *See* N.Y. CODE PROC. tit. 8, ch. 1, § 427 (1849); Actions Against Corporations—How Commenced, ch. 86, § 1, 1866 Wis. Gen. Laws 102; MD. CODE pt. 1, art. 26, § 211 (1868); N.C. PUB. STAT. ch. 17, tit. 7, § 82(1) (1873); IOWA CODE § 101.1705 (1851); Act of Apr. 17, 1874, ch. 87, 1874 Tex. Gen. Laws 107; § 23, 1827 Va. Acts at 84; § 1, 1841 Pa. Laws at 29; § 1, 1854 Ohio Laws at 91; 112 ILL. COMP. STAT. § 68 (1855); ARK. STAT. ch. 76, § 3561 (1873); *see also* Pennoyer v. Neff, 95 U.S. 714 (1878).

182. *See* Int'l Shoe Co. v. Washington, 326 U.S. 310 (1945).

183. *Mallory*, 143 S. Ct. at 2037.

184. *Id.* at 2039.

185. Nat'l Equip. Rental, Ltd. v. Szukhent, 375 U.S. 311, 316 (1964) (holding that "parties to a contract may agree in advance to submit to the jurisdiction of a given court").

186. Petrowski v. Hawkeye-Sec. Ins. Co., 350 U.S. 495, 495–96 (1956).

187. FED. R. CIV. P. 12(h)(1) (1982); *see also* Ins. Corp. of Ir. v. Compagnie des Bauxites de Guinee, 456 U.S. 694, 704 (1982) (listing these and more methods of consent to jurisdiction).

188. *See, e.g.*, Nate Arrington, *Consent by Registration: The "Back-Door Thief,"* 73 ARK. L. REV. 771, 779 (2021).

189. *See* J. McIntyre Mach., Ltd. v. Nicastro, 564 U.S. 873, 881 (2011); *see also* Shaffer v. Heitner, 433 U.S. 186, 204 (1977) ("[T]he relationship among the defendant, the forum, and the litigation, rather than the mutually exclusive sovereignty of the States on which the rules of *Pennoyer* rest, became the central concern of the inquiry into [specific] personal jurisdiction.").

190. 42 PA. CONS. STAT. § 5301(a)(2)(i), (ii), (iii) (2024).

Pennsylvania, a corporation must agree to be sued for any and all disputes in that forum, including disputes with no real connection to that forum.[191] And it is illegal to conduct business in Pennsylvania without registering to do business.[192]

"Consent" is "[a] voluntary yielding to what another proposes or desires; agreement, approval, or permission regarding some act or purpose, [especially] given *voluntarily* by a competent person; legally effective assent."[193] Consent can be express—"clearly and unmistakably stated"[194]—or implied—"inferred from one's conduct rather than from one's direct expression."[195] Pennsylvania's statute, and any registration-jurisdiction statutes that may follow, do not generate either form of consent.

First, Pennsylvania's statutory scheme does not make for "clearly and unmistakably stated" consent.[196] As Justice Barrett points out,[197] the statute splits bases for general jurisdiction, with one being "[i]ncorporation under or qualification as a foreign corporation under the laws of this Commonwealth,"[198] and a separate method being "[c]onsent, to the extent authorized by the consent."[199] Further, despite it being a consequence of registering to do business in the state, jurisdiction is not mentioned at all in a corporation's registration paperwork.[200] Therefore, a company registering to do business in Pennsylvania does not "clearly and unmistakably"[201] give consent to be haled into Pennsylvania's courts for any claim, regardless of where it may have arisen.

Second, consent under a registration-jurisdiction statute cannot fairly be "inferred from [a corporation's] conduct,"[202] either. The plurality contends that because Norfolk Southern "appreciated the jurisdictional consequences attending [registering to do business and establishing an office to receive service of process] and proceeded anyway," it thereby impliedly consented to general jurisdiction.[203] For Justice Jackson, "When a defendant chooses to engage in behavior that 'amounts to a legal submission to the jurisdiction of the

---

191.  15 PA. CONS. STAT. § 411(a) (2024).

192.  *Id.*

193.  *Consent*, BLACK'S LAW DICTIONARY (12th ed. 2024) (emphasis added).

194.  *Express Consent*, BLACK'S LAW DICTIONARY (12th ed. 2024).

195.  *Implied Consent*, BLACK'S LAW DICTIONARY (12th ed. 2024).

196.  *Express Consent*, BLACK'S LAW DICTIONARY (12th ed. 2024).

197.  Mallory v. Norfolk S. Ry. Co., 143 S. Ct. 2028, 2057 (2023) (Barrett, J., dissenting).

198.  42 PA. CONS. STAT. § 5301(a)(2)(i) (2024).

199.  *Id.* § 5301(a)(2)(ii).

200.  *Mallory*, 143 S. Ct. at 2057 (Barrett, J., dissenting).

201.  *Express Consent*, BLACK'S LAW DICTIONARY (12th ed. 2024).

202.  *Implied Consent*, BLACK'S LAW DICTIONARY (12th ed. 2024).

203.  *Mallory*, 143 S. Ct. at 2043.

court,' the Due Process Clause poses no barrier to the court's exercise of personal jurisdiction."[204] And for Justice Alito, "Norfolk Southern is a sophisticated entity, and we may 'presum[e]' that it 'acted with knowledge' of state law when it registered," making consent appropriate.[205]

But as centuries of American law reveal, "everyone is presumed to know the law."[206] And because everyone presumably knows the law, everyone is presumed to "know the grounds on which a state will assert jurisdiction."[207] Completing this syllogism, then, if voluntarily acting in a way that is grounds for jurisdiction produced consent, consent would always be present, and no disputes over jurisdiction would ever be necessary.[208]

Further, the presumption that everyone knows the law "is a legal presumption which every one knows has no real foundation in fact, and has been adopted because it is necessary as a general rule for the purposes of justice."[209] As Justice Alito stated, Norfolk Southern is a sophisticated corporation: It is publicly traded[210] and has at least $1.5 billion in capital investments.[211] It may be fair to task such a large corporation with knowledge of the laws of the states in which it transacts. But all businesses are subject to a registration-jurisdiction statute, not just large corporations.[212] A midsize company considering expansion into a state with such a statute may not fairly be presumed to know the law well enough to attribute consent to it. This is especially true with Pennsylvania's statutes, which do not clearly outline that registering to do business is sufficient grounds for general jurisdiction.[213]

Rather than provide for consent, a registration-jurisdiction statute provides a corporation with a Hobson's choice. Option one: A corporation can do business in Pennsylvania, but it must be willing to be haled into Pennsylvania courts for any dispute from anywhere with anyone, with the only remedy being forum non conveniens. As such:

---

204. *Id.* at 2046 (Jackson, J., concurring) (second alteration in original) (quoting Ins. Corp. of Ir. v. Compagnie des Bauxites de Guinee, 456 U.S. 694, 704–05 (1982)).

205. *Id.* at 2047 (Alito, J., concurring in part and concurring in judgment) (alteration in original).

206. Respondent's Brief, *supra* note 105, at 12 (quoting Parker v. Levy, 417 U.S. 733, 751 (1974)); Moore v. Brown, 52 U.S. 414, 428 (1851) ("[E]very person is presumed to know the law.").

207. *Id.*

208. *Id.*

209. *Moore*, 52 U.S. at 428.

210. *Company Overview*, Norfolk S., https://www.norfolksouthern.com/en/about-us/company-overview [https://perma.cc/EK28-P6V6] (last visited Nov. 27, 2024).

211. *Id.*

212. 15 Pa. Cons. Stat. § 411(a) (2024); 42 Pa. Cons. Stat. § 5301(a) (2024).

213. 15 Pa. Cons. Stat. § 411(a); 42 Pa. Cons. Stat. § 5301(a).

> [T]he doctrine of forum non conveniens . . . . provides the
> court with a means of looking beyond technical considerations
> such as jurisdiction and venue to determine whether litigation
> in the plaintiff's chosen forum would serve the interests of
> justice . . . .[214]

However, in Pennsylvania, "the plaintiff's choice of forum should not be disturbed except for 'weighty reasons.'"[215] Although "a court may find that the presumption in favor of a plaintiff's choice of forum may be less stringently considered when the plaintiff has chosen a foreign forum to litigate his or her claims,"[216] the doctrine still places the burden on the defendant. And in this case, a defendant has been haled to Pennsylvania for claims that may have taken place anywhere else.

Option two: avoid being dragged into Pennsylvania's courts for claims wholly unrelated to the forum by refusing to register to do business in the state. The result? The company cannot legally do business in Pennsylvania,[217] a state with a land area of almost 45,000 square miles and over 13 million residents.[218] For large companies, especially companies like Norfolk Southern that already conducted business in the state when Pennsylvania enacted this statute,[219] this is an untenable "choice." Rather, as Pennsylvania's own supreme court noted, this so-called "consent" is truly "compelled submission to general jurisdiction by legislative command."[220] In the absence of real choice, consent is absent.

### C. Tag Jurisdiction and Consent-to-Jurisdiction Statutes Are Distinct

The plurality's analogy to tag jurisdiction on individuals is also inapposite. Tag jurisdiction subjects to personal jurisdiction a non-resident individual who is served with process while physically present in that state.[221] In holding that tag jurisdiction does not violate due process, Justice Scalia reasoned:

> The short of the matter is that jurisdiction based on
> physical presence alone constitutes due process because it is

---

214.  Alford v. Phila. Coca-Cola Bottling Co., 531 A.2d 792, 794 (Pa. Super. Ct. 1987).

215.  Burnett v. Penn Cent. Corp., 250 A.3d 1240, 1248 (Pa. Super Ct. 2021).

216.  *Id.*

217.  15 PA. CONS. STAT. § 411(a) ("Except as provided in section 401 (relating to application of chapter) or subsection (g), a foreign filing association or foreign limited liability partnership may not do business in this Commonwealth until it registers with the department under this chapter.").

218.  *Pennsylvania*, U.S. CENSUS BUREAU, https://data.census.gov/profile/Pennsylvania?g=040XX00US42 [https://perma.cc/698R-H8FJ] (last visited Nov. 27, 2024).

219.  Transcript of Oral Argument at 62, Mallory v. Norfolk S. Ry. Co., 143 S. Ct. 2028 (2023) (No. 21-1168).

220.  Mallory v. Norfolk S. Ry. Co., 266 A.3d 542, 569 (Pa. 2021), *vacated*, 143 S. Ct. 2028.

221.  Burnham v. Superior Court, 495 U.S. 604, 628 (1990) (plurality opinion).

> one of the continuing traditions of our legal system that define
> the due process standard of "traditional notions of fair play and
> substantial justice." That standard was developed by *analogy*
> to "physical presence," and it would be perverse to say it could
> now be turned against that touchstone of jurisdiction.[222]

The history of tag jurisdiction and the history of registration jurisdiction are incomparable.

Tag jurisdiction, as Justice Scalia made clear, has a history and tradition dating back centuries. His plurality opinion cites to a baker's dozen nineteenth-century and early-twentieth-century cases declaring tag jurisdiction over an individual appropriate.[223] The bulk of these cases came after the Fourteenth Amendment was ratified and *Pennoyer* was decided.[224] Further, "[a]lthough research has not revealed a case deciding the issue in every State's courts, that appears to be because the issue was so well settled that it went unlitigated."[225] And "*not one* American case from the period (or, for that matter, not one American case until 1978) held, or even suggested, that in-state personal service on an individual was insufficient to confer personal jurisdiction."[226]

The history and tradition did not stop there. More than just a historical concept, tag jurisdiction's tradition was "continuing."[227] The Court could not find "a single state or federal statute, or a single judicial decision resting upon state law, that has abandoned in-state service as a basis of jurisdiction. Many recent cases reaffirm[ed] it."[228]

Unlike tag jurisdiction, consent-to-jurisdiction statutes were hardly universal and have no continuing prominence in American jurisprudence. As outlined above, the bulk of consent-to-jurisdiction statutes from the late nineteenth century did not resemble Pennsylvania's modern statute.[229] Robert Mallory could not have sued Norfolk Southern in most states if he were an out-of-state plaintiff suing an out-of-state corporation for an out-of-state claim. And he still could not today. Pennsylvania is the only state that continues to have a consent-to-jurisdiction statute, and only Georgia's caselaw infers consent to jurisdiction by registration to do business within its state lines.[230] The history

---

222. *Id.* at 619.

223. *Id.* at 612–13.

224. *Id.*

225. *Id.* at 613.

226. *Id.* at 613–14.

227. *Id.* at 615.

228. *Id.* at 615–16 (compiling fourteen cases).

229. *See supra* Section IV.A.

230. Cooper Tire & Rubber Co. v. McCall, 863 S.E.2d 81, 83 (Ga. 2021).

and tradition of tag jurisdiction and consent-to-registration statutes are not in the same ballpark; they are not even playing the same sport.

Nor are the mechanics of tag jurisdiction and registration jurisdiction comparable. As Norfolk Southern pointed out, tag jurisdiction is "transient."[231] It "applies only while a person is voluntarily present in a state, and only in one state at a time. Indeed, a non-resident individual can do as much business as she likes in Pennsylvania" without subjecting herself to general jurisdiction.[232] "Tag jurisdiction is thus easier to avoid, and raises minimal forum-shopping and extraterritoriality problems" than consent-to-jurisdiction statutes.[233] The plurality stretches to compare these two methods of obtaining jurisdiction, but there is no substantive similarity. The only real comparison it could make was to deem each to have a rich history and tradition, an assertion that falls apart upon closer inspection.

The Court's comparison to tag jurisdiction eludes the real comparison to be made. A consent-to-jurisdiction statute fits more closely in the Court's existing general jurisdiction jurisprudence. "[G]eneral jurisdiction exists as an imperfect safety valve that sometimes allows plaintiffs access to a reasonable forum in cases when specific jurisdiction would deny it."[234] Dating back at least to the days of *International Shoe*, "continuous activity of some sorts within a state is not enough to support the demand that the corporation be amenable to suits unrelated to that activity."[235] The Court rejects the exercise of general jurisdiction based just on "substantial, continuous, and systematic" business in a forum, deeming this theory "sprawling,"[236] "exorbitant,"[237] and "unacceptably grasping."[238] Rather, outside hypothetical, extreme circumstances, general jurisdiction can be exercised only where the corporation is "at home": its principal place of business or location of incorporation.[239]

More analogous than tag jurisdiction, then, is the most obvious analogy: the rest of the Court's general jurisdiction jurisprudence. "Adding the antecedent step of registration does not change that conclusion. If it did, 'every corporation

---

231.  Respondent's Brief, *supra* note 105, at 23.

232.  *Id.*

233.  *Id.*

234.  Daimler AG v. Bauman, 571 U.S. 117, 133 n.9 (2014) (alteration in original) (quoting Patrick J. Borchers, *The Problem with General Jurisdiction*, U. CHI. LEGAL F. 119, 139 (2001)).

235.  Int'l Shoe Co. v. Washington, 326 U.S. 310, 318 (1945).

236.  Goodyear Dunlop Tires Operations, S.A. v. Brown, 564 U.S. 915, 929 (2011).

237.  *Daimler*, 517 U.S. at 139.

238.  *Id.* at 138.

239.  *See supra* Part II.

would be subject to general jurisdiction in every state in which it registered, and *Daimler*'s ruling would be robbed of meaning by a back-door thief.'"[240]

## V.  IS JUSTICE ALITO CORRECT? DO CONSENT-TO-JURISDICTION STATUTES VIOLATE THE CONSTITUTION'S DORMANT COMMERCE CLAUSE?

Representing the "one" in the four-one-four decision, Justice Alito concurred only in part and posited a different challenge to consent-to-jurisdiction statutes. Addressing the narrow issue of whether consent-to-jurisdiction statutes violate due process, Justice Alito agreed with Justice Gorsuch that the statute did not violate the Due Process Clause.[241]

However, Justice Alito did not stop there; instead, he raised concerns that a consent-to-jurisdiction statute would violate the Dormant Commerce Clause. Justice Alito outlined the doctrine, first explaining the two ways in which a state law can violate the Dormant Commerce Clause: either by discriminating against or imposing an undue burden on interstate commerce.[242] He then explained the standards for each:

> Discriminatory state laws are subject to "a virtually *per se* rule of invalidity." "[O]nce a state law is shown to discriminate against interstate commerce 'either on its face or in practical effect,'" the law's proponent must "demonstrate both that the statute 'serves a legitimate local purpose,' and that this purpose could not be served as well by available nondiscriminatory means." Justification of a discriminatory law faces a "high" bar to overcome the presumption of invalidity. Laws that "even-handedly" regulate to advance a "legitimate local public interest" are subject to a looser standard. These laws will be upheld "unless the burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits." In these circumstances, "the question becomes one of degree," and "the extent of the burden that will be tolerated will . . . depend on the nature of the local interest involved."[243]

Justice Alito then explained that Pennsylvania's statute arguably discriminates against interstate commerce, but it unquestionably imposes an undue burden on interstate commerce and would unlikely pass constitutional muster.[244]

240.  Mallory v. Norfolk S. Ry. Co., 143 S. Ct. 2028, 2056–57 (2023) (Barrett, J., dissenting) (quoting Brown v. Lockheed Martin Corp., 814 F.3d 619, 640 (2d Cir. 2016)).

241.  *Id.* at 2047 (Alito, J., concurring in part and concurring in judgment).

242.  *Id.* at 2053 (citing South Dakota v. Wayfair, Inc., 138 S. Ct. 2080, 2091 (2018)).

243.  *Id.* (alterations in original) (citations omitted) (quoting *Wayfair, Inc.*, 138 S. Ct. at 2091; Maine v. Taylor, 477 U.S. 131, 138 (1986); New Energy Co. of Ind. v. Limbach, 486 U.S. 269, 278 (1988); Raymond Motor Transp. v. Rice, 434 U.S. 429, 441 (1970)).

244.  *Id.*

Coincidentally, on the same day *Mallory* was decided, the Court also decided a Dormant Commerce case.[245] Because the decision is fractured, which may cause confusion in Dormant Commerce doctrine moving forward, it is important to analyze this case before applying it to Pennsylvania's consent-to-jurisdiction statute.

In *National Pork Producers Council v. Ross*, the Court considered a California statute requiring all pork sold in state to have been treated humanely.[246] A fractured Court held that such a statute did not violate the Dormant Commerce Clause because the statute did not purposefully discriminate against out-of-state pork merchants.[247] The Court rejected two arguments with varying levels of support.[248] First, a majority rejected an argument that the Dormant Commerce Clause advances an "almost per se rule" against state laws with extraterritorial effects on commerce outside a state's borders.[249]

The second argument caused more division. The Court considered whether the so-called "*Pike* balancing test" required courts to weigh the benefits of a state law against its detrimental impacts on interstate commerce.[250] Under this test, "[w]here the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits."[251]

One group—the plurality of Justices Gorsuch, Thomas, and Barrett—found that the onerous *Pike* balancing test should not give courts a "freewheeling power" to "strike down duly enacted state laws . . . based on nothing more than their own assessment of the relevant law's 'costs' and 'benefits.'"[252] According to these Justices, "[n]o neutral legal rule," including *Pike*'s balancing test, "guides the way" when "a court [is] supposed to compare or weigh economic costs (to some) against noneconomic benefits (to others)."[253] In other words, when the costs and benefits are incomparable to each other, the *Pike* balancing test provides no guidance for a court and cannot be used.

---

245.  Nat'l Pork Producers Council v. Ross, 143 S. Ct. 1142 (2023).

246.  *Id.* at 1149.

247.  *Id.* at 1150.

248.  *Id.*

249.  *Id.* at 1147.

250.  *Id.* at 1157.

251.  Pike v. Bruce Church, Inc., 397 U.S. 137, 142 (1970).

252.  *Nat'l Pork Producers Council*, 143 S. Ct. at 1159.

253.  *Id.*

A different plurality—still including Justices Gorsuch and Thomas but swapping out Justice Barrett for Justices Sotomayor and Kagan—instead found that the *Pike* balancing test could be used only after a showing that the state statute imposes "substantial burdens" on interstate commerce.[254] Thus, because these Justices found that the statute imposed no such burden, the test could not apply to the statute at all.[255]

Because the decision was so fractured, several justices wrote separately to clarify their positions on *Pike*'s continued vitality and applicability to Dormant Commerce questions. First, Justice Sotomayor clarified that she (and Justice Kagan) affirmed the judgment "not because of any fundamental reworking of [the *Pike*] doctrine," but rather solely because the petitioners in the specific case "fail[ed]" to allege a substantial burden on interstate commerce as required by *Pike*."[256]

Next, in her partial concurrence, Justice Barrett clarified her position on the *Pike* balancing test:

> A state law that burdens interstate commerce in clear excess of its putative local benefits flunks *Pike* balancing. In most cases, *Pike*'s "general rule" reflects a commonsense principle: Where there's smoke, there's fire. Under our dormant Commerce Clause jurisprudence, one State may not discriminate against another's producers or consumers. A law whose burdens fall incommensurately and inexplicably on out-of-state interests may be doing just that.
>
> But to weigh benefits and burdens, it is axiomatic that both must be judicially cognizable and comparable. I agree with Justice Gorsuch that the benefits and burdens of [the California statute] are incommensurable. . . .
>
> . . . That said, I disagree with my colleagues who would hold that petitioners have failed to allege a substantial burden on interstate commerce.[257]

For Justice Barrett, therefore, a substantial burden on interstate commerce did result from the California statute.[258] However, because the economic costs and noneconomic benefits were not in equal proportion, the *Pike* balancing test should not apply, and a court should not strike down the statute on dormant commerce grounds.[259]

---

254. *Id.* at 1161.

255. *Id.*

256. *Id.* at 1165 (Sotomayor, J., concurring in part).

257. *Id.* at 1166–67 (Barrett, J., concurring in part) (citations omitted).

258. *Id.* at 1167.

259. *Id.*

Finally, Chief Justice Roberts, along with Justices Alito, Kavanaugh, and Jackson, concurred in part and dissented in part. These Justices agreed with the majority that (1) "many of the leading cases invoking the dormant Commerce Clause are properly read as invalidating statutes that promoted economic protectionism," and (2) "[the Court's] precedent does not support a *per se* rule against state laws with 'extraterritorial effects.'"[260]

However, for these Justices, the majority went on to "narrowly typecast" the *Pike* balancing test as applying to cases of state laws that discriminate against interstate commerce, on the one hand, and cases of state laws that implicate "the instrumentalities of interstate transportation," on the other hand.[261] Instead, the Chief Justice argued, "sometimes there is no avoiding the need to weigh seemingly incommensurable values"—a proposition, he points out, that is supported by a majority of the court in Justices Roberts, Alito, Kavanaugh, Jackson, Sotomayor, and Kagan.[262]

Finally, Chief Justice Roberts concluded that the identifiable "broader, market-wide consequences of compliance" raised by the pork producers would amount to a burden on interstate commerce.[263] Therefore, the California statute should have been subject to the *Pike* balancing test on remand to a lower court.[264]

After examining an opinion with four partial concurrences (Justice Kavanaugh wrote separately on matters unrelated to the Dormant Commerce Clause), it is easy to wonder where the Court stands on Dormant Commerce jurisprudence. But from *National Pork Producers Council* come certain insights as to how a Dormant Commerce challenge to a consent-to-jurisdiction statute may come out were such a challenge to eventually reach the Supreme Court.

First, separate from mere effects on interstate commerce are laws that discriminate against interstate commerce. Justice Alito stated in his concurrence that "[t]here is reason to believe" that a consent-to-jurisdiction statute discriminates against interstate commerce.[265] Further, he argued, "Pennsylvania's law seems to discriminate against out-of-state companies by forcing them to increase their exposure to suits on all claims in order to access

---

260. *Id.* at 1167 (Roberts, C.J., concurring in part and dissenting in part) (citations omitted).

261. *Id.* at 1168.

262. *Id.* at 1168–69.

263. *Id.* at 1169 (emphasis omitted).

264. *Id.*

265. Mallory v. Norfolk S. Ry. Co., 143 S. Ct. 2028, 2053 (2023) (Alito, J., concurring in part and concurring in judgment).

Pennsylvania's market while Pennsylvania companies generally face no reciprocal burden for expanding operations into another State."[266]

In the past, however, this principle has applied primarily to statutes with a more direct impact on commerce than consent-to-jurisdiction statutes. Although Justice Alito cites some cases contemplating simultaneously the exercise of personal jurisdiction and that exercise's effects on interstate commerce, those cases predate modern contemplations of either doctrine.[267] Instead, the cases Justice Alito cites when explaining dormant commerce consider a statute regarding the importation of live bait[268] and an ordinance requiring waste disposal at certain state public benefit corporations.[269] The *National Pork Producers Council* decision handed down the same day as *Mallory* was, of course, about pork sales.[270] A statute requiring a corporation wishing to do business in a state to agree to be haled into its courts is more removed from interstate commerce altogether—and certainly more removed from discrimination against interstate commerce—than laws directed at commerce themselves.

To that point: The impacts on interstate commerce of a consent-to-jurisdiction statute would be entirely indirect. For example, a midsize corporation from New York that previously wished to expand into Pennsylvania may now see that decision as risky given the exposure to Pennsylvania's court system. But the corporation is not being asked to modify the way it produces its goods or prevented from importing its goods into Pennsylvania. The effects on interstate commerce thus would be collateral.

To be sure, a statute need not deal directly with the sale of goods to be stricken down on Dormant Commerce grounds. For example, an Ohio statute that "suspend[ed] [statute of] limitations protection for out-of-state entities" was found to impose substantial burdens on interstate commerce in violation of the Dormant Commerce Clause.[271] However, more frequently, the burdens on interstate commerce are more direct than a statute that imposes different civil procedural burdens on out-of-state corporations.[272] Furthermore, to prove discrimination is more difficult than the second prong of the Dormant

---

266. *Id.* at 2053 n.7.

267. *Id.* at 2052 n.5.

268. Maine v. Taylor, 477 U.S. 131, 133 (1986).

269. United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth., 550 U.S. 330, 334 (2007).

270. Nat'l Pork Producers Council v. Ross, 143 S. Ct. 1142 (2023).

271. Bendix Autolyte Corp. v. Midwesco Enters., Inc., 486 U.S. 888, 889 (1988).

272. *See, e.g.*, Bibb v. Navajo Freight Lines, Inc., 359 U.S. 520, 529 (1959) (holding that a law requiring trucks to use different mudflaps within Illinois borders than in every other state was unconstitutionally burdensome on interstate commerce).

Commerce Clause as mentioned by Justice Alito—to prove a substantial and undue burden on interstate commerce, notwithstanding outright discrimination.[273] It is therefore important to return to the fractured *National Pork Producers Council* decision for guidance.

In *National Pork Producers Council*, the Court unambiguously declared that the mere fact of extraterritorial effects on commerce alone is insufficient to mount a claim that a statute violates the Dormant Commerce Clause.[274] Accordingly, any effects on out-of-state commerce are not, per se, enough to strike down a statute on these grounds. From there, the question becomes whether the *Pike* balancing test must be applied, and if so, whether Pennsylvania's statute would, to use Justice Barrett's verbiage, "flunk" that test.[275]

Pennsylvania's consent-to-jurisdiction statute would be unconstitutional under *Pike*'s test. Justice Alito does not outright state that he is applying the *Pike* balancing test. But consider his weighing of the costs and benefits of the law:

> Aside from the operational burdens it places on out-of-state companies, Pennsylvania's scheme injects intolerable unpredictability into doing business across state borders. . . . Small companies may prudently choose not to enter an out-of-state market due to the increased risk of remote litigation. Some companies may forgo registration altogether, preferring to risk the consequences rather than expand their exposure to general jurisdiction. . . . States, meanwhile, "would externalize the costs of [their] plaintiff-friendly regimes."

> Given these serious burdens, to survive Commerce Clause scrutiny under this Court's framework, the law must advance "a legitimate local public interest" and the burdens must not be "clearly excessive in relation to the putative local benefits." But I am hard-pressed to identify any *legitimate local* interest that is advanced by requiring an out-of-state company to defend a suit brought by an out-of-state plaintiff on claims wholly unconnected to the forum State. . . . [A] State generally does *not* have a legitimate local interest in vindicating the rights of non-residents harmed by out-of-state actors through

---

273.  Mallory v. Norfolk S. Ry. Co., 143 S. Ct. 2028, 2053 (2023) (Alito, J., concurring in part and concurring in judgment) (citing South Dakota v. Wayfair, Inc., 138 S. Ct. 2080, 2091 (2018)).

274.  *Nat'l Pork Producers Council*, 143 S. Ct. at 1148.

275.  *Id.* at 1166 (Barrett, J., concurring in part).

conduct outside the State.[276]

Put simply, the Pennsylvania statute imposes substantial costs on out-of-state companies wishing to conduct business within its borders. To legally conduct business in the state, a corporation must be willing to be haled into Pennsylvania's courts. But most significantly, as Justice Alito points out, Pennsylvania receives no discernible benefit from opening its courts for out-of-state plaintiffs for out-of-state losses against out-of-state defendants.[277] Furthermore, the costs imposed on out-of-state businesses would be classified as economic costs, even if they are not directly commercial in nature. Therefore, in the absence of any benefit for Pennsylvania in maintaining this law, the statute should not pass muster under any *Pike* balancing, regardless of which part of the Court's formulation of the test is applied.

## VI. SHOULD OTHER STATES FOLLOW PENNSYLVANIA'S LEAD AND ADOPT CONSENT-TO-JURISDICTION STATUTES?

Finally, if a dormant commerce challenge does not follow or succeed on remand in the Pennsylvania court and beyond, consent-to-jurisdiction statutes like Pennsylvania's will remain. The question remaining is whether such statutes will proliferate. As of the time of the *Mallory* decision, as Justice Barrett pointed out in dissent, "Pennsylvania [wa]s the only State with a statute treating registration as sufficient for general jurisdiction."[278] In fact, only two states treat registering to do business as a sufficient basis for personal jurisdiction. Joining Pennsylvania's approach is Georgia, where despite no statutory language to this end, the state supreme court nonetheless decided to treat registration to do business as consent to personal jurisdiction.[279]

Even before the *Mallory* decision, an overwhelming majority of states expressly disclaimed registering to do business as consenting to personal jurisdiction in their borders, either in court decisions or expressly by statute. In her dissent, Justice Barrett highlighted decisions from New Mexico ("Reliance upon outdated legal fictions . . . would be absurd and, as explained above, inconsistent with contemporary understandings of due process"),[280] Delaware ("[W]e no longer live in a time where foreign corporations cannot operate in

---

276. *Mallory*, 143 S. Ct. at 2054 (Alito, J., concurring in part and concurring in judgment) (first alteration in original).

277. *Id.*

278. *Id.* at 2060 (Barrett, J., dissenting) (emphasis omitted).

279. Cooper Tire & Rubber Co. v. McCall, 863 S.E.2d 81, 91 (Ga. 2021).

280. *Mallory*, 143 S. Ct. at 2060 (Barrett, J., dissenting) (quoting Chavez v. Bridgestone Americas Tire Operations, LLC, 2022-NMSC-006, ¶¶1, 53–54, 503 P.3d 332).

other states unless they somehow become a resident"),[281] and helpfully, Montana, where the state supreme court pointed to several more states where the idea of consent to jurisdiction has been stricken down.[282]

For example, the Model Registered Agents Act states that, "The designation or maintenance in this state of a registered agent does not by itself create the basis for personal jurisdiction over the represented entity in this state."[283] Ten states—Arkansas,[284] Idaho,[285] Indiana,[286] Maine,[287] Mississippi[288] Montana,[289] Nevada,[290] North Dakota,[291] South Dakota,[292] Utah[293]—and the District of Columbia[294] follow the Model Act. Furthermore, Hawaii does not follow the Model Act, but its statute is similar, providing "[t]he appointment or maintenance of a registered agent in the State does not by itself create the basis for personal jurisdiction over the represented entity in the State."[295]

More states' high courts have refused to recognize registration to do business as consent to personal jurisdiction. Arizona,[296] California,[297] and Wisconsin,[298] for example, have all held against registration as consent to jurisdiction. I will examine Wisconsin's decision, and its ability to change that decision, in particular.

The Wisconsin Supreme Court considered the question of consent to jurisdiction just three years after the Supreme Court established the "at home"

---

281. *Id.* (quoting Genuine Parts Co. v. Cepec, 137 A.3d 123, 137 (Del. 2016)).

282. *Id.* (citing DeLeon v. BNSF Ry. Co., 426 P.3d 1, 7 n.1 (Mont. 2018)).

283. MODEL REGISTERED AGENTS ACT (amended 2011) (NAT'L CONF. OF COMM'RS ON UNIF. STATE LAWS 2006).

284. ARK. CODE ANN. § 4-20-115 (2024).

285. IDAHO CODE § 30-21-414 (2015).

286. IND. CODE § 23-0.5-4-12 (2024).

287. ME. REV. STAT. ANN. tit. 5, § 115 (2024).

288. MISS. CODE ANN. § 79-35-15 (2020).

289. MONT. CODE ANN. § 35-7-115 (2023).

290. NEV. REV. STAT. § 77.440 (2024).

291. N.D. CENT. CODE § 10-01.1-15 (2008).

292. S.D. CODIFIED LAWS § 59-11-21 (2024).

293. UTAH CODE ANN. § 16-17-401 (2008).

294. D.C. CODE § 29-104.14 (2024).

295. HAW. REV STAT. § 425R-12 (2024).

296. Wal-Mart Stores, Inc. v. Lemaire, 395 P.3d 1116, 1119–20 (Ariz. Ct. App. 2017).

297. Bristol-Myers Squibb Co. v. Superior Court, 377 P.3d 874, 884 (Cal. 2016), *rev'd on other grounds*, 137 S. Ct. 1773 (2017); *see also* AmTrust v. UBS AG, 681 F. App'x 587, 589 (9th Cir. 2017) (applying California law).

298. Segregated Acct. of Ambac Assurance Corp. v. Countrywide Home Loans, Inc., 2017 WI 71, ¶ 1, 376 Wis. 2d. 528, 898 N.W.2d 70.

test in *Daimler*.[299] The court looked at the language of Wisconsin's statute governing registered agents of foreign corporations.[300] It found that "[t]he text of [Wisconsin's statute] is devoid of any language regarding either consent or jurisdiction."[301] Accordingly,

> Because Chapter 180 in no way telegraphs that registration equals consent to general jurisdiction, a foreign corporation would be understandably surprised to learn, perhaps before it even conducts any business here, that registration automatically subjects it to being hauled into a Wisconsin court in a case having no connection whatsoever to Wisconsin.[302]

The court went on to examine Wisconsin's long-arm statute.[303] That statute provides that a defendant can be subject to personal jurisdiction if it is "engaged in substantial and not isolated activities within this state, whether such activities are wholly interstate, intrastate, or otherwise."[304] As the Wisconsin court points out, this statutory language would be rendered pointless if mere registration to do business in the state constituted consent to general personal jurisdiction.[305]

The Wisconsin court, then, was guided by two sources of law: statutory interpretation and the Supreme Court's "at home" test outlined in *Goodyear* and *Daimler*.[306] However, in the wake of the *Mallory* decision, each of these sources of law is subject to change. The Wisconsin legislature could adopt a statute like the Pennsylvania statute. And, under *Mallory*, Wisconsin's highest court could not overrule it on due process grounds (though, as noted earlier, dormant commerce arguments could still prevail).

Therefore, the final question this Comment examines is whether a state like Wisconsin could benefit from following Pennsylvania's lead and adopting a statute that treats registering to do business in a state as giving consent to being sued in that state for losses incurred elsewhere by parties lacking connections to the state. I will continue to use Wisconsin for this hypothetical inquiry.

This calculus will depend on a variety of factors. First, many businesses would be put off from fora adopting these statutes and could consider limiting their interactions with those states. In the wake of the *Mallory* decision, law firms across the country published alerts warning their corporate clients that

---

299.  *Id.* ¶ 11.

300.  *Id.* ¶ 15; *see also* WIS. STAT. § 180.1507 (2023–2024).

301.  *Ambac Assurance Corp.*, 2017 WI 71, ¶ 15.

302.  *Id.*

303.  *Id.* ¶ 17; WIS. STAT. § 801.05.

304.  *Ambac Assurance Corp.*, 2017 WI 71, ¶ 18.

305.  *Id.*

306.  *Id.* ¶ 11.

"the potential proliferation of consent-by-registration or similar laws poses a risk to companies across the country."[307] Some expressed apprehension, as did the dissenters, that stereotypically plaintiff-friendly states may join Pennsylvania in enacting similar laws, which would encourage forum shopping.[308]

But there is another side of this coin. Consent-to-jurisdiction statutes would put off businesses considering expansion into states adopting them. In fact, even the Eastern District of Pennsylvania considered this result in an unrelated case before the Court delivered the *Mallory* decision.[309] Were Wisconsin to adopt such a law, it may not deter businesses already present in the state. It may also not affect corporations that are so large they could not avoid registering in Wisconsin—would a company like Amazon really cease business in Wisconsin (or Pennsylvania)? The real impact, then, would be on midsize businesses that may no longer see upside in expanding to Wisconsin, which would add another forum to the list of states in which it could be sued. Wisconsin, which a decade ago was touted as "Open for Business,"[310] may be reticent to turn off such businesses to cultivating a Wisconsin presence.

Second, as highlighted by Justice Barrett, Wisconsin would be only the third state to adopt such a law.[311] Were this to remain, Wisconsin could face the adverse effects of enacting a consent-to-jurisdiction statute more strongly without more fellow states as cover. The harm to Wisconsin would be disproportionate if it did not at least wait until more states adopt such a law. A corporation could far more easily decide to avoid doing business in Wisconsin, Pennsylvania, and Georgia than it could avoid a larger percentage of states. This

---

307.  George W. Hicks, Jr., Anna G. Rotman, Kasdin Miller Mitchell & Colin R. Monaghan, *U.S. Supreme Court Rejects Due Process Challenge to State Business Registration Statute Requiring Consent to Jurisdiction*, KIRKLAND & ELLIS (July 17, 2023), https://www.kirkland.com/publications/kirkland-alert/2023/07/us-supreme-court-rejects-due-process-challenge-to-state-business-registration-statute [https://perma.cc/U3V6-LKEN].

308.  Carolyn Nussbaum, Brock Seraphin, Matthew Costello & Erik Goergen, *Personal Jurisdiction Examined in* Mallory v. Norfolk Southern Railway Co.—*Did SCOTUS Go off the Rails?*, NIXON PEABODY (June 30, 2023), https://www.nixonpeabody.com/insights/alerts/2023/06/30/personal-jurisdiction-examined-in-mallory-v-norfolk-southern-railway-co [https://perma.cc/Z3CS-B49Z].

309.  *See* Diab v. Brit. Airways, PLC, No. 20-3744, 2020 WL 6870607, at *5 (E.D. Pa. Nov. 23, 2020) (positing that "the mere fact that a company might need to face lawsuits in Pennsylvania as a price for doing business in the Commonwealth presents no great threat to companies," and contemplating that "[t]he Pennsylvania legislature could have concluded that the need to protect individuals and businesses by providing them with a forum to seek redress for possible legal grievances was worth the possible loss of business that might befall the Commonwealth").

310.  Steve Apps, *Wisconsin is Open for Business*, WIS. STATE J. (Oct. 8, 2014), https://madison.com/wisconsin-is-open-for-business/image_65e7f521-0fc7-5631-bd5a-ccd74dbf140c.html [https://perma.cc/DUY2-VCL3].

311.  *See* Mallory v. Norfolk S. Ry. Co., 143 S. Ct. 2028, 2060 n.2 (2023) (Barrett, J., dissenting).

is especially true now, when the nation's largest and most populous states have declined to adopt such laws.[312] Consequently, even if Wisconsin sought to adopt a statute, it could be wise to wait and see if the *Mallory* decision actually ushers in an alleged sea change.

Third, as raised by the *Mallory* dissenters, any state adopting a consent-to-jurisdiction statute would need to consider whether such a statute could encourage forum shopping. Forum shopping is defined as "[t]he practice of choosing the most favorable jurisdiction or court in which a claim might be heard."[313] For example, this frequently occurs when a plaintiff files its lawsuit "in a jurisdiction with a reputation for high jury awards."[314] The reasons could be that selecting one forum may allow the plaintiff to choose a forum with more favorable substantive or procedural laws.[315] For example, a plaintiff may seek out a state with a longer statute of limitations for its claim.[316]

Indeed, Robert Mallory filed this suit in the Philadelphia Court of Common Pleas, a venue tort reformists consider "infamous for delivering so-called 'nuclear' verdicts by providing plaintiff-friendly jury instructions and maintaining low barriers of entry."[317] After the *Mallory* decision, some commentators have expressed concern that the case "likely will make Pennsylvania an even more attractive venue" to bring certain kinds of claims.[318] The American Tort Reform Foundation dramatically named Pennsylvania and Georgia—the only two states treating registration to do business as a sufficient basis for general jurisdiction—the foremost "judicial hellhole[s]" in America.[319] Largely driving this result is the worry that the *Mallory* decision greenlit forum shopping in these two states.[320]

---

312. *See, e.g.*, Preciado v. Freightliner Custom Chassis Corp., 304 Cal. Rptr. 3d 209, 226 (2023), *cert. denied*, No. S278884, 2023 Cal. LEXIS 2444 (May 3, 2023).

313. *Forum-Shopping*, BLACK'S LAW DICTIONARY (12th ed. 2024).

314. *Id.*

315. Note, *Forum Shopping Reconsidered*, 103 HARV. L. REV. 1677, 1678 (1990).

316. Tanya J. Monestier, *Registration Statutes, General Jurisdiction, and the Fallacy of Consent*, 36 CARDOZO L. REV. 1343, 1410–11 (2015).

317. *Philadelphia's Courts Continue to Be 'Judicial Hellholes,'* AM. TORT REFORM ASS'N (Feb. 2, 2024), https://www.atra.org/2024/02/02/philadelphias-courts-continue-to-be-judicial-hellholes [https://perma.cc/EL7M-VTN2].

318. *See* Andrea M. Kirshenbaum, *Will the Supreme Court's 'Mallory' Decision Create Litigation Flood in Pennsylvania?*, THE LEGAL INTELLIGENCER (July 24, 2023), https://www.bloomberglaw.com/document/XB67MFV4000000?jcsearch=hdf45egkieh#jcite [https://perma.cc/48JY-AM83].

319. *Pennsylvania Named America's Worst 'Judicial Hellhole' in 2023*, PA CHAMBER OF BUS. & INDUS., https://www.pachamber.org/media/13018/pennsylvania_named_americas_worst_jud icial_hellhole_in_2023/ [https://perma.cc/GR2H-8YT9] (last visited Nov. 27, 2024).

320. *Id.*

The Supreme Court has previously condemned forum shopping, declaring that the "discouragement of forum-shopping" is one of its aims in establishing choice-of-law jurisprudence.[321] But despite this edict, forum shopping remains an unavoidable fact of American civil litigation.[322] Therefore, when considering a consent-to-jurisdiction statute, a state must also consider if such a statute, in conjunction with the other laws of the state, would influence plaintiffs to flock to its courts.

One remaining question is whether Wisconsin would be attractive to plaintiffs in the first place. As part of its "Open for Business" push in 2011, Wisconsin's legislature enacted 2011 Wisconsin Act 2,[323] a "controversial omnibus tort reform bill."[324] Among other things, the Act created a statute capping punitive damages at "twice the amount of any compensatory damages recovered by the plaintiff or $200,000, whichever is greater."[325] The Act also "encompasse[d] a comprehensive re-write of Wisconsin product liability law."[326] The "re-write" was widely regarded as business-friendly.[327]

---

321. Hanna v. Plumer, 380 U.S. 460, 468 (1965).

322. *See* Louise Weinberg, *Against Comity*, 80 GEO. L.J. 53, 68 (1991).

323. S.B. 1, 2011–2012 Leg., Jan. 2011 Spec. Sess. (Wis. 2011).

324. Kristen Irgens, Comment, *Wisconsin is Open for Business or Business Just as Usual? The Practical Effects and Implications of 2011 Wisconsin Act 2*, 2012 WIS. L. REV. 1245, 1247.

325. WIS. STAT. § 895.043(6) (2023–2024). The only carveouts from this general limitation involve intoxicated operators of various motor vehicles. *Id.* Accordingly, a business being sued in Wisconsin would benefit from the punitive damages cap in almost all instances.

326. Andrew Cook & Delanie Breuer, *Wisconsin Tort Reform 2011 Wisconsin Act 2*, WIS. CIV. JUST. COUNCIL (Feb. 2011), https://www.wisciviljusticecouncil.org/wwcms/wp-content/uploads/2011/03/2011_WCJC_Wis-Act-2-Tort-Reform-Summary1.pdf [https://perma.cc/F3NW-CFET].

327. The bill created Wisconsin Statutes section 895.047, a product liability statute. "Prior to Act 2, Wisconsin was one of the few states still applying the consumer contemplation test." Irgens, *supra* note 324, at 1258. That test asks whether the product is more dangerous than an ordinary consumer would expect it to be. *Id.* at 1253–54. Now, "an injured person has to clear a higher bar to prove that a product is defective[]" because they must also "show a 'reasonable alternative design' that would have reduced the risk of harm." Timothy D. Edwards & Jessica E. Ozalp, *A New Era: Products Liability Law in Wisconsin*, 84 WIS. LAW. 9, 10 (2011); *see also* Murphy v. Columbus McKinnon Corp., 2022 WI 109, ¶ 40, 405 Wis. 2d 157, 982 N.W.2d 898 (clarifying that the consumer-contemplation standard was not supplanted but incorporated into a multi-part test). In addition, the new statute added several defenses to product liability claims that "did not exist prior to Act 2 and do not exist under the *Restatement (Third) of Torts*." Irgens, *supra* note 324, at 1259. Further, the Act "provide[d] for reduction of recovery by the percent of fault attributed to the plaintiff[] and limit[ed] claims against sellers and distributors." Edwards & Ozalp, *supra*. The Act has since been labeled "a proven victory for manufacturers." Allen C. Schlinsog, Jr., *Wisconsin's Tort Reform Four Years Later: A Proven Victory for Manufacturers*, MONDAQ (Apr. 27, 2015), https://www.mondaq.com/unitedstates/product-liability-safety/392446/wisconsins-tort-reform-four-years-later-a-proven-victory-for-manufacturers [https://perma.cc/MS6R-RCQU].

Perhaps more of a concern to plaintiff's lawyers would be Wisconsin's renegade reputation in tort and product liability laws. Commentators have opined that "Wisconsin seems to relish being a bit unique when it comes to tort-based claims."[328] Even the reporters of the *Restatement (Third) of Torts* have said that in product liability law, Wisconsin is the "lone star state . . . marching to its own, sometimes quite peculiar, drummer."[329] Among other departures from standard tort law, Wisconsin has a unique public policy approach to proximate cause[330] and follows Justice Andrews's famous *Palsgraf* dissent in finding a "duty to the world."[331] Given the perceived instability of Wisconsin tort law, plaintiffs may not find Wisconsin an attractive forum even if its jurisdictional borders were opened to foreign claims between foreign parties.

There is a countervailing concern. A forum that is attractive to plaintiffs could exacerbate court congestion—a constant worry, and one made worse by the recent COVID-19 pandemic.[332] Wisconsin's state and federal dockets could certainly become crowded were the state legislature to adopt a consent-to-jurisdiction statute. In fact, even Justice Sotomayor, who voted with the plurality, doubts that other states will follow suit. To Norfolk Southern's counsel, she averred, "I suspect today that very crowded courts are not going to want for . . . cases [involving out-of-state incidents between out-of-state parties] to come to them and will continue having their laws as they are."[333] Similarly, Wisconsin's legislature should consider the immense burden that a consent-to-jurisdiction statute would place on the court system.

Finally, after considering these costs and concerns a state like Wisconsin might face if it enacts a consent-to-jurisdiction statute, one must ask whether Wisconsin would actually derive any benefit from adopting such a law. It may develop a reputation as a plaintiff-friendly state, which plaintiff lawyers could praise. But this reputation comes with no tangible benefits to Wisconsin. To the

---

328. *The Wisconsin Supreme Court Keeps Wisconsin Weird and Applies the Common Law in Its First Look at Wisconsin's Product Liability Statute*, FOLEY & LARDNER LLP (Feb. 1, 2023), https://www.foley.com/insights/publications/2023/02/wisconsin-supreme-court-weird-product-liability/ [https://perma.cc/KTU9-JBHV].

329. James A. Henderson Jr. & Aaron D. Twerski, *A Fictional Tale of Unintended Consequences: A Response to Professor Wertheimer*, 70 BROOK. L. REV. 939, 940 (2005).

330. *See* Kendall W. Harrison, *Wisconsin's Approach to Proximate Cause*, 73 WIS. LAW. 20, 54 (2000).

331. Donnie Malchow, *Wisconsin's Law of Negligence Is Inherently Incompatible with the Restatement—So Why Does the Court Regularly Adopt Restatement Provisions?*, 2020 WIS. L. REV. 1, 3 (averring "Wisconsin is one of just two states that has explicitly adopted Judge Andrews's famous dissent") (discussing Palsgraf v. Long Island R.R. Co., 162 N.E. 99 (1928)).

332. *See* Joshua A. Swanson, *Do Not Boast About Tomorrow: Lessons We Can Learn from Today's Covid-19 Court Cases to Prepare for Future Disasters*, 96 N.D. L. REV. 207, 235 (2021).

333. Transcript of Oral Argument, *supra* note 219, at 88.

contrary, it could bring with it the cost of court congestion. Perhaps this, and not the questionable constitutionality of consent-to-jurisdiction statutes, is the reason most states have not adopted such laws. At bottom, a state like Wisconsin should not blaze any trails in joining Pennsylvania and Georgia in adopting such a statute, as any costs of the decision would be particularly harsh without other states following suit to provide cover. The potential for turning away businesses and increasing court congestion is simply too big a risk for Wisconsin to take, especially when the statute may not survive a dormant commerce challenge.

## VII. Conclusion

The Supreme Court's decision to eschew decades of precedent and allow consent-to-jurisdiction statutes to remain (for now) is curious, to say the least. Such statutes nevertheless may still fail on dormant commerce grounds, even under the Court's current fractured approaches to the doctrine. If the *Pike* balancing test applies to consent-to-jurisdiction statutes, such laws would be unlikely to survive. And these statutes may not even reach that point, as there is an argument that these statutes discriminate against interstate commerce outright.

It is presently a hypothetical inquiry whether more states would, or should, follow Pennsylvania's lead and adopt their own statutes conflating registration to do business in a state's borders with consent to be haled to their courts. Yet, the ultimate death knell to these statutes should be their utter lack of benefits to the states that have them. Certainly, given the lack of other states that have such statutes, any other states considering adopting consent-to-jurisdiction laws should consider the many costs attached to such statutes and comparatively few—or more likely no—benefits.

Abigail Nilsson\*

\*  J.D. 2025, Marquette University Law School; B.A. 2017, University of Wisconsin. Thank you to the entire staff of the *Marquette Law Review* for your hard work in preparing this Comment for publication. I would also like to express my gratitude to my friends and family, including the good folks at 5018 W. State St., for their friendship and support not just as I drafted this Comment but throughout my law school tenure. Finally, I thank Peter K. Rofes, Professor of Law, for his mentorship, friendship, and dogged commitment to the spirit of *cura personalis*.