Buffalo Law Review

Volume 73 | Number 1 Article 6

1-1-2025

# From Mallory to Morality: The Compatibility of Registration-Jurisdiction Laws with the Dormant Commerce Clause

Matthew J. O'Hara

Follow this and additional works at: https://digitalcommons.law.buffalo.edu/buffalolawreview

 Part of the Constitutional Law Commons

Recommended Citation
Matthew J. O'Hara, *From Mallory to Morality: The Compatibility of Registration-Jurisdiction Laws with the Dormant Commerce Clause*, 73 Buff. L. Rev. (2025).
Available at: https://digitalcommons.law.buffalo.edu/buffalolawreview/vol73/iss1/6

This Article is brought to you for free and open access by the Law Journals at Digital Commons @ University at Buffalo School of Law. It has been accepted for inclusion in Buffalo Law Review by an authorized editor of Digital Commons @ University at Buffalo School of Law. For more information, please contact lawscholar@buffalo.edu.

# COMMENT

## From *Mallory* to Morality: The Compatibility of Registration-Jurisdiction Laws with the Dormant Commerce Clause

MATTHEW J. O'HARA†

HIGHLIGHT

In June 2023, the Supreme Court handed down its decision in *Mallory v. Norfolk Southern Railway Co.*, a case that threatened to cause the largest shift in personal jurisdiction law since *Daimler AG* and *Bristol-Myers Squibb*. While the Court upheld Pennsylvania's registration-jurisdiction law under the Due Process Clause and *International Shoe*'s "fair play and substantial justice" standard, Justice Alito's concurrence opined that the law may violate the Dormant Commerce Clause (DCC). This Comment argues that registration-jurisdiction laws, which permit States to assert general personal jurisdiction over out-of-state businesses merely because they have registered to do business in the State, do not violate the DCC. First, these laws are not discriminatory, either on their face or in their practical effect, as they apply uniformly to all companies and do not grant any advantage to in-state companies over out-of-state companies. On the contrary, the laws seriously harm the economic interests of the enacting State. Second, registration-jurisdiction laws are justified under the *Pike* balancing test because States have a legitimate interest in providing a forum for out-of-state

† J.D., University at Buffalo School of Law, 2025; B.A., Canisius University, 2022. The author would like to thank Professor Jorge Farinacci-Fernós for fanning the flame of academic passion, his brother Daniel for both his mentorship and his friendship, and his parents Laura and Jim for their inexplicable faith in him.

plaintiffs as a matter of ethical solidarity, even when the State itself derives no direct benefit. The nature of this ethical interest precludes weighing it against the economic burdens imposed by the laws. Consequently, registration-jurisdiction laws, such as the one at issue in *Mallory*, do not violate the Dormant Commerce Clause and should be upheld as a valid exercise of State power.

## INTRODUCTION

In June of 2023, the Supreme Court handed down their decision in the case of *Mallory v. Norfolk Southern Railway Co.* Described as "one of the biggest sleeper cases" of that term, the repercussions of *Mallory* threaten to cause the largest shift in personal jurisdiction law since *Daimler AG* and *Bristol-Myers Squibb*.[1] The case asked fundamental questions about the nature of consent to jurisdiction, with implications for class action, products liability, and mass tort litigations.[2]

This Comment deals with none of those ideas. Instead, this Comment seeks to answer a seemingly minor question posed by Justice Alito's concurrence in *Mallory*. While he agreed that the Pennsylvania law at issue did not violate Due Process or *International Shoe*, Justice Alito opined that the law may be unconstitutional under the Dormant Commerce Clause (DCC).[3] The law, known as a "registration-

1. P. Thomas DiStanislao & N. Denver Smith, *High Court Pa. Case Could End Personal Jurisdiction Divide*, LAW360 (Nov. 10, 2022), https://www.law360.com/articles/1548514/high-court-pa-case-could-end-personal-jurisdiction-divide; Daimler AG v. Bauman, 571 U.S. 117, 117 (2014); Bristol-Myers Squibb Co. v. Superior Court, 582 U.S. 255, 255 (2017).

2. DiStanislao, *supra* note 1.

3. *International Shoe* was a fundamental case in personal jurisdiction law that laid the first foundational tests for establishing personal jurisdiction over out-of-state entities. The Court stated:

> [D]ue process requires only that in order to subject a defendant to a judgment *in personam,* if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice."

jurisdiction" statute, permitted Pennsylvania courts to assert general personal jurisdiction over out-of-state businesses merely because they had registered to do business in the State. As a result, plaintiffs from other States could file lawsuits against out-of-state companies in Pennsylvania, even where there was no connection between the litigation and the State itself. The Court ultimately said that the law did not violate Due Process or *International Shoe*, but its validity under the DCC remains unknown.[4] Although this seems like a mere academic curiosity, the resolution of this question will have a massive impact on commercial litigation; it is a chance for companies to eliminate a method of establishing general personal jurisdiction—an opportunity they will never pass up.[5]

The Dormant Commerce Clause is as old as it is controversial. Springing from[6] the death of the Articles of Confederation, the DCC "denies the States the power to unjustifiably discriminate against or burden the interstate flow of articles of commerce."[7] For example, a Texas law stating that any item manufactured in Tennessee shall have a 10% tax imposed on it would be found unconstitutional under the DCC, because Texas would be unduly burdening interstate commerce.[8] The doctrine was born out of a desire to prevent States from regulating the economy in ways that benefits themselves to the detriment of other States—an activity that plagued the States during the Articles of

Int'l Shoe Co. v. Wash., 326 U.S. 310, 316 (1945) (citing Milliken v. Meyer, 311 U.S. 457, 463 (1940)).

4. *Int'l Shoe Co.*, 326 U.S. at 316.

5. *See generally* David W. Ichel, *A New Guard at the Courthouse Door: Corporate Personal Jurisdiction in Complex Litigation After the Supreme Court's Decision Quartet*, 71 RUTGERS U. L. REV. 1, 32–61 (2018).

6. Or, according to some, *causing* the death of the Articles of Confederation. *See generally* Brannon P. Denning, *Confederation-Era Discrimination Against Interstate Commerce and the Legitimacy of the Dormant Commerce Clause Doctrine*, 94 Ky. L.J. 37 (2005/2006).

7. Or. Waste Sys., Inc. v. Dep't of Env't. Quality, 511 U.S. 93, 98 (1994) (citing Wyoming v. Oklahoma, 502 U.S. 437, 454 (1992); Welton v. Missouri, 91 U.S. 275 (1875)).

8. *See infra* Part II.

Confederation. Through both the praises[9] and criticisms[10] leveled at the doctrine during the last century, the Dormant Commerce Clause remains a powerful instrument in the tool-bag of judicial review.

Although Justice Alito's belief that Pennsylvania's law violates the DCC is well-founded, he is wrong. Registration-jurisdiction laws do not violate the Dormant Commerce Clause, and the purpose of this Comment is to explain why. First, registration-jurisdiction laws are not discriminatory either on their face or in their practical effect. They apply uniformly to all companies that wish to do business in the State, irrespective of whether they are in-state or out-of-state companies. The laws also do not grant any advantage to in-state companies over out-of-state companies; on the contrary, they create serious economic harms for the enacting State. This goes against the primary concern of the DCC, which is to prevent economic protectionism, and therefore precludes judicial review under the doctrine.

Second, registration-jurisdiction laws are justified under the *Pike* balancing test. States enacting such laws may have an ethical interest in providing a forum for out-of-state plaintiffs because they are showing solidarity with injured parties across the country. These ethical benefits are incommensurable with the economic burdens, and therefore can't be weighed under *Pike* at all.

For these reasons, Pennsylvania's registration-jurisdiction law does not violate the Dormant Commerce Clause. Part II of this Comment details the background and evolution of the DCC doctrine, culminating in an explanation

---

9. Donald H. Regan, *The Supreme Court and State Protectionism: Making Sense of the Dormant Commerce Clause*, 84 MICH. L. REV. 1091, 1092 (1986) ("In the central area of dormant commerce clause jurisprudence . . . the Court has been concerned exclusively with preventing States from engaging in purposeful economic protectionism. Not only is this what the Court has been doing, it is just what the Court should do. This and no more.").

10. Camps Newfound v. Town of Harrison, 520 U.S. 564, 610 (1997) (Thomas, J., dissenting) ("The negative Commerce Clause has no basis in the text of the Constitution, makes little sense, and has proved virtually unworkable in application."). *See generally* James M. McGoldrick, Jr., *Why Does Justice Thomas Hate the Commerce Clause?*, 65 LOY. L. REV. 329 (2019).

of the tests that are applied under the current day standard. Part III explains *Mallory*, its reasoning, and Justice Alito's concurrence. Part IV explains why registration-jurisdiction laws, such as the one in *Mallory*, are not discriminatory on their face or in their effect, and why the laws pass the *Pike* balancing test. Finally, Part V explains recent litigation around the question and offers parting thoughts for future courts.

## I. HISTORICAL BACKGROUND OF THE DCC

### A. *The DCC is an Implied Prohibition on the States' Ability to Regulate Commerce Themselves, Springing from the Failures of the Articles of Confederation*

The DCC occupies a unique place in American law. Rather than stemming from the express text of the Constitution, the DCC is an inferred prohibition on the States' powers.[11] The Constitution grants Congress the power to regulate commerce "among the several states."[12] What this means, however, is that the States themselves are *not* allowed to regulate interstate commerce, because to do so would be to exercise a power that has been reserved solely

11. STONE ET AL., CONSTITUTIONAL LAW 254 (Rachel E. Barkow et al. eds., 8th ed. 2018). Inferring a provision of the Constitution is rare, though not unique. For example, total sovereign immunity under the 11th Amendment is inferred. The plain text of the 11th Amendment states, "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." But in *Hans v. Louisiana*, the Court interpreted this amendment to mean that suits brought against a state by its own citizens are also disallowed, and not just suits brought by citizens of other states. Subsequent cases, such as S*eminole Tribe v. Florida*, 517 U.S. 44, 44 (1996) and *Alden v. Maine*, 527 U.S. 706, 706 (1999), have further reinforced the doctrine of state sovereign immunity as an implied constitutional principle. U.S. CONST. amend. XI; Hans v. Louisiana, 134 U.S. 1, 13 (1890). Justice Thomas, however, takes a very dim view of inferred constitutional powers, stating the Dormant Commerce Clause "has no basis in the text of the Constitution," and believes the doctrine should not be applied at all. *Camps Newfound*, 520 U.S. at 610 (Thomas, J., dissenting).

12. U.S. CONST. art. 1, § 8, cl. 3.

for Congress.[13] Indeed, even if Congress has not passed any law regulating commerce at all, the States still may not pass a law that regulates commerce.[14] This is what gives rise to the moniker "dormant"—even when Congress is dormant, the States are forbidden from acting.

The origins of the DCC can be traced back to the failures of the Articles of Confederation, the first constitution of the United States.[15] Ratified in 1781, the Articles of Confederation established a barely-connected conglomerate of States, each retaining "its sovereignty, freedom, and independence."[16] Under the Articles, the majority of governmental powers were retained by the individual States, while the national Congress was granted only an extremely narrow set of enumerated powers.[17] Indeed, Congress lacked even the power to levy taxes; instead, the States were supposed to voluntarily give a tax to Congress according to the value of property within their borders.[18] Unsurprisingly, the States were not forthcoming with their fair share, leaving Congress's impotence clear.[19]

In their effort to maintain the extreme sovereignty they viewed themselves as possessing,[20] the States reserved the power to regulate commerce exclusively to themselves under

13. *See* Gibbons v. Ogden, 22 U.S. 1, 227 (1824) (stating that the constitution's "grant of this power [to Congress] carries with it the whole subject, leaving nothing for the State to act upon").

14. JEANNE M. DENNIS, CONG. RSCH. SERV., No. 117-12, THE CONSTITUTION OF THE UNITED STATES OF AMERICA: ANALYSIS AND INTERPRETATION 352 (2022).

15. Martin H. Redish & Shane V. Nugent, *The Dormant Commerce Clause and the Constitutional Balance of Federalism*, 1987 Duke L.J. 569, 616 (1986).

16. ARTICLES OF CONFEDERATION of 1781, art. II.

17. Dennis, *supra* note 14, at 117–21.

18. *Id.* at 117–21.

19. *Id.*

20. Rhode Island was notorious for its staunch independence. Its many vetoes of congressional acts during the Articles of Confederation era earned it nicknames like "rogue island" and "the perverse sister." *See* Jessie Kratz, *"Rogue Island": The last State to ratify the Constitution*, NATIONAL ARCHIVES BLOG, (May 18, 2015) https://prologue.blogs.archives.gov/2015/05/18/rogue-island-the-last-state-to-ratify-the-constitution/.

the Articles of Confederation.[21] The States could, in their discretion, lay whatever duties, tariffs, or taxes they wanted on commodities bought or sold in their borders.[22] It did not matter if the goods were entering or exiting their borders, or if the destination or origin of the goods was another State or a foreign country.[23] The States enjoyed plenary power to enact whatever economy regulating laws they wanted, even if their laws harmed the other States. And this is precisely what many of them did—the economies between States routinely devolved into "balkanization," where each State would pass laws that benefited itself to the detriments of the others.[24]

For example, let's say New York wanted to encourage the sale of textiles that were created in New York.[25] To effectuate

---

21. Dennis, *supra* note 14, at 117–12; Denning, *supra* note 6, at 45.

22. *Id.* at 45.

23. *Id.*

24. *See* Tenn. Wine & Spirits Retailers Ass'n v. Thomas, 139 S. Ct. 2449, 2461 (2019) (highlighting as the "central concern of the Framers . . . the conviction that in order to succeed, the new Union would have to avoid the tendencies toward economic Balkanization that had plagued relations among the Colonies and later among the States under the Articles of Confederation.").

25. Alexander Hamilton provides another example of this in Federalist No. 7. He wrote,

> The opportunities which some States would have of rendering others tributary to them by commercial regulations would be impatiently submitted to by the tributary States. The relative situation of New York, Connecticut, and New Jersey would afford an example of this kind. New York, from the necessities of revenue, must lay duties on her importations. A great part of these duties must be paid by the inhabitants of the two other States in the capacity of consumers of what we import. New York would neither be willing nor able to forego this advantage. Her citizens would not consent that a duty paid by them should be remitted in favor of the citizens of her neighbors; nor would it be practicable, if there were not this impediment in the way, to distinguish the customers in our own markets. Would Connecticut and New Jersey long submit to be taxed by New York for her exclusive benefit? Should we be long permitted to remain in the quiet and undisturbed enjoyment of a metropolis, from the possession of which we derived an advantage so odious to our neighbors, and, in their opinion, so oppressive? Should we be able to preserve it against the incumbent weight of Connecticut on the one side, and the co-operating pressure of New Jersey on the other?

this, the State would impose a 10% tariff on any textiles that came from Massachusetts, their chief competitor in the textile industry. This has the immediate effect of New York textiles being cheaper to buy in New York, encouraging their sale. However, when Massachusetts hears of this, they decide to implement a tariff of their own, stating that any textile manufactured in New York has a 15% tariff laid on it. New York, in response, raises their tariff against Massachusetts even higher; this process continues *ad infinitum*. The States constantly engaged in this one-upmanship, reveling in protectionism and parochialism.[26] One author noted that "the States, acting on their own, were more likely to be drawn into conflicts with one another than to improve their commercial situations."[27] This, obviously, was a major problem for the budding nation.

The Founding Fathers were acutely aware of the dangers presented by the issue of interstate protectionism.[28] Far from being just a speculative fear, this was a tangible concern that "occupied the minds of the Framers."[29] James Madison and Alexander Hamilton "constantly commented upon the inability of the Confederation government to stop commercial predation among the States."[30] The broad consensus among the founders, therefore, was that the ability to regulate commerce must be stripped from the States and given exclusively to Congress.[31]

This is precisely what the founders did in the 1787 Constitution.[32] They wrote that Congress may "regulate Commerce . . . among the several States," with Justice

---

THE FEDERALIST NO. 7 (Alexander Hamilton).

26. Denning, *supra* note 6, at 45 (describing the myriad of ways that the States discriminated against each other commercially).

27. CATHY D. MATSON & PETER S. ONUF, A UNION OF INTERESTS: POLITICAL AND ECONOMIC THOUGHT IN REVOLUTIONARY AMERICA 70 (1990).

28. Denning, *supra* note 6, at 39.

29. *Id.* at 39.

30. *Id.* at 49–50.

31. *Id.* at 55–56.

32. *Id.* at 81.

Marshall later writing in *Gibbons v. Ogden* that "[the] grant of this power [to Congress] carries with it the whole subject, leaving nothing for the State to act upon."[33] From both a textualist and a historical perspective, the Constitution's Commerce Clause was intended to strip the power to regulate commerce from the States and give it instead to Congress.[34]

First, the Import-Export Clause provides that no State shall "lay any Imposts or Duties on Imports or Exports," including those arriving from or destined to other States.[35] Far from the DCC having "no basis in the text of the Constitution,"[36] the Import-Export Clause textually embodies the exact removal of power from the States inferred from the Dormant Commerce Clause doctrine.[37] Second,

33. U.S. CONST. art. I, § 8, cl. 3; *Gibbons*, 22 U.S. at 227.

34. U.S. CONST. art. I, § 8, cl. 3; Denning, *supra* note 6, at 81. Interestingly, the Dormant Commerce Clause is one of the few areas of law where Congress can, through a mere statute, overrule a constitutional interpretation by the Supreme Court. Because the Constitution gives Congress the authority to regulate commerce, and because there is no constitutional provision saying the States may *never* regulate commerce, Congress may authorize the States to burden commerce in certain ways it deems acceptable. For example, Congress has given the States the power to regulate or outright ban the importation of liquors that were manufactured in other States, a facially discriminatory practice that would otherwise violate the DCC. Wilson Act, 27 U.S.C.S. § 121 (2024). The Supreme Court has repeatedly upheld Congress's power to overrule the Court on this topic, stating that Congress "certainly has the power to authorize State regulations that burden or discriminate against interstate commerce." Hillside Dairy Inc. v. Lyons, 539 U.S. 59, 66 (2003). However, one scholar has argued that this is wrong, and that Congress does not have the power to overrule the Supreme Court. *See* Norman R. Williams, *Why Congress May Not "Overrule" the Dormant Commerce Clause*, 53 U.C.L.A. L. REV. 153 (2005).

35. U.S. CONST. art I, § 10, cl. 2; *Camps Newfound/Owatonna, Inc.*, 520 U.S. at 624–25 (Thomas, J., dissenting) (arguing that the Import-Export Clause applies to interstate commerce); WILLIAM WINSLOW CROSSKEY, POLITICS AND THE CONSTITUTION IN THE HISTORY OF THE UNITED STATES 297 (1953) ("Imports, within the meaning of the Import-Export Clause, should include all goods brought into a State from without. The term certainly includes goods brought from foreign countries in the United States, but its meaning should not be so limited, as the historical record makes clear.")

36. *Camps Newfound/Owatonna, Inc.*, 520 U.S. at 610 (Thomas, J., dissenting).

37. Denning, *supra* note 6, at 81.

James Madison explicitly stated that the Commerce Clause was intended to remove the commerce power from the States.[38] In his letter to J.C. Cabell, Madison wrote that the Commerce Clause's grant of power to Congress "grew out of the abuse of the power by the importing States in taxing the non-importing, and was intended as a negative and preventive provision against injustice among the States themselves."[39]

The point of all this is that the Dormant Commerce Clause's foundations are rooted in combating the State protectionism that plagued the Articles of Confederation. That's why the doctrine exists: to prevent a State from passing laws that economically benefits itself. As the Court recently wrote,

> The modern law of what has come to be called the dormant Commerce Clause is driven by concern about economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors. The point is to effectuate the Framers' purpose to prevent a State from retreating into the economic isolation that plagued relations among the Colonies and later among the States under the Articles of Confederation.[40]

As the Dormant Commerce Clause doctrine evolved over time, the Supreme Court developed a set of tests to determine whether a State law impermissibly interferes with interstate commerce.[41] These tests aim to strike a balance between the States' authority to regulate matters within their borders and the federal government's interest in maintaining a unified national market. The modern application of the DCC reflects these competing interests and

38. Letter from James Madison to J.C. Cabell (Feb. 13, 1829), *reprinted in* 3 THE RECORDS OF THE FEDERAL CONVENTION OF 1787, 478 (Max Farrand ed., rev. ed. 1966).

39. *Id.*

40. Dep't of Revenue v. Davis, 553 U.S. 328, 337–38 (2008) (cleaned up) (citing New Energy Co. of Ind. v. Limbach, 486 U.S. 269, 273–74 (1988); Fulton Corp. v. Faulkner, 516 U.S. 325, 330 (1996); Hughes v. Oklahoma, 441 U.S. 322, 325–26 (1979)).

41. *See infra* Part I(b).

provides a framework for evaluating the constitutionality of State laws that affect interstate commerce.

## B. *The Current Application of the DCC*

### 1. The First Two Tests: Is the State Law Facially Discriminatory, and is it Discriminatory-in-Effect?

In the modern day, when a plaintiff argues that a State law has violated the DCC, a reviewing court must undertake a multi-step inquiry.[42] The first test asks if the law discriminates on the basis of State origin in one of two ways: either (1) on its face; or (2) in its practical effect.[43] If the court finds that the State law does either, the law is held to a "virtually *per se* rule of invalidity."[44] The first of these two is easy to understand; a law is facially discriminatory if it affords different treatment based on the origin of the item. For example, if New York passes a law that states "all textiles originating from Massachusetts have a 5% tax laid on them," the law is facially discriminatory and invalid

---

42. Mallory v. Norfolk Southern Ry. Co., 600 U.S. 122, 160 (2023) (Alito, J., concurring).

43. Hunt v. Wash. State Apple Adver. Comm'n, 432 U.S. 333, 350–51 (1977).

44. *Mallory*, 600 U.S. at 160 (Alito, J., concurring); Granholm v. Heald, 544 U.S. 460, 476 (2005). While laws that are facially discriminatory or discriminatory-in-effect are subject to a "virtually *per se* rule of invalidity," the Supreme Court has recognized a narrow exception for statutes that "advance[] a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives." *Dep't of Revenue*, 553 U.S. at 338 (quoting Oregon Waste Systems, Inc. v. Dep't of Env't Quality of Ore., 511 U.S. 93, 101 (1994)). However, this exception is exceedingly rare, with it only ever being successfully argued in *Maine v. Taylor*. In *Taylor*, the Supreme Court upheld a Maine statute banning the importation of live baitfish, stemming from a fear that the out-of-state baitfish could infect Maine's lakes with an invasive species. They found that the law served a legitimate local purpose that could not be adequately served by available nondiscriminatory means, emphasizing the legitimacy of Maine's interest in guarding against environmental risks, and highlighting the lack of a way to inspect the imported baitfish for the parasitic species. *Taylor* thus represents one of the rare cases where a State has overcome the heavy burden of justifying a facially discriminatory law. Maine v. Taylor, 477 U.S. 131, 131 (1986).

under the DCC because the amount of tax laid on the textile is determined by whether the good was made in-state or out-of-state.[45]

A law that discriminates "in [its] practical effect" is one that, while facially neutral, has a severely disparate effect on out-of-state commerce.[46] To illustrate, let's say Puerto Rico has a beer company, and the Puerto Rican government would like to promote the sale of its own beer within its borders. Puerto Rico therefore passes a law that states that any beer company that brews more than 10 million gallons of beer per year is subject to a 20% tax; Puerto Rico's beer company fortuitously only brews 9 million gallons per year, and is not subject to the tax. At the same time, almost all mainland beer companies would be subject to the tax.[47] This law would be struck down as discriminatory by the Supreme Court, because, while it is facially neutral,[48] its practical effect is to "disadvantage out-of-state companies to the benefit of in-state competitors."[49]

Identifying discrimination-in-effect is not always this clear-cut, however; oftentimes the discrimination against out-of-state commerce takes non-economic forms. In the seminal case of *Hunt v. Washington State Apple Advertising Commission*, the Supreme Court used the Dormant Commerce Clause to invalidate a North Carolina statute that banned certain grading labels on apple shipments.[50] North Carolina's law, ostensibly to combat fraud in labeling, stated that "no grade other than the applicable [federal]

45. *See generally* Donald H. Regan, *The Supreme Court and State Protectionism: Makings Sense of the Dormant Commerce Clause*, 84 MICH. L. REV. 1091 (1986).

46. *Maine*, 477 U.S. 131, 138 (1986) (citing *Hughes*, 441 U.S. at 336).

47. The US collectively brewed over 5 billion gallons of beer in 2021. *See* BEER INSTITUTE, THE BREWERS ALMANAC 2021 (2021) https://www.beerinstitute.org/member%20items/2020-brewers-almanac/ (last visited Dec. 5, 2023).

48. If there were a beer company in Puerto Rico that brewed 11 million gallons a year, they would be subject to the tax too.

49. *Mallory*, 600 U.S. at 162 n.7.

50. *Hunt*, 432 U.S. at 335.

grade or standard" could be attached to apple shipments.[51] What this meant, however, was that Washington State's grading labels were banned from being used inside North Carolina.[52] This was significant; Washington is renowned for their apple production,[53] and had devised an intricate and thorough grading and inspection process that carried substantial influence in the apple economy.[54] By effectively banning Washington's grading system within their borders, "the statute [had] the effect of stripping away from the Washington apple industry the competitive and economic advantages it [had] earned for itself . . . [This] insidiously operate[d] to the advantage of [North Carolina] apple producers."[55] Thus, the Court found North Carolina's law to be discriminatory-in-effect, and invalidated the statute.[56] So even if the protectionist nature of a State's law is lurking behind a veneer of neutrality, or is shoe-horned in through non-economic forms, the Dormant Commerce Clause is

---

51. *Id.* (citing N.C. GEN. STAT. § 106-189.1 (1973)).

52. *Id.*

53. *See* Eric Jessup & Ryan Herrington, *Estimating the Impact of Seasonal Truck Shortages on the Movement of Time-Sensitive, Perishable Products*, 1906 TRANSP. RSCH. REC. 1, 1 (2005) ("Washington State is the number one apple-producing State in the United States, accounting for more than 2.7 million tons of apples per year valued in excess of $1 billion.").

54. *See* H. Melvin Couey & Max W. Williams, *The Washington State Apple Revolution: Innovative Production, Storage, and Merchandizing Techniques Extend the Marketing Season*, 17 HORTSCIENCE 14, 14 (1982) ("Much of the success [of the Washington apple market] is because of the keen observation and cooperation of growers, nurserymen, fieldmen, extension agents, research scientists, and apple sales promotion agents, along with strong support for research by the industry. The resultant improvement and adaptation of new production, storage, and marketing techniques have completely revolutionized the apple industry." The Court noted this too, stating "The record demonstrates that the Washington apple-grading system had gained nationwide acceptance in the apple trade. Indeed, it contains numerous affidavits from apple brokers and dealers located both inside and outside of North Carolina who State their preference, and that of their customers, for apples graded under the Washington, as opposed to the USDA system, because of the former's greater consistency, its emphasis on color, and its supporting mandatory inspections." *Hunt*, 432 U.S. at 351).

55. *Hunt*, 432 U.S. at 351.

56. *Id.* at 354.

equipped to uncover and nullify such measures, preserving the national economic union that the Framers envisioned.

These are the two initial tests that a State law must pass when challenged under the DCC: is it facially discriminatory, and is it discriminatory-in-effect? After these, the law is subjected to the final constitutional standard: the *Pike* balancing test. But before explaining the test, it is helpful to take a step back and understand the bigger picture.

2. The State Police Powers and the Pike Test

Congress is a government of enumerated powers, which means that it cannot exercise an authority unless the Constitution has explicitly granted Congress that power.[57] Textually, the Constitution only grants Congress the power to "lay and collect Taxes, Duties, Imposts and Excises"; to "declare War"; to "raise and support Armies" and a "Navy"; and to "regulate Commerce with foreign Nations, and among the several States."[58] Through the Necessary and Proper clause, these powers are fleshed out substantially; but the fact remains that Congress is limited to only these powers.[59]

The States, on the other hand, are not so constrained. They are governments of general power, also known as the

57. Nat'l Fed'n of Indep. Bus. v. Sebelius, 567 U.S. 519, 534–35 (2012) (opinion of Roberts, C.J.) ("The Federal Government 'is acknowledged by all to be one of enumerated powers.' . . . . The enumeration of powers is also a limitation of powers, because 'the enumeration presupposes something not enumerated.' . . . . If no enumerated power authorizes Congress to pass a certain law, that law may not be enacted.") (quoting McCulloch v. Maryland, 17 U.S. 316, 405 (1819)).

58. U.S. CONST. art. I, § 8, cl. 1–18.

59. *Sebelius*, 567 U.S. at 534. This is also provided for in the 10th Amendment to the Constitution, which states "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. CONST. amend. X. *But see* Richard Primus, *"The Essential Characteristic": Enumerated Powers and the Bank of the United States*, 117 MICH. L. REV. 415, 418 (2018) (arguing that the enumeration principle—that Congress can only legislate using enumerated powers—does not necessarily lead to the "internal-limits canon" which states that the total of Congress's enumerated powers must be less than a grant of general legislative authority).

"police power."[60] The police power is a broad grant of authority to the States, giving them the general power to "provide for the public health, safety, and morals" of a society.[61] Indeed, "[a]s far as the Federal Constitution is concerned, [the] States can exercise all powers that the Constitution does not withhold from them."[62] The practical uses of this power are too many to list, and include such fundamentals as regulating speed limits on roads,[63] making zoning decisions,[64] and setting business-licensing requirements.[65]

Notice, however, that each of the above examples affects interstate commerce in a substantial way. A low speed limit may convince a trucking company to send its trucks through another State; a lack of business-zoned districts may discourage companies from moving across State borders; stringent licensing requirements may prevent new businesses from forming at all. From this pattern, a simple

60. U.S. CONST. amend. X; Santiago Legarre, *The Historical Background of the Police Power*, 9 U. PA. J. CONST. L. 745, 745 (2007). *See also* WESTEL WOODBURY WILLOUGHBY, THE CONSTITUTIONAL LAW OF THE UNITED STATES 1766 (2d Ed. 1929) (describing the police power as "that general authority not surrendered to the [Federal] Government, and reserved severally by each State to regulate in the manner that each should see fit all the matters of local concern").

61. Barnes v. Glen Theatre, 501 U.S. 560, 569 (1991).

62. U.S. Term Limits v. Thornton, 514 U.S. 779, 847–48 (1995) (Thomas, J., dissenting). *See also* Commonwealth v. Alger, 61 Mass. 53, 85 (1851) (stating that "[i]t is much easier to perceive and realize the existence and sources of [the police power] than to mark its boundaries, or prescribe limits to its exercise"); Legarre, *supra* note 60.

63. Arrow Carrier Corp. v. Traffic Com.., 99 N.Y.S.2d 138, 141 (N.Y. Sup. Ct. 1950) ("It has been held and appears to be beyond dispute that the regulation of traffic and the establishment of routes of travel are within the proper exercise of the police power.") (citing Bradley v. Public Utilities Com., 289 U.S. 92, 95 (1933)).

64. Kamhi v. Yorktown, 547 N.E.2d 346, 351 (N.Y. 1989) (stating that New York delegates a portion of its police power to local governments in the form of "land use controls to meet the increasing encroachments of urbanization on the quality of life").

65. Big Apple Food Vendors' Ass'n v. City of N.Y., 644 N.Y.S.2d 216, 217 (N.Y. App. Div. 1996) (stating that the refusal to grant multiple business licenses to one entity was a valid exercise of the police powers).

fact emerges: *everything* a State does may "regulate" interstate commerce.[66] Does this mean that *everything* a State does is violative of the DCC? Thankfully, no.[67]

The Supreme Court has recognized that the incidental effects on commerce from the States' exercise of their police powers do not *always* amount to regulating commerce.[68] The Court understands that the economic world is made up of a "myriad variations in the methods and incidents of commercial intercourse," and that protecting the States' powers to "remain free to act within their respective jurisdictions . . . is of the highest importance to the continued existence of our dual form of government."[69]

Nevertheless, sometimes the burdens on interstate commerce from a State's law goes too far. To determine if the effect on commerce is too great for the DCC to allow, the Court uses the final test in modern-day analysis: the *Pike* balancing test.[70] The *Pike* test asks two main questions: first, does the State law advance a legitimate local interest; and second, if it does, do the local benefits of the law outweigh the burdens on commerce?[71] If the local benefits are greater, the law is upheld.[72]

---

66. Milk Control Bd. v. Eisenberg Farm Prod., 306 U.S. 346, 351–52 (1933) ("Every State police statute necessarily will affect interstate commerce in some degree, but such a statute does not run counter to the grant of Congressional power merely because it incidentally or indirectly involves or burdens interstate commerce.").

67. Wabash, St. Louis v. Ill., 118 U.S. 557, 566 (1886) ("[I]t is not everything that affects commerce that amounts to a regulation of it, within the meaning of the Constitution.").

68. *Milk Control Bd.*, 306 U.S. at 351–52.

69. *Id.*

70. Pike v. Bruce Church, 397 U.S. 137, 142 (1970). It should be noted, however, that some circuits do not require the *Pike* to be applied if the law does not discriminate facially or in effect. *See* Nat'l Paint & Coatings Ass'n v. City of Chi., 45 F.3d 1124, 1132 (1995); Ill. Rest. Ass'n v. City of Chi., 492 F. Supp. 2d 891, 904 (N.D. Ill., 2007) ("The Court thus concludes that *Pike* balancing is not necessary in all cases and, more specifically, is not necessary in this case.").

71. *Pike*, 397 U.S. at 142.

72. *Id.*

This is a low bar to meet. Similar to a rational-basis test,[73] the Court has stated that if the justifications for the law "are not illusory, the Court will not second-guess legislative judgment about [the justifications'] importance."[74] One of the few times where a State law failed the *Pike* test was *Bibb v. Navajo Freight Lines*.[75]

Although *Bibb* came out before *Pike*, the Court applied the same reasoning to invalidate an Illinois statute that required trucks to use distinctive and costly mudflaps when on their highways.[76] Most other States required normal, square mudflaps on trucks, but the Illinois law required curved mudflaps that would cost transporters anywhere from $4,500 to $45,000 to install.[77] These mudflaps granted no additional safety features, and in fact created new hazards by "caus[ing] an accumulation of heat in the brake drum, thus decreasing the effectiveness of [the] brakes."[78] The trucking companies brought suit against Illinois, arguing that the law impermissibly burdened interstate commerce and afforded no benefit at all to the State.[79] The State countered by arguing that enacting the mudflap law was "a reasonable exercise of [their] police power" and that a court "must sustain the validity of the statute notwithstanding the extent of the burden it imposes on interstate commerce."[80]

The Supreme Court rejected the State's argument and invalidated the law. Although the States are due a "presumption of validity" when exercising their police

---

73. *See* James D. Fox, State *Benefits Under the Pike Balancing Test of the Dormant Commerce Clause: Putative or Actual?*, 1 AVE MARIA L. REV. 175, 206 (2003) (arguing that the Court should simply use the rational-basis test to determine whether a State has failed the *Pike* test).

74. Kassel v. Consol. Freightways Corp., 450 U.S. 662, 670 (1981) (citing Raymond Motor Transp., Inc. v. Rice, 434 U.S. 429, 449 (1978)).

75. Bibb v. Navajo Freight Lines, 359 U.S. 520 (1959).

76. *Id.* at 521–22.

77. *Id.* at 525.

78. *Id.*

79. *Id.* at 523.

80. *Id.* at 528.

powers, "the heavy burden which the Illinois mudguard law places on the interstate movement of trucks and trailers seem[ed] to [the Court] to pass the permissible limits even for" the police powers.[81] The Court's decision shows us that, on the whole, the *Pike* test is a relatively easy one to pass. To overcome the presumption of validity regarding the use of police powers, the law must not only serve no interest at all, but must *create* hazards that could easily be avoided.[82]

When State laws are challenged as unconstitutional under the DCC, these are the tests that a reviewing court employs: the facially discriminatory/discrimination-in-effect tests and the *Pike* balancing test.[83] The former scrutinizes whether laws, though neutral on their surface, disproportionately harm out-of-state economic activities, while the latter considers whether the local benefits of a law justify its burden on interstate commerce. This dual analysis

---

81. *Id.* at 529–30.

82. The Court reaffirmed the *Bibb* holding in *Kassel v. Consol. Freightways Corp.*, 450 U.S. 662, 662 (1981). In that case, Iowa had prohibited the use of 65-foot double trailers within its borders, allowing only 55-foot single trailers or 60-foot doubles. This effectively required trucking companies to either use smaller trailers in Iowa or detach the larger trailers and send them through separately. Iowa claimed this law promoted highway safety, but the Court struck it down as an unconstitutional burden on interstate commerce. The Court found that Iowa had failed to present persuasive evidence that the 65-foot doubles were any less safe than the 55-foot singles or 60-foot doubles. At the same time, evidence showed Iowa's law imposed substantial burdens on interstate trucking companies in terms of increased costs and time. The Court held that Iowa's "illusory" safety interests could not justify this significant interference with the federal interest in efficient interstate transportation. They stated that while "regulations that touch upon safety—especially highway safety—are those that 'the Court has been most reluctant to invalidate,'" even those regulations can still violate the dormant Commerce Clause if "the safety benefits from the regulation are demonstrably trivial while the burden on commerce is great." *Id.* at 670, 692 (citing Raymond Motor Transp., Inc. v. Rice, 434 U.S. 429, 443 (1978)).

83. *Mallory*, 600 U.S. at 160–61 (Alito, J., concurring). While this Comment has endeavored to bring clarity to the morass of the Dormant Commerce Clause tests, it must be acknowledged that the doctrine remains stubbornly chaotic in practice. Justice Thomas famously characterized the doctrine as "mak[ing] little sense," and proving to be "virtually unworkable in application." Another author went so far as to analogize the *Pike* test to chaos theory, stating "*Pike* analysis suffers from a lack of clear legal rules . . . that shape the flow of a case . . . as it careens down the *Pike* slopes, yielding unpredictable judicial outcomes." Camps Newfound, 520 U.S. at 610 (Thomas, J., dissenting); Fox, *supra* note 73, at 177.

ensures that State regulations serve legitimate purposes without unduly impeding the national economic fabric, and thus protects the framers' goal of preventing State protectionism.[84]

## II. WHAT HAPPENED IN *MALLORY*?

As the beginning of this Comment explained, the Court's majority opinion in *Mallory* had nothing to do with the Dormant Commerce Clause; instead, the case dealt with issues of personal jurisdiction and *International Shoe*.[85] Plaintiff Robert Mallory filed a federal workers' compensation lawsuit against Norfolk Southern Railway Co. in Pennsylvania State court.[86] He alleged that, while working for Norfolk Southern in Ohio and Virginia, he was exposed to carcinogenic chemicals from which he later developed cancer.[87] Norfolk Southern is incorporated and headquartered in Virginia, and Mallory was a resident of Viriginia at the time the suit was filed.[88] Pennsylvania had no connection to the parties or the facts of the case, except for the fact that Mallory filed his lawsuit there.[89]

This, obviously, raises questions of personal jurisdiction, especially after the Supreme Court eliminated "doing business" jurisdiction in 2014's *Daimler AG v. Bauman*.[90] At the time Mallory filed his suit, general personal jurisdiction could only be established where a company was incorporated

---

84. Letter from James Madison to J.C. Cabell, *supra* note 38.

85. *Mallory*, 600 U.S. at 125; *see also* Int'l Shoe Co. v. Wash., 326 U.S. 310, 311 (1945).

86. *Mallory*, 600 U.S. at 126.

87. *Id.*

88. *Id.*

89. *Id.*

90. *Daimler AG*, 571 U.S. at 127 (2014). Prior to *Daimler*, establishing general personal jurisdiction over a company was relatively easy. All a plaintiff had to show was that the corporation was "doing continuous and systematic business in the forum." Mary Twitchell, *Why We Keep Doing Business with Doing-Business Jurisdiction*, 2001 U. CHI. LEGAL F. 171, 173 (2001) (citing Perkins v. Benguet Consol. Mining Co., 342 U.S. 437, 438 (1952)).

and where it was headquartered;[91] in Norfolk Southern's case, neither was Pennsylvania.[92] However, Pennsylvania had passed a law stating that any company that did business within their borders must register with the State, and that by registering, the company consented to have "any cause of action" asserted against them in Pennsylvania's courts.[93] By passing their "registration-jurisdiction" law, Pennsylvania had sidestepped the incorporation and headquarter requirements—any company that registered to do business in Pennsylvania could now be sued there under general personal jurisdiction.[94] And because Norfolk had registered to do business in Pennsylvania, Mallory's lawsuit against Norfolk was allowed to proceed despite a lack of contacts with the State.[95]

Norfolk contested, arguing that the registration-jurisdiction law violated both the Due Process clause and *International Shoe*'s progeny, but the Supreme Court upheld

---

91. *Daimler AG*, 571 U.S. at 127. *Daimler* also created a third way of establishing general personal jurisdiction: it may be established where the company's "affiliations with the State are so continuous and systematic as to render them essentially at home in the forum State." However, "at home" jurisdiction is difficult to prove, being an "exceptional case," and was not attempted in *Mallory*. *Mallory*, 600 U.S. at 166. *See generally* Judy M. Cornett & Michael H. Hoffheimer, *Good-Bye Significant Contacts: General Personal Jurisdiction After Daimler AG v. Bauman*, 76 OHIO ST. L.J. 101 (2015).

92. *Mallory*, 600 U.S. at 126.

93. 42 PA. CONS. STAT. § 5301 (2023).

94. *Mallory*, 600 U.S. at 127; Pennsylvania's registration law is not unique to that State. *See* Cooper Tire & Rubber Co. v. McCall, 863 S.E.2d 81, 90 (Ga. 2021) (holding that Georgia's registration statute confers personal jurisdiction). *But see* State ex rel. Norfolk Southern R. v. Dolan, 512 S.W.3d 41, 52 (Mo. 2017) (holding that Missouri's registration statute does not confer personal jurisdiction); K&C Logistics, LLC v. Old Dominion Freight Line, Inc., 374 So.3d 515, 519 (Miss. 2023) (holding that Mississippi's registration statute does not confer personal jurisdiction); Chavez v. Bridgestone Ams. Tire Operations, LLC, 503 P.3d 332, 344 (N.M. 2021) (holding that New Mexico's registration statute does not confer personal jurisdiction). In addition, although the legislature of New York had passed a law identical to Pennsylvania's, the law was vetoed by Governor Hochul and never went into effect. Goldberg Segalla, *Governor Hochul Vetoes Bill Requiring Foreign Corporations to Consent to General Jurisdiction in New York Courts*, JD SUPRA (Jan. 3, 2024), https://www.jdsupra.com/legalnews/governor-hochul-vetoes-bill-requiring-1607583/.

95. *Mallory*, 600 U.S. at 127.

the law.[96] The Court reasoned that *International Shoe* did not apply because in that case "an out-of-state corporation [*had not*] consented to in-state suits," whereas in *Mallory* the company *had* consented to in-state suits, and that "'express or implied consent' can . . . ground personal jurisdiction."[97]

For the purposes of this Comment, the validity of State registration being equal to consent to jurisdiction is largely irrelevant.[98] What is relevant, however, is that Justice Alito

---

96. *Id.* at 2045.

97. *Id.* at 2039 (citing Ins. Corp. of Ir. v. Compagnie Des Bauxites De Guinee, 456 U.S. 694, 703 (1982)).

98. This is not to say that the issue isn't fascinating. For those curious, *see* Brief for Tanya Monestier as Amicus Curiae, Mallory v. Norfolk Southern, 600 U.S. 122 (2023) (No. 21-1168) 2022 WL 4109393. Professor Monestier argues that a corporation's compliance with a State's registration statute does not constitute valid consent to general jurisdiction because: 1) it is unlike other recognized forms of case-specific jurisdiction consent between parties; 2) it provides no meaningful choice for corporations who must either consent everywhere or not do business at all; and 3) even clear statutory language cannot legitimize such compelled consent. She further contends that allowing registration-based jurisdiction would undermine the holdings of *Daimler AG*, enable States to overreach their sovereign interests, incentivize corporations to defy registration statutes leading to negative consequences, and promote forum-shopping by plaintiffs. On the other hand, Matthew Kaminer argues that corporate registration can constitute valid consent to general jurisdiction in two scenarios. First, where a state has an explicit statutory scheme requiring consent to general jurisdiction as a condition of registering to do business (like Pennsylvania's statute), the express language puts the corporation on notice of the jurisdictional consequences, so voluntary registration amounts to informed consent. This is analogous to how parties agreeing to forum selection clauses are deemed to have validly consented to jurisdiction in the chosen forum based on the express language, even for disputes not specifically contemplated. Second, even where a registration statute is silent on jurisdictional impact, if the state's highest court has clearly interpreted it as requiring consent to general jurisdiction, the corporation is assumed to be aware of that controlling decisional law when it chooses to register, so its voluntary registration constitutes valid implied consent with sufficient notice of the consequences. This is analogous to how plaintiffs impliedly consent to counterclaims by filing suit based on longstanding Supreme Court precedent, even without any statutory language about counterclaims. Under either scenario, Kaminer contends the corporation's knowing and voluntary registration, with adequate notice provided by the state's express statute or clearly established case law, amounts to valid consent to general jurisdiction. *See* Matthew D. Kaminer, *The Cost of Doing Business? Corporate Registration as Valid Consent to General Personal Jurisdiction*, 78 WASH. & LEE L. REV. 55, 83–6 (2021).

believes Pennsylvania's law may violate the Dormant Commerce Clause.[99] He agreed with the majority that the Pennsylvania law did not offend either constitutional Due Process or *International Shoe's* "fair play and substantial justice" standard.[100] However, he wrote that "[b]ecause the right of an out-of-state corporation to do business in another State is based on the Dormant Commerce Clause, it stands to reason that this doctrine may also limit a State's authority to condition that right."[101] Justice Alito believes that the law is likely both discriminatory-in-effect and is insufficient to pass the *Pike* balancing test.[102] He is wrong on both counts.

99. *Mallory*, 600 U.S. at 150 (Alito, J., concurring).

100. *Id.*; *Int'l Shoe Co.*, 326 U.S. at 316.

101. *Mallory*, 600 U.S. at 158 (Alito, J., concurring).

102. *Id.* at 2054–55.

## III. PENNSYLVANIA'S REGISTRATION-JURISDICTION DOES NOT VIOLATE THE DORMANT COMMERCE CLAUSE

### A. *The law is not discriminatory, either on its face or in its practical effect*

As an initial matter, neither Justice Alito nor scholars believe that registration-jurisdiction laws are facially discriminatory.[103] This makes sense; registration-jurisdiction laws "generally apply to all companies that desire to do business in the State, regardless of whether the companies also claim that State as their home," and are therefore not facially discriminatory.[104] The discriminatory *effect* of registration-jurisdiction laws, however, is more complicated. For ease of understanding, we will use two hypothetical companies: Company A is headquartered and incorporated in Pennsylvania, and Company B is headquartered and incorporated in New York. Pennsylvania has a registration-jurisdiction law, and New York does not.

Justice Alito believes that registration-jurisdiction laws may have a discriminatory effect against out-of-state competitors.[105] The only argument he makes is in a footnote,[106] and it hinges on a specific imbalance: out-of-state businesses, such as Company B from New York, are forced to face increased legal risks when expanding into the Pennsylvania market because they become subject to general personal jurisdiction there.[107] At the same time, Pennsylvania's Company A does not encounter similar

103. *Id.* at 2054 n.7; John F. Preis, *The Dormant Commerce Clause As a Limit on Personal Jurisdiction*, 102 IOWA L. REV. 121, 138 (2016) (stating simply that "jurisdiction-via-registration laws do not facially discriminate against out-of-staters").

104. *Id.*

105. *Mallory*, 600 U.S. at 161 (Alito, J., concurring).

106. *Id.* ("Pennsylvania's law seems to discriminate against out-of-state companies by forcing them to increase their exposure to suits on all claims in order to access Pennsylvania's market while Pennsylvania companies generally face no reciprocal burden for expanding operations into another State.").

107. *Id.* at 2053.

increased legal risks when expanding into the New York market, because New York does not have a registration-jurisdiction statute.[108] Alito's sole contention centers on this lack of a "reciprocal burden," where a Pennsylvania company entering New York does not face the same increase in legal exposure as a New York company does when expanding into Pennsylvania.[109] According to Alito, this is discriminatory-in-effect because the law "disadvantage[s] out-of-state companies to the benefit of in-state competitors."[110]

This perspective is wrong for several reasons. First, if we followed his argument to its logical conclusion, Pennsylvania *could* enact a registration-jurisdiction law so long as every other State had already established similar laws.[111] If New York *had* established a registration-jurisdiction law, then the Pennsylvania company moving into New York would be subject to the required "reciprocal burden" of new litigation, and Pennsylvania would be free to enact its own registration-jurisdiction law.

This inevitable conclusion of Justice Alito's argument violates the most basic interstate sovereignty principles of our country: no State has ever had their ability to pass a law

---

108. Alito states,

> Pennsylvania's scheme injects intolerable unpredictability into doing business across state borders. Large companies may be able to manage the patchwork of liability regimes, damages caps, and local rules in each State, but the impact on small companies, which constitute the majority of all U.S. corporations, could be devastating. Large companies may resort to creative corporate structuring to limit their amenability to suit. Small companies may prudently choose not to enter an out-of-state market due to the increased risk of remote litigation.

*Id.* at 2053–54.

109. *Id.* at 2053–54 n.7.

110. *Id.* at 2054 (emphasis added).

111. It is important to note that Justice Alito's concurrence does not explicitly argue that Pennsylvania could enact a registration-jurisdiction law if every other State had similar laws. Rather, his concurrence focuses only on the lack of a "reciprocal burden" on Pennsylvania companies when they do business in States without registration-jurisdiction laws. Nonetheless, the broader point remains that conditioning the constitutionality of a State's law on the actions of other States would be a significant departure from principles of State sovereignty and autonomy in our federal system. *Id.* at 2053–54 n.7.

conditioned on whether other States have passed similar laws.[112] Our federal system has long held the States to be independent "political communities[,] foreign to each other in regard to" their laws.[113] This autonomy is a cornerstone of American federalism, allowing for a diverse range of policies and regulations that reflect the unique needs and values of each State's populace.[114] Indeed, the States are tasked with the heavy responsibility of "providing for the public health, safety, and morals" [115] of their communities, "the burden of which cannot be cast by one State upon another, and no State can be excused from performance by what another State may do or fail to do."[116] Pennsylvania's law must therefore stand on its own merits and purposes, without bearing the responsibility for, or being determined by, the legislative decisions of other States.[117]

The development of the "extraterritoriality principle" under the Dormant Commerce Clause also supports the argument against this restriction on State legislatures.[118]

---

112. Timothy Zick, *Are the States Sovereign?*, 83 WASH. U. L. Q. 229, 306 (2005) ("Thus, as separate sovereign communities, the States enjoy a measure of 'external' sovereignty with regard to one another. Except insofar as the Constitution requires unity or recognition, the States are legally and politically independent of one another."). *See also* Texas v. White, 74 U.S. 700, 725 (1869) ("Not only, therefore, can there be no loss of separate and independent autonomy to the States, through their union under the Constitution, but it may be not unreasonably said that the preservation of the States, and the maintenance of their governments, are as much within the design and care of the Constitution as the preservation of the Union and the maintenance of the National government. The Constitution, in all its provisions, looks to an indestructible Union, composed of indestructible States."); Lane Cty. v. Or., 74 U.S. 71, 76 (1868) ("[T]he people of each state compose a state having its own government and endowed with all the functions essential to separate and independent existence.").

113. Bank of the United States v. Daniel, 37 U.S. 32, 54 (1838).

114. Zick, *supra* note 112, at 306.

115. Barnes v. Glen Theatre, 501 U.S. 560, 569 (1991).

116. Missouri *ex rel.* Gaines v. Canada, 305 U.S. 337, 350 (1938).

117. Zick, *supra* note 112, at 306.

118. *See* Healy v. Beer Inst., 491 U.S. 324, 336 (1989). *See generally* Peter C. Felmly, *Beyond the Reach of States: The Dormant Commerce Clause, Extraterritorial State Regulation, and the Concerns of Federalism*, 55 ME. L. REV. 467, 513 (2003) (arguing that the broad use of the extraterritoriality principle to

Under the extraterritoriality principle, courts will invalidate State legislation that has "the 'practical effect' of regulating commerce occurring wholly outside" the State.[119] In *Healy v. Beer Institute*, Connecticut required out-of-state beer companies to confirm that they were not, and indeed would not, sell beer to Connecticut wholesalers at a different price than was being sold to neighboring Massachusetts, New York, or Rhode Island.[120] This prevented beer sellers from changing their prices in those other States once they had confirmed the price for Connecticut, and therefore had the practical effect of regulating beer prices in those other States.[121]

The Court struck down Connecticut's law because it offended Massachusetts's, New York's, and Rhode Island's "autonomy [to legislate] within their respective spheres."[122] The *Healy* case is not just about prohibiting a State from directly influencing commerce in another State; it also affirms the autonomy of each State to legislate *its own affairs* without undue external influence.[123] Applying this reasoning to Pennsylvania, just as New York's, Rhode Island's, or Massachusetts's legislatures could not be burdened by other States' actions, Pennsylvania's legislative authority should

---

invalidate State laws has "placed in jeopardy the willingness of the states to experiment with new legislation designed to respond to the changing needs of their citizens.").

119. *Healy*, 491 U.S. at 332.

120. *Id.* at 326.

121. *Id.* at 332.

122. *Id.* at 335–36.

123. *See id.* at 336. The principle that states should be free from interference by other states in legislating their own affairs finds further support in *Edgar v. MITE Corp.* In that case, the Court struck down a law that provided that any takeover offer for shares of a target company had to be approved with the Illinois Secretary of State, and the target company could be a corporation not incorporated in Illinois, or not having its principal place of business in the state. The Court held that the Illinois law "directly regulate[d] transactions which [took] place across state lines," because the law "purports to give Illinois the power to determine whether a tender offer may proceed anywhere [in the country]." The Court emphasized "the Commerce Clause . . . precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State." Edgar v. MITE Corp., 457 U.S. 624, 641–43 (1982).

not be compromised or conditioned by the legislative frameworks of other States. Pennsylvania's right to pass laws governing its own commerce should stand independently, free from the constraints or expectations set by the policies of other States.

Moving past interstate sovereignty principles, there are additional reasons registration-jurisdiction laws are not discriminatory-in-effect. The most obvious is that Pennsylvania is not economically benefited by its registration-jurisdiction law, and a State benefiting from the contested law is a necessary requirement for it to be found violative of the DCC.[124] As this Comment has explained extensively, the purpose of the Dormant Commerce Clause is to prevent States from engaging in economic protectionism; that is, in preventing behavior that benefits the State to the detriment of other States.[125] The test referenced by Justice Alito in his concurrence explicitly states that a law is discriminatory-in-effect only if it "disadvantage[s] out-of-state companies *to the benefit of in-state competitors*."[126] If a State is not benefitting from the law, the statute cannot be discriminatory-in-effect.[127]

Here, no economic benefit is afforded to Pennsylvania; on the contrary, the registration-jurisdiction statute is a serious

---

124. *Maine*, 477 U.S. at 138.

125. *Dep't of Revenue*, 553 U.S. at 337–38 (cleaned up) (citing *New Energy Co. of Ind.*, 486 U.S. at 273–74). *See also* Nat'l Pork Producers Council v. Ross, 598 U,S, 356 (2023). In this case, the Court found that because California's law did not seek to advantage in-state companies or disadvantage out-of-state rivals, and in fact imposed the same burdens on both, the dormant Commerce Clause did not apply at all. The petitioners even conceded this point, stating "the dormant Commerce Clause . . . bar on protectionist state statutes that discriminate against interstate commerce . . . is not in issue here."

126. *Mallory*, 600 U.S. at 161 n.7(Alito, J., concurring) (emphasis added).

127. *Dep't of Revenue*, 553 U.S. at 337–38 (cleaned up) (citing *New Energy Co. of Ind.*, 486 U.S. at 273–74) ("The modern law of what has come to be called the dormant Commerce Clause is driven by concern about economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors. The point is to effectuate the Framers' purpose to prevent a State from retreating into the economic isolation that plagued relations among the Colonies and later among the States under the Articles of Confederation.").

detriment to the State. The economic effect of registration-jurisdiction laws is that out-of-state corporations are less likely to invest in Pennsylvania, because doing so would expose them to general personal jurisdiction.[128] Alito concedes this, stating that some companies "may prudently choose not to enter [Pennsylvania's] market due to the increased risk of remote litigation."[129] By discouraging these investments from foreign corporations, Pennsylvania loses out on a wealth of benefits like increased tax revenue for the State,[130] more jobs for citizens,[131] and lower prices for consumers.[132] In fact, the positives from corporate investment are so great that States—including Pennsylvania—routinely spend billions per year *incentivizing* companies to enter their market.[133] To say that Pennsylvania is benefitting from the hinderance of their own incentivization efforts is paradoxical at best, and oxymoronic at worst. Put simply, Pennsylvania is actively engaged in economic self-flagellation, not protectionism. This is a behavior that the Supreme Court cannot use the DCC to prevent, because as the Court put it, "the Dormant

---

128. *Mallory*, 600 U.S. at 161–62 (Alito, J., concurring).

129. *Id.*

130. *See* GMC v. Commonwealth, 265 A.3d 353, 370 (Pa. 2021) (holding constitutional a law that taxed companies simply for "the privilege of doing business in the Commonwealth").

131. *See generally* Enrico Moretti & Per Thulin, *Local multipliers and human capital in the United States and Sweden*, 22 INDUS. CORP. CHANGE 1, 339, 339 (2013).

132. *See* ALFRED MARSHALL, PRINCIPLES OF ECONOMICS 8 (Macmillan and Co., 8th ed. 1920) ("The traders or producers, who find that a rival is offering goods at a lower price than will yield them a good profit, are angered at his intrusion, and complain of being wronged; even though it may be true that those who buy the cheaper goods are in greater need than themselves, and that the energy and resourcefulness of their rival is a social gain.").

133. *See* Matthew Mitchell et al., *The Political Economy of Targeted Economic Development Incentives*, 48(1) REV. REG'L STUD. 1, 1 (2018) ("In recent years, States and localities have spent approximately $70 billion per year on targeted incentives [for companies].").

Commerce Clause is driven by concern about economic protectionism."[134]

Even more, far from putting out-of-state companies at a disadvantage to in-state companies, Pennsylvania's law merely evens the playing field between all parties. All Pennsylvania-based companies are already subject to general personal jurisdiction, and subjecting out-of-state companies to general personal jurisdiction simply ensures equal treatment between all parties.[135] When laws are found to be violative of the Dormant Commerce Clause, it is when "in-state companies, having lower costs or built-in demand, are able to undercut their out-of-state competition."[136] This is not the case here. The registration-jurisdiction law makes it so that neither in-state nor out-of-state companies are able to undercut the other. As one scholar put it, "[o]ut-of-staters are either treated equally or they are not," and Pennsylvania's law makes *sure* all parties are treated equally.[137]

Professor John F. Preis believes this equalization argument to be ineffective.[138] In his 2016 article, Preis argued that registration-jurisdiction laws are discriminatory-in-effect, and that the equalization argument "misses the fact that laws can violate the Dormant Commerce Clause even where in-state and out-of-state businesses are treated the same."[139] Preis correctly cited

---

134. Dep't of Revenue, 553 U.S. at 337–38 (cleaned up) (citing New Energy Co. of Ind., 486 U.S. at 273–74; Fulton Corp., 516 U.S. at 330; Hughes, 441 U.S. at 325–26 (1979)). *See also* Catherine Gage O'Grady, *Targeting State Protectionism Instead of Interstate Discrimination Under the Dormant Commerce Clause*, 34 SAN DIEGO L. REV. 571, 575 (1997) (arguing that "the primary concern in evaluating local regulations ought to be the long-recognized prohibition against resident economic protectionism.").

135. Preis, *supra* note 103, at 139 ("In-state companies, by virtue of their residency, are already subject to general jurisdiction in the State.").

136. *Id.* at 135.

137. *Id.* at 136.

138. *Id.* at 121.

139. *Id.* at 139.

*Hunt* for the applicable law, but misapplies the current factual circumstances.[140]

In *Hunt*, the Court decided that North Carolina's law was discriminatory-in-effect because it "insidiously operated to the advantage of local apple producers" by nullifying an advantage that out-of-staters had.[141] Preis takes this nullification-of-an-advantage principle and argued that, like in *Hunt*, Pennsylvania has stripped out-of-state companies of an advantage that in-state companies did not possess—the advantage of not being subject to general personal jurisdiction—and thus "potentially protects locals from competition."[142] For Preis' argument to be correct, two conditions must be met: (1) Pennsylvania must nullify an advantage that out-of-state companies possess; and (2) this nullification must benefit Pennsylvania companies.[143] He is correct that Pennsylvania's law strips an advantage from out-of-state companies; he is wrong that this benefits Pennsylvania companies.

We must recognize that the presence of out-of-state companies actually confer an economic benefit on Pennsylvania businesses, because they offer lower prices than their in-state counterparts.[144] Consider a Pennsylvania steel mill sourcing ore. Because of differences in "economies of scale, vertical integration, and synergies unavailable to smaller companies," a national mining corporation would be able to offer ore to the steel mill at a substantially lower price than a Pennsylvania-based mining corporation.[145] If the

140. *Id.*

141. *Hunt*, 432 U.S. at 350–51.

142. Preis, *supra* note 103, at 140.

143. *Id.*

144. Dustin Sharpes, *Reintroducing Intent into Predatory Pricing Law*, 61 EMORY L.J. 903, 916–17 (2012) ("For various reasons . . . including economies of scale, vertical integration, and synergies unavailable to smaller companies[,] large companies can often produce products at much lower prices than smaller companies.").

145. The concept of "economies of scale" refers to the cost advantages that businesses can exploit by expanding their scale of production. As a company grows and produces more, it can spread fixed costs over a larger number of units, resulting in lower average costs per unit. This principle is particularly relevant

Pennsylvania mill can procure ore at a lower cost from such an out-of-state supplier, the mill benefits from reduced input costs and is able to grow.[146] But the effect of Pennsylvania's registration-jurisdiction law is that the national mining corporation is less likely to sell ore to the mill in Pennsylvania, causing higher costs for the mill by limiting its access to competitively priced out-of-state resources.[147] Far from "protecting locals from competition," Pennsylvania's law harms local businesses, and is therefore not discriminatory-in-effect.[148]

To put a bow on the issue, we will use the Court's analysis employed in *Granholm* and *Haliburton Oil*: if a State law "require[s] an out-of-state firm to 'become a resident in order to compete on equal terms'" with companies in-state, it is discriminatory-in-effect and violative of the DCC.[149] Here, if an out-of-state company *did* relocate its headquarters to within Pennsylvania's borders, no difference would be made in its ability to compete. In both instances,

---

in capital-intensive industries like mining, where large upfront investments in equipment and infrastructure are required. Larger mining corporations can leverage their scale to reduce costs and offer more competitive prices to customers like steel mills. *See* Will Kenton, *Economies of Scale: What Are They and How Are They Used?*, INVESTOPEDIA (Jan. 29, 2021) https://www.investopedia.com/terms/e/economiesofscale.asp. Vertical integration, another strategy employed by larger corporations, involves a company controlling multiple stages of the supply chain. For example, a mining corporation that also owns its own transportation and processing facilities can streamline its operations and reduce costs compared to smaller companies that rely on external providers for these services. *See* Adam Hayes, *Vertical Integration Explained: How It Works, With Types and Examples*, INVESTOPEDIA (last accessed Jan. 12, 2024) https://www.investopedia.com/terms/v/verticalintegration.asp. Synergies, which refer to the benefits that arise when two or more entities combine their resources and capabilities, can also contribute to cost advantages for larger corporations. For instance, a mining corporation with diverse operations across multiple regions can optimize its supply chain and reduce risks associated with local supply disruptions or market fluctuations. *See* The Investopedia Team, *Synergies: Concepts in Finance and Examples*, INVESTOPEDIA (Aug. 9, 2023) https://www.investopedia.com/terms/s/synergy.asp.

146. Sharpes, *supra* note 144 at 916–17.

147. *Id.*

148. Preis, *supra* note 103, at 140.

149. *Granholm*, 544 U.S. at 475 (quoting Haliburton Oil Well Cementing Co. v. Reily, 373 U.S. 64, 72 (1963)).

the company would be subject to the same burden of general personal jurisdiction. Therefore, registration-jurisdiction laws are not discriminatory-in-effect.

### B. *Pennsylvania has an Ethical Interest Under Pike because the State is Showing Solidarity with Litigants Across the Country*

As explained earlier, it is not enough that a State law merely does not discriminate against out-of-state commerce; the law must also pass the *Pike* balancing test.[150] Under this test, State laws that "regulat[e] even-handedly to effectuate a legitimate local public interest . . . will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits."[151] First, a "legitimate local public interest" must be identified; if there is no legitimate local public interest, the law fails at step one because "there is nothing to be weighed in the balance to sustain the law."[152] If an interest is identified, it is then weighed against the burdens imposed on interstate commerce, and if the interest's benefits are greater than the burdens, the law is upheld.[153] Justice Alito believes registration-jurisdiction laws fail both steps of the *Pike* test.[154] He is wrong, because Pennsylvania has an ethical interest in their registration-jurisdiction law, and because

150. Pike v. Bruce Church, 397 U.S. at 137, 142 (1970).

151.

> Where the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities.

*Id.* (citations omitted) (citing Huron Cement Co. v. Detroit, 362 U.S. 440, 443 (1960)).

152. Edgar v. MITE Corp., 457 U.S. 624, 644 (1982).

153. *Pike*, 397 U.S. at 142.

154. *Mallory*, 600 U.S. at 162–63 (Alito, J., concurring).

the nature of Pennsylvania's interest makes it unweighable under current Supreme Court precedent.

Justice Alito began by arguing that no legitimate local interest to Pennsylvania can be identified, and attempted to condense the interests of a State into two categories.[155] According to him, a State either has an interest: in "regulating activities conducted within its borders, which may include providing a forum to redress harms that occurred within the State," even if the parties to the suit are not residents;[156] or "in providing its residents with a convenient forum for redressing injuries inflicted by out-of-state actors."[157] According to Alito, for a State to have an interest in the suit, either the events in controversy must have occurred in the State or one of the parties to the suit must be a resident of the State.[158]

Justice Alito is correct that registration-jurisdiction statutes serve neither of these purposes. Robert Mallory is not a resident of Pennsylvania, so Pennsylvania has no interest in providing him a convenient forum for redressing injuries that occurred to him out-of-state.[159] And because Mallory's exposure to chemicals did not occur in Pennsylvania, there was no conduct within their borders that Pennsylvania may have an interest in regulating.[160] Because Justice Alito believes registration-jurisdiction statutes involve "vindicating the rights of non-residents harmed by out-of-state actors through conduct outside the State," he concluded that the law serves no interest to Pennsylvania.[161] What he misses with this argument, however, is that these are not the only two interests available to a State.

---

155. *Id.*

156. *Id.* (citing State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 422 (2003)).

157. *Mallory*, 600 U.S. at 162–63 (Alito, J., concurring) (citing Burger King Corp. v. Rudzewicz, 471 U.S. 462, 473 (1985)).

158. *Mallory*, 600 U.S. at 162–63 (Alito, J., concurring).

159. *Id.* at 122.

160. *Id.*

161. *Id.* at 161.

Although Justice Alito tries to characterize the State interest requirement under *Pike* as a simple, conflict-of-laws-analogous[162] connection, it is not nearly that clear; finding a local interest is, in reality, "[e]specially unclear."[163] The Court's methodology for determining what constitutes an interest under *Pike* has varied wildly, "sometimes look[ing] at putative or supposed State benefits, sometimes look[ing] at actual benefits, and sometimes [saying] that the courts should not second-guess the choices of lawmakers" at all.[164] Basically though, for a State to have an interest under *Pike*, the law must be a valid exercise of their police powers, such that it "protect[s] the lives, health, and property of their citizens, and . . . preserve[s] good order and public morals."[165] It is within this last that Pennsylvania's interest lies: in "preserv[ing] . . . public morals."[166]

The same year that *Mallory* came out, the Court also decided *National Pork Producers Council v. Ross*, a case that is particularly illustrative for our discussion of State morality legislation.[167] In 2018, California adopted Proposition 12, which banned the in-state sale of any pork

---

162. In conflict of laws analysis, State interests are generally bifurcated into two categories: (1) an interest in regulating the conduct that has occurred within their borders and (2) an interest in protecting resident domiciliaries from out of State suits. Here, Justice Alito has transplanted the first, and reworked the second to be "providing its residents with a convenient forum for redressing injuries inflicted by out-of-state actors." *See generally* Schultz v. Boy Scouts of America, Inc., 480 N.E.2d 679, 679 (N.Y. 1985); *Burger King Corp.*, 471 U.S. at 472 n.14.

163. Fox, *supra* note 73, at 188.

164. *Id.* at 188–89.

165. THOMAS M. COOLEY, THE GENERAL PRINCIPLES OF CONSTITUTIONAL LAW IN THE UNITED STATES OF AMERICA 79 (1898); Fox, *supra* note 73, at 177–78 ("At the very least, a State law that is tested under *Pike* must be legitimately concerned with health, safety, or public welfare and must somehow further at least one of those ends. Just what constitutes a legitimate health, safety, or public welfare concern, however, is somewhat murky, and there is considerable, largely unacknowledged, disagreement over how strongly related a law must be to the State's goal.").

166. Cooley, *supra* note 165, at 79.

167. Nat'l Pork Producers Council v. Ross, 598 U,S, 356, 356 (2023).

meat that came from pigs "confined in a cruel manner."[168] Out-of-state pork farmers were therefore presented with a choice: incur substantial costs by modifying their current pig cages to be compliant with California's law, or lose out on the California market entirely.[169] As would be expected, out-of-state pork suppliers immediately brought suit, arguing that California's law impermissibly burdened interstate commerce under the Dormant Commerce Clause.[170] They argued that the law failed the threshold inquiry under the *Pike* test because California could not State a local interest that was benefited by their law.[171] Although the pork farmers conceded that "safeguarding the welfare of domestic animals is a valid exercise of [the] police power, a law that attempts to address perceived harms to animals in *other* States is not."[172]

The Supreme Court rejected this argument. They sided with California and the animal rights groups who argued that an ethical interest existed for Californians, even when

---

168. CAL. HEALTH & SAFETY CODE § 25990(b)(2) (West 2018). The full text of California's code is:

> (b) A business owner or operator shall not knowingly engage in the sale within the State of any of the following: (1) Whole veal meat that the business owner or operator knows or should know is the meat of a covered animal who was confined in a cruel manner. (2) Whole pork meat that the business owner or operator knows or should know is the meat of a covered animal who was confined in a cruel manner, or is the meat of immediate offspring of a covered animal who was confined in a cruel manner. (3) Shell egg that the business owner or operator knows or should know is the product of a covered animal who was confined in a cruel manner. (4) Liquid eggs that the business owner or operator knows or should know are the product of a covered animal who was confined in a cruel manner.

*Id.*

169. *Nat'l Pork Producers Council*, 598 U.S. at 366–67. The modifications to pig farming necessary to come into compliance with Proposition 12 would "increase production costs [by] 9.2%." In addition, this law almost entirely harmed out-of-state entities, as California "imports almost all of the pork it consumes."

170. *Id.*

171. Brief for Petitioners at 40, Nat'l Pork Producers Council v. Ross, 598 U.S. 356 (2023) (No. 21-468).

172. *Id.* (emphasis added).

it concerned the welfare of animals in other States.[173] According to the petitioners, the State residents would receive a "hard-to-quantify benefit[ like] moral satisfaction, peace of mind, [or] social approval" by refusing to sell or eat pork that was raised in unethical conditions.[174] The Court agreed with this reasoning, and held that it was not the place of the courts to second-guess legislative decisions of a moral nature.[175] Recall that Justice Alito attempts to pigeonhole the State interest requirement for *Pike* into purely tangible, economic interests;[176] the Court's decision here shoots down

173. *Nat'l Pork Producers Council*, 598 U.S. at 356. Also illustrative on this topic is *Illinois Restaurant Association v. City of Chicago* from the Northern District of Illinois. In that case, Chicago had banned the sale of foie gras within the city's restaurants. Foie gras (French for "fatty liver") is a luxury food product made by force-feeding ducks or geese to fatten their livers, which were then spread on breads and consumed. It is a practice strongly condemned by animal rights groups, and in 2006 Chicago forbade the sale of foie gras entirely. Various restaurants and farmers brought suit, arguing *inter alia* that the ban failed the *Pike* balancing test because there was no local interest benefited by the law; Chicago countered by arguing that they had an interest in promoting the morals of the community. The District Court did not reach an actual weighing of the *Pike* test however, because it concluded that the *Pike* test need not have been conducted at all. Before the Circuit Court could review, Chicago repealed the ban. After the District Court's decision, one scholar foreshadowed the Court's opinion in *Pork Council* by arguing that "Chicago could have received a substantial local benefit from 'ensuring the ethical treatment of animals,'" even though those animals were not in the State. Ill. Rest. Ass'n v. City of Chicago, 492 F. Supp. 2d at 904 (N.D. Ill., 2008); CHICAGO, ILL. MUN. CODE § 7-39-001 (2006) (adopted Apr. 26, 2006), *repealed by* Chicago, Ill., Ordinance 2008-2041 (May 14, 2008); Joshua I. Grant, *Hell to the Sound of Trumpets: Why Chicago's Ban on Foie Gras Was Constitutional and What It Means for the Future of Animal Welfare Laws*, 2 STAN. J. ANIMAL L. & POL'Y 52, 96 (2009).

174. Petitioner Appendix at 75a, Nat'l Pork Producers v. Ross, 598 U.S. 356 (2023) (No. 21-468).

175. *Nat'l Pork Producers Council*, 598 U.S. at 382 ("How should we settle [the weighing of ethical benefits against economic harms]? The competing goods are incommensurable. Your guess is as good as ours. More accurately, your guess is *better* than ours. In a functioning democracy, policy choices like these usually belong to the people and their elected representatives. They are entitled to weigh the relevant 'political and economic' costs and benefits for themselves, and 'try novel social and economic experiments' if they wish.") (citing Moorman Mfg. Co. v. Bair, 437 U.S. 267, 279 (1978); New State Ice Co. v. Liebmann, 285 U.S. 262, 311 (1932))(Brandeis, J., dissenting)).

176. *See supra* p. 27.

that idea.[177] States can indeed ground their interests in intangible ethical considerations.[178]

Turning back to Pennsylvania's law, Pennsylvania's moral interest here is in *showing solidarity* with injured parties across the country—that is, in allowing plaintiffs to redress their injuries in a forum that they otherwise would not have had, even if those plaintiffs are not Pennsylvania residents. Solidarity originates from the Roman legal concept of *in solidum*,[179] and it involves giving support to an aggrieved party even when no reciprocal benefit is afforded to the person offering support.[180] For example, heterosexual individuals that support same-sex marriage do so not because they will benefit from the acceptance of gay marriage, but because they believe the LGBT community is suffering an injustice.[181] As Van Parijs put it, "[w]hen I help you out of solidarity, I do so because you are 'one of us,'

177. *Mallory*, 600 U.S. at 162–63 (Alito, J., concurring).

178. Other authors have also argued for the validity of ethical interests under the *Pike* test. A recent Harvard Law Review note argued that even though the DCC aims to maintain a uniform national market, there are compelling reasons nonetheless for States to enact laws that disrupt that national market, particularly when these laws address participation in practices deemed unethical by the State or its citizens. The author suggested that the judiciary should not simply dismiss State moral interests as irrelevant under the DCC but should consider whether a significant moral interest justifies the State's regulation. *See generally* Note, *The Dormant Commerce Clause and Moral Complicity in a National Marketplace*, 137 HARV. L. REV. 980 (2024).

179. J.E.S. Hayward, *Solidarity: The Social History of an Idea in Nineteenth Century France*, 4(2) INT'L REV. OF SOC. HIST. 261, 271–72 (1959). The Romans allowed a legal contractual obligation in which each signatory declared himself liable for the debts of all together.

180. Andrea Sangiovanni & Juri Viehoff, *Solidarity in Social and Political Philosophy*, in STAN. ENCYCLOPEDIA OF PHIL. (June 21, 2023), https://plato.stanford.edu/entries/solidarity/#NatuSoli.

181. AVERY KOLERS, A MORAL THEORY OF SOLIDARITY, 58 (2016) ("For instance, insofar as they are in solidarity, heterosexual persons who support the right of same-sex couples to marry do so not because they individually want same-sex marriages to be possible, but because the LGBTQ community treats that as an important goal.").

because 'I could have been you,' because, in this sense, I 'identify' with you."[182]

Pennsylvania's registration-jurisdiction statute embodies this conception of solidarity, because the Commonwealth is opening their courts to plaintiffs in other States—even when no benefit is afforded to Pennsylvania. If Robert Mallory had originally intended to bring suit in Virginia (Norfolk Southern's incorporation and headquarter State) but found that Virginia had a shockingly short statute of limitations for workplace injury suits, his suit would have been barred. Mallory would have been unable to redress his injuries. But Pennsylvania, by extending general personal jurisdiction over Norfolk Southern and providing Mallory a venue, shows solidarity with him by allowing his suit to proceed in their courts despite no connection to the events in controversy or the parties. It is the Robert Mallory's of the nation, those people who suffer needlessly from the actions of others, that are the most deserving of this judicial solidarity.[183] What interest (for the purposes of *Pike*) does Pennsylvania have in this? The same interest California had in *Pork Council*: "moral satisfaction, peace of mind, [or] social approval."[184]

---

182. Philippe Van Parijs, *Solidarity and the Just Society*, *in* THE VIRTUE OF SOLIDARITY (Andrea Sangiovanni & Juri Veihoff eds., 2024).

183. *See* JÓZEF TISCHNER, THE SPIRIT OF SOLIDARITY, 8–9 (Marek B. Zaleski & Benjamin Fiore trans., Harper & Row 1984) ("With whom, therefore, is our solidarity? It is, above all, with those who have been wounded by other people, with those who suffer pain that could be avoided—accidental, needless pain. This does not preclude solidarity with others, with all who suffer. However, the solidarity with those who suffer at the hands of others is particularly vital, strong, spontaneous."); *see also* KOLERS, *supra* note 181, at 123–24 ("In [showing solidarity against injustice] we are not only working to (teleologically) bring about the end of oppression; rather, we constitutively embody a nonoppressive alternative world—even if, as is likely, our joint efforts ultimately fail, in part or in whole. As Elizabeth Anderson suggests, social movements are 'experiments in living,' both in the sense that the movement itself can embody new ways of relating, and in the sense that the goal it seeks to bring about is no sure thing. While a more just society is a standing hope, the value of the practice is principally found in constituting a community of equals." (emphasis omitted)).

184. Petitioner Appendix, *supra* note 174, at 75a.

Solidarity as a State interest is not a new concept; on the contrary, "our federalism encompasses solidarity values."[185] As Justice Cardozo famously put it, "[t]he Constitution was framed . . . upon the theory that the peoples of the several States must sink or swim together, and that in the long run prosperity and salvation are in union and not division."[186] In fact, Justice Jackson wrote that the ultimate goal of the Dormant Commerce Clause is to "advance[] the *solidarity* and prosperity of this Nation."[187] Therefore, because "[a] State's self-interest can no longer be said to stop at its own borders," Pennsylvania's solidarity-interest with out-of-state residents is sufficient for the purposes of *Pike*.[188]

### C. *The Ethical Nature of Pennsylvania's Interest Makes it Unweighable Against the Economic Burdens, and Therefore Allows the Law to Survive*

Now that an interest to the State has been identified, the final step in the *Pike* analysis (and indeed the Dormant Commerce Clause analysis entirely), is to weigh the benefits of the law against the detriments to interstate commerce.[189]

---

185. Erin F. Delaney & Ruth Mason, *Solidarity Federalism*, 98 NOTRE DAME L. REV. 617, 623 (2022).

186. Baldwin v. G.A.F. Seelig, Inc., 294 U.S. 511, 523 (1935).

187. *H*.P. Hood & Sons, Inc. v. Du Mond, 336 U.S. 525, 535 (1949) (emphasis added). As an interesting aside, Justice Jackson is a hometown hero for the University at Buffalo School of Law, the law school of the author of this article. Before being nominated to the Supreme Court and writing such foundational opinions as *Wickard v. Filburn* and the *Youngstown* concurrence, Justice Jackson spent the majority of his career building a successful practice in Buffalo. After leaving a lasting impact on the legal and political community of Western New York, he went on to give the opening prosecutorial argument at the Nuremberg trials, served as the Solicitor General for the U.S., and eventually joined the Supreme Court. For those curious, *see generally* GAIL JARROW, ROBERT H. JACKSON: NEW DEAL LAWYER, SUPREME COURT JUSTICE, NUREMBERG PROSECUTOR (Calkins Creek 2008); Collin Makamson, *"The Grave Responsibility of Justice": Justice Robert H. Jackson's Opening Statement at Nuremberg*, THE NATIONAL WWII MUSEUM (Nov. 20, 2020), https://www.nationalww2museum.org/war/articles/robert-jackson-opening-statement-nuremberg.

188. Delaney, *supra* note 185, at 623.

189. *Pike*, 397 U.S. at 142.

The question to be asked is whether Pennsylvania's ethical solidarity-interest outweighs the burdens on commerce that registration-jurisdiction laws create.[190] Justice Alito is skeptical that "any local benefits of the State's assertion of jurisdiction in these circumstances could overcome the serious burdens on interstate commerce that [the law] imposes."[191]

The Court has once before touched on how being subjected to litigation can be a burden on interstate commerce. In *Bendix Autolite Corp. v. Midwesco Enterprises, Inc.*, Bendix Corp. (an Ohio company) wanted to sue Midwesco (an Illinois corporation) for improperly installing a boiler.[192] Bendix brought the suit 6 years after the installation, and because Ohio's statute of limitations was 4 years, the suit would have been barred—had it not been for an Ohio law that froze the statute of limitations.[193] Under Ohio's law, if an out-of-state entity had not designated an agent in Ohio for service of process, that entity had the statute of limitations tolled against them indefinitely.[194] The choice, for out-of-state corporations, was to either: appoint an in-state agent to receive process and indefinitely subject themselves to general personal jurisdiction, or have the statute of limitations be suspended against them in perpetuity.[195] Midwesco had not appointed an agent for service of process in Ohio, which meant the statute of limitations was frozen and Bendix's suit was allowed to proceed.[196] The case made its way to the Supreme Court, and the principle question was whether Ohio's law violated the

190. *Id.*

191. *Mallory*, 600 U.S. at 163 (Alito, J., concurring).

192. Bendix Autolite Corp. v. Midwesco Enterprises, Inc., 486 U.S. 888, 889–90 (1988).

193. *Id.* at 889.

194. *Id.*

195. *Id.* at 889–90.

196. *Id.* at 889–90.

Dormant Commerce Clause.[197] The Court held that it did, and invalidated the law.[198]

The Court stated that "[r]equiring a foreign corporation . . . to defend itself with reference to all transactions, including those in which it did not have the minimum contacts necessary for supporting personal jurisdiction, is a significant burden."[199] Justice Alito obviously agrees in his *Mallory* concurrence—and so does this Comment.[200] But for the purposes of *Pike*, it does not matter how much interstate commerce is burdened; the economic harms of registration-jurisdiction laws cannot be weighed against ethical benefits *at all*. The qualitative differences between ethical interests and economic interests are so fundamentally dissimilar that attempting to weigh the two is impossible.

This exact sentiment was stated in *Pork Council*.[201] The Court explained that asking a judge to weigh economic detriments against moral benefits is a "task no court is equipped to undertake," and analogized it to "being asked to decide 'whether a particular line is longer than a particular rock is heavy.'"[202] California's law was *precisely* the kind of

---

197. *Id.*

198. *Id.* at 894.

199. *Id.* at 893. Other cases have also held submitting to jurisdiction to be a burden. *See* Davis v. Farmers Co-operative Equity Co., 262 U.S. 312, 315–17 (1923) (the commerce burden from jurisdiction is "serious and unreasonable," "heavy," and "undu[e]"); Michigan Central R. Co. v. Mix, 278 U.S. 492, 495 (1929) (burden is "heavy"); Denver & Rio Grande Western R. Co. v. Terte, 284 U.S. 284, 287 (1932) (burden is "serious"); Atchison, T. & S. F. R. Co. v. Wells, 265 U.S. 101, 103 (1924) (jurisdiction "interfered unreasonably with interstate commerce").

200. *Mallory*, 600 U.S. at 162–63 (Alito, J., concurring); *supra* Part IV(a).

201. *Nat'l Pork Producers Council*, 598 U.S. at 382.

202. *Id.* (citing *Bendix Autolite Corp.*, 486 U.S. 897 (1988) (Scalia, J., concurring)). Justice Roberts dissented, with whom Justice Alito joined. Roberts believed that even if weighing the two interests is difficult, "sometimes there is no avoiding the need to weigh seemingly incommensurable values." *Nat'l Pork Producers Council*, 598 U.S. at 396 (citing Schneider v. State (Town of Irvington), 308 U. S. 147, 162 (1939) (weighing "the purpose to keep the streets clean and of good appearance" against the "the constitutional protection of the freedom of speech and press"); Winston v. Lee, 470 U. S. 753, 760 (1985) ("The reasonableness" under the Fourth Amendment "of surgical intrusions beneath the skin depends on a case-by-case approach, in which the individual's interests

law that the Court has said judges have a duty not to invalidate, explaining that "[t]he dormant Commerce Clause is not a roving license for federal courts to decide what activities are appropriate for State and local government to undertake, and what activities must be the province of private market competition."[203] Instead, these kinds of ethical decisions must be left to representatives in the State legislatures. The court stated:

> In a functioning democracy, policy choices like these usually belong to the people and their elected representatives. They are entitled to weigh the relevant "political and economic" costs and benefits themselves, and try "novel social and economic experiments" if they wish. Judges cannot displace the cost-benefit analyses embodied in democratically adopted legislation guided by nothing more than their own faith in "Mr. Herbert Spencer's Social Statics,"—or, for that matter, Mr. Wilson Pond's Pork Production Systems.[204]

---

in privacy and security are weighed against society's interests in conducting the procedure"); Addington v. Texas, 441 U. S. 418, 425 (1979) ("In considering what standard should govern in a civil commitment proceeding, we must assess both the extent of the individual's interest in not being involuntarily confined indefinitely and the State's interest in committing the emotionally disturbed under a particular standard of proof.")).

203. United Haulers Ass'n v. Oneida-Herkimer Solid Waste Mgmt. Auth., 550 U.S. 330, 343 (2007). *See also* Robin Feldman & Gideon Schor, *Lochner Revenant: The Dormant Commerce Clause & Extraterritoriality*, 16 N.Y.U. J.L. & LIBERTY 209, 210 (2022) (arguing that the DCC's extraterritoriality principle is turning the circuit courts into a new *Lochner* era, where "numerous State laws regulating health and safety will be invalidated on the thinnest of constitutional grounds").

204. *Nat'l Pork Producers Council*, 598 U.S. at 382 (citing *Moorman Mfg. Co.*, 437 U.S. at 279; *New State Ice Co.*, 285 U.S. at 311 (Brandeis, J., dissenting); Lochner v. New York, 198 U.S. 45, 75 (1905) (Holmes, J., dissenting)). The reference to "Mr. Herbert Spencer's Social Statics" is an allusion to the famous dissenting opinion by Justice Holmes in *Lochner v. New York*. In Lochner, the Supreme Court struck down a New York law that limited the working hours of bakers, holding that it violated the "liberty of contract" protected by the Fourteenth Amendment's Due Process Clause. The Court's decision was based on a laissez-faire economic philosophy that opposed government intervention in the marketplace, espoused by 19th-century British philosopher and sociologist Herbert Spencer, who advocated for individualism and free-market capitalism in his book "Social Statics." In his dissent, Justice Holmes criticized the majority's reasoning, arguing that the Constitution does not embody any particular economic theory. He famously wrote "The Fourteenth Amendment does not enact Mr. Herbert Spencer's Social Statics . . . [A] constitution is not intended to embody a particular economic theory, whether of paternalism and the organic

The same is true for Pennsylvania's law; it embodies the ethical solidarity-interest that they have decided to show with citizens of other States. The Commonwealth's legislature, as the embodiment of the will of the people,[205] has made a value judgment that providing a forum for out-of-state litigants is more important than the economic burdens registration-jurisdiction laws may impose. It is not the place of the courts to overturn such decisions simply because they disagree with the legislature's calculations.[206] Doing so would elevate economic considerations above all other considerations, and would disregard the States's fundamental right to govern the morals of their own communities.[207] Because this is a legislative decision that the Court has said judges should not second-guess, Pennsylvania's ethical-interest in its registration-jurisdiction law does more than "sustain the law" when

relation of the citizen to the State or of laissez faire." In *Pork Council*, Justice Gorsuch is drawing an analogy: judges should not substitute their own economic or political preferences for the decisions of democratically elected representatives. *Lochner*, 198 U.S. at 75 (Holmes, J., dissenting); *Nat'l Pork Producers Council*, 598 U.S. at 380. *But see* David N. Mayer, *The Myth of "Laissez-Faire Constitutionalism": Liberty of Contract During the Lochner Era*, 36 HASTINGS CONST. L.Q. 217, 224 (2009) ("Contrary to the orthodox, Holmesian view, judges did not read Herbert Spencer's Social Statics or any other laissez-faire writing into the Constitution. At most, what judges did in protecting liberty of contract was to apply something like a general presumption in favor of liberty, a presumption that could be rebutted by sufficient showing of reasonableness to justify a given governmental regulation.").

205.

> [W]ere I to assign to [the term 'republic'] a precise and definite idea, I would say that, purely and simply, it means a government, by its citizens, in mass, acting directly and personally, according to rules established by the majority: and that every other government is more or less republican in proportion as it has in its composition more or less of this ingredient of the direct action of the citizens. [It is foundational that republics] secure the duty of expressing the will of their constituents.

Letter from Thomas Jefferson to John Taylor (May 28, 1816), *reprinted in* [May 1816 to 18 January, 1817] 10 THE PAPERS OF THOMAS JEFFERSON, RETIREMENT SERIES 86–90 (J. Jefferson Looney ed., Princeton Univ. Press, 2013).

206. *Nat'l Pork Producers Council*, 598 U.S. at 381–82.

207. *Barnes*, 501 U.S. at 569.

weighed under *Pike*; it precludes weighing altogether, and therefore allows the law to survive.[208]

## IV. Subsequent Developments and Conclusion

Since the release of *Mallory*, only one court has ruled on the compatibility of registration-jurisdiction laws with the Dormant Commerce Clause.[209] In November 2023, the Southern District of Georgia held in *Sloan v. Burist* that Georgia's registration-jurisdiction law does not violate the DCC, and dismissed the objections brought by defendant Mayflower Transit LLC.[210] However, the court did not perform any of the DCC analyses that it should have; instead, the court simply sidestepped the issue and gave several alternative reasonings for dismissing the motions.[211] First, they held that because Alito's concurrence was not a binding authority, the court did not need to apply it.[212] Second, in the facts of the case before them, the motorcycle accident that gave rise to the suit *did* occur in Georgia, and so the case was "not 'wholly unconnected to the forum State.'"[213] Lastly, the court cited a perfunctory 1932 Supreme

208. *Edgar*, 457 U.S. at 644; *Nat'l Pork Producers Council*, 598 U.S. at 381 (citing *Bendix Autolite Corp.*, 486 U.S. at 897 (Scalia, J., concurring)).

209. Sloan v. Burist, No. 2:22-cv-00076-LGW-BWC, 2023 U.S. Dist. LEXIS 199056, at *5 (S.D. Ga., Nov. 6, 2023).

210. Georgia's registration-jurisdiction law is slightly different than Pennsylvania's. Pennsylvania's business registration statute explicitly provides that registering is equivalent to consent to general personal jurisdiction. Georgia's statute does not state this. Instead, the Georgia Supreme Court has interpreted Georgia's business registration law, in combination with Georgia's long arm statute, to be equal to consent to general personal jurisdiction. ("'Georgia's Business Corporation Code does not expressly notify out-of-state corporations that obtaining authorization to transact business in this State . . . subjects them to general jurisdiction in our courts,' but the [Georgia Supreme] Court's previous holdings do 'notify out-of-state corporations that their corporate registration will be treated as consent to general personal jurisdiction in Georgia.'") *Id.* at *14 (citing *Cooper Tire & Rubber Co.*, 863 S.E.2d at 90 (citing *Allstate Ins. Co. v. Klein*, 422 S.E.2d 863, 865 (Ga. 1992))).

211. Specifically, none of the tests explained by this article: facial discrimination, discriminatory-in-effect, or the *Pike* test. *Id.* at *16–21.

212. *Id.*

213. *Id.* at *18 (citing *Mallory*, 600 U.S. at 162 (Alito, J., concurring)).

Court case that held that the DCC was an insufficient reason to dismiss a suit over an out-of-state company.[214] No other court has taken up the issue left by Justice Alito in *Mallory*.[215]

For its part, Norfolk Southern has already filed new objections to Mallory's lawsuit following the Supreme Court's decision.[216] Parroting Justice Alito's concurrence,[217] Norfolk now argues that registration-jurisdiction laws are unconstitutional under the DCC because of the burdens on interstate commerce the laws create.[218] As evidenced by Norfolk's quick objections, this issue is very likely to come back before the Court. The ability to establish general personal jurisdiction is foundationally important to commercial litigation, and the chance to close off an avenue of proving such jurisdiction is irresistible for companies.[219] Already, Norfolk is sounding the alarm bell, urging the Pennsylvania court to rule on the issue of the DCC now "[b]efore Pennsylvania's courts are inundated with foreign litigation—much of which the Commonwealth will have no interest in."[220]

214. *Id.* at *19–21 (citing *Denver & R.G.W.R. Co. v. Terte*, 284 U.S. 284, 287 (1932)). The *Terte* Court did not conduct any analysis at all concerning the burden on commerce from registration-jurisdiction. All the Court did hold was that a company that was joined to the lawsuit—a company which had *not* registered to do business in the forum State—should not have been joined because of the burdens to the company from defending the lawsuit in a foreign State.

215. As of March 26, 2024.

216. *See* Motion for Leave to File Amended Preliminary Objections to Plaintiff's Complaint and Memorandum of Law in Support thereof, Mallory v. Norfolk Southern Ry., No. 170901961 (Pa. Phila. Cty. C.P. Oct. 18, 2023), Doc. Entry No. 86-23103786, at *6.

217. Alito practically invited Norfolk to make these new arguments, stating, "Presumably, Norfolk Southern can renew the [Dormant Commerce Clause] challenge on remand." *Mallory*, 600 U.S. at 150 (Alito, J., concurring).

218. Motion for Leave to File Amended Preliminary Objections to Plaintiff's Complaint and Memorandum of Law in Support thereof, *supra* note 216, at *8.

219. *See generally* Ichel, *supra* note 5, at 32–61.

220.Motion for Leave to File Amended Preliminary Objections to Plaintiff's Complaint and Memorandum of Law in Support thereof, *supra* note 216, at *8.

When this case does come back before the Court, I hope the Justices will keep several key things in mind: the Dormant Commerce Clause is meant to prevent State protectionism, not self-flagellation; State sovereignty requires that States have their laws judged on their own merits, and not against what other States have done or not done; registration-jurisdiction laws economically harm the enacting State, preventing review under the DCC; States may have an ethical interest in enacting their registration-jurisdiction law; and the nature of that interest precludes the weighing of it against the economic burdens.

Failing to consider these factors risks undermining the fundamental principles of federalism, State autonomy, and the right of States to prioritize the moral welfare of their communities. But acknowledging the validity of Pennsylvania's registration-jurisdiction law would mean reaffirming the States' independent role in our constitutional system, and ensuring that the voices of the people, as expressed through their elected representatives, are not silenced by an overreaching judiciary.