**APPENDICES**

1a

## APPENDIX A

## UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

NATIONAL PORK PRODUCERS COUNCIL; AMERICAN FARM BUREAU FEDERATION,

*Plaintiffs-Appellants,*

v.

KAREN ROSS, in her official capacity as Secretary of the California Department of Food & Agriculture; TOMÁS J. ARAGÓN, in his official capacity as Director of the California Department of Public Health; ROB BONTA,* in his official capacity as Attorney General of California,

*Defendants-Appellees,*

and

THE HUMANE SOCIETY OF THE UNITED STATES; ANIMAL LEGAL DEFENSE FUND; ANIMAL EQUALITY; THE HUMANE LEAGUE; FARM SANCTUARY; COMPASSION IN WORLD FARMING USA; COMPASSION OVER KILLING,

*Intervenor-Defendants-Appellees.*

No. 20-55631

D.C. No. 3:19-cv-02324-W-AHG

---

* Rob Bonta is substituted for his predecessor, Xavier Becerra, as Attorney General of California; and Tomás J. Aragón is substituted for his predecessor, Sonia Angell, as Director of the California Department of Public Health. Fed. R. App. 43(c)(2).

2a

Appeal from the United States District Court
for the Southern District of California
Thomas J. Whelan, District Judge, Presiding

Argued and Submitted April 14, 2021
Pasadena, California

Filed July 28, 2021

Before: Milan D. Smith, Jr. and Sandra S. Ikuta, Circuit Judges, and John E. Steele,** District Judge.

Opinion by Judge Ikuta

## OPINION

IKUTA, Circuit Judge:

In 2018, California voters passed Proposition 12, which bans the sale of whole pork meat (no matter where produced) from animals confined in a manner inconsistent with California standards. The National Pork Producers Council and the American Farm Bureau Federation (collectively referred to as "the Council") filed an action for declaratory and injunctive relief on the ground that Proposition 12 violates the dormant Commerce Clause. Under our precedent, a state law violates the dormant Commerce Clause only in narrow circumstances. Because the complaint here does not plausibly allege that such narrow circumstances apply to Proposition 12, we conclude that the district court did not err in dismissing the Council's complaint for failure to state a claim.

---

** The Honorable John E. Steele, United States District Judge for the Middle District of Florida, sitting by designation.

3a

## I

Proposition 12 amended sections 25990–25993 of the California Health and Safety Code to "prevent animal cruelty by phasing out extreme methods of farm animal confinement, which also threaten the health and safety of California consumers, and increase the risk of foodborne illness and associated negative fiscal impacts on the State of California." Cal. Prop. 12, § 2 (2018). The relevant portion of Proposition 12 precludes a business owner or operator from knowingly engaging in a sale within California of various products, including the sale of "[w]hole pork meat" unless the meat was produced in compliance with specified sow confinement restrictions. Cal. Prop. 12, § 3(b) (2018); *see* Cal. Health & Safety Code §§ 25990(b)(1)–(2), 25991(e)(1)–(4).

On December 5, 2019, the Council filed a complaint against California officials (referred to collectively as the California defendants) challenging Proposition 12 and seeking, among other things, a declaratory judgment that Proposition 12 is unconstitutional under the dormant Commerce Clause, and a permanent injunction enjoining the implementation and enforcement of Proposition 12.[1] The complaint alleged that Proposition 12 violates the dormant Commerce Clause in two ways. First, it impermissibly regulates extraterritorial conduct outside of California's borders by compelling out-of-state producers to change their operations to meet California standards. Second, it imposes excessive burdens on interstate

---

[1] On January 9, 2020, several nonprofit organizations were granted intervention as defendants (referred to collectively as the intervenors).

4a

commerce without advancing any legitimate local interest because it significantly increases operation costs, but is not justified by any animal-welfare interest and "has no connection to human health or foodborne illness."

On April 27, 2020, the district court granted the California defendants' motion to dismiss and the intervenors' motion for judgment on the pleadings. The district court held that Proposition 12 did not impermissibly control extraterritorial conduct and did not impose a substantial burden on interstate commerce. Although the district court had granted the Council leave to amend, the Council instead moved for entry of judgment, and the district court dismissed the complaint with prejudice. The Council timely appealed.

We have jurisdiction under 28 U.S.C. § 1291, and review de novo the district court's order granting a motion to dismiss for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure, *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009), and the district court's order granting a motion for judgment on the pleadings under Rule 12(c) of the Federal Rules of Civil Procedure, *Lyon v. Chase Bank USA, N.A.*, 656 F.3d 877, 883 (9th Cir. 2011). At the motion to dismiss stage, we take as true the facts plausibly alleged in the complaint. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009).

## II

The Constitution grants Congress the power to "regulate Commerce . . . among the several States." U.S. Const. art. I., § 8, cl. 3. The Commerce Clause does not, on its face, impose any restrictions on state law in the absence of congressional action. Nonetheless, "[f]rom early in its history," the Supreme Court

5a

has interpreted the Commerce Clause as implicitly preempting state laws that regulate commerce in a manner that is disruptive to economic activities in the nation as a whole. *See South Dakota v. Wayfair, Inc.*, 138 S. Ct. 2080, 2090 (2018); *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 200–01 (1824). In its most recent consideration of the scope of the dormant Commerce Clause, the Court stated there are "two primary principles that mark the boundaries of a State's authority to regulate interstate commerce." *Wayfair*, 138 S. Ct. at 2090. "First, state regulations may not discriminate against interstate commerce; and second, States may not impose undue burdens on interstate commerce." *Id.* at 2091. Although "State laws that discriminate against interstate commerce face 'a virtually *per se* rule of invalidity,'" *id.* (quoting *Granholm v. Heald*, 544 U.S. 460, 476 (2005)), "State laws that 'regulat[e] evenhandedly to effectuate a legitimate local public interest . . . will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits,'" *id.* (quoting *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970)). *Wayfair* indicated that these two principles are "subject to exceptions and variations." *Id.* Among other things, *Wayfair* cited an earlier decision holding that a state law may violate the dormant Commerce Clause when it has extraterritorial effects. *Id.* (citing *Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573 (1986)).

The Council does not argue that the complaint has plausibly pleaded that Proposition 12 discriminates against out-of-state interests, and so has foregone the first principle recognized in *Wayfair*. Instead, it argues the second *Wayfair* principle, that Proposition 12 places an undue burden on interstate commerce, and the *Brown-Forman* variation, that Proposition 12 has

6a

an impermissible extraterritorial effect. At the motion to dismiss stage, we must determine whether the Council has plausibly pleaded a dormant Commerce Clause claim under its theories.

## A

The Council's primary argument is that the complaint adequately alleges that Proposition 12 has an impermissible extraterritorial effect.

## 1

In making this claim, the Council relies primarily on three historical Supreme Court cases that first delineated when a state law violates the dormant Commerce Clause by impermissibly regulating prices in other states. *See Baldwin v. G.A.F. Seelig, Inc.*, 294 U.S. 511 (1935); *Brown-Forman*, 476 U.S. at 579; *Healy v. Beer Inst., Inc.*, 491 U.S. 324 (1989). In *Baldwin*, the Court struck down a New York law that required a dealer selling milk in New York to pay an out-of-state milk producer the minimum price set by New York law in order to equalize the price of milk from in-state and out-of-state producers. 294 U.S. at 518–19. As the Court later explained, the New York law in *Baldwin* was "aimed solely at interstate commerce attempting to affect and regulate the price to be paid for milk in a sister state, [which] amounted in effect to a tariff barrier set up against milk imported into the enacting state." *Milk Control Bd. of Pa. v. Eisenberg Farm Prods.*, 306 U.S. 346, 353 (1939). In *Brown-Forman*, the Court invalidated a New York law requiring every liquor distiller or producer selling to wholesalers within the state to affirm that the prices charged for every bottle or case of liquor were no higher than the lowest price at which the same product would be sold in any other State during the

7a

month covered by the particular affirmation. 476 U.S. at 576. The Court concluded that the price-affirmation law was invalid because it had the "practical effect" of requiring "producers or consumers in other States to surrender whatever competitive advantages they may possess," by forcing them to sell their product in-state for a set price. 476 U.S. at 580, 583. Last, *Healy* struck down a Connecticut price-affirmation statute that, in interaction with the laws in the neighboring states, had the practical effect of controlling prices in those states, causing an anti-competitive result. 491 U.S. at 337–39.

These cases used broad language. For instance, *Healy* states that the extraterritoriality principle "protects against inconsistent legislation arising from the projection of one state regulatory regime into the jurisdiction of another State," and "precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the [regulating] State." *Id.* at 336–37 (cleaned up). But such broad statements are "so sweeping that most commentators have assumed that these cases cannot mean what they appear to say." Katherine Florey, *State Courts, State Territory, State Power: Reflections on the Extraterritoriality Principle in Choice of Law and Legislation*, 84 Notre Dame L. Rev. 1057, 1090 (2009); *see also* Jack L. Goldsmith & Alan O. Sykes, *The Internet and the Dormant Commerce Clause*, 110 Yale L.J. 785, 806 (2001) (suggesting that the Court's "overbroad extraterritoriality dicta" can be ignored). The extraterritoriality test cannot strictly bar laws that have extraterritorial effect, scholars argue, because "[i]n practice, states exert regulatory control over each other all the time." Gillian E. Metzger, *Congress, Article IV, and Interstate Relations*, 120 Harv. L. Rev. 1468, 1521

8a

(2007) (noting, for example, "Delaware's corporate law, which has de facto nationwide application").

And indeed, the Supreme Court has given force to these scholarly observations, as it has indicated that the extraterritoriality principle in *Baldwin*, *Brown-Forman*, and *Healy* should be interpreted narrowly as applying only to state laws that are "price control or price affirmation statutes," *Pharm. Rsch. & Mfrs. of Am. v. Walsh*, 538 U.S. 644, 669 (2003). We have adopted this interpretation and held that the extra-territoriality principle is "not applicable to a statute that does not dictate the price of a product and does not tie the price of its in-state products to out-of-state prices." *Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris* (*Eleveurs*), 729 F.3d 937, 951 (9th Cir. 2013) (cleaned up). The Tenth Circuit has followed suit. *See Energy & Env't Legal Inst. v. Epel*, 793 F.3d 1169, 1172 (10th Cir. 2015) (Gorsuch, J.) (holding that the "three essential characteristics" that mark *Baldwin*, *Brown-Forman*, and *Healy* are that the state law at issue (1) was a price-control statute, (2) linked prices paid in-state with those paid out-of-state, or (3) discriminated against interstate commerce).

Under this narrow interpretation, *Baldwin, Brown-Forman,* and *Healy* do not support the Council's arguments. It is undisputed that Proposition 12 is neither a price-control nor price-affirmation statute, as it neither dictates the price of pork products nor ties the price of pork products sold in California to out-of-state prices. *See Eleveurs*, 729 F.3d at 951. And the Council has not claimed that Proposition 12 discriminates against interstate commerce.

9a

2

The Council nevertheless asks us to hold that Proposition 12's extraterritorial impact violates the underlying principles of the dormant Commerce Clause in light of the unique nature of the pork industry. According to the allegations of the complaint, the pork industry is highly interconnected. A single hog is butchered into many different cuts which would normally be sold throughout the country. In order to ensure they are not barred from selling their pork products into California, all the producers and the end-of-chain supplier will require assurances that the cuts and pork products come from hogs confined in a manner compliant with Proposition 12. This means that all pork suppliers will either produce hogs in compliance with California specifications or incur the additional cost of segregating their products. As a practical matter, given the interconnected nature of the nationwide pork industry, all or most hog farmers will be forced to comply with California requirements. The cost of compliance with Proposition 12's requirements is high, and would mostly fall on non-California transactions, because 87% of the pork produced in the country is consumed outside California. Therefore, the complaint alleges, Proposition 12 violates the dormant Commerce Clause given its substantial extraterritorial impact as a practical matter.

The Council's theory is not barred by *Walsh*'s characterization of the *Baldwin* line of cases as being limited to price-control and price-affirmation statutes. We have recognized that the Supreme Court has not expressly narrowed the extraterritoriality principle to only price-control and price-affirmation cases, and we have recognized a "broad[er] understanding of the ex-

10a

traterritoriality principle" may apply outside this context, *Ward v. United Airlines, Inc.*, 986 F.3d 1234, 1240–41 (9th Cir. 2021). But even though the Council's complaint plausibly alleges that Proposition 12 has an indirect "practical effect" on how pork is produced and sold outside California, we have rejected the argument that such upstream effects violate the dormant Commerce Clause.

Under our precedent, state laws that regulate only conduct in the state, including the sale of products in the state, do not have impermissible extraterritorial effects. *See Rosenblatt v. City of Santa Monica*, 940 F.3d 439, 445 (9th Cir. 2019). A state law may require out-of-state producers to meet burdensome requirements in order to sell their products in the state without violating the dormant Commerce Clause. *See Rocky Mountain Farmers Union v. Corey* (*Rocky II*), 913 F.3d 940, 952 (9th Cir. 2019); *Eleveurs*, 729 F.3d at 942. Even if a state's requirements have significant upstream effects outside of the state, and even if the burden of the law falls primarily on citizens of other states, the requirements do not impose *impermissible* extraterritorial effects. *See Eleveurs*, 729 F.3d at 942, 948–53. A state law is not impermissibly extraterritorial unless it directly regulates conduct that is wholly out of state. *Rosenblatt*, 940 F.3d at 442, 445 (holding that a city ordinance restricting vacation rentals in a California city did not violate the dormant Commerce Clause even though 95% of vacation rentals in the city involved an out-of-state party, because the ordinance penalized only conduct within the city).

The Council's allegations regarding the upstream effects of Proposition 12 are most closely analogous to those we rejected in *Eleveurs*. 729 F.3d at 942. In *Eleveurs*, plaintiffs argued that a law banning the sale in

11a

California of certain duck products made by force feeding the duck violated the extraterritoriality principle because it controlled commerce outside of California. According to the plaintiffs, the law targeted out-of-state entities and compelled out-of-state farmers to comply with California's standards. *Id.* at 949. We held that the plaintiff's argument failed because the state law applied to "both California entities and out-of-state entities," and the law merely precluded "a more profitable method of operation—force feeding birds for the purpose of enlarging its liver—rather than affecting the interstate flow of goods." *Id.*

The requirements under Proposition 12 likewise apply to both California entities and out-of-state entities, and merely impose a higher cost on production, rather than affect interstate commerce. Therefore, even though Proposition 12 has some upstream effects, California is "free to regulate commerce and contracts within [its] boundaries with the goal of influencing the out-of-state choices of market participants." *Rocky Mountain Farmers Union v. Corey* (*Rocky I*), 730 F.3d 1070, 1103 (9th Cir. 2013); *see also Eleveurs*, 729 F.3d at 948–49 ("A statute is not invalid merely because it affects in some way the flow of commerce between the States." (cleaned up)).

For the same reason, California's promulgation of regulations to implement Proposition 12, which, as a practical matter, may result in the imposition of complex compliance requirements on out-of-state farmers, does not have an impermissible extraterritorial effect. Proposition 12 required the California Department of Food and Agriculture (CDFA) to publish implementing regulations. Cal. Prop. 12 § 6 (2018); Cal. Health & Safety Code § 25993(a). Under the proposed regula-

12a

tions,[2] an out-of-state producer must hold a valid California certification in order to sell its products in California. CDFA, Proposed Regulations at 30 (May 28, 2021) (proposing to adopt California Code of Regulations Title 3, § 1322.1(b)). And to obtain the certification, a producer must "allow access by the certifying agent, and/or authorized representatives of the Department, to . . . houses where covered animals and covered animal products may be kept . . . ." *Id.* at 40 (proposing to adopt § 1326.1(c)). Once certified, pork-producing operations must also comply with the recordkeeping requirements. *Id.* at 40–41 (proposing to adopt § 1326.2).

Even assuming these proposed regulations become effective, "[a]ppropriate certificates may be exacted" from out-of-state producers for in-state health and safety purposes without violating the dormant Commerce Clause. *Baldwin*, 294 U.S. at 524. Indeed, in *Rocky I*, we held that a California law did not impermissibly regulate extraterritorial conduct even though it required out-of-state fuel distributors "to seek regulatory approval in California before undertaking a transaction also in California" and imposed reporting requirements on out-of-state producers. 730

---

[2] The complaint alleges that Proposition 12 charges California agencies with promulgating regulations to implement the proposition. After oral argument was held in this appeal, CDFA published proposed regulations implementing Proposition 12. The proposed regulations are located at http://www.cdfa.ca.gov/ahfss/pdfs/regulations/AnimalConfinementText1stNotice_05252021.pdf. *See also* 22-Z Cal. Regulatory Notice Reg. 594 (May 28, 2021).

Although the CDFA has published the proposed regulations, it has not yet promulgated a final version.

13a

F.3d at 1104. Therefore, the proposed regulations' requirement that out-of-state producers seek a California certification in order to access the California market is not an impermissible extraterritorial effect.

**3**

The Council relies on a handful of cases in which we determined that a state law had an impermissibly extraterritorial effect because it directly regulated transactions conducted entirely out of state. In *Daniels Sharpsmart, Inc. v. Smith*, we struck down a California law requiring a company that sent medical waste out of state for disposal to use only a medical waste facility that met California requirements. 889 F.3d 608, 612–13, 615–16 (9th Cir. 2018). The transaction at issue in that case (the purchase of medical waste disposal services from out-of-state treatment facilities in Kentucky and Indiana) occurred wholly outside California. *Id.*; *see also Sam Francis Found. v. Christies, Inc.*, 784 F.3d 1320, 1323 (9th Cir. 2015) (en banc) (striking down a law that required California residents to pay five percent of their sales price in out-of-state art sale transactions to the artists). And in *National Collegiate Athletic Ass'n v. Miller*, we held that a statute had extraterritorial effect because it was "directed at interstate commerce and only interstate commerce," given that "it regulates only interstate organizations, *i.e.*, national collegiate athletic associations which have member institutions in 40 or more states." 10 F.3d 633, 638 (9th Cir. 1993); *see also Legato Vapors, LLC v. Cook*, 847 F.3d 825, 833 (7th Cir. 2017) (invalidating a state law which "govern[ed] the services and commercial relationships between out-of-state manufacturers and their employees and contractors"). Citing *Daniels Sharpsmart* and *Miller*, the Council argues that Proposition 12 necessarily

14a

controls transactions conducted among out-of-state pork producers, processors, distributors and sellers of pork products, because it compels them to ensure that pork products that may eventually be sold in California are traceable to hogs that have been confined in a manner that meets California requirements.

The Council's reliance on the *Daniel Sharpsmart* line of cases is misplaced, because Proposition 12 does not regulate transactions conducted wholly outside of California. Rather, Proposition 12 directly regulates only the in-state sales of "products that are brought into or are otherwise within the borders of [California]." *Daniels Sharpsmart*, 889 F.3d at 615. Nor does Proposition 12 directly regulate interstate commerce; rather, by its terms, it is aimed at the in-state sales of pork, regardless whether it is produced by in-state or out-of-state farmers. We have not extended the *Daniel Sharpsmart* line of cases to a situation where the state law had an upstream effect only as a practical matter on out-of-state transactions. As explained above, we have rejected similar arguments relying on this theory. *See Eleveurs*, 729 F.3d at 942; *see also Epel*, 793 F.3d at 1174 (holding that the Supreme Court has rejected the "grand[] proposition" that the *Baldwin* line of cases "require [courts] to declare automatically unconstitutional any state regulation with the practical effect of controlling conduct beyond the boundaries of the State" (cleaned up)).

### 4

Finally, the Council argues that Proposition 12 violates the dormant Commerce Clause because it poses a risk of inconsistent regulations that undermines a "compelling need for national uniformity in regulation." *See Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 299 n.12 (1997). While *Wayfair* did not overrule this

15a

principle (so it may be deemed a "variation" of the two primary principles of the dormant Commerce Clause), *see* 138 S. Ct. at 2090–91, we have held that only "state regulation of activities that are inherently national or require a uniform system of regulation" violates the dormant Commerce Clause, *Rosenblatt*, 940 F.3d at 452 (quoting *Chinatown Neighborhood Ass'n v. Harris*, 794 F.3d 1136, 1146 (9th Cir. 2015)); *see also Ward*, 986 F.3d at 1242 (holding that to prevail on the contention that it will inevitably be subjected to a patchwork of inconsistent regulations, a party must show that the challenged state law "regulates in an area that requires national uniformity"). Absent such a need for uniform national regulation, a state regulation does not violate the dormant Commerce Clause even where there is a threat of conflicting regulations. *See Chinatown*, 794 F.3d at 1146–47. The "small number" of cases dealing with "activities that are inherently national or require a uniform system of regulation" generally concern taxation or interstate transportation. *See Rosenblatt*, 940 F.3d at 452 (quoting *Chinatown*, 794 F.3d at 1146). Unless the state law at issue interferes with a system of national concern, it does not violate the dormant Commerce Clause. Thus in *Eleveurs*, we held that "Plaintiffs have not demonstrated that a nationally uniform foie gras production method is required to produce foie gras." 729 F.3d at 950. Likewise, neither optometrists nor gas producers demonstrated a need for national uniformity in their economic activities. *See Nat'l Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144, 1148 (9th Cir. 2012); *Rocky I*, 730 F.3d at 1104–05.

The complaint here fails to make a plausible allegation that the pork production industry is of such national concern that it is analogous to taxation or interstate travel, where uniform rules are crucial. *See Gen.*

16a

*Motors Corp.*, 519 U.S. at 298 n.12. Although the complaint plausibly alleges that Proposition 12 will have an impact on a national industry, we have already held that such impacts do not render the state law impermissibly extraterritorial. Accordingly, the complaint fails to state a claim on this basis.[3]

### B

We now turn to the Council's second argument that Proposition 12 imposes a burden on interstate commerce which is "clearly excessive in relation to the putative local benefits" and thus violates the dormant Commerce Clause. *Pike*, 397 U.S. at 142. The Supreme Court has not provided a clear methodology for comparing in-state benefits and out-of-state burdens, but at the motion to dismiss stage a complaint must, at a minimum, "plausibly allege the ordinance places a 'significant' burden on interstate commerce." *Rosenblatt*, 940 F.3d at 452.

---

[3] In any event, the Council has not shown that a threat of "*conflicting*, legitimate legislation[s]" by other jurisdictions is "both actual and imminent." *Rocky I*, 730 F.3d at 1104–05 (emphasis added) (quoting *S.D. Myers v. City of San Francisco*, 253 F.3d 461, 469–70 (9th Cir. 2001)). According to an amicus brief, "Massachusetts, Maine, Michigan, and Rhode Island have enacted animal-confinement laws similar" or "nearly identical" to California's current confinement rules. The Council points to Ohio's regulations, *see* Ohio Admin. Code 901:12-8-02(G)(4), (5), but while they differ in approach from Proposition 12, compliance with both sets of regulations is possible. In short, while it is plausible that other states will implement laws regulating pork meat production, the referenced laws demonstrate that the Council has not stated a plausible claim that the various regulations will be conflicting.

17a

We have held that a statute imposes such a significant burden only in rare cases. "[M]ost statutes that impose a substantial burden on interstate commerce do so because they are discriminatory." *Eleveurs*, 729 F.3d at 952. As indicated above, the Council does not allege that Proposition 12 has a discriminatory effect. "[L]ess typically, statutes impose significant burdens on interstate commerce as a consequence of inconsistent regulation of activities that are inherently national or require a uniform system of regulation." *Id.* (cleaned up). As we have explained, the complaint here does not plausibly allege that Proposition 12 falls into the narrow class of state laws that meets this requirement.

For dormant Commerce Clause purposes, laws that increase compliance costs, without more, do not constitute a significant burden on interstate commerce. "The mere fact that a firm engaged in interstate commerce will face increased costs as a result of complying with state regulations does not, on its own, suffice to establish a substantial burden on interstate commerce." *Ward*, 986 F.3d at 1241–42. Nor does a non-discriminatory regulation that "precludes a preferred, more profitable method of operating in a retail market" place a significant burden on interstate commerce. *Nat'l Ass'n of Optometrists*, 682 F.3d at 1154–55. Finally, even a state law that imposes heavy burdens on some out-of-state sellers does not place an impermissible burden on interstate commerce. In *Exxon Corp. v. Governor of Maryland*, the Supreme Court held that even where the burdens imposed by a Maryland law would cause some refiners to stop selling in Maryland, and would deprive consumers of some special services, the law did not impermissibly burden interstate commerce. 437 U.S. 117, 127 (1978). While some refiners "may choose to withdraw entirely from

18a

the Maryland market," it was reasonable to assume that they would "be promptly replaced by other interstate refiners." *Id.* "[I]nterstate commerce is not subjected to an impermissible burden simply because an otherwise valid regulation causes some business to shift from one interstate supplier to another." *Id.*; *see also Rosenblatt*, 940 F.3d at 453 (holding that a city ordinance did not violate the dormant Commerce Clause merely because it shifted tourism dollars from vacation rentals to hotels).

In this case, the crux of the allegations supporting the Council's substantial burden claim is that the cost of compliance with Proposition 12 makes pork production more expensive nationwide. The complaint alleges that, to comply with Proposition 12's requirements, "producers will have to expend millions in upfront capital costs and adopt a more labor-intensive method of production." The cost of compliance would result in a 9.2 percent increase in production cost, which would be passed on to consumers, and producers that do not comply with Proposition 12 would lose business with packers that are supplying the California market.

Taking the plausible allegations in the complaint as true and making all reasonable inferences in the Council's favor, we conclude that these alleged cost increases to market participants and customers do not qualify as a substantial burden to interstate commerce for purposes of the dormant Commerce Clause. "[A] loss to [some specific market participants] does not, without more, suggest that the [state] statute impedes substantially the free flow of commerce from state to state." *Burlington N. R.R. Co. v. Dep't of Pub. Serv. Regul.*, 763 F.2d 1106, 1114 (9th Cir. 1985) (cleaned up). Even if producers will need to adopt a

19a

more costly method of production to comply with Proposition 12, such increased costs do not constitute a substantial burden on interstate commerce. *Eleveurs*, 729 F.3d at 952. Nor do higher costs to consumers qualify as a substantial burden on interstate commerce. *See Nat'l Ass'n of Optometrists*, 682 F.3d at 1152. "[I]f the statute caused the loss [to some sellers] and therefore caused harm to the consuming public, such a result would be related to the wisdom of the statute, not to a burden on interstate commerce." *Id.* (citing *Exxon*, 437 U.S. at 127–28)).

Accordingly, the district court did not err in holding that, as a matter of law, the Council failed to state a claim that Proposition 12 imposes a substantial burden on interstate commerce. Because the complaint failed to make a plausible allegation to that effect, the district court was correct in concluding that it "need not determine whether the benefits of the challenged law are illusory." *See Rosenblatt*, 940 F.3d at 452.

## III

While the dormant Commerce Clause is not yet a dead letter, it is moving in that direction. Indeed, some justices have criticized dormant Commerce Clause jurisprudence as being "unmoored from any constitutional text" and resulting in "policy-laden judgments that [courts] are ill equipped and arguably unauthorized to make," *Camps Newfound / Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564, 610, 618 (1997) (Thomas, J., dissenting). Under our precedent, unless a state law facially discriminates against out-of-state activities, directly regulates transactions that are conducted entirely out of state, substantially impedes the flow of interstate commerce, or interferes with a national regime, a plaintiff's complaint is unlikely to survive a motion to dismiss. Even though the Council has

20a

plausibly alleged that Proposition 12 will have dramatic upstream effects and require pervasive changes to the pork production industry nationwide, it has not stated a violation of the dormant Commerce Clause under our existing precedent.

**AFFIRMED.**

21a

## APPENDIX B

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

NATIONAL PORK PRODUCERS COUNCIL &
AMERICAN FARM BUREAU FEDERATION,

Plaintiffs,

v.

KAREN ROSS, in her official capacity as Secretary
of the California Department of Food and Agricul-
ture, SONIA ANGELL, in her official capacity as Di-
rector of the California Department of Public Health,
and XAVIER BECERRA, in his official capacity as
Attorney General of California,

Defendants,

THE HUMAN SOCIETY OF THE UNITED
STATES; ANIMAL LEGAL DEFENSE FUND; ANI-
MAL EQUALITY; THE HUMAN LEAGUE; FARM
SANCTUARY; COMPASSION IN WORLD FARM-
ING USD; and COMPASSION OVER KILLING

Defendant-Intervenors.

Case No.: 19-cv-02324 W (AHG)

Filed 04/27/20

## ORDER:
## (1) GRANTING DEFENDANTS' MOTION TO
## DISMISS [DOC. 18]; AND

## (2) GRANTING DEFENDANT-INTERVENORS'
## MOTION FOR JUDGMENT ON THE PLEAD-
## INGS [DOC. 19.]

22a

Pending before this Court are Defendants' motion to dismiss and Defendant-Intervenors' motion for judgment on the pleadings. The Court decides the matters without oral argument pursuant to Civil Local Rule 7.1(d)(1). For the reasons that follow, the Court **GRANTS** Defendants' motion to dismiss [Doc. 18] and Defendant-Intervenors' motion for judgment on the pleadings [Doc. 19] with leave to amend.

## I.    BACKGROUND

National Pork Producers Council & American Farm Bureau Federation (collectively "Plaintiffs") file this case against Defendants Karen Ross, in her official capacity as Secretary of California Department of Food and Agriculture, Sonia Angell, in her official capacity as Director of the California Department of Public Health, and Xavier Becerra, in his official capacity as Attorney General of California (collectively "Defendants"). Plaintiffs file this action for declaratory and injunctive relief and allege California's Proposition 12 violates the Commerce Clause of the U.S. Constitution.

### A.    Procedural Background

This case was initially filed on December 5, 2019. (*Compl.* [Doc. 1].) On January 9, 2020 Defendant-Intervenors' motion to intervene was granted. [Doc. 17.] On January 10, 2020, Defendants filed a motion to dismiss for failure to state a claim. [Doc. 18.] That same day Defendant-Intervenors filed a motion for judgment on the pleadings. [Doc. 19.] Plaintiffs filed an opposition to these motions on February 28, 2020. [Doc. 26.]

On January 29, 2020, California Egg Farmers filed a supplemental Amicus Brief in support of the

23a

Defendants' motion to dismiss and Defendant-Inter-venors' motion for judgment on the pleadings. [Doc. 25.] A supplemental Amicus Brief in support of the Plaintiffs was filed on March 10, 2020, by the States of Alabama, Arkansas, Indiana, Iowa, Kansas, Louisiana, Missouri, Nebraska, Ohio, Oklahoma, South Carolina, South Dakota, Texas, Utah, and West Virginia. [Doc. 32.]

## B. <u>Factual Background</u>

Plaintiffs allege Proposition 12 violates the Commerce Clause of the U.S. Constitution because it reaches extraterritorially and imposes substantial burdens on interstate commerce. (*Compl.* ¶ 31.) Plaintiffs seek a declaration that Proposition 12 violates the Commerce Clause and seek an injunction against the enforcement of Proposition 12's requirements concerning pork. (*Id.* ¶¶ 31, 32.)

Proposition 12 is a ballot initiative passed in November 2018 that amended the California Health and Safety Code. (*Id.* ¶ 14.) Proposition 12 regulates the production of veal, pork, and eggs. (*Id.* ¶ 33.) Importantly for this case, it forbids the sale in California of pork meat from the hogs born of sows (female pigs) not housed in conformity with the law's requirements. (*Id.* ¶ 21.) The law "requires that a sow cannot be confined in such a way that it cannot lie down, stand up, fully extend its limbs, or turn around without touching the side of its stall or another animal." (*Id.* ¶ 23.) This requirement, known as the stand up-turn around requirement, "requires producers to house their sows together in a group, referred to as `group housing.'" (*Id.* ¶¶ 23, 24.) In contrast, individual stalls each hold one sow and do not allow sows to turn around. (*Id.* ¶ 24.) Thus, Proposition 12 bans the use of individual

24a

stalls that do not meet the stand up-turn around space requirements. (*Id*. ¶25.)

The U.S. Department of Agriculture's Census of Agriculture for 2017 estimates nearly 65,000 farms nationwide sold hogs for a market value of $26 billion. (*Id*. ¶ 3.) Pigs are raised throughout the country with a majority of production concentrated in the Midwest and North Carolina. (*Id*. ¶ 5.) A small percentage of farms are structured as "wean to finish," meaning the pigs are held at the same farm throughout the production process. (*Id*. ¶ 145.) However, a majority of the production of pork comes from a segmented production chain. (*Id*. ¶ 138.) Sows give birth to piglets on sow-specific farms where the piglets are raised for about three weeks before they are weaned at approximately 10 pounds. (*Id*. ¶ 8.) After weaning, piglets are generally moved to nursery farms for about six to eight weeks. (*Id*. ¶¶ 142, 143.) At six to eight weeks piglets have grown into "feeder pigs" and are "transferred again to separate finishing facilities." (*Id*. ¶ 143.) Pigs spend 16 to 17 weeks at the finishing farms before being sent to markets and packers where the pigs are slaughtered. (*Id*. ¶ 144.) Packers slaughter and butcher the market hogs and sell the pork to wholesalers or retailers, which then distribute to consumers. (*Id*. ¶ 124.) Pork product from one hog is cut into primals, or different cuts of meat, and then shipped to different end users across the country. (*Id*. ¶ 96.)

Beginning December 31, 2021, Proposition 12 requires each sow whose offspring is intended to be sold into California be allotted at least 24 square feet in the group pen. (*Id*. ¶ 26.) However, Proposition 12 has an immediate impact on what producers must do now given the time needed for building and production

25a

changes. (*Id*.) Plaintiffs allege these requirements are "inconsistent with industry practice and standards, generations of producer experience, scientific research, and standards set by other states." (*Id*. ¶ 28.) Plaintiffs also allege these requirements impose costly mandates on producers that interfere with commerce among the states and impose costs on pork producers that will ultimately increase costs for American consumers. (*Id*.)

In California, there are an estimated 8,000 breeding sows and "1,500 out of California's 8,000 sows are used in commercial breeding" which produces around 30,000 offspring a year. (*Id*. ¶¶ 16, 17.) However, "California's pork consumption makes up about 13 percent of the national market." (*Id*. ¶ 20.) As a result, California's in-state sow breeding does not supply the demand of pork consumption in the state. (*Id*.) Thus, the offspring of approximately "673,000 sows is required to satisfy California consumers' demand for pork meat annually." (*Id*.)

Plaintiffs claim that by imposing these requirements on an industry that is national in scope, Proposition 12 unconstitutionally interferes with the functioning of a $26 billion a year interstate industry. (*Id*. ¶ 303.) In addition, Plaintiffs claim that compliance with Proposition 12 will require new and less efficient methods of animal husbandry that will increase operating, staff training and veterinary costs. (*Id*. ¶ 322.) As a result, Plaintiffs allege producers may be forced to comply with Proposition 12 standards even if most of their product is not bound for California. (*Id*. ¶¶ 339, 347.)

26a

## II. LEGAL STANDARD

The Court must dismiss a cause of action for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the complaint. See Parks Sch. of Bus., Inc. v. Symington, 51 F.3d 1480, 1484 (9th Cir. 1995). A complaint may be dismissed as a matter of law either for lack of a cognizable legal theory or for insufficient facts under a cognizable theory. Balisteri v. Pacifica Police Dep't., 901 F.2d 696, 699 (9th Cir. 1990). In ruling on the motion, a court must "accept all material allegations of fact as true and construe the complaint in a light most favorable to the non-moving party." Vasquez v. L.A. Cnty., 487 F.3d 1246, 1249 (9th Cir. 2007).

A complaint must contain "a short plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The Supreme Court has interpreted this rule to mean that "[f]actual allegations must be enough to raise a right to relief above the speculative level." Bell Atl. Corp. v. Twombly, 550 U.S. 554, 555 (2007). The allegations in the complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 570).

Leave to amend should be freely granted when justice so requires. See Fed. R. Civ. P. 15(a). However, where an amendment would be futile, a district court may dismiss a pleading without leave. Chubb Custom Ins. Co. v. Space Sys./Loral, Inc., 710 F.3d 946, 956 (9th Cir. 2013).

A motion for judgment on the pleadings may be brought "[a]fter the pleadings are closed—but early

27a

enough not to delay trial[.]" Fed. R. Civ. P. 12(c). "Analysis under Rule 12(c) is substantially identical to analysis under Rule 12(b)(6) because, under both rules, a court must determine whether the facts alleged in the complaint, taken as true, entitle plaintiff to a legal remedy." <u>Chavez v. United States</u>, 683 F.3d 1102, 1108 (9th Cir. 2012).

### III. <span style="font-variant:small-caps">Discussion</span>

Plaintiffs allege Proposition 12 violates the dormant Commerce Clause. The Commerce Clause authorizes Congress to "regulate commerce with foreign Nations, and among the several States...." U.S. Const., art. I, § 8, cl. 3. "The Commerce Clause has accordingly been interpreted by this Court not only as an authorization for congressional action, but also, even in the absence of a conflicting federal statute, as a restriction on permissible state regulation." <u>Hughes v. Oklahoma</u>, 441 U.S. 322, 326 (1979). "This limitation on state power has come to be known as the dormant Commerce Clause." <u>Nat'l Ass'n of Optometrists & Opticians v. Harris</u>, 682 F.3d 1144, 1147 (9th Cir. 2012).

The Supreme Court has adopted a two tiered approach in determining whether a law violates the dormant Commerce Clause. <u>Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.</u>, 476 U.S. 573, 578-79 (1986). First, a law that (1) "discriminate[s] against interstate commerce" or (2) "directly regulate[es] extra-territorial conduct" is "generally struck down without further inquiry." <u>Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris</u>, 729 F.3d 937, 948-49 (9th Cir. 2013) (quoting <u>Brown</u>, 476 U.S. at 579). Second, a law that (3) "regulate[s] even-handedly to effectuate a legitimate local public interest, and [where] its effects on interstate commerce are

28a

only incidental, [] will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefit." <u>Pike v. Bruce Church, Inc.</u>, 397 U.S. 137, 142 (1970). Thus, "[i]f a legitimate local purpose is found, the question becomes one of degree." Id. "[T]he extent of the burden that will be tolerated will of course depend on the nature of the local interest involved and whether it could be promoted as well with a lesser impact on interstate activities." <u>Id.</u>

//

## A.  <u>Extraterritorial Effect</u>

Plaintiffs argue Proposition 12 violates the extraterritorial principle because it regulates wholly out-of-state conduct. (*Compl.* 47:7-8.) Any "statute that directly controls commerce occurring wholly outside the boundaries of a State exceeds the inherent limits of the enacting State's authority and is invalid regardless of whether the statute's extraterritorial reach was intended by the legislature." <u>Healy v. Beer Institute, Inc.</u>, 491 U.S. 324, 336 (1989). However, "[a] statute is not invalid merely because it affects in some way the flow of commerce between the states." <u>Eleveurs</u>, 729 F.3d at 948-49. Even when a statute "has significant extraterritorial effects it passes Commerce Clause muster when those effects result from the regulation of in-state conduct." <u>Chinatown Neighborhood Ass'n v. Harris</u>, 794 F.3d 1136, 1145 (9th Cir. 2015). "The critical inquiry is whether the practical effect of the regulation is to control the conduct beyond the boundaries of the State." <u>Healy</u>, 491 U.S. at 336 (quoting <u>Brown</u>, 476 U.S. at 579).

29a

A statute that applies both to California entities and out-of-state entities does not target wholly extraterritorial activity. See Eleveurs, 729 F.3d at 949. In Eleveurs, the statute at issue "applie[d] both to California entities and out-of-state entities and preclude[d] the sale within California of products produced by force feeding birds." Id. Because the statute precluded sales within California of products produced by force feeding birds regardless of where the force feeding occurred, the statute did not directly target out-of-state entities. See id. The court in Eleveurs reasoned that the economic impact did not "depend on *where* the items were produced, but rather *how* they were produced." Id. at 948. In other words, the statute was not directed solely at out-of-state producers because it applied to both in-state and out-of-state producers. See id. at 949.

Similarly here, Proposition 12 applies both to California entities and out-of-state entities. (*Compl.* ¶ 292.) Proposition 12 precludes the sale within California of products produced by hogs not raised in conformity with the requirements of Proposition 12, regardless of where the hogs are raised. It therefore does not regulate wholly out-of-state conduct. "[I]n-state and out-of-state" hog farmers "are burdened in exactly the same way-all are effectively prevented from" raising hogs in violation of Proposition 12 if they wish to sell their products to California. See Hass v. Oregon State Bar, 883 F.2d 1453, 1462 (9th Cir. 1989); see also Rocky Mountain Farmers Union v. Corey, 913 F.3d 940, 952 (9th Cir. 2019) (explaining that "subjecting both in and out-of-jurisdiction entities to the same regulatory scheme to make sure that out-of-state jurisdiction entities are subject to consistent [] standards is a traditional use of the State's police power").

30a

Plaintiffs argue Proposition 12 reaches extraterritorially because it will "impose California's . . . housing requirements on other states and their producers" and "farms developing some or all of their product primarily for sale outside California will likely be required to meet Proposition 12" regulations. (*See Compl.* ¶¶ 31, 301.) However, such arguments of disproportionate impact are ineffective in an extraterritorial effect analysis. Even when a statute "has significant extraterritorial effects it passes Commerce Clause muster when . . . those effects result from the regulation of in-state conduct." <u>Chinatown</u>, 794 F.3d at 1145. Further, California may seek to influence which hog products are sold in-state and create incentives for less harmful farming practices. <u>See</u> <u>Rocky Mountain Farmers Union</u>, 913 F.3d at 952. Although Proposition 12's regulations may consequentially touch out of state farmers, "[t]he Commerce Clause … does not treat regulations that have upstream effects on how sellers who sell to California buyers produce their goods as being necessarily extraterritorial." <u>Id.</u> (citing <u>Minnesota v. Clover Leaf Creamery Co.</u>, 449 U.S. 456, 472 (1981)).

Generally, a statute violates the extraterritorial principle when it is "directed at interstate commerce and only interstate commerce." <u>See</u> <u>National Collegiate Athletic Ass'n v. Miller</u>, 10 F.3d 633, 638 (9th Cir. 1993). In <u>NCAA</u>, the statute only regulated the NCAA-an inherently interstate organization. <u>Id.</u> In order to avoid liability under the statute, the NCAA needed to apply Nevada's procedures throughout the entire country. <u>Id.</u> at 639. This type of extraterritorial effect is forbidden by the commerce clause because it "could control the regulation of the integrity of a product in interstate commerce that occurs wholly outside Nevada's borders." <u>Id.</u>

31a

In contrast, Proposition 12 is not directed at interstate commerce and only interstate commerce. See id. at 638. Unlike the Nevada statute, Proposition 12 does not call for uniform procedures and practices throughout the entire country. Only those out-of-state producers who sell directly to California need to follow the regulations that Proposition 12 details. In addition, although a majority of production might take place outside of California, California contains "approximately 8,000 sows" of which "1,500 of those are in commercial production." (*Compl.* ¶ 292.) Proposition 12 applies to these California producers just the same as out-of-state producers.

Thus, Proposition 12 does not regulate extraterritorially because it does not target solely interstate commerce and it regulates in-state and out-of-state conduct equally. Although there are upstream effects on out-of-state producers, those effects are a result of regulating in-state conduct. The motions challenging the sufficiency of Plaintiffs' allegations supporting the unconstitutional regulation claim are accordingly **GRANTED** and Plaintiffs' first claim for relief is denied without prejudice. If Plaintiffs elect to file an amended extraterritorial claim they will need to allege facts that demonstrate Proposition 12 regulates conduct wholly outside of California.

## B. <u>Substantial Burden on Interstate Commerce</u>

In their second claim for relief, Plaintiffs allege that Proposition 12 places excessive burdens on interstate commerce. (*Compl.* ¶ 465.) The second tier of the dormant Commerce Clause analysis focuses on statutes that "regulate[] even-handedly to effectuate a legitimate local public interest." <u>Pike</u>, 397 U.S. at 142. These laws "will be upheld unless the burden imposed

32a

on such commerce is clearly excessive in relation to the putative local benefit." Id. "[U]nder Pike, a plaintiff must first show that the statute imposes a substantial burden before the court will 'determine whether the benefits of the challenged laws are illusory.'" Eleveurs, 729 F.3d at 951-52 (quoting Optometrists, 682 F.3d at 1155).

"[M]ost statutes that impose a substantial burden on interstate commerce do so because they are discriminatory" or attempt to regulate extraterritorially. See Eleveurs, 729 F.3d at 952. Plaintiffs do not raise a discriminatory argument, and as we concluded above, their extraterritorial argument fails. However, the Ninth Circuit has found a small number of cases violate the dormant Commerce Clause because they "generally result from inconsistent regulation of activities that are inherently national or require a uniform system of regulation." Optometrists, 682 F.3d at 1148; Chinatown, 794 F.3d at 1146; Eleveurs, 729 F.3d at 952.

"Where [a] regulation does not regulate activities that inherently require a uniform system of regulation and does not otherwise impair the free flow of materials and products across state borders, there is not a significant burden on interstate commerce." Optometrists, 682 F.3d at 1154-55. In Optometrists, the plaintiffs challenged a California law that "prohibited opticians and optical companies from offering prescription eyewear at the same location in which eye examinations are provided." Id. at 1146. The plaintiffs wanted opticians to be able to offer similar one-stop shops as optometrists and ophthalmologists could offer. Id. at 1151. They argued the law imposed a significant burden because the restriction of one-stop shops resulted in a transfer of market share income from

33a

out-of-state to in-state eyewear sellers. Id. at 1150. However, the court found the plaintiffs failed to raise an argument regarding a burden on interstate commerce because the plaintiffs did not produce evidence that the law interfered with the flow of eyewear into California and the court concluded the activities did not require a uniform system of regulation. Id. at 1155; see also NCAA, 10 F.3d at 639 (finding a Nevada statute unconstitutional because its extraterritorial reach created a uniform system of application of enforcement proceedings.)

Plaintiffs make two arguments in support of their claim that Proposition 12 imposes a substantial burden on interstate commerce. First, Plaintiffs claim Proposition 12 substantially interferes with the interstate commerce of pork. (*Compl.* 56:6-7.) Plaintiffs allege that if a cut of pork is sold in California, the entire pig must be raised in accordance with Proposition 12 requirements. (*Id.* ¶ 346.) This means producers will be required to conform to Proposition 12's standards even for cuts of pork bound for other states where there is no consumer demand for Proposition 12 pork. (*Id.* ¶ 347.) However, while Proposition 12 might result in barriers to the production of pork, there are no barriers to the flow of pork across state lines. See Optometrists, 682 F.3d at 1155. Further, unlike the statute in NCAA, the fact that some Proposition 12 compliant pork might reach states other than California does not mean Proposition 12 has the effect of requiring a uniform system of regulation. While Proposition 12 will require "many producers" to remodel their farms, (*Compl.* ¶ 231), Plaintiffs have not alleged that Proposition 12 will require a uniform system of regulation.

34a

Plaintiffs' second argument in support of their claim that Proposition 12 imposes a substantial burden on interstate commerce is that compliance with Proposition 12 will result in substantial costs on out-of-state producers. (*Compl.* 51:3.) They allege producers will incur direct costs from required renovations and indirect costs from new and less efficient methods of animal husbandry. (*Id.* ¶¶ 310, 322.) "Supreme Court precedent establishes that there is not a significant burden on interstate commerce merely because a non-discriminatory regulation precludes a preferred, more profitable method of operating." Optometrists, 682 F.3d at 1154; see also Exxon Corp. v. Governor of Maryland, 437 U.S. 117 (1978). This is because the Commerce Clause "protects the interstate market, not particular interstate firms, from prohibitive or burdensome regulations." Exxon, 473 U.S. at 127-28. Although Proposition 12's regulations may burden pork producers and result in a less efficient mode of operation, there is no burden on interstate commerce merely because it is less profitable than a preferred method of operation.

In support of their argument that Proposition 12 will impose substantial costs on producers, Plaintiffs claim the pork industry will consolidate into larger farms and smaller farms will cease operations as a consequence of increased costs. *(Compl.* ¶ 341.) However, "interstate commerce is not subjected to an impermissible burden simply because an otherwise valid regulation causes some business to shift from one [] supplier to another." Exxon, 437 U.S. at 127. While pork producers and consumers might be injured economically, "that argument relates to the wisdom of the statute, not its burden on commerce." See id. at 128. The fact that changes to the physical farms and oper-

35a

ations might impose financial burdens on the hog producers is not enough to establish a substantial burden on interstate commerce.

Thus, Plaintiffs have failed to demonstrate that there is a substantial burden on interstate commerce. As such, the Court need not determine whether the benefits of the challenged law are illusory. The motions challenging the sufficiency of Plaintiffs' substantial burden on interstate commerce claim for relief are **GRANTED** and the second claim for relief is dismissed with leave to amend.

## IV. CONCLUSION & ORDER

For the foregoing reasons, the court **GRANTS** Defendants' motion to dismiss [Doc. 18] and Defendant-Intervenors' motion for judgment on the pleadings [Doc. 19] with leave to amend.

Plaintiffs shall have 14 days to file an amended pleading, if any, to cure the defects detailed above.

**IT IS SO ORDERED.**

Dated: April 27, 2020

_/s/ Thomas J. Whelan_
Hon. Thomas J. Whelan
United States District
Judge

36a

**APPENDIX C**

# United States District Court
## SOUTHERN DISTRICT OF CALIFORNIA

National Pork Producers Council;
American Farm Bureau Federation

**Plaintiff,**

**V.**

(See Attached)

**Defendant.**

**Civil Action No.** <u>19cv2324-W-AHG</u>

JUDGMENT IN A CIVIL CASE

IT IS HEREBY ORDERED AND ADJUDGED:

The Court hereby enters judgment dismissing Plaintiffs' Complaint with prejudice.

**Date:** <u>6/16/20</u>        **CLERK OF COURT**
**JOHN MORRILL, Clerk of Court**

By: s/ <u>J. Taylor            </u>
                    J. Taylor, Deputy

\*   \*   \*

# APPENDIX D

## PROPOSITION 12

This initiative measure is submitted to the people in accordance with the provisions of Section 8 of Article II of the California Constitution.

This initiative measure amends and adds sections to the Health and Safety Code; therefore, existing provisions proposed to be deleted are printed in ~~strikeout type~~ and new provisions proposed to be added are printed in *italic type* to indicate that they are new.

## PROPOSED LAW

The people of the State of California do enact as follows:

SECTION 1.  This act shall be known, and may be cited, as the Prevention of Cruelty to Farm Animals Act.

SEC. 2.  The purpose of this act is to prevent animal cruelty by phasing out extreme methods of farm animal confinement, which also threaten the health and safety of California consumers, and increase the risk of foodborne illness and associated negative fiscal impacts on the State of California.

SEC. 3.  Section 25990 of the Health and Safety Code is amended to read:

25990.  PROHIBITIONS.  In addition to other applicable provisions of law~~,~~*:*

*(a)* ~~a person~~ *A farm owner or operator within the state* shall not ~~tether or confine~~ *knowingly cause* any covered animal*; to be confined in a cruel manner.* ~~on a farm, for all or the majority of any day, in a manner that prevents such animal from:~~

38a

(a) ~~Lying down, standing up, and fully extending his or her limbs; and~~

(b) ~~Turning around freely.~~

*(b) A business owner or operator shall not knowingly engage in the sale within the state of any of the following:*

> *(1) Whole veal meat that the business owner or operator knows or should know is the meat of a covered animal who was confined in a cruel manner.*
>
> *(2) Whole pork meat that the business owner or operator knows or should know is the meat of a covered animal who was confined in a cruel manner, or is the meat of immediate offspring of a covered animal who was confined in a cruel manner.*
>
> *(3) Shell egg that the business owner or operator knows or should know is the product of a covered animal who was confined in a cruel manner.*
>
> *(4) Liquid eggs that the business owner or operator knows or should know are the product of a covered animal who was confined in a cruel manner.*

SEC. 4.  Section 25991 of the Health and Safety Code is amended to read:

> 25991. DEFINITIONS.  For the purposes of this chapter, the following terms have the following meanings:

*(a) "Breeding pig" means any female pig of the porcine species kept for the purpose of commercial breeding who is six months or older or pregnant.*

*(b) "Business owner or operator" means any person who owns or controls the operations of a business.*

*(c) "Cage-free housing system" means an indoor or outdoor controlled environment for egg-laying hens within which hens are free to roam unrestricted; are provided enrichments that allow them to exhibit natural behaviors, including, at a minimum, scratch areas, perches, nest boxes, and dust bathing areas; and within which farm employees can provide care while standing within the hens' usable floorspace. Cage-free housing systems include, to the extent they comply with the requirements of this subdivision, the following:*

*(1) Multitiered aviaries, in which hens have access to multiple elevated platforms that provide hens with usable floorspace both on top of and underneath the platforms.*

*(2) Partially slatted systems, in which hens have access to elevated flat platforms under which manure drops through the flooring to a pit or litter removal belt below.*

*(3) Single-level all-litter floor systems bedded with litter, in which hens have limited or no access to elevated flat platforms.*

40a

*(4) Any future systems that comply with the requirements of this subdivision.*

~~(a)~~*(d)* "Calf raised for veal" means any calf of the bovine species kept for the purpose of producing the food product described as veal.

*(e) "Confined in a cruel manner" means any one of the following acts:*

*(1) Confining a covered animal in a manner that prevents the animal from lying down, standing up, fully extending the animal's limbs, or turning around freely.*

*(2) After December 31, 2019, confining a calf raised for veal with less than 43 square feet of usable floorspace per calf.*

*(3) After December 31, 2021, confining a breeding pig with less than 24 square feet of usable floorspace per pig.*

*(4) After December 31, 2019, confining an egg-laying hen with less than 144 square inches of usable floorspace per hen.*

*(5) After December 31, 2021, confining an egg-laying hen with less than the amount of usable floorspace per hen required by the 2017 edition of the United Egg Producers' Animal Husbandry Guidelines for U.S. Egg-Laying Flocks: Guidelines for Cage-Free Housing or in an enclosure other than a cage-free housing system.*

~~(b)~~*(f)* "Covered animal" means any ~~pig during pregnancy~~, calf raised for veal, *breeding pig,* or egg-laying hen who is kept on a farm.

(c)(g) "Egg-laying hen" means any female domesticated chicken, turkey, duck, goose, or ~~guinea fowl~~ *guineafowl* kept for the purpose of egg production.

(d)(h) "Enclosure" means ~~any cage, crate, or other~~ *a* structure ~~(including what is commonly described as a "gestation crate" for pigs; a "veal crate" for calves; or a "battery cage" for egg laying hens)~~ used to confine a covered animal *or animals*.

(e)(i) "Farm" means the land, building, support facilities, and other equipment that are wholly or partially used for the commercial production of animals or animal products used for food or fiber; and does not include live animal markets~~.~~*, establishments at which mandatory inspection is provided under the Federal Meat Inspection Act (21 U.S.C. Sec. 601 et seq.), or official plants at which mandatory inspection is maintained under the federal Egg Products Inspection Act (21 U.S.C. Sec. 1031 et seq.).*

*(j) "Farm owner or operator" means any person who owns or controls the operations of a farm.*

(f)(k) "Fully extending ~~his or her~~ *the animal's* limbs" means fully extending all limbs without touching the side of an enclosure, ~~including, in the case of egg laying hens, fully spreading both wings without touching the side of an enclosure or other egg laying hens~~ *or another animal*.

*(l) "Liquid eggs" means* eggs *of an egg-laying hen broken from the shells, intended for human food, with the yolks and whites in their*

*natural proportions, or with the yolks and whites separated, mixed, or mixed and strained. Liquid eggs do not include combination food products, including pancake mixes, cake mixes, cookies, pizzas, cookie dough, ice cream, or similar processed or prepared food products, that are comprised of more than liquid eggs, sugar, salt, water, seasoning, coloring, flavoring, preservatives, stabilizers, and similar food additives.*

(g)*(m) "Person" means any individual, firm, partnership, joint venture, association, limited liability company, corporation, estate, trust, receiver, or syndicate.*

(h) "Pig during pregnancy" means any pregnant pig of the porcine species kept for the primary purpose of breeding. *(n) "Pork meat" means meat, as defined in Section 900 of Title 3 of the California Code of Regulations as of August 2017, of a pig of the porcine species, intended for use as human food.*

*(o) "Sale" means a commercial sale by a business that sells any item covered by this chapter, but does not include any sale undertaken at an establishment at which mandatory inspection is provided under the Federal Meat Inspection Act (21 U.S.C. Sec. 601 et seq.), or any sale undertaken at an official plant at which mandatory inspection is maintained under the federal Egg Products Inspection Act (21 U.S.C. Sec. 1031 et seq.). For purposes of this section, a sale shall be deemed to occur at the location where the buyer takes physical possession of an item covered by Section 25990.*

43a

*(p) "Shell egg" means a whole egg of an egg-laying hen in its shell form, intended for use as human food.*

~~(i)~~*(q)* "Turning around freely" means turning in a complete circle without any impediment, including a tether, and without touching the side of an enclosure *or another animal.*

*(r) "Uncooked" means requiring cooking prior to human consumption.*

*(s) "Usable floorspace" means the total square footage of floorspace provided to each covered animal, as calculated by dividing the total square footage of floorspace provided to the animals in an enclosure by the number of animals in that enclosure. In the case of egg-laying hens, usable floorspace shall include both groundspace and elevated level flat platforms upon which hens can roost, but shall not include perches or ramps.*

*(t) "Veal meat" means meat, as defined in Section 900 of Title 3 of the California Code of Regulations as of August 2017, of a calf raised for veal intended for use as human food.*

*(u) "Whole pork meat" means any uncooked cut of pork, including bacon, ham, chop, ribs, riblet, loin, shank, leg, roast, brisket, steak, sirloin, or cutlet, that is comprised entirely of pork meat, except for seasoning, curing agents, coloring, flavoring, preservatives, and similar meat additives. Whole pork meat does not include combination food products, including soups, sandwiches, pizzas, hotdogs, or similar processed or prepared food products, that are comprised of more than pork meat, seasoning,*

44a

*curing agents, coloring, flavoring, preservatives, and similar meat additives.*

*(v) "Whole veal meat" means any uncooked cut of veal, including chop, ribs, riblet, loin, shank, leg, roast, brisket, steak, sirloin, or cutlet, that is comprised entirely of veal meat, except for seasoning, curing agents, coloring, flavoring, preservatives, and similar meat additives. Whole veal meat does not include combination food products, including soups, sandwiches, pizzas, hotdogs, or similar processed or prepared food products, that are comprised of more than veal meat, seasoning, curing agents, coloring, flavoring, preservatives, and similar meat additives.*

SEC. 5.  Section 25992 of the Health and Safety Code is amended to read:

25992.  EXCEPTIONS.  This chapter shall not apply:

(a)  During ~~scientific or agricultural~~ *medical* research.

(b)  During examination, testing, individual treatment, or operation for veterinary purposes.

(c)  During transportation.

(d)  During rodeo exhibitions, state or county fair exhibitions, 4-H programs, and similar exhibitions.

(e)  During the slaughter of a covered animal in accordance with the provisions of Chapter 6 (commencing with Section 19501) of Part 3 of Division 9 of the Food and Agricultural Code, relating to humane methods of slaughter, and other applicable law and regulations.

45a

*(f)* To a *breeding* pig during the ~~seven-day~~ *five-day* period prior to the *breeding* pig's expected date of giving birth, *and any day that the breeding pig is nursing piglets.*

*(g) During temporary periods for animal husbandry purposes for no more than six hours in any 24-hour period, and no more than 24 hours total in any 30-day period.*

SEC. 6.  Section 25993 of the Health and Safety Code is amended to read:

25993.  ENFORCEMENT. *(a) The Department of Food and Agriculture and the State Department of Public Health shall jointly promulgate rules and regulations for the implementation of this act by September 1, 2019.*

*(b)* Any person who violates any of the provisions of this chapter is guilty of a misdemeanor, and upon conviction thereof shall be punished by a fine not to exceed one thousand dollars ($1,000) or by imprisonment in the county jail for a period not to exceed 180 days or by both such fine and imprisonment. *In addition, a violation of subdivision (b) of Section 25990 constitutes unfair competition, as defined in Section 17200 of the Business and Professions Code, and is punishable as prescribed in Chapter 5 (commencing with Section 17200) of Part 2 of Division 7 of the Business and Professions Code.*

*(c) The provisions of this chapter relating to cruel confinement of covered animals and sale of products shall supersede any conflicting regulations, including conflicting regulations in Chapter 6 (commencing with Section 40601) of*

46a

*Subdivision 6 of Division 2 of Title 22 of the California Code of Regulations.*

SEC. 7.  Section 25993.1 is added to the Health and Safety Code, to read:

*25993.1.  It shall be a defense to any action to enforce subdivision (b) of Section 25990 that a business owner or operator relied in good faith upon a written certification by the supplier that the whole veal meat, whole pork meat, shell egg, or liquid eggs at issue was not derived from a covered animal who was confined in a cruel manner, or from the immediate offspring of a breeding pig who was confined in a cruel manner.*

SEC. 8.  This act shall be amended only by a statute approved by a vote of four-fifths of the members of both houses of the Legislature. Any amendment of this act shall be consistent with and further the purposes of this act.

SEC. 9.  If any provision of this act, or the application thereof to any person or circumstances, is held invalid or unconstitutional, that invalidity or unconstitutionality shall not affect other provisions or applications of this act that can be given effect without the invalid or unconstitutional provision or application, and to this end the provisions of this act are severable.

47a

## APPENDIX E

## TITLE 3. FOOD AND AGRICULTURE

## PROPOSED REGULATIONS – ANIMAL CONFINEMENT

**NOTICE IS HEREBY GIVEN** that the Department of Food and Agriculture (Department) is proposing to take the action described in the Informative Digest. A public hearing is not scheduled for this proposal. A public hearing will be held if any interested person, or his or her duly authorized representative, submits a written request for a public hearing to the Department no later than 15 days prior to the close of the written comment period. Any person interested may present statements or arguments in writing relevant to the action proposed to the person designated in this Notice as the contact person beginning **May 28, 2021 and ending on July 12, 2021**. Following the public hearing, if one is requested, or following the written comment period if no public hearing is requested, the Department, upon its own motion or at the instance of any interested party, may thereafter adopt the proposals substantially as described below or may modify such proposals if such modifications are sufficiently related to the original text. With the exception of technical or grammatical changes, the full text of any modified proposal will be available for 15 days prior to its adoption from the person designated in this Notice as contact person and will be mailed to those persons who submit written or oral testimony related to this proposal or who have requested notification of any changes to the proposal.

**Authority and Reference:** Pursuant to the authority vested by section 25993 of the Health and

48a

Safety Code (HSC), the Department is proposing to implement, interpret, or make specific the requirements relating to the confinement of egg-laying hens, veal calves, and breeding pigs, and/or selling specified whole veal meat, whole pork meat, shell eggs, and liquid eggs in California in accordance with sections 25990, 25991, 25992, 25993.1, and 25994 of the HSC, as described in the Informative Digest.

## INFORMATIVE DIGEST/POLICY STATEMENT OVERVIEW

In 2018, California voters passed Proposition 12, Farm Animal Confinement Initiative, self-titled as the Prevention of Cruelty to Farm Animals Act, and as defined in the proposed regulatory text, the Farm Animal Cruelty statute (Act), which amended the requirements of HSC sections 25990 through 25993 and added section 25993.1; section 25994 remained unchanged. The purpose of the Act is to prevent animal cruelty by phasing out certain methods of farm animal confinement for covered animals raised in the State and the products harvested from those animals, or immediate offspring of those animals in the case of breeding pigs, if sold within the State for human consumption. The Act mandates farm animal confinement standards and compliance timeframes, establishes definitions affecting the production and sale of shell eggs, liquid eggs, whole veal meat, and whole pork meat in the State, and directs the Department and the Department of Public Health (DPH) to jointly promulgate regulations to implement the provisions of the HSC relating to the confinement of specified farm animals and the sale of specified products derived from them.

In this rulemaking, the Department proposes to adopt new Chapter 10 (commencing with section

49a

1320) of Division 2 of Title 3 of the California Code of Regulations (CCR) to implement, interpret, and make specific the laws established by the Act. Specifically, this proposal would establish a program of registration, certification, conveyance inspection, and labeling and marking requirements for the sale of shell eggs, liquid eggs, whole veal meat, and whole pork meat in the State which is necessary to fully effectuate the intent of the Act.

Existing law, section 25990(a) of the HSC specifies that a farm owner or operator within the State of California shall not knowingly cause any covered animal to be confined in a cruel manner.

Existing law, section 25990(b) of the HSC specifies that a business owner or operator shall not knowingly engage in the sale within the State of any of the following: (1) Whole veal meat that the business owner or operator knows or should know is the meat of a covered animal who was confined in a cruel manner; (2) Whole pork meat that the business owner or operator knows or should know is the meat of a covered animal who was confined in a cruel manner, or is the meat of immediate offspring of a covered animal who was confined in a cruel manner; (3) Shell eggs that the business owner or operator knows or should know is the product of a covered animal who was confined in a cruel manner; (4) Liquid eggs that the business owner or operator knows or should know are the product of a covered animal who was confined in a cruel manner.

Existing law, section 25991(a) of the HSC defines "breeding pig" as meaning any female pig of the porcine species kept for the purpose of commercial breeding who is six (6) months or older or pregnant.

50a

Existing law, section 25991(b) of the HSC defines a "business owner or operator" to mean any person who owns or controls the operations of a business.

\* \* \*

Existing law, section 25991(e) of the HSC defines acts that mean an animal was "confined in a cruel manner" including, but not limited to, confining a calf raised for veal with less than 43 square feet of usable floorspace per calf after December 31, 2019; confining a breeding pig with less than 24 square feet of usable floorspace per pig after December 31, 2021; confining an egg-laying hen with less than 144 square inches of usable floorspace per hen after December 31, 2019; and confining an egg-laying hen with less than the amount of usable floorspace per hen required by the 2017 edition of the United Egg Producers' Animal Husbandry Guidelines for U.S. Egg-Laying Flocks: Guidelines for Cage-Free Housing or in an enclosure other than a cage-free system after December 31, 2021.

Existing law, section 25991(f) of the HSC defines a "covered animal" as meaning any calf raised for veal, breeding pig, or egg-laying hen who is kept on a farm.

\* \* \*

Existing law, section 25991(h) of the HSC defines "enclosure" as meaning a structure used to confine a covered animal or animals.

Existing law, section 25991(i) of the HSC defines "farm" as meaning the land, building, support facilities, and other equipment that are wholly or partially used for the commercial production of animals or animal products used for food or fiber; and does not include live animal markets, establishments at which

51a

mandatory inspection is provided under the Federal Meat Inspection Act (21 U.S.C. Sec. 601 et seq.), or official plants at which mandatory inspection is maintained under the federal Egg Products Inspection Act (21 U.S.C. Sec. 1031 et seq.).

Existing law, section 25991(j) of the HSC defines "farm owner or operator" as meaning any person who owns or controls the operations of a farm.

Existing law, section 25991(k) of the HSC defines "fully extending the animal's limbs" as meaning fully extending all limbs without touching the side of an enclosure, or another animal.

\* \* \*

Existing law, section 25991(m) of the HSC defines a "person" as meaning any individual, firm, partnership, joint venture, association, limited liability company, corporation, estate, trust, receiver, or syndicate.

Existing law, section 25991(n) of the HSC defines "pork meat" as meaning meat, as defined in 3 CCR 900 as of August 2017, of a pig of the porcine species, intended for use as human food.

Existing law, section 25991(o) of the HSC defines "sale" as meaning a commercial sale by a business that sells any item covered by this chapter, but does not include any sale undertaken at an establishment at which mandatory inspection is provided under the Federal Meat Inspection Act (21 U.S.C. Sec. 601 et seq.), or any sale undertaken at an official plant at which mandatory inspection is maintained under the federal Egg Products Inspection Act (21 U.S.C. Sec. 1031 et seq.). For purposes of this section, a sale shall be deemed to occur at the location where the buyer

52a

takes physical possession of an item covered by HSC section 25990.

\* \* \*

Existing law, section 25991(q) of the HSC defines "turning around freely" as meaning turning in a complete circle without any impediment, including a tether, and without touching the side of an enclosure or another animal.

Existing law, section 25991(r) of the HSC defines "uncooked" as meaning requiring cooking prior to human consumption.

Existing law, section 25991(s) of the HSC defines "usable floorspace" as meaning the total square footage of floorspace provided to each covered animal, as calculated by dividing the total square footage of floorspace provided to the animals in an enclosure by the number of animals in that enclosure. In the case of egg-laying hens, usable floorspace shall include both ground space and elevated level flat platforms upon which hens can roost but shall not include perches or ramps.

\* \* \*

Existing law, section 25991(u) of the HSC defines "whole pork meat" as meaning any uncooked cut of pork, including bacon, ham, chop, ribs, riblet, loin, shank, leg, roast, brisket, steak, sirloin, or cutlet, that is comprised entirely of pork meat, except for seasoning, curing agents, coloring, flavoring, preservatives, and similar meat additives. Whole pork meat does not include combination food products, including soups, sandwiches, pizzas, hotdogs, or similar processed or prepared food products, that are comprised of more

53a

than pork meat, seasoning, curing agents, coloring, flavoring, preservatives, and similar meat additives.

\* \* \*

Existing law, section 25992 of the HSC specifies the exceptions to the provisions of Chapter 13.8 of Division 20 of the HSC, including during medical research; during examination, testing, individual treatment, or operation for veterinary purposes; during transportation; during rodeo exhibitions, state or county fair exhibitions, 4-H programs, and similar exhibitions; during slaughter; for a breeding pig during the five (5) day period prior to her farrowing date and while she is nursing piglets; and during temporary periods of no more than six (6) hours in an 24-hour period and no more than 24 hours total in any 30-day period.

Existing law, section 25993(a) of the HSC specifies that the Department and DPH shall jointly promulgate rules and regulations for the implementation of these provisions by September 1, 2019.

Existing law, sections 25993(b) and (c) specify that a violation of any of the provisions of Chapter 13.8 of Division 20 of the HSC is a misdemeanor and punishable by a fine not to exceed $1,000 or by imprisonment in the county jail for a period not to exceed 180 days or by both, and that provisions of the chapter supersede any conflicting regulations, including those in Chapter 6 (commencing with section 40601) of Subdivision 6 of Division 2 of Title 22 of the CCR.

Existing law, section 25993.1 of the HSC specifies that it shall be a defense to any action to enforce section 25990(b) that a business owner or operator relied in good faith upon a written certification by a supplier that the whole veal meat, whole pork meat, shell eggs,

54a

or liquid eggs at issue was not derived from a covered animal confined in a cruel manner, or from the immediate offspring of a breeding pig who was confined in a cruel manner.

Existing law, section 25994 of the HSC specifies that the provisions of the chapter are in addition to, and not in lieu of, any other laws protecting animal welfare, including the California Penal Code, and shall not be construed to limit any state law or regulations protecting the welfare of animals, nor prevent a local governing body from adopting and enforcing its own animal welfare laws and regulations.

\* \* \*

Regulations do not exist for the confinement of veal calves and breeding pigs, or the covered products of whole veal meat and whole pork meat as mandated by the Act.

Therefore, the Department is proposing to adopt new Chapter 10 (commencing with section 1320), of Division 2, of Title 3 of the CCR to specify the requirements for persons housing egg- laying hens, veal calves, and breeding pigs, and/or selling specified whole veal meat, whole pork meat, shell eggs, and liquid eggs in the State in accordance with sections 25990, 25991, and 25993 of the HSC.

<u>Anticipated Benefits of the Proposal</u>: This proposal would establish a regulatory framework for purposes of implementation of the provisions of the Act as mandated by section 25993 of the HSC. Effective implementation of the provisions specified in HSC sections 25990 through 25994 by adopting these regulations would benefit the objectives of the citizens of California that voted to approve the Proposition 12 initiative and the standards for animal confinement and

55a

prohibition of animal cruelty that it described. Egg,
pork, and veal producers and distributors would ben-
efit from this proposal because the Department is es-
tablishing compliance requirements for producing and
selling covered products in the State in accordance
with current law as specified in HSC sections 25990
through 25994 to ensure the orderly sale of covered
products from covered animals not confined in a cruel
manner regardless of their state or country of origin
within California. This proposal does not directly im-
pact human health and welfare of California resi-
dents, worker safety, or the State's environment, how-
ever the Department can infer that benefits accrue to
Californians knowing that breeding pigs, veal calves,
and egg-laying hens are raised with a minimum space
requirement, which may be more space than covered
animals previously were allotted. There are no quan-
titative studies that document or measure the effect
of confinement covered animals according the stand-
ards outlined in the Act for people in California. The
proposed regulations are necessary to implement ani-
mal confinement requirements and sale of the covered
products pursuant to HSC sections 25990, 25991 and
25993.

Comparable Federal Regulations/Mandated by
Federal Law or Regulations: This proposal is not man-
dated by federal law or regulations and does not du-
plicate or conflict with any federal regulations be-
cause there are no federal regulations governing farm
animal confinement requirements if the products
from specified animals are marketed to California
consumers.

Consistency and Compatibility with Existing
State Regulations: The Department has evaluated
this proposal and believes that it is not inconsistent or

incompatible with existing State regulations. The intent is to conform the Department's regulations relating to marketing shell eggs, liquid eggs, whole veal meat, and whole pork meat in California to HSC sections 25990 and 25991. Existing regulations in 3 CCR section 1350 (Shell Egg Food Safety) specify the minimum cage size requirements for egg producers and egg handlers, as defined as defined by FAC section 27510, for marketing unpasteurized shell eggs in California. The Egg Safety and Quality Management (ESQM) program ensures shell eggs have been properly handled, labeled, transported, and refrigerated by inspecting eggs at production, packing, distribution, and retail facilities; and are wholesome and safe to eat. The intent of the ESQM program's section 1350 regulations is based on food safety to prevent the occurrence of Salmonella enterica serotype Enteritidis (SE) contamination of shell eggs at production and to prevent SE contaminated shell eggs from being marketed to California consumers. Regulations do not exist for the confinement of veal calves and breeding pigs, or the covered products of whole veal meat and whole pork meat as mandated by the Act.

Forms Incorporated by Reference: None.

Technical, Theoretical, and Empirical Study, Report, or Similar Documents (Materials Relied Upon):

- California Proposition 12, Farm Animal Confinement Initiative (2018)

- United Egg Producers, Animal Husbandry Guidelines for U.S. Egg-Laying Flocks, Guidelines for Cage-Free Housing, 2017 Edition

- Federal Meat Inspection Act (21 U.S.C. 601 et seq.)

57a

- Egg Products Inspection Act (21 U.S.C. 1031 et seq.)

- Title 3, California Code of Regulations section 900

- Title 3, California Code of Regulations section 1350

- Food and Agricultural Code section 27510

- CDFA Workshop to Discuss CA Proposition 12: Farm Animal Confinement Initiative (2018), February 22, 2019, Sacramento, CA

- Sumner, D.A., Goldstein, R., Hart, J.D., Lee, H., Matthews, W.A., & Medellin-Asuara, J. (2020). *Standardized regulatory impact assessment of proposed regulations to implement proposition 12.* University of California, Davis, UC Agricultural Issues, and California Department of Food and Agriculture

- California Department of Public Health, Memo dated November 13, 2020

- CDFA State Organic Program (FAC sections 46000-46029 and 3 CCR sections 1391- 1391.7)

- USDA National Organic Program (7 CFR Part 205)

- Internal Revenue Code (26 U.S.C. 501(c)(3))

- Health and Safety Code section 113758

- USDA, Food Safety Inspection Service, Meat, Poultry and Egg Product Inspection Directory, Legend for Establishment Numbers

58a

- Title 21, Code of Federal Regulations, Part 172 sections 172.510 and 172.515(b); Part 182 sections 182.10, 182.20, 182.40, and 182.50; and Part 184

- Health and Safety Code section 113789

- Health and Safety Code section 109947

- Title 21, Code of Federal Regulations, Part 160

- Title 21, Code of Federal Regulations, Part 101 section 101.3

- Title 21, United States Code, Part 343 section 403; Title 9, Code of Federal Regulations section 590.5; Health and Safety Code section 109992; and Food and Agricultural Code section 27519.6

- Health and Safety Code section 110460

- Title 9, Code of Federal Regulations, Part 424 section 424.21(c)

- USDA, Institutional Meat Purchase Specifications: Fresh Veal Series 300 (November 2014)

- 2014 Uniform Retail Meat Identity Standards

- Title 9, Code of Federal Regulations Part 317 section 317.2(1) and Part 381 section 381.125(b)

- USDA, Institutional Meat Purchase Specifications: Fresh Pork Series 400 (November 2014)

- Title 21, Code of Federal Regulations, Part 530 section 530.3(i)

- Title 3, Code of Federal Regulations, Part 2 section 2.31

59a

- Economic and Fiscal Impact Statement, STD 399 with Attachment

## LOCAL MANDATE

There will be no local mandate.

## COST OR SAVINGS TO STATE AGENCIES (FISCAL IMPACTS)

The Act mandates farm animal confinement standards and compliance timeframes, establishes definitions affecting the production and sale of shell eggs, liquid eggs, whole veal meat, and whole pork meat in the State, and directs the Department and the DPH to jointly promulgate regulations to implement the provisions of the HSC relating to the confinement of specified farm animals and the sale of specified products derived from them. Details of the estimated fiscal impacts discussed below can be found in the Department's Standardized Regulatory Impact Assessment (SRIA) and appendix.

*Department.* The total annual agency budget for Fiscal Year (2020-21) equals approximately $3.53 million. The Department estimates the total annual fiscal costs for Fiscal Years (2021-22) and (2022-23) to each equal approximately $4.94 million.

Pursuant to the Act, the Department's proposed regulations describe a program to implement prohibitions on the sale of shell eggs, liquid eggs, whole veal meat, and whole pork meat derived from cruelly confined animals so Californians can have confidence that the products they purchase come only from sources that meet specified animal housing standards, as described. Specifically, this proposal would establish a program of registration, certification, convey-

ance inspection, and labeling and marking require-
ments for the sale of shell eggs, liquid eggs, whole veal
meat, and whole pork meat in the State which is nec-
essary to fully effectuate the intent of the Act.

*Schools.* Schools in California serve free or re-
duced-price meals to needy children with funding
from the State Meal Program that includes state and
federal dollars. In the 2018-2019 school year a total of
288 million breakfasts and 536 million lunches were
provided to school children. Eggs and pork are compo-
nents in these meals and the costs of these covered
products will increase after January 1, 2022 when the
full standards go into effect. In total, it is expected
State costs for school meals to increase by $1.84 mil-
lion in the first full school year after egg- laying hen
and breeding pig confinement standards move to cage-
free and twenty-four square feet, respectively.

*Colleges and universities.* The economic impact on
the operating costs of California state colleges and
universities is accounted for in meal plan fees to par-
ticipating students living on campus. The costs to the
State of California from the increase in meal plan fees
is the State expenditure to fund meal plans for stu-
dents on state-subsidized scholarships which include
coverage of room and board fees. The State costs for
student meal plan subsidy is $1.32 million for the first
full academic year after January 1, 2022 when animal
confinement minimum standards go into full effect
due to an increase in food costs.

*State prisons.* California's state prison population
is projected to remain at about 117 thousand people
for the next several years when animal confinement
minimum standards go into full effect after January
1, 2022. (California Department of Corrections and
Rehabilitation 2020). An increase in the price of shell

61a

eggs, liquid eggs, and whole pork meat would increase the total costs of meals for the state prisons by about $4.68 million per year.

## COST TO ANY LOCAL AGENCY OR SCHOOL DISTRICT WHICH MUST BE REIMBURSED IN ACCORDANCE WITH GOVERNMENT CODE SECTIONS 17500 THROUGH 17630

Cost to local governments will not be reimbursed by the State.

## OTHER NON-DISCRETIONARY COST OR SAVINGS IMPOSED ON LOCAL AGENCIES

The Department's regulations do not require additional expenditures by local governments; however, local agencies may incur costs. Fiscal impact on local governments will begin when the second deadline of animal confinement minimum standards go into effect January 1, 2022 for whole pork meat, shell eggs, and liquid eggs due to the increase in the cost of these foods sold in California. Whole veal meat is not included in this impact to local agencies because it is not purchased by the impacted local governments. This cost to local governments will not be reimbursed by the State.

*County jails.* California county jail population totaled around 73,000 inmates in 2018 and 2019. (California Board of State and Community Corrections August 25, 2020 report). Beginning in 2022, an annual total cost for county jails of about $2.92 million due to increase in costs of shell egg, liquid egg, and whole pork meat due to full implementation of animal confinement standards as outlined in statutes.

62a

## COST OR SAVINGS IN FEDERAL FUNDING TO STATE

None.

## DETERMINATION OF ANTICIPATED BUSINESS IMPACT

The Department has made an initial determination that this regulatory proposal will impact egg, veal, and pork producers; food processing facilities (referred to as "food manufacturing" in SRIA); distribution; food retailers (supermarkets/grocery/convenience stores); and restaurants (and drinking establishments) that purchase or sell shell eggs, liquid eggs, whole veal meat, or whole pork meat in California, as specified. Details of the estimated business impacts as discussed below can be found in the Department's SRIA and appendix.

Businesses (and individuals) affected by this proposal:

California egg producers:  approximately 6,546 farms
California veal producers: approximately 0 farms
California pork producers: approximately 1,236 farms
California restaurant/drinking establishments: approximately 76,200
California supermarkets/grocery/convenience stores: approximately 20,000
California food processing facilities: approximately 450
Total number of businesses affected: approximately 104,432

Compete with businesses in other states. In-state farms will find it more costly to compete with farms outside of the State when selling shell eggs, liquid eggs, whole veal meat, and whole pork meat to an out-

63a

of-state buyer compared to farms located in states that do not have the same animal confinement standards as described in the Act. Food processing facilities based in the State will have to use more expensive ingredients, shell eggs, liquid eggs, whole veal meat, and whole pork meat, that are compliant with the Act compared to food processing facilities located outside the State.

Creation/elimination of existing businesses/expansion of businesses: The proposed regulations will impact whole veal meat, whole pork meat, shell eggs, and liquid eggs produced and marketed in California. The current businesses from farm to end-user will be affected. Some farms may choose to exit during implementation rather than make the necessary adjustments, others may find the implementation of the regulations attractive for entry into the market. Private third-party certifying businesses providing certification services to farms and "handlers" according the NOP standards within the State will be able to expand services to additional farms and distributors for compliance with the Act and this proposal. This flux is expected to be small relative to the numbers already in the production, distribution, processing, and retailing businesses. It is expected entries and exits in the range of less than 100 businesses.

Creation/elimination of jobs: Impacts on jobs in California is minimal compared to the impact on consumer expenditures for the covered food items. Overall, there is a projected a loss of 31 jobs statewide in the calendar year 2022, when final deadlines for the Act go into effect, and then a loss of 332 jobs in 2023, after adjustments for the a reduction in cage-free shell egg production are fully incorporated. A large portion of the jobs effect from the proposed regulations are in

64a

California's shell egg production and associated industries due to requirement to a cage-free production system.

<u>Anticipated compliance requirements as a result of this proposal:</u> Producers and distributors who sell their shell eggs, liquid eggs, whole pork meat, and whole veal meat in California would need to comply with the certification, registration, and labeling requirements as proposed. Private third-party certifiers would need to be accredited by the Department to certify operations in as compliance with the Act and these regulations.

*Certification.* The proposed regulations require producers and distributors to be certified as compliant with the Act. This may be done by a private third-party that is accredited by the Department, a government entity outside of the State, or directly by the Department. Certification compliance consists of credible regulatory documentation (audit trail) of a production or distribution operation's good standing with certification requirements in these regulations and conformance with the specific minimum confinement standards in accordance with HSC section 25991.

*Registration.* The proposed regulations require annual distributor registration application and renewal used by the Department to identify and ensure compliance of businesses selling shell eggs, liquid eggs, whole pork meat, and whole veal meat within or into California.

65a

*Labeling.* The proposed regulations require product container labeling for shell egg cartons, which is already a requirement under the Department's ESQM program (3 CCR section 1354), although this proposal would require some modifications to the existing required labeling on printed cartons. Consumer facing packaging labeling of other products such as liquid eggs, whole pork meat, and whole veal meat is not a requirement of the proposed regulations, however, could be implemented voluntarily by associated industries. Required labeling of shipping manifests and bills of lading is proposed for all covered product sales transactions within or into the State, however these types of documents are easily generated and modified.

<u>Paperwork/Reporting:</u> There are new paperwork and reporting requirements under this proposal. The requirements include annual distributor registration application and renewal forms, certifying agent accreditation application and renewal (every five years) forms that may be retained and otherwise required by statute or regulation, and submitted to the Department as part of routine business transactions in order for the sale of covered products in California. Accredited third-party certifying agents are also required to submit an annual report to the Department of the operations that have been granted, renewed, or denied certification. Each producer and distributor operation must be certified as compliant to raise covered animals producing covered products sold in California, and/or businesses selling covered products within and into the State. This certification requires necessary

66a

records to be maintained for review or audit by a certifying agent or the Department, as specified.

Recordkeeping: There are new recordkeeping requirements under this proposal that may impact egg, pork, and veal distributors and producers. The proposed regulations require that records must be sufficient for an audit trail and documented in a traceable manner that covered product originated from certified compliant operations with the Act and these regulations. For example, records of their business operations, such as, production and shipment records, invoices, receipts, and related paperwork. The records are not required to be sent to the Department, however certified producers and certified distributors must keep the records on-site or available electronically for two years. Accredited third-party certifiers are to submit annual reports to the Department as a part of their recordkeeping requirements as specified in this proposal. The Department conducts routine and risk-based audits and inspections of farms, distributors, end-users, and certifying agents to ensure compliance with statutes and regulations.

Benefits to human health, worker safety, or the State's environment. This proposal does not directly impact human health and welfare of California residents, worker safety, or the State's environment, however the Department can infer that benefits accrue to Californians knowing that breeding pigs, veal calves, and egg-laying hens are raised with a minimum space requirement, which may be more space than covered animals previously were allotted. This proposal is needed to implement the Proposition 12 initiative which was passed by California voters in 2018. A benefit is for proper and orderly implementation of a law directly decided by voters for them to purchase with

67a

confidence covered products from covered animals not raised in a cruel manner. There are no quantitative studies that document or measure the effect of purchasing shell eggs, liquid eggs, whole veal meat, and whole pork meat from farms animals not confined in a cruel manner for people in California.

The Department has made an initial determination that the proposed regulatory action will have significant, statewide adverse economic impact directly affecting California businesses including the ability of California businesses to compete with businesses in other states. The Department has considered proposed alternatives that would lessen any adverse economic impacts on business and invites you to submit proposals. Submissions may include the following considerations:

• The establishment of differing compliance or reporting requirements or timetables that take into account the resources available to businesses.

• Consolidation or simplification of compliance and reporting requirements for businesses.

• The use of performance standards rather than prescriptive standards.

• Exemption or partial exemption from the regulatory requirements for businesses.

## COST IMPACTS ON REPRESENTATIVE PRIVATE PERSONS OR BUSINESSES

The Department is aware of cost impacts that a representative private person or businesses would necessarily incur in reasonable compliance with the proposed action. This determination is based on the

68a

SRIA included in this filing. The impacts are as a result of the implementation of existing law, HSC sections 25990 and 25991.

Private persons: There are no initial costs for an individual and ongoing costs for an individual are estimated at $50 per year for increase in food costs after January 1, 2022. California per individual annual covered egg consumption (including in processed products made in California) is a little over 20 dozen. Per dozen cost increase about $2 per dozen, increasing ongoing costs to $40 per individual and it is estimated that increase in whole pork meat and whole veal meat prices will increase food costs $10 per individual giving a total of $50 per year individual ongoing costs.

Businesses: Producers and distributors selling shell eggs, liquid eggs, whole pork meat, and whole veal meat would need to comply with the provisions for animal confinement or ensure covered product sold in the State originate from animals that comply with the provisions for animal confinement as specified in HSC section 25990 and 25991.

Whole pork meat. A typical breeding pig farm has about 1,000 breeding pigs and produces 20,000 hogs per year. Estimated initial cost for a typical breeding pig operation is $66,000 per farm to convert barns and pens into housing compliant with minimum standards outlined in the Act. Estimated ongoing cost is greater than the initial cost of conversion at $100,000 per year for a typical breeding pig farm due to smaller inventory of breeding pigs, lower piglet output per animal and increased breeding pig mortality.

* * *

69a

Paperwork/Reporting and Recordkeeping: The recordkeeping/reporting requirement for a typical California business is estimated at $5,000/year and a conservative estimate of 7,900 businesses will need to comply with proposed recording requirements for a total of $39.5 million/year. The possible 7,900 businesses include egg producers, pork producers, and distributors of covered egg, pork, and veal products. Each of these operations must be certified as compliant to raise covered animals in California and/or sell covered products in California. This certification requires necessary records to be maintained for review or audit by an accredited third-party certifier or the Department. This number of California businesses, 7,900, is potentially an overestimate based on the current number of commercial egg and pork producers in California being much smaller than the United States Department of Agriculture (USDA) 2017 Agricultural census reference of 6,500 covered farming operations in the State. The Act does not have a minimum herd or flock size requirement for compliance (ESQM program), or a minimum number of dollars sold to register (State Organic Program), so any farm raising egg-laying hens or breeding pigs will need to comply with recordkeeping requirements. In addition, California distributors are responsible for documenting traceability of selling shell eggs, liquid eggs, whole veal meat, and whole pork meat sourced from certified farms, which may originate at locations outside of the State or country.

### HOUSING COSTS

None.

70a

## SMALL BUSINESS IMPACT

The Department's proposal may affect small California businesses, as defined in Government Code section 11342.610, such as small retail food establishments (supermarkets, grocery stores, convenience stores, restaurants, and other food retailers) that have veal on their menus due to the increase in veal wholesale prices, however, as a whole, costs are negligible because total sales change little. For small California pork and egg producers, they face initial and annual compliance costs that are less than a typical operation because they are likely to have space that is compliant or almost compliant. There are about 210 small pork farms selling more than 25 hogs annually and 823 small egg farms may need to make investments for animal confinement compliance in California. Estimated initial costs is $5,000 and ongoing annual cost $500 for small pork and egg producers.

## BUSINESS REPORTING REQUIREMENT

It is necessary for the health, safety, or welfare of the people of the State that the regulation apply to businesses. There are new paperwork and reporting requirements under this proposal. The requirements include annual distributor registration application and renewal forms, certifying agent accreditation application and renewal (every five years) forms that may be retained and otherwise required by statute or regulation, and submitted to the Department as part of routine business transactions in order for the sale of covered products in California. Accredited third-party certifying agents are also required to submit an annual report to the Department of the operations that have been granted, renewed, or denied certification.

71a

## RESULTS OF STANDARDIZED REGULATORY IMPACT ASSESSMENT

The Department completed a SRIA, which is included in this filing. A summary of the results of the assessment is as follows:

a. *The creation or elimination of jobs within the State.*

Impacts on jobs in California is minimal compared to the impact on consumer expenditures for the covered food items. Overall, the Department projects a loss of 31 jobs statewide in the calendar year 2022, when final deadlines for the Act go into effect and proposed regulations are fully implemented, and then a loss of 332 jobs in 2023, after adjustments for the reduction in cage-free shell egg production are fully incorporated. A large portion of the jobs lost are in the shell egg production and associated industries because the mandates of the Act require these industries to move into a cage-free production system.

b. *The creation of new businesses or the elimination of existing businesses within the State.*

Creation and elimination of businesses is natural given any significant change to the business conditions. The regulations considered here will change the nature of veal, pork, and eggs produced and marketed in California. The current businesses from farm through end-user will be affected. Some farms may choose to exit during im-

72a

plementation rather than make adjustments others may find the implementation of the regulations attractive for entry. The Department expects this flux to be small relative to the numbers already in the production, distribution, and retailing businesses. The Department expects entries and exits in the range of less than 100 businesses.

California has a large shell egg industry. Egg producers in California face higher costs by $72 million, and egg output will decline by 51 million dozen relative to the baseline in 2022. Shell egg farm revenue rises by $7 million in 2022.

c. *The competitive advantages or disadvantages for businesses currently doing business within the State.*

The cage-free mandate for egg-laying hens and 24-square-foot mandate for breeding pigs (the portion of the proposed regulations that goes into effect starting January 1, 2022) may cause some egg and pork producers to exit because they find it uneconomical to adapt their facilities to comply with the new mandates required by the Act. The Department expects that some preexisting producers whose facilities already meet the Act's standards will enjoy corresponding competitive advantages. Preexisting cage-free egg producers, whose potential market grows when statutes take effect, will have an advantage over those who have not engaged in cage-free production in

73a

that they will not face costs of converting facilities. Similar competitive farm issues apply to breeding pig operations, but there are very few such businesses in California.

d. *The increase or decrease of investment in the State.*

As discussed in Section 6.2 and 6.3 of the SRIA, some new businesses and investment may enter the market as a result of the proposed regulations, the overall effect of the regulations (as summarized in Section 1.4, reported in Section 4, and detailed in Appendices 1–4 of the SRIA) is to decrease the total amount of shell eggs, liquid eggs, whole pork meat, and whole veal meat consumed in California. Although some one-time investments in construction, machinery, and labor will be made by businesses as they adapt their facilities, in the long run the Department expects that the regulations promulgated to implement the Act will decrease average annual investment in California egg and pork producers and distributors, relative to the Baseline. Although investment in other businesses in California may correspondingly decrease as investors move resources elsewhere, the Department expects the net effect to be a modest decrease in overall investment in the State.

California consumers will be affected by higher food prices and respond with lower quantity consumed. In the 2022 calendar year, when the Act's standards go into full

74a

effect, proposed regulations will increase consumer expenditures in California of $1,195 million. The largest impacts are on consumers of shell eggs and whole pork meat due to increased cost of these covered products at wholesale and retail.

e. *The incentives for innovation in products, materials, or process.*

Farms may have some incentives to innovate in their business processes as they adapt their facilities to be compliant with the Act's confinement standards. However, businesses involved in the design and manufacturing of products and materials for adaptation, such as animal cages, are not typically located in California.

f. *The benefits of the regulations, including, but not limited to, benefits to the health, safety, and welfare of California residents, worker safety, and the State's environment and quality of life, among any other benefits identified by the agency.*

The SRIA did not quantify any benefits directly impacting human health and welfare of California residents, worker safety, or the State's environment. Other economic studies have shown that some government regulations of meat and egg production and processing increase consumer willingness to pay more in food markets. About 20% of California's shell egg consumption prior to 2022 already met California cage-free egg standards. This means cage-free shell egg

75a

consumers were already willing to pay more than twice as much, on average, for cage-free shell eggs than for conventional shell eggs. Other consumers who are not willing to pay double for cage-free eggs may be willing to pay a smaller increased amount for cage-free shell eggs. Both of these types of consumers would therefore receive some corresponding benefits (even if they are hard-to-quantify benefits such as moral satisfaction, peace of mind, social approval, etc.) from knowing all eggs raised and sold in California are cage-free after January 1, 2022. In addition, non-consumers of the covered products may benefit from assurance that shell eggs, liquid eggs, whole veal meat, and whole pork meat sold in California meet the specified housing standards even if they do not plan to consume these foods. The Department notes that a large majority of voters in 2018 approved, 63%, the Proposition 12 initiative to eliminate egg-laying hens, veal calves, and breeding pigs from being cruelly confined in the State or if products from those animals are sold in the State.

Animal confinement space allowances prescribed in the Act (cage-free for egg-laying hens, 43 square feet for veal calves and 24 square feet for breeding pigs) are not based in specific peer-reviewed published scientific literature or accepted as standards within the scientific community to reduce human food-borne illness, promote worker safety, the environment, or other human or

76a

safety concerns. Health and Safety Code confinement standards are described as a minimum standard for space allowance to prevent cruel confinement of covered animals and the law was not primarily written with the concern or benefit of human foodborne illness, worker safety, environment, etc. The standard of cage-free in HSC references the United Egg Producers 2017 guidelines and is the cage-free standard set by the egg industry to provide uniform guidance of cage-free egg operations. Minimum space requirements for veal calves and breeding pigs outlined in HSC are not drawn from specific industry standards or published scientific research prescribing 43 square feet for veal calves and 24 square feet for breeding pigs. The Department has no regulatory discretion over the Act's animal confinement mandates, so any such effects would stem not from the way regulations were written or implemented, but from the mandates directly imposed by the Act.

## SUMMARY OF DEPARTMENT OF FINANCE COMMENTS AND DEPARTMENT'S RESPONSE

The Department of Finance (Finance) provided comments to the Department's SRIA. A summary of the five comment categories and the Department's responses are below. Reference citations noted in the below responses can be found in the Department's SRIA.

77a

*Finance comment #1:* *The SRIA must estimate the costs to producers to comply with the new housing, certification, labeling, and reporting requirements and for individuals to maintain their consumption or to substitute. Furthermore, disparate impacts must be discussed. For instance, some small farmers might not be able to switch to cage-free eggs right away and might reduce or stop production altogether. Larger farms, who typically can adapt more quickly, will increase their market share to compensate for lower production from smaller farms.*

a. Cost to producers for certification, labeling, and reporting requirements

*Certification costs.* Proposed regulations require farms to be certified as compliant with the Act. This may be done by a private third-party that is accredited by the Department or directly by the Department. Producers would incur costs for certification services from accredited third-party certifiers by payment of fees charged by these private entities. For existing private businesses that conduct certification services similar to those proposed in these regulations (e.g., American Certified Humane, Certified Humane, Validus, Global Humane Animal Partnership, etc.), the fee structures are most commonly based on a sliding scale depending on the size of the production operation. Small producers may pay $100-$200 per year for certification while large producers may pay $2,000-4,000 each year for certification (subsection b. below for more information on smaller- and larger-sized operations). If a production operation is already inspected by a third- party company for welfare standards who is accredited by the Department, then the producer may not have to incur additional costs for

78a

certification. For example, American Certified Humane, Certified Humane, and Global Animal Partnership all have standards that meet the minimum confinement requirements for egg-laying hens. Similar costs might be expected for producers receiving certification services directly from the Department, depending upon the extent of public funds available to support this activity.

*Labeling costs.* Product container labeling is only required for shell egg cartons under this proposal. Currently, all cartons of unpasteurized eggs still in the shell that are sold in California have required labeling of "CA SEFS COMPLIANT" as part of the Department's Shell Egg Food Safety program. The addition of "CA CAGE FREE" labeling as part of the proposed regulations starting in July of 2022 is not expected to result in significant additional costs to shell egg producers that already must print cartons with California specific statements. Additionally, the use of "Cage Free" statements on cartons to identify this type of production system for consumers purchasing eggs is already common in the marketplace, and the proposed addition of "CA" to existing statements to designate conformance with the Act and this proposal's specific standards is not expected to be a significant added cost.

Labeling of other covered products (e.g., liquid eggs, whole pork meat, and whole veal meat) on consumer facing packaging is not a requirement of the proposed regulations, but could be done voluntarily by the industry at the discretion of the producer, packer, or co-packer to communicate compliance with the Act and these regulations for marketing purposes.

Proper labeling of shipping manifests and bills of lading is required by the proposed regulations and

79a

again is estimated to be a nominal cost to the producer or distributor because these types of documents are already being generated and printed for covered products distributed and sold in California. For example, beginning in January of 2022 shipments of whole pork meat under this proposal will need to have "CA 24+" printed on the shipping documents and be available for review during the certification process, upon entry at a California Border Protection Station, or during an inspection or investigation.

_Reporting costs_. The additional cost of reporting requirements as outlined in the proposed regulations is estimated to be $5,000 annually for a typical California business (producer, distributor or accredited third-party certifier). This record keeping cost will vary depending on the extent of time required to maintain documents required to demonstrate compliance and traceability with the Act and these regulations. Additionally, annual reporting to the Department is required of accredited third-party certifiers and annual renewal distributor registration under this proposal will contribute to overall recordkeeping costs for a typical California business.

b. Consideration of disparate impacts

* * *

_California Pork Operations: small and large farm potential differential impacts._ According to the 2017 United States (US) Census of Agriculture, there were 1,389 swine farms that had a total of 96,456 hogs and pigs in California. The census data does not distinguish between breeding pig, weaned pig, finishing, or fully integrated operations. Of the total swine operations in California, 1,236 of the farms sold hogs and pigs at a total of 207,768 animals in 2017. Most of the

80a

farms that sold hogs and pigs (USDA reported term for number of head slaughtered), 1,009 farms, sold fewer than 25 hogs and pigs each annually. To qualify as a "farm" operation under the USDA definition, the business only needs to have products that might have sold for more than $1,000 in a year. Of these 1,009 very small operations, a total of 5,950 animals were sold, giving an average of about 6 hogs and pigs from each farm. A breeding pig will produce about 25 piglets per year, therefore few of these small operations would have any breeding pigs that would be affected by the Act's confinement square footage minimums. There were six farms in 2017 that sold more than 5,000 hogs and pigs each for a total of 161,409 animals, giving an average of about 26,900 hogs and pigs sold by each of these larger swine operations.

Of the six large farms that sold more than 5,000 pigs each, three were farrow-to-finish, meaning they housed breeding sows and would need to comply with minimum confinement standards requirements in 2022. Calculations assume that these farms sold about 25,000 hogs and pigs each, that would imply about 1,000 breeding pigs at each of these three larger swine farms. Nationwide, breeding pigs represent about 4% of hogs and pig inventory, which of the 96,456 hogs and pigs in California indicates there are less than 4,000 breeding pigs in California. According to the 2017 Agricultural Census, the total inventory of hogs and pigs in the United States (US) was 72 million animals. Since breeding pigs represent 4% of the total hog and pig population, California has about 0.133% of the national breeding pig herd.

California pork producers produce specialty pork, such as organic, pasture-raised, and show animals for 4-H and FFA projects. Farrowing operations with a

81a

small number of breeding pigs will likely find it easier to meet California-specific housing regulations than would commercial- sized operations. Generally, very small livestock farms have higher measured, imputed, or implied accounting costs per animal sold, but continue to operate the farm because either their actual individual costs are lower than those imputed or implied in the studies or for non- pecuniary reasons (Whitt, McDonald and Todd).

The economic impact of proposed regulations on swine producers in California is likely concentrated on the larger operations that are more likely to have already made the capital investment in housing that based on pens and square footage allowance from traditional commercial breeding pig operations. Very small pork producers are more likely to already be compliant with confinement standards outlined in the Act or would have nominal cost adjustments to become compliant.

Data and economic analysis indicate no significant change in the size distribution of pork producers in California from the proposed regulations.

\* \* \*

*Finance comment #2: Small businesses that rely on regulated products such as small restaurants, who tend to have a thin profit margin, might increase prices or close if cost increases cannot be absorbed.*

a. Effects on restaurants that are small businesses

The National Restaurant Association estimates that there were about 76,200 eating and drinking establishments in California in 2018, with $97 billion in retail sales, and employing 1.83 million food service

82a

workers. Of course, these statistics are pre-pandemic and the long-term effects of COVID on restaurant businesses in California is not known. The Small Business Association (SBA) has specific definitions to include these food services as a small business; full-service restaurants, mobile food services, "drinking places," caterers, and Snack and Nonalcoholic Beverage Bars if they have less than $8 million in annual revenues. Limited- service restaurants are small businesses if they have less than $12 million in annual revenues. Cafeterias and buffets are small businesses if they have less than $30 million in annual revenues. And food service contractors are small businesses if they have less than $41.5 million in annual revenues. Under these definitions established by the SBA, most restaurants in California are considered small businesses.

By National Restaurant Association estimates, average annual revenues of an "eating and drinking establishment" in California in 2018 were $1.27 million, less than one-sixth of the maximum revenue for an (SBA-defined) "small business." A restaurant in California with average revenue for its industry is thus considered a small business as defined by the SBA. Thus, most impacts on restaurants identified in the SRIA are primarily impacts on small businesses.

Within the restaurant category, sit-down family restaurants or "fine dining" restaurants tend to be smaller businesses than fast-casual or fast-food restaurants. Veal is unusual among most restaurant categories in that it is primarily consumed at high-end restaurants. Popular restaurant veal dishes include veal chop, veal parmigiana, and veal marsala and will cost more for restaurant patrons to enjoy after full im-

83a

plementation of the Act and proposed regulations be-
cause it is assumed the increase in veal meat whole-
sale prices will be passed along to the customer. Cali-
fornians may not be willing to bear an increase in veal
meal prices on the menu; alternatively, many restau-
rants may simply stop including veal on their menu or
serve fewer portions of veal. Thus, the Act and this
proposal will have a significant impact on those small
businesses in California that have historically had
veal dishes on their menus.

Restaurants or other food service places that pur-
chase covered pork and egg products that are cage-
free, crate-free, or otherwise already meet or almost
meet the confinement standards in the Act would face
lower costs of adjusting to the new standards. The im-
pact for those restaurants serving pork is less severe
because the price impact is small on menu prices,
given the high share of whole pork meat in food ser-
vice food prices. The other category of restaurants
likely to be significantly affected are those with menu
items that have significant covered egg product con-
tent. Certain large quick-serve chains, like McDon-
ald's, declared plans to shift to cage-free eggs inde-
pendent of the Proposition 12 initiative, but few had
completed that adjustment before the Act was passed
into law. There is no data to indicate that their costs
of shifting or maintaining confinement standards to
meet the requirements outlined in the Act would be
different per unit of sales than other independent food
service places. There is no data to suggest that the
Act's standards have a particular impact by size of es-
tablishment.

b. Grocery stores and retail that are small busi-
nesses

84a

A substantial portion of grocery stores and convenience stores in California sell covered pork and egg products and are also classified as "small businesses" under the SBA definition.

IBISWorld (2019) reports that there are about 8,000 supermarkets and grocery stores in California employing about 300,000 people. The California Grocers Association (2020) reports having about 6,000 member-businesses. The National Association of Convenience Stores (2020) reports that there are about 12,000 convenience stores in California.

Meat markets, fish and seafood markets, fruit and vegetable markets, baked goods stores, confectionery and nut stores, and other specialty food stores are classified by the SBA as small businesses if they have less than $8 million in annual revenues. Convenience stores are small businesses if they have less than $32 million in annual revenues. Supermarkets and other grocery stores are small businesses if they have less than $35 million in annual revenues. Thus, a substantial portion of grocery stores and convenience stores are small businesses, although large chains have a greater presence in the grocery and convenience store category than in the restaurant category. Consumers shopping at small or large grocery stores, or convenience stores, are likely to respond to higher shell egg, liquid egg, whole veal meat, and whole pork meat prices by buying less of the covered pork, veal and egg products, and are also likely to substitute some or all of their covered product spending for spending on other food products, including non-covered pork such as ready-to-eat or ground pork products. The covered egg, veal and pork products represent a small share of total consumer food spending at grocery stores and

85a

even less at convenience stores. Therefore, no disproportionate impact of the Act's standards on small grocery or other retail companies is expected.

*Finance comment #3*: *Effects on individual SNAP and food subsidy program benefits*

a. SNAP: Low income Californians pay a higher share of their total income on food

Covered pork, and especially covered egg products will become more expensive to consumers starting in January 2022 because of the animal confinement standards mandated in statutes. Eggs are purchased by low-income consumers as a higher share of their food budgets compared to middle- and high-income consumers.

Many low-income consumers in California are enrolled in USDA food and nutrition service programs such as school meals, the Special Supplemental Nutrition Program for Women, Infants, and Children (WIC), and Supplemental Nutrition Assistance Program (SNAP), which in California is administered as the Cal Fresh program. These programs enroll millions of Californians, many of whom participate in several programs. For example, there were almost 4 million SNAP recipients (about 10% of the population in California in 2019). Supplemental Nutrition Assistance Program benefits averaged about $1,700 annually per household member in 2019. However, not all low-income consumers are enrolled in programs and many face higher food costs with little assistance. It is not yet clear the extent, if any, to which federal program benefits will be adjusted to fully cover the added food costs of consumers beginning in 2022. For example, the typical consumer (across all ages and other characteristics) consumes about 21 dozen eggs and 40

86a

pounds of pork meat annually, and estimated increase in food costs are approximately $2 per dozen shell eggs and $0.20 per pound of whole pork meat. This means covered egg and pork costs go up by $42 and $8 per year respectively for a total of $50 per person per year starting in 2022. This increase in food costs does not include veal because it is assumed lower-income households are not purchasing veal. These calculations are based on economic results which repeatedly find that the quantity purchased by low-income households of broad food items like shell eggs or whole pork meat do not fall proportionately to when the price increase (demand is price inelastic). Meaning, when price rises, the expenditure on that item also rises. The increased cost of $50 per person will need to be included in federal benefits for California recipients otherwise their real food purchasing power will fall.

Therefore, the Act will disproportionately reduce food purchasing power of low-income consumers. However, since some of the food budget of low-income consumers is covered by federal programs, they may not be differentially affected, as a group, relative to consumers with higher incomes that are not eligible for food assistance. Food consumers most affected will be those low-income consumers that are not enrolled in assistance programs.

Consumers least affected are those who already consume cage-free shell and liquid eggs and whole pork meat from hogs for whom the mother pig experienced additional space during gestation. These tend to be higher income consumers.

b. Other food subsidy benefit programs

87a

In addition, as noted above, there are federal meal subsidy programs serving other populations such as daycare for younger children and eldercare facilities. A brief summary of the Federal Child and Adult Care Food Program is provided by the USDA Economic Research Service (USDA, ERS 2019). The program is designed to improve nutrition with meals and snacks for infants, children, and adults. Providers are reimbursed for meals and snacks. In 2018-19 Federal reimbursement for the California program was $485 million and state reimbursement was about $2.1 million. Almost all the outlays were for childcare centers and in-home daycares. (CDE, 2020). In addition, the state cost of the Federal Child and Adult Care Food Program is $2.1 million. The best estimate of added cost of these programs is about 0.5% times $2.1million, equaling an added cost due to the Act's confinement standards of about $11,000 per year.

*Finance comment #4: Fiscal cost calculations must be disclosed and include all costs to state and local governments. Costs should be broken down by category including but not limited to certification, registration, enforcement, and other administrative costs.*

The Department's proposed program for implementation of Proposition 12 initiative is titled the Animal Care Program and total fiscal cost for 22/23 fiscal year for this program is $4,936,485. This is the first full fiscal year after the Act's timelines are all in effect for covered animals and costs have been broken down into administration, compliance audits, investigations, and registration/certification/accreditation. Within each of these categories the expenses are further divided into personal services and operating expenses and equipment. More specifically, total administration costs are $1,047,157 ($557,661 for personal

88a

services and $489,496 for operating expenses and equipment), total compliance audits costs are $3,024,377 ($1,858,393 from personal services and $1,165,984 from operating expenses and equipment), total investigations costs are $456,058 ($349,186 from personal services and $106,872 from operating expenses and equipment), and total registration/certification/accreditation costs are $408,893 ($350,021 from personal services and $58,872 from operating expenses and equipment).

No fiscal costs to local governments.

*Finance comment #5*: *The SRIA must evaluate impacts on other government agencies that are consumers of the covered products, such as schools and prisons.*

a. Fiscal impact on California schools

Schools in California served 288 million breakfasts and 536 million lunches in the 2018-2019 academic year. Of those meals, 233 million breakfasts and 405 million lunches were served free of charge to needy children. The total funds expended for school meal programs were $2.27 billion with the State contributing $161 million or about 7% of this budget in 2018-2019. Of these state funds, $103 million were expended for lunches, and $58 million were expended for breakfast meals. In addition, summer meal programs in the 2018-2019 school year served 14.8 million meals, including 3.2 million breakfast meals and 9.5 million lunch meals. Total funds expended for the summer meal programs were $46.1 million with State funds contributing $1.7 million or about 3.7% of the total budget. Of these state funds for the summer meal program, $1.2 million were expended for lunches and $495 thousand for breakfast meals (CDEa).

89a

To estimate the increase in covered egg and pork costs beginning in 2022, the same average annual increase in food costs is used as in the SNAP explanation above of $50 per person or $50/ (3X365) = $0.0457 per meal increase in food costs. This estimate was then rounded down to $0.04 per meal because these meals are mostly lunch and breakfast, the average consumption of children from 6 to 18 is less than the average person, and schools have access to bulk buying and economies in covered egg and pork purchases. Applying this $0.04/meal to the free school-year meals of 638 million meals gives an increased cost of about $25.5 million. The California budget pays about 7% of the total or about $1.80 million ($25.5 million X 0.07). For summer meals the added total cost is $0.6 million, and the California cost is $0.042 million ($0.6 million X 0.07). In total, California state government costs for these school meals are about $1.84 ($1.80 million plus $0.042 million) million in the 2022-23 school year.

Besides federal cash contribution to school meals programs USDA has provided direct food purchasing of egg products to some school districts at a discounted rate. Two frozen liquid egg products and an egg patty product have been available (USDA Foods) for schools to purchase. California egg producer housing standards have been distinct from those in the rest of the US for retail sales since 2015, but the California egg production is mainly for shell eggs which are not often used in school meal programs. Under the proposed regulations, liquid eggs and egg products included in the Egg Products Inspection Act are also included as covered product needing to come from cage-free hens and therefore California schools may not be able to purchase low-cost covered egg products from USDA Foods.

90a

It is not known whether USDA will provide USDA egg products to California schools that meet California cage-free standards. If not provided, this source of benefit may be lost to school meal programs in California. If USDA is unwilling to use egg products that meet California standards this will reduce the benefit of school meal programs in California, unless menu planners avoid the use of covered egg products. Alternatively, USDA may use cage-free eggs to produce compliant USDA egg products for use in California schools.

b. Fiscal impact on California colleges and universities

The impact of the Act and this proposal on food costs for California state colleges and universities is small and accounted for in meal plan fees to students. The University of California system and the California State University system together enroll about 700 thousand undergraduates (The Regents of the University of California 2020, The California State University 2020, USDE/NCES 2020). About 110 thousand UC and CSU students live on campus and most of those are enrolled in campus meal plans. The number of students living on campus is calculated using the average percentage of undergraduates living on campus for each UC and major CSU campus from Carnegie Dartlett (2020). On most campuses, basic meal plans are included in room and board fees and vary from about $100 to over $200 per week. Cost of meal plans for each campus was obtained from the corresponding campus website. On average, meal plans cost about $175 per student, per week, for an equivalent of three meals per day, seven days a week. A typical school year not including summer school consists of about 32 weeks. Using 32 weeks as the length of an

91a

average school year, the total cost of meals per student amounts to $5,600 per year. For the total student population living in campus housing on the UC and CSU campuses, student meal plans amount to $616 million per year ($5,600 X 110,000).

Estimates of increased covered egg and pork costs (veal is not served on college campuses) for meals served beginning in 2022 take into account the nine-month academic year and a slight increase in total eggs consumed based on the demographic and ability to purchase in bulk. The total increase is $40 per person annually for purchasing covered eggs and pork. This total uses college student consumption of 23 dozen eggs per year (shell and liquid), but average 3/4 of the year (9 months) on the meal plan so egg cost increase is (0.75) X 46 = $34.50 due to the price of cage-free eggs and rounded up to $35 per year. Increase in costs due to increase in the price of whole pork meat is $5 ($8 X 0.75=$6, rounded down to $5) because of slightly lower prices due to bulk purchases. The increase in food costs totals $40 per person or a total of $4.4 million per year for students living on campus taking part in a meal program ($40 X 110,000). The cost to the State of California due to this increase in cost of covered eggs and pork depends on the expenditure to cover meal plans for students on state-subsidized scholarships that include coverage of room and board fees.

About 30% of California public college and university students receive financial benefits that will be affected by meal plan costs and 70% of added meal plan costs are paid by the students or their families. Therefore, the estimated cost of the Act and this proposal on State costs for meal plan student subsidy is about 30%

times $4.4 million or $1.32 million during the first academic year after full implementation in 2022 ($4.4 million X 0.30).

c. California and local jurisdictions operate prisons and jails that provide meals

California's state prison population is projected to remain at about 117 thousand people for the next several years (California Department of Corrections and Rehabilitation 2020). About 117 thousand inmates is a five-year rolling average projection for 2021 and 2022 based on prison population for 2015–2019. This gives a total of 42.7 million prison-days per year, or just over 128 million meals (assuming three meals per person per day).

California county jail population is totaled at about 73 thousand in 2018 and 2019 (Board of State and Community Corrections Jail Profile Survey August 25, 2020 report). Using the same calculation for county jail inmates as state inmates yields about 80 million meals served each year.

An increase in the price of covered eggs and pork as a result of the mandated statute and proposed regulations will increase the annual costs of meals per prisoner by about $40 per year starting in 2022, which is mostly the higher costs of cage-free shell eggs and liquid eggs, but with a small amount for cost of whole pork meat and no added cost for whole veal meat. This was calculated by estimating that the increase in meal costs provided to prisoners will be lower than for the average Californian by about 20%, so additional costs of covered eggs and pork would be $40 per year ($50 X 0.8). At the current and projected incarceration population numbers, this would increase the total costs of meals for the state prisons by about $4.68 million per

93a

year ($40 X 117,000). For county jails, this will be an added cost of about $2.92 million per year ($40 X 73,000) for meals served to its 73,000 inmates.

## CONSIDERATION OF ALTERNATIVES

The Department must determine that no reasonable alternative it considered or that has otherwise been identified and brought to its attention would be more effective in carrying out the purpose for which the action is proposed, would be as effective and less burdensome to affected private persons than the proposed action, or would be more cost-effective to affected private persons and equally effective in implementing the statutory policy or other provision of law.

Any interested person may present statements or arguments orally or in writing relevant to the above determinations at the hearing (if a hearing is requested) or during the written public comment period.

The two alternatives considered do not vary the basic requirements of the Act itself, for example, the alternatives did not consider whether eggs must be cage-free, or by when. The two alternatives considered the economic impacts of the Department's discretionary choices, namely through definitions and procedures, used to implement the Act. The two alternative regulations considered and ultimately rejected include (1) lower-cost regulations and (2) higher- cost regulations:

<u>Alternative 1:</u> Under the lower-cost alternative, annual farm cost and consumer expenditure increases by $982 million; = $19.5 billion in present value at a 5% discount rate.

The lower-cost regulations apply a narrower interpretation of which food products are covered and

94a

which businesses are subject to annual registration and certification requirements. Intent of the Act is not fully applied across sales of covered products and therefore California residents would not be able to confidently purchase and consume covered products knowing they were sourced from covered animals raised according to the confinement standards of the Act, regardless of origin of product. The lower-cost alternative would be confusing for the California consumer because there would be a mix of compliant and non-compliant covered product for sale in California. The lower-cost regulations are defined in detail in SRIA 4.2.1, however some key variations in the lower-cost regulations, versus the proposed regulations, are as follows:

- "Shell eggs" include only raw or pasteurized eggs with the shell still intact, therefore, excluding all forms of hard-cooked eggs such as peeled, sliced, or chopped.

- "Liquid eggs" include only eggs broken from the shell with the yolks and whites in their natural proportions, or with the yolks and whites separated, mixed or mixed and strained as defined by the Code of Federal Regulations, therefore excluding other forms of liquid eggs such as frozen, dried, cooked, and prepared egg products (e.g. egg patties or egg "pucks" consisting of mostly eggs except for added seasoning and flavoring).

- The Act's confinement requirements are limited to sales of shell eggs, liquid eggs, whole veal meat, or whole pork meat at the retail level to a consumer.

- Restaurants, prepared food vendors, and food processing facilities are not required to source shell eggs, liquid eggs, whole veal meat, or whole pork

95a

meat compliant with the Act for their business of further processing those ingredients.

The Department rejected this option because the narrow definitions of shell eggs and liquid eggs did not coincide with the intent of the Act that was overwhelmingly passed by voters to ensure eggs purchased and consumed by Californians were not from egg-laying hens confined in a cruel manner. Whether the shell egg consumed is purchased raw or hardboiled, peeled, and included in a snack pack, the Department determined that hardboiled eggs need from be from egg-laying hens confined according to the Act's standards to meet the expectations of Californians. Californians that voted to ensure liquid eggs purchased in California were from egg-laying hens not confined in a cruel manner are most likely not aware of all food manufacturing processes or the extensive list of egg products defined in the Egg Products Inspection Act. Due to the versatile use of liquid eggs in food processing, and food service, the Department adopted the definitions of liquid egg to include all products in the federal Egg Products Inspection Act. The Department feels confident this was the expectation of voters when they voted for the Proposition 12 initiative in 2018. Whether the liquid eggs are frozen, dried, or cooked into a patty, if the covered egg product is sold in California, then it must have originated from egg-laying hens not confined in a cruel manner.

The Department also rejected this lower-cost alternative option because there would be a mix of compliant and noncompliant covered products sold in California and it would be difficult for the consumer to know if they were purchasing shell eggs, liquid eggs, whole veal meat, and whole pork meat from animals not confined in a cruel manner. Also, the lower-cost

alternative would be more difficult to regulate because wholesale and retail costs of covered products coming from covered animals not confined in a cruel manner are significantly higher than the prices of covered products from animals housed in a cruel manner. With a narrower scope of products included in the lower-cost alternative option and compliant and non-compliant covered products in the California marketplace, there would more opportunities for cheating, greater challenges for enforcement, and unfair cost burden put on California small businesses, mostly restaurants who purchase shell eggs, liquid eggs, whole veal meat, and whole pork meat from a retailer.

Alternative 2: Under the higher-cost alternative, annual farm and consumer expenditure increases by $1.263 billion; = $25.26 billion in present value at a 5% discount rate.

Higher-cost regulations impose more stringent restrictions on some covered products moving through California and expand the definition of covered products; they imply larger negative economic consequences, including reduced California port activity. Benefits may be larger under the higher-cost alternative if more covered animals are not raised in a cruel manner. The higher-cost regulations are defined in detail in SRIA section 4.2.2. Specifically, the higher-cost regulations include all the requirements of the proposed regulations plus the following additional requirements:

- Raw ground veal, raw ground pork, and their products (meaning foods composed of raw ground veal or pork plus seasonings, coloring, curing agents, etc.) are considered cuts of "whole veal meat" and cuts of "whole pork meat," and thus subject to the Act's requirements.

97a

- The Act's requirements apply to covered food products moving through California for sale and end-use in another state or country.

- Consumer-facing labeling is required for all covered products or prepared foods containing a covered product. Labels would allow the buyer to scan a QR code at retail or when consuming a prepared food made with covered product and see record of the Act's animal confinement certification and traceability of product back to farm of origin.

The Department rejected this option because in the Act definitions of whole veal meat and whole pork meat exclude processed or prepared foods such as hot dogs. Raw ground and comminuted products made from veal or pork are specifically identified in these regulations as not needing to be included under the definitions of covered products. This decision was made based on informal feedback from pork stakeholders and due to the definitions in statute. Analysis for the SRIA include calculations with and without ground pork because there has been mixed informal feedback from stakeholders regarding the exclusion of ground and comminuted products.

The higher-cost alternative option to apply the Act's confinement standards of covered products only moving through California and destined for export, use on cruise ships, or sale in other states was rejected because the Department did not think including these products under the Act's animal confinement standards was the intention of the law. California has busy ports for export and import and if all shell eggs, liquid eggs, whole veal meat, and whole pork meat moving through these ports had to be compliant with the Act and these regulations, then import/export business in

98a

California would be devastated and moved to other states. The Department specifically excluded covered products moving through the State for a destination outside of the State or country in these regulations for stakeholders to understand the processes and expectations for these types of products.

The final suggestion in the higher-cost alternative option was rejected by the Department because the requirement for a consumer facing labeling with a unique QR code was determined to be overly burdensome for stakeholders including restaurants which are often independently owned and classified as small businesses. Instead of putting the burden of proof to defend and communicate that a food is or contains covered product from covered animals not confined in a cruel manner to the Department on these small businesses, the Department decided to move this compliance one level up in the supply chain to a distributor. In addition, many of the final consumer facing packaging of liquid eggs, whole veal meat, and whole pork meat are under inspection of USDA, FSIS and any labeling of those products would need to be approved by FSIS.

This proposal is necessary for compliance with section 25990, 25991, 25992, and 25993 of the HSC.

\* \* \*

99a

# APPENDIX F

## DEPARTMENT OF FOOD AND AGRICULTURE ANIMAL HEALTH AND FOOD SAFETY SERVICES PROPOSED REGULATIONS ANIMAL CONFINEMENT

The Department of Food and Agriculture, Animal Health and Food Safety Services Division, proposes to adopt Chapter 10 of Division 2 of Title 3 of the California Code of Regulations, as specified below.

1) Adopt Chapter 10 of Division 2 of Title 3 of the California Code of Regulations, to read as follows:

Chapter 10. Animal Confinement.

[Article 1, Egg-laying Hens, and Article 2, Veal Calves, omitted]

4) Adopt Article 3 and sections 1322 through 1322.10 of Chapter 10 of Division 2 of Title 3 of the California Code of Regulations, to read as follows:

Article 3. Breeding Pigs.

Section 1322. Definitions.

Unless the context otherwise requires, the following definitions apply to this Article and words in the singular form shall be deemed to impart the plural and vice versa, as the case may demand:

(a) "Act" means the Farm Animal Cruelty statute, as amended (Chapter 13.8 (commencing with section 25990) of Division 20 of the Health and Safety Code.).

(b) "Audit trail" means records that are in sufficient detail to document the identification, source, supplier, transfer of ownership, transportation, storage, segregation, handling, packaging, distribution,

100a

and sale of whole pork meat that was derived from a breeding pig confined in compliance with sections 25991 and 25992 of the Health and Safety Code and this Article, and from pork producers that hold a valid certification as a certified operation issued pursuant to Article 5 of this Chapter.

(c) "Breeding pig" means, pursuant to section 25991(a) of the Health and Safety Code, any female pig of the porcine species kept for the purpose of commercial breeding who is six (6) months of age or older, or pregnant.

(d) "Certified operation" means as defined in section 1326(e) of this Chapter.

(e) "Certifying agent" means as defined in section 1326(f) of this Chapter.

(f) "Commercial sale" for purposes of section 25991(o) of the Health and Safety Code and this Article means to sell, offer for sale, expose for sale, possess for sale, exchange, barter, trade, transfer possession, or otherwise distribute in California commerce including, but not limited to, transactions by a retailer with a consumer and electronic transactions made using the internet. It shall not include any of the following transactions or transfers of possession:

(1) Whole pork meat produced outside of the state that enters and exits California, without additional processing or repackaging, exclusively for purposes of transshipment or export for human consumption outside of the state;

(2) Any sale of whole pork meat undertaken on the premises of an establishment at which mandatory inspection is provided under the Federal Meat Inspection Act (21 U.S.C. Sec. 601 et seq.) and that holds an

101a

official establishment number (prefix "M") granted by the Food Safety Inspection Service of the United States Department of Agriculture; or

(3) Donations to religious, charitable, scientific, educational, or other nonprofit organizations that have a tax exemption under section 501(c)(3) of the Internal Revenue Code (26 U.S.C.).

(4) The exception to definition of commercial sale applies only to a specific transaction listed above, not to the covered product itself, and therefore does not apply to all subsequent sales of whole pork meat.

(g) "Consumer" means any person who purchases whole uncooked pork meat, as defined in section 25991(u) of the Health and Safety Code and this Article, for the sole purpose of their own family use or consumption, or that purchases or consumes cooked pork meat at a restaurant, food facility, or other business that serves cooked or ready-to-eat pork meat to customers or patrons.

(h) "Container" means any box, case, basket, tote, can, carton, sack, pouch, bag, package, wrapper, receptacle, or any other device which is used to facilitate the handling, distribution, transportation, or commercial sale of whole pork meat.

(i) "Cottage food operation" means an establishment as defined in section 113758 of the Health and Safety Code.

(j) "Curing agents" for purposes of section 25991(u) of the Health and Safety Code and this Article means any substance listed and described in section 424.21(c) of Title 9 of the Code of Federal Regulations.

102a

(k) "Cut" for purposes of section 25991(u) of the Health and Safety Code and this Article means any uncooked primal, wholesale, sub-primal or retail cut including, but not limited to, those identified and described in the United States Department of Agriculture's Institutional Meat Purchase Specifications: Fresh Pork Series 400 (November 2014 Edition) and the 2014 Uniform Retail Meat Identity Standards developed by the Industry-Wide Cooperative Meat Identification Standards Committee, but shall exclude any ground or otherwise comminuted meat products.

(l) "Department" means the California Department of Food and Agriculture.

(m) "Document of title" means a document which in the regular course of business or financing is treated as adequately evidencing that the person in possession of it is entitled to receive, hold, and dispose of the document and the whole pork meat it covers. Examples of such document include bill of lading, dock warrant, dock receipt, warehouse receipt, or an order for the delivery of whole pork meat.

(n) "Enclosure" means a structure used to confine a covered animal or animals. For purposes of this subsection and this Article, a structure means any cage, crate, pen, or other construction used to confine a breeding pig.

(o) "End-user" means any of the following:

(1) A consumer;

(2) A retailer that is not a pork producer and only conducts commercial sales directly to a consumer, without any further distribution, of whole pork meat that was purchased or received from a pork distributor;

103a

(3) A food processing facility or cottage food operation that receives whole pork meat solely for use as an ingredient to manufacture a combination food product that does not meet the definition of whole pork meat as defined in this Article; or

(4) A restaurant, food facility or other business that only cooks and serves pork meat, and/or serves only ready-to-eat pork meat, to customers, patrons or guests for purposes of consumption.

(p) "Enforcement officer" means any of the following:

(1) Persons employed by and under the supervision and control of the Department; or (2) Persons employed by and under the supervision and control of the Department of Public Health.

(q) "Flavoring" for purposes of section 25991(u) of the Health and Safety Code and this Article means any substance, whether artificial or natural, the function of which is to impart flavor rather than nutrition, and includes the substances listed and described in sections 172.510, 172.515(b), 182.10, 182.20, 182.40, and 182.50, and part 184 of Title 21 of the Code of Federal Regulations.

(r) "Food facility" means a facility as defined in section 113789 of the Health and Safety Code.

(s) "Food processing facility" means a facility as defined in section 109947 of the Health and Safety Code.

(t) "Person" means any individual, firm, partnership, joint venture, association, limited liability company, corporation, estate, trust, receiver, or syndicate.

104a

(u) "Pork distributor" means a person or facility engaged in the business of commercial sales or distribution of whole pork meat (as a pork producer or otherwise) to an end-user in California. This definition shall not apply to a person or facility that only receives whole pork meat as an end-user.

(v) "Pork producer" means a person engaged in the business of keeping, maintaining, confining and/or housing a female pig of the porcine species that is six (6) months of age or older, or is pregnant, for the purpose of commercial breeding to produce pork meat for human food. This definition shall not apply to an establishment at which mandatory inspection is provided under the Federal Meat Inspection Act (21 U.S.C. Sec. 601 et seq.) and that holds an establishment number (prefix "M") granted by the Food Safety Inspection Service of the United States Department of Agriculture.

(w) "Ready-to-eat (RTE)" means in a form that is edible without additional preparation to achieve food safety and may receive additional preparation for palatability or aesthetic, gastronomic, or culinary purposes. RTE product is not required to bear a safe-handling instruction (as required for non-RTE products by sections 317.2(l) and 381.125(b)) of Title 9 of the Code of Federal Regulations) or other labeling that directs that the product must be cooked or otherwise treated for safety and can include frozen meat products.

(x) "Requiring cooking" for the purposes of section 25991(r) of the Health and Safety Code and this Article means not ready-to-eat in the condition sold, offered for sale or otherwise distributed.

105a

(y) "Retailer" means a facility location that conducts commercial sales of whole pork meat to a consumer.

(z) "Seasoning" for purposes of section 25991(u) of the Health and Safety Code and this Article is synonymous with the term "spice" and means any aromatic vegetable substance in the whole, broken, or ground form, whose primary function in food is seasoning rather than nutritional and from which no portion of any volatile oil or other flavoring principle has been removed. Spices include onions, garlic, peppers, and the spices listed in section 182.10, and Part 184 of Title 21 of the Code of Federal Regulations.

(aa) "Uncooked" means requiring cooking prior to human consumption.

(bb) "Whole pork meat" means, pursuant to section 25991(u) of the Health and Safety Code, any uncooked cut of pork, including bacon, ham, chop, ribs, riblet, loin, shank, leg, roast, brisket, steak, sirloin, or cutlet, that is comprised entirely of pork meat, except for seasoning, curing agents, coloring, flavoring, preservatives, and similar meat additives. Whole pork meat does not include combination food products, including soups, sandwiches, pizzas, hotdogs, or similar processed or prepared food products, that are comprised of more than pork meat, seasoning, curing agents, coloring, flavoring, preservatives, and similar meat additives. Note: Authority cited: Section 25993, Health and Safety Code. Reference: Sections 25990, 25991, 109947, 113758, and 113789, Health and Safety Code; Title 9, Part 317, section 317.2(l), Part 381, section 381.125(b), and Part 424, section 424.21(c), Title 21, Part 172, sections 172.510 and 172.515(b), Part 182, sections 182.10, 182.20, 182.40, 182.50; and Part 184, Code of Federal Regulations;

106a

Federal Meat Inspection Act, 21 U.S.C. section 601 et seq.; and Internal Revenue Code, 26 U.S.C. section 501(c)(3).

Section 1322.1. Breeding Pig Confinement.

(a) No pork producer or pork distributor shall knowingly sell or contract to sell whole pork meat for human consumption in the state if it is the product of a breeding pig, or the product of the immediate off-spring of a breeding pig, that was confined in an enclosure that fails to comply with the following standard:

(1) Commencing January 1, 2022, an enclosure shall provide a minimum of 24 square feet of usable floorspace per breeding pig.

(2) The amount of usable floorspace required by (a)(1) of this section shall be calculated by dividing the total square footage of floorspace provided to breeding pigs in an enclosure by the number of breeding pigs in the enclosure. For purposes of this section, floorspace shall also include ground-space for enclosures that are outdoor pens or pastures accessible at all times by all pigs in the enclosure.

(3) Exceptions specified in section 25992 of the Health and Safety Code and Article 4 of this Chapter apply to the requirements of this section.

(b) Commencing January 1, 2023, any person engaged in business in this state as a pork producer, or any out-of-state pork producer that is keeping, maintaining, confining, and/or housing a breeding pig for purposes of producing whole pork meat, from the breeding pig or its immediate offspring, for human food use in California, shall hold a valid certification

107a

issued pursuant to Article 5 of this Chapter as a certi-fied operation. Note: Authority cited: Section 25993, Health and Safety Code. Reference: Sections 25990, 25991, and 25992, Health and Safety Code.

<u>Section 1322.2. Pork Distributor Registration.</u>

(a) Any person engaged in business in this state as a pork distributor, or any out-of-state pork distrib-utor selling whole pork meat into California for pur-poses of human food use in the state, shall register with the Department pursuant to this Article.

(b) Any person required to register pursuant to (a) of this section shall submit an application for registra-tion provided by the Department including the follow-ing information: Business name, physical address of distribution operation, mailing address, phone num-ber, email address, website address, federal tax iden-tification number, and name, phone number and email of person authorized to act on the applicant's behalf.

(c) The registration shall not be transferable to any person and shall be applicable only to the location for which originally issued.

(d) A registration is required for each facility loca-tion from which whole pork meat is sold, distributed, or otherwise supplied to the location of an end-user.

(e) A pork distributor shall not engage in the com-mercial sale of whole pork meat within, or into, Cali-fornia unless such person has obtained and holds a valid registration from the Department pursuant to this section for each facility location.

(f) Any change in ownership, change of business name, change in business location, closure of busi-ness, or change of name, address, phone number or

108a

email of person authorized to act on behalf of the registered distributor must be reported to the Department within 30 business days of such change.

(g) All information set forth on applications for registrations and renewals for registrations, including but not limited to any documentation of certification required by (j) of this section, shall be truthful and not misleading.

(h) Every registration expires 12 months from the date of issue.

(i) A registration may be renewed each 12-month period by the Department in response to an application for renewal by a pork distributor if the business of the facility applying for renewal was conducted in accordance with the requirements of this Article and sections 25990 and 25991 of the Health and Safety Code during the preceding 12 months for which the renewal is requested.

(j) An application to the Department by a pork distributor for initial registration, or for purposes of renewal, shall be accompanied by documentation of valid certification pursuant to Article 5 of this Chapter for each location where registration is being sought. A registration shall not be issued for any facility location for which the valid certification required by this section has not been submitted to the Department.

(k) Notwithstanding the requirements of (j) of this section, a registration may be granted prior to January 1, 2023 to a pork distributor that submits a self-certification to the Department that the pork distributor complies with all applicable requirements of sections 1322.4 and 1322.5 of this Article, and distributes whole pork meat within or into California only from

109a

pork producers that comply with section 1322.1 of this Article.

(l) This section shall not apply to an establishment at which mandatory inspection is provided under the Federal Meat Inspection Act (21 U.S.C. Sec. 601 et seq.) and that holds an establishment number (prefix "M") granted by the Food Safety Inspection Service of the United States Department of Agriculture with prefix of "M".

Note: Authority cited: Section 25993, Health and Safety Code. Reference: Sections 25990 and 25991, Health and Safety Code and Federal Meat Inspection Act (21 U.S.C. section 601 et seq.).

Section 1322.3. Inspection and Audit of Registered Pork Distributor Facilities.

(a) Every person required to be registered pursuant to section 1322.2 of this Article shall comply with this section.

(b) Every pork distributor by submitting an application for registration of a facility agrees as a condition of registration to provide the Department, and/or certifying agent, entrance and access to the premises and business records of the facility for purposes of inspection and audit as described in Article 5 of this Chapter. Note: Authority cited: Section 25993, Health and Safety Code. Reference: Sections 25990 and 25991, Health and Safety Code.

Section 1322.4. Whole Pork Meat Shipping Document Requirements.

(a) Shipping Documents.

(1) Commencing January 1, 2022, all documents of title, shipping invoices, bills of lading, and shipping

110a

manifests for all shipments of whole pork meat entering the state or transported within the state for commercial sale in California shall include the statement "California 24+ Compliant" and may be abbreviated to read "CA 24+". The statement shall be clearly legible and plainly printed or stamped;

(2) For shipments of whole pork meat that was not produced in compliance with section 25991 of the Health and Safety Code and this Article, and enter California exclusively for purposes of transshipment or export for human consumption outside of the state and are not destined for commercial sale in California, all documents of title, shipping invoices, bills of lading, and shipping manifests shall, upon entrance into the state and during transportation and storage within the state, be marked with the statement "Not for California Consumption" or "Not for California Sale";

(3) For shipments of whole pork meat not produced in compliance with section 25991 of the Health and Safety Code and this Article that originate from a facility, whether located inside or outside of the state, holding an establishment number with prefix "M" granted by the Food Safety Inspection Service of the United States Department of Agriculture under the Federal Meat Inspection Act (21 U.S.C. Sec. 601 et seq.) and being transported to another facility in California holding an establishment number with prefix "M" granted by the Food Safety Inspection Service of the United States Department of Agriculture under the Federal Meat Inspection Act (21 U.S.C. Sec. 601 et seq.), solely for purposes of using the whole pork meat for making food products not covered by the Act or this Article, all documents of title, shipping invoices, bills of lading, and shipping manifests shall,

111a

upon entrance into the state and during transportation within the state, be clearly marked with the statement "Only for use at" immediately followed by the complete establishment number, including the prefix "M", granted by the Food Safety Inspection Service of the United States Department of Agriculture for the specific facility where the shipment is destined for delivery.

(b) No person shall label, identify, mark, advertise, or otherwise represent, pigs or pork meat for commercial sale in California using the statements in (a) of this section, or as meeting the requirements of the Act or otherwise meeting California enclosure space requirements, unless they were produced in compliance with section 25991 of the Health and Safety Code and this Article.

Note: Authority cited: Section 25993, Health and Safety Code. Reference: Sections 25990 and 25991, Health and Safety Code and Federal Meat Inspection Act, 21 U.S.C. section 601 et seq.

Section 1322.5. Pork Distributor Recordkeeping.

(a) A pork distributor, as a condition of registration pursuant to section 1322.2 of this Article, shall maintain records that comply with all the requirements of this section.

(b) Records shall be sufficient for purposes of an audit trail as defined in section 1322(b) of this Article and the applicable recordkeeping requirements described in section 1326.2 of this Chapter.

(c) Records shall document in a traceable manner that whole pork meat being distributed for commercial sale into or within California originates from pork

112a

producers that are in compliance with all requirements of section 1322.1 of this Article.

(d) Records shall document the address of the location where the distributor, as the buyer, takes physical possession of whole pork meat for each sales transaction.

(e) Records shall be maintained for two (2) years from the date of creation and be made accessible for inspection and audit by the Department and/or a certifying agent as required by section 1322.3 of this Article.

(f) This section shall not apply to an establishment at which mandatory inspection is provided under the Federal Meat Inspection Act (21 U.S.C. Sec. 601 et seq.) and granted an establishment number (prefix "M") by the Food Safety Inspection Service of the United States Department of Agriculture with prefix of "M".

Note: Authority cited: Section 25993, Health and Safety Code. Reference: Sections 25990 and 25991, Health and Safety Code and Federal Meat Inspection Act, 21 U.S.C. section 601 et seq.

<u>Section 1322.6. Inspection of Conveyances.</u>

(a) Every pork distributor by submitting an application for registration agrees as a condition of registration to provide the Department or other enforcement officer, and/or a certifying agent, access to inspect in California any vehicle or other conveyance under the registrant's operation or control that is transporting whole pork meat into or within the state.

(b) Every person shall stop at the request of an enforcement officer at any California Border Protection

113a

Station for purposes of inspection of cargo and any accompanying shipping documents, manifests, and bills of lading, any vehicle or other conveyance transporting into or within the state whole pork meat.

(c) The Department, or other enforcement officer in California, may deny entry to or order diversion from the state any vehicle or other conveyance transporting whole pork meat intended for commercial sale that was produced, packaged, identified, or shipped in violation of the requirements of sections 25990-25992 of the Health and Safety Code, or the provisions of this Article, including but not limited to shipping document requirements specified in section 1322.4 of this Article. Note: Authority cited: Section 25993, Health and Safety Code. Reference: Sections 25990, 25991, and 25992, Health and Safety Code.

## Section 1322.7. Tagging and Seizure of Whole Pork Meat.

(a) The Department or other enforcement officer may affix a warning tag or notice to shipping documents, manifests, containers, sub-containers, lots, or loads of pork meat which have been produced, packaged, stored, labeled, marked, identified, transported, delivered, or sold in violation of the requirements of sections 25990-25992 of the Health and Safety Code, or the provisions of this Article, and may give notice of such violation to the pork producer, pork distributor, owner, or other person in possession of the pork meat.

(b) No person shall remove a warning tag or notice from the place it is affixed except upon written permission or specific direction of the Department or other enforcement officer.

114a

(c) An enforcement officer may seize and hold any containers, sub-containers, lots or loads of pork meat in California which they have reasonable suspicion to believe is in violation of the provisions of sections 25990-25992 of the Health and Safety Code, or the provisions of this Article. If the Department or other enforcement officer seizes any container, sub-container, lot, or load of pork meat, a hold notice shall be issued to the person that has control of the pork meat, and a tag or notice may be affixed to the container, sub-container, lot, or load which states it is so held.

(d) Any whole pork meat for which a hold notice is issued shall be held by the person having control of the whole pork meat and shall not be disturbed, moved, diverted, or offered for sale except under the specific directions of the Department or other enforcement officer.

(e) A person may request an informal hearing to contest tagging, hold notice, or seizure of whole pork meat pursuant to section 1327.1 of this Chapter. Note: Authority cited: Section 25993, Health and Safety Code. Reference: Sections 25990, 25991, and 25992, Health and Safety Code.

Section 1322.8. Written Certification.

(a) For purposes of section 25993.1 of the Health and Safety Code, any written certification from a supplier to a buyer engaged in commercial sales of whole pork meat that was not derived from a breeding pig, or offspring of a breeding pig, confined in a cruel manner shall be based upon an audit trail as defined in section 1322(b), of this Article, and shall be traceable to pork producers compliant with all requirements of section 1322.1 of this Article.

115a

(b) A retailer or food processing facility that is an end-user and takes possession, whether by use of a common carrier, private carrier or other means of conveyance, of whole pork meat at, or directly from, an establishment at which mandatory inspection is provided under the Federal Meat Inspection Act (21 U.S.C. Sec. 601 et seq.) granted an establishment number (prefix "M") by the Food Safety Inspection Service of the United States Department of Agriculture with a prefix of "M", shall:

(1) Maintain records documenting written certifications that meet the requirements of this section for whole pork meat received during the preceding 12-month period.

(2) Maintain records documenting the address of the location where the retailer or food processor, as the buyer, takes physical possession of whole pork meat for each sales transaction.

(3) Make the records required by this subsection available on-site for inspection by the Department and other state or local health agencies upon request. Electronic records are considered on-site if they are accessible from an on-site location.

(c) Subsection (b) of this section shall not apply to a whole pork meat end-user that is an official establishment inspected under the Federal Meat Inspection Act (21 U.S.C. Sec. 601 et seq.) and granted an establishment number (prefix "M") by the Food Safety Inspection Service of the United States Department of Agriculture. Note: Authority cited: Section 25993, Health and Safety Code. Reference: Sections 25900 and 25991, Health and Safety Code and Federal Meat Inspection Act, 21 U.S.C. section 601 et seq.

116a

Section 1322.9. Denial, Suspension, or Revocation of Pork Distributor Registration.

(a) The Department may deny, suspend, or revoke a registration issued pursuant to this Article for any of the following:

(1) Violations that resulted, or reasonably could have resulted, in the commercial sale of whole pork meat from breeding pigs, or offspring of breeding pigs, that was not confined in compliance with this Article;

(2) Repetitive failure to comply with the requirements of this Article and/or statutes pertaining to whole pork meat or breeding pigs in sections 25990-25992 of the Health and Safety Code;

(3) Refusal to grant access for, or interference with, inspections or audits described in sections 1322.3 or 1322.6 of this Article;

(4) Misrepresenting whole pork meat as being produced in compliance with this Article; or

(5) Providing false information on an application for registration.

(b) A person may appeal the Department's decision to refuse to issue, or to deny, suspend, or revoke a registration certificate by requesting a formal hearing pursuant to Chapter 5 (commencing with Section 11500) of Part 1 of Division 3 of Title 2 of the Government Code.

(c) The Department's decision to deny, suspend, or revoke a registration shall remain in effect pending the outcome of an appeals process.

Note: Authority cited: Section 25993, Health and Safety Code. Reference: Sections 25990, 25991, and 25992, Health and Safety Code.

117a

Section 1322.10. Registration with the California Department of Public Health.

(a) Notwithstanding section 1322.2 of this Article, any person operating a food processing establishment in California shall also register with the California Department of Public Health pursuant to section 110460 of the Health and Safety Code. The registration requirement applies to all forms of processed pork.

(b) Evidence of this registration shall be provided to the Department or its designee upon request. Note: Authority cited: Sections 25993 and 110065, Health and Safety Code. Reference: Sections 25990, 25991, 109875, 109935, 110045, and 110460, Health and Safety Code.

5) Adopt Article 4 and section 1324 of Chapter 10 of Division 2 of Title 3 of the California Code of Regulations, to read as follows:

Article 4. Exceptions.

Section 1324. Definitions.

(a) "Individual treatment" for purposes of section 25992 of the Health and Safety Code, and this Chapter, means any protocol, practice, procedure, or application of care concerned with the diagnosis, treatment, mitigation, or prevention of animal disease, injury or harm that is administered by, or conducted under the order or recommendation of, a licensed veterinarian as part of a veterinarian-client-patient relationship as defined in section 530.3(i) of Title 21 of the Code of Federal Regulations.

118a

(b) "Medical research" for purposes of section 25992 of the Health and Safety Code, and this Chapter, means any basic and applied research that relates or contributes to the scientific understanding, promotion, or protection of human or animal health, fitness, function, performance, welfare or care, and that is conducted under the review of an Institutional Animal Care and Use Committee operating in accordance with section 2.31 of Title 9 of the Code of Federal Regulations.

Note: Authority cited: Section 25993, Health and Safety Code. Reference: Sections 25990, 25991, and 25992, Health and Safety Code and Title 9, Part 2, section 2.31 and Title 21, Part 530, section 530.3(i), Code of Federal Regulations.

6) Adopt Article 5 and sections 1326 through 1326.22 of Chapter 10 of Division 2 of Title 3 of the California Code of Regulations, to read as follows:

Article 5. Certification and Accredited Certifiers.

Section 1326. Definitions.

Unless the context otherwise requires, the following definitions apply to this Article and words in the singular form shall be deemed to impart the plural and vice versa, as the case may demand:

(a) "Accreditation or accredit" means a determination made by the Department that authorizes a private entity to conduct certification activities as a certifying agent under this Chapter.

(b) "Act" means the Farm Animal Cruelty statute, as amended (Chapter 13.8 (commencing with section 25990) of Division 20 of the Health and Safety Code.).

119a

(c) "Area of operation" means the types of covered animal production or distribution operations, including veal calves and whole veal meat, breeding pigs and whole pork meat, egg-laying hens and shell eggs or liquid eggs, or any combination thereof that a certifying agent may be accredited to certify under this Chapter.

(d) "Certification or certify" means a determination made by a certifying agent that a production or distribution operation is in compliance with the Act and this Chapter, which is documented by a certificate of California farm animal confinement compliance.

(e) "Certified operation" means a production or distribution operation, or portion of such operation, that is certified by a certifying agent as utilizing a system of animal confinement or distribution as described by the Act and this Chapter.

(f) "Certifying agent" means any private entity accredited by the Department as a third-party certifying agent for the purpose of certifying a production or distribution operation as a certified operation, the Department, or any government entity that the Department recognizes as providing functionally equivalent certification services to the requirements of this Chapter.

(g) "Certifying agent's operation" means all sites, facilities, personnel, and records used by an accredited private certifying agent to conduct certification activities under the regulations in this Chapter.

(h) "Covered animal" means any calf raised for veal, breeding pig, or egg-laying hen who is kept on a farm pursuant to sections 25991(f) and (i) of the Health and Safety Code for purposes of producing covered products.

120a

(i) "Covered product" means all of the following:

(1) Shell eggs as defined in section 25991(p) of the Health and Safety Code and section 1320(aa), of this Chapter; or

(2) Liquid eggs as defined in section 25991(l) of the Health and Safety Code and, section 1320(u) of this Chapter; or

(3) Whole veal meat as defined in section 25991(v) of the Health and Safety Code and section 1321(bb) of this Chapter; or

(4) Whole pork meat as defined in section 25991(u) of the Health and Safety Code and section 1322(bb) of this Chapter.

(j) "Department" means the California Department of Food and Agriculture.

(k) "Distributor" means an egg distributor as defined in section 1320(k), a veal distributor as defined in section 1321(z), and a pork distributor as defined in section 1322(u), of this Chapter.

(l) "Distributor operation" means any operation or portion of an operation that conducts activities as a distributor.

(m) "Employee" means any person providing paid or volunteer services for a certifying agent.

(n) "Governmental entity" means any local, state, or federal domestic government, tribal government, or foreign governmental subdivision providing certification services.

(o) "Immediate family" means the spouse, minor children, or blood relatives who reside in the immediate household of a certifying agent or in the immediate household of employee, inspector, contractor, or

121a

other personnel of the certifying agent. For the purpose of this Chapter, the interest of a spouse, minor child, or blood relative who is a resident of the immediate household of a certifying agent or an employee, inspector, contractor, or other personnel of the certifying agent shall be considered to be an interest of the certifying agent or an employee, inspector, contractor, or other personnel of the certifying agent.

(p) "Inspection" means the act of examining and evaluating the production or distribution operation of an applicant for certification or a certified operation to determine compliance with the Act and this Chapter.

(q) "Inspector" means any person retained or used by a certifying agent to conduct inspections of certification applicants or certified production or distribution operations, or an authorized representative of the Department.

(r) "Label" means a display of written, printed, or graphic material on the immediate container of a covered product or any such material affixed to any covered product or affixed to a bulk container containing a covered product, except for package liners or a display of written, printed, or graphic material which contains only information about the weight of the product.

(s) "Labeling" means all written, printed, or graphic material accompanying a covered product at any time or written, printed, or graphic material about the covered product displayed at retail stores about the product.

122a

(t) "Person" means any individual, firm, partnership, joint venture, association, limited liability corporation, corporation, estate, trust, receiver, or syndicate.

(u) "Private entity" means any domestic or foreign nongovernmental, for-profit, or not-for-profit organization providing certification services.

(v) "Producer" means an egg producer as defined in section 1320(m), a veal producer as defined in section 1321(aa), and a pork producer as defined in section 1322(v).

(w) "Records" means any information in written, visual, or electronic form that documents the activities undertaken by a producer, distributor, or certifying agent to comply with the Act and this Chapter.

(x) "Responsibly connected" means any person who is a partner, officer, director, holder, manager, or owner of 10 percent or more of the voting stock of an applicant, or a recipient of certification or accreditation.

(y) "Split operation" means an operation that produces or distributes covered animals and/or covered products from operations, or portions of an operation, that are both in conformance and out-of-conformance with the confinement standards of the Act and this Chapter.

(z) "State" means any of the several States of the United States of America, its territories, the District of Columbia, and the Commonwealth of Puerto Rico. Note: Authority cited: Section 25993, Health and Safety Code. Reference: Sections 25990 and 25991, Health and Safety Code.

123a

Section 1326.1. General Requirements for Certification.

A person seeking to receive or maintain certification under this Chapter must:

(a) Comply with the Act and applicable regulations of this Chapter;

(b) Allow on-site inspections by the certifying agent, and/or authorized representatives of the Department, with access to the production and/or distribution operation, and offices as provided for in sections 1326.2 and 1326.5 of this Article;

(c) If a producer, allow access by the certifying agent, and/or authorized representatives of the Department, to pastures, fields, structures, and houses where covered animals and covered animal products may be kept, produced, processed, handled, stored or transported, including the inspection of all enclosures for covered animals;

(d) If a distributor, allow access by the certifying agent, and/or authorized representatives of the Department, to examine all covered products that are sold or intended, held, segregated, stored, packaged, labeled, or represented for sale or distribution;

(e) Allow access by the certifying agent, and/or authorized representatives of the Department, to containers, labels, labeling, invoices, documents of title, and bills of lading used in the handling, storage, packaging, sale, transportation, or distribution of covered products;

(f) Allow access by the certifying agent, and/or authorized representatives of the Department, during normal business hours for review and copying of records required by section 1326.2 of this Article; and

124a

(g) Immediately notify the certifying agent concerning any change in a certified operation or any portion of a certified operation that may affect its compliance with the Act and this Chapter.

Note: Authority cited: Section 25993, Health and Safety Code. Reference: Sections 25990 and 25991, Health and Safety Code.

Section 1326.2. Recordkeeping by Certified Operations.

(a) In order to receive and maintain certification, a certified operation must maintain records concerning the production and distribution of covered animals and/or covered products.

(b) Such records must:

(1) Be maintained by a producer in sufficient detail to document that covered animals were confined in compliance with sections 25991 and 25992 of the Health and Safety Code and the requirements of this Chapter;

(2) Be maintained by a distributor in sufficient detail to document the identification, source, supplier, transfer of ownership, transportation, storage, segregation, handling, packaging, distribution, and sale of covered products that were derived from animals confined in compliance with sections 25991 and 25992 of the Health and Safety Code and this Chapter;

(3) Be maintained for not less than two (2) years beyond their creation;

(4) Include records of all covered animal and/or covered product transactions for the preceding two-year period. The records must indicate the date, quantity, identity of the buyer and seller, and the address

125a

where physical possession of covered product took place for each transaction;

(5) Include documentation and records for the preceding two-year period pertaining to the production, processing, handling, packaging, storage, transportation, or sale of covered animals or covered products sold, intended for sale in California or identified or represented as compliant with the confinement requirements of the Act and this Chapter;

(6) Include documentation of the size of the certified operation, the quantity of covered animals and/or covered products produced or processed from each facility or farm unit in the certified operation, the number of covered animal enclosures for each facility or farm unit, the size of each enclosure, the number of covered animals housed in each enclosure, and the dates of stocking, harvest and production;

(7) If the facility is a split operation, include documentation sufficient to demonstrate the identification, segregation, distribution, and handling of covered animals and/or covered products to prevent commingling with any animals or products that do not comply with requirements of the Act; and

(8) Include documentation of registration issued by the Department pursuant to sections 1320.2, 1321.2, and 1322.2 of this Chapter, as applicable to the certified operation.

(c) The inspection and audit of any records and documents required by this section, may be conducted by the Department, or other certifying agent, by on-site inspection at the certified operation location, or by utilizing email, phone, teleconference, or any combination thereof, at the discretion of the certifying agent or the Department. Note: Authority cited: Section

126a

25993, Health and Safety Code. Reference: Sections 25990, 25991, and 25992, Health and Safety Code.

Section 1326.3.  Application for Certification.

(a) A person seeking certification of a production or distribution operation by a certifying agent under this Article must submit an application for certification that includes all the following information:

(1) The name of the person completing the application; the applicant's business name, physical address, mailing address, and telephone number; and, when the applicant is a corporation, the name, address, email, and telephone number of the person authorized to act on the applicant's behalf;

(2) The name(s) of any certifying agent(s) to which application has previously been made; the year(s) of application; the outcome of the application(s) submission, including, when available, a copy of any notification of noncompliance, denial or revocation of certification issued to the applicant for certification; and a description of the actions taken by the applicant to correct the noncompliance noted in the notification of noncompliance, including evidence of such correction;

(3) A description of the type and quantity of covered animals and/or covered products to be produced and/or distributed at the facility for which certification is being requested;

(4) A description of the covered animal confinement system to be used at the facility, including but not limited to the number of enclosures, size of enclosures and maximum number of covered animals to be housed in each, and additional information as deemed necessary by the certifying agent to determine compliance with the Act and this Chapter;

127a

(5) A description of the management practices, physical barriers, and standard operating procedures established to prevent commingling of covered animals or covered products if the facility is a split operation; and

(b) If the certifying agent is a government entity other than the Department, it may use its own authorized procedures for application for certification in lieu of this section's requirements. Note: Authority cited: Section 25993, Health and Safety Code. Reference: Sections 25990 and 25991, Health and Safety Code.

Section 1326.4. Review of Application for Certification.

(a) Upon acceptance of an application for certification, a certifying agent must:

(1) Review the application to ensure completeness pursuant to section 1326.3 of this Article;

(2) Determine by a review of the application materials whether the applicant appears to comply or may be able to comply with the applicable requirements of the Act and this Chapter;

(3) Verify that an applicant who previously applied to another certifying agent and received a notification of noncompliance, denial or revocation of certification, pursuant to section 1326.7 of this Article, has submitted documentation to support the correction of any issues of noncompliance identified in the notification of noncompliance or denial of certification, as required in section 1326.7(e) of this Article; and

(4) Schedule an on-site inspection, pursuant to section 1326.5 of this Article, of the production or distribution operation to determine whether the appli-

128a

cant qualifies for certification if the review of application materials reveals that the production or distribution operation may be in compliance with the applicable requirements of the Act and this Chapter.

(b) A certifying agent shall:

(1) Review the application materials received and communicate its findings to the applicant; and

(2) Provide the applicant with a copy of the on-site inspection report, as approved by the certifying agent, for any on-site inspection performed.

(c) The applicant may withdraw its application at any time. An applicant that voluntarily withdrew its application prior to the issuance of a notice of noncompliance will not be issued a notice of noncompliance. Similarly, an applicant that voluntarily withdrew its application prior to the issuance of a notice of certification denial will not be issued a notice of certification denial.

(d) If the certifying agent is a government entity other than the Department, it may use its own authorized procedures for application review in lieu of this section's requirements as long as such review includes an on-site verification of an applicant's compliance with the Act and applicable provisions of this Chapter by a process equivalent to that described in section 1326.5 of this Article. Note: Authority cited: Section 25993, Health and Safety Code. Reference: Sections 25990 and 25991, Health and Safety Code.

Section 1326.5. On-site Inspections.

(a) On-site inspections.

(1) In order to grant certification, a certifying agent must conduct an initial on-site inspection of each production unit, facility, and site that produces

129a

or distributes covered animals or covered products that is included in an operation for which certification is requested. An on-site inspection must be conducted at least once every 12 months thereafter for each certified operation that produces or distributes covered animals or covered products for the purpose of determining whether to approve the request for certification or whether certification of the operation should continue.

(2) The Department may require that additional inspections be performed by an accredited certifying agent or the Department for the purpose of determining compliance with the Act and this Chapter. Additional inspections may be announced or unannounced as required by the Department.

(b) Scheduling.

(1) The initial on-site inspection must be conducted within 3 months following a determination that the applicant appears to comply or may be able to comply with the requirements of the Act and this Chapter.

(2) All on-site inspections must be conducted when an authorized representative of the operation who is knowledgeable about the operation is present and at a time when facilities and activities that demonstrate the operation's compliance with or capability to comply with the applicable provisions of the Act and this Chapter can be observed, except that this requirement does not apply to unannounced on-site inspections.

(c) Verification of information. The on-site inspection of an operation must verify:

(1) The operation's compliance or capability to comply with the Act and this Chapter; and

130a

(2) That the information provided in accordance with sections 1326.3 and 1326.8 of this Article accurately reflects the practices used or to be used by the applicant for certification or by the certified operation.

(d) Exit interview. The inspector must conduct an exit interview with an authorized representative of the operation who is knowledgeable about the inspected operation to confirm the accuracy and completeness of inspection observations and information gathered during the on-site inspection. The inspector must also address the need for any additional information as well as any issues of concern.

(e) A copy of the on-site inspection report shall be sent to the inspected operation by the certifying agent. Note: Authority cited: Section 25993, Health and Safety Code. Reference: Sections 25990 and 25991, Health and Safety Code.

Section 1326.6. Granting Certification.

(a) After completion of the initial on-site inspection, a certifying agent must review the on-site inspection report, and any additional information requested from or supplied by the applicant. If the certifying agent determines that the confinement or distribution system and all procedures and activities of the applicant's operation are in compliance with the Act and this Chapter, the agent shall grant certification.

(b) When a certifying agent issues a certificate of compliance it shall specify all the following:

(1) Name and address of the certified operation; (2) Effective date of certification;

(3) Date of most recent on-site inspection;

131a

(4) Categories of operation, including whether the operation is a producer, distributor or both, a split operation, and the species of covered animals and/or types of covered products produced or distributed by the certified operation; and

(5) Name, address, and telephone number of the certifying agent.

(c) Notwithstanding (a) of this section, the Department will accept certifications granted by another government entity using procedures established under the authority of that government entity, provided such certification is based on on-site verification of a certified operation's compliance with the Act and applicable provisions of this Chapter by a process equivalent to that described in section 1326.5 of this Article, and that the certificate specifies at a minimum the information described in paragraph (b) of this section. Note: Authority cited: Section 25993, Health and Safety Code. Reference: Sections 25990 and 25991, Health and Safety Code.

Section 1326.7. Denial of Certification.

(a) When the certifying agent, based on a review of the information specified in sections 1326.2, 1326.3, 1326.4 or 1326.5 of this Article, determines that an applicant for certification is not in compliance with the Act and this Chapter, the certifying agent shall provide a written notification of noncompliance to the applicant. When correction of a noncompliance is not possible, a notification of noncompliance and a notification of denial of certification may be combined in one notification. The notification of noncompliance shall provide:

(1) A description of each noncompliance;

132a

(2) The facts upon which the notification of non-compliance is based; and

(3) The date by which the applicant must rebut or correct each noncompliance and submit supporting documentation of each such correction when correction is possible.

(b) Upon receipt of such notification of noncompliance, the applicant may:

(1) Correct noncompliances and submit a description of the corrective actions taken with supporting documentation to the certifying agent;

(2) Correct noncompliances and submit a new application to another certifying agent: Provided, that the applicant must include a complete application, the notification of noncompliance received from the first certifying agent, and a description of the corrective actions taken with supporting documentation; or

(3) Submit written information to the issuing certifying agent to rebut the noncompliance described in the notification of noncompliance.

(c) After issuance of a notification of noncompliance, the certifying agent must:

(1) Evaluate the applicant's corrective actions taken and supporting documentation submitted or the written rebuttal and conduct an on-site inspection if necessary;

(2) When the corrective action or rebuttal is sufficient for the applicant to qualify for certification, issue the applicant an approval of certification pursuant to section 1326.6 of this Article; or

(3) When the corrective action or rebuttal is not sufficient for the applicant to qualify for certification,

133a

issue the applicant a written notice of denial of certification;

(d) A certifying agent must issue a written notice of denial of certification to an applicant who fails to respond to the notification of noncompliance.

(e) A notice of denial of certification must state the reason(s) for denial and the applicant's right to:

(1) Reapply for certification pursuant to sections 1326.3 and 1326.8 of this Article;

(2) Request mediation pursuant to section 1327.2 of this Chapter; or

(3) File an appeal for a formal hearing of the denial of certification pursuant to Chapter 5 (commencing with Section 11500) of Part 1 of Division 3 of Title 2 of the Government Code.

(f) An applicant for certification who has received a written notification of noncompliance or a written notice of denial of certification may apply for certification again at any time with any certifying agent, in accordance with sections 1326.3 and 1326.8 of this Article. When such applicant submits a new application to a certifying agent other than the agent who issued the notification of noncompliance or notice of denial of certification, the applicant for certification must include a copy of the notification of noncompliance or notice of denial of certification and a description of the actions taken, with supporting documentation, to correct the noncompliances noted in the notification of noncompliance.

(g) A certifying agent who receives a new application for certification, which includes a notification of noncompliance, a notice of denial or revocation of cer-

134a

tification, must treat the application as a new application and begin a new application process pursuant to sections 1326.3 and 1326.4 of this Article.

(h) Notwithstanding (a) of this section, if a certifying agent has reason to believe that an applicant for certification has willfully made a false statement or otherwise purposefully misrepresented the applicant's operation or its compliance with the certification requirements pursuant to this Article, the certifying agent may deny certification pursuant to (e) of this section without first issuing a notification of noncompliance. Note: Authority cited: Section 25993, Health and Safety Code. Reference: Sections 25990 and 25991, Health and Safety Code.

Section 1326.8. Continuation of Certification.

(a) To continue certification, a certified operation must annually submit the following renewal information, as applicable, to the certifying agent:

(1) A summary statement, supported by documentation, detailing any deviations from, or changes to, information submitted on the previous year's application, including but not limited to any additions to or deletions from the information required pursuant to section 1326.3 of this Article;

(2) An update on the correction of minor noncompliances previously identified by the certifying agent as requiring correction for continued certification; and

(3) Other information as deemed necessary by the certifying agent to determine compliance with the Act and this Chapter.

(b) Following the receipt of the information specified in subsection (a) of this section, the certifying agent shall arrange and conduct an on-site inspection

135a

of the certified operation pursuant to section 1326.5 of this Article to determine compliance with the Act and this Chapter.

(c) If the certifying agent determines, based on the on-site inspection and a review of the information specified in (a) of this section, that a certified operation is not complying with the requirements of the Act and this Chapter, the certifying agent shall provide a written notification of noncompliance to the operation in accordance with section 1326.20 of this Article.

(d) If the certifying agent determines, based on the on-site inspection and a review of the information specified in subsection (a) of this section, that the certified operation is complying with the Act and this Chapter, the certifying agent shall issue an updated certificate of compliance pursuant to section 1326.6(b) of this Article.

(e) Any change in ownership, change of business name, or change in business location, closure of business, or change of name, address, phone number or email of person authorized to act on behalf of the certified operation must be reported to the certifying agent within 30 days of such change.

(f) If the certifying agent is a government entity other than the Department, it may use its own authorized procedures for continuation of certification in lieu of this section's requirements as long as such renewal process includes an on-site verification of the certified operation's compliance with the Act and applicable provisions of this Chapter by a process equivalent to that described in section 1326.5. Note: Authority cited: Section 25993, Health and Safety Code. Reference: Sections 25990 and 25991, Health and Safety Code.

136a

## Section 1326.9. Areas and Duration of Accreditation as a Certifying Agent.

(a) The Department may accredit a qualified domestic or foreign applicant to certify a domestic or foreign production or distribution operation as a certified operation.

(b) Accreditation shall be for a period of five (5) years from the date of approval of accreditation pursuant to section 1326.14 of this Article.

(c) In lieu of accreditation under (a) of this section, the Department will accept a foreign certifying agent's accreditation to certify production or distribution operations if the Department determines, upon the request of a foreign government, that the standards under which the foreign government authority accredited the foreign certifying agent are functionally equivalent to the requirements of this Chapter.

(d) Notwithstanding any provision of this Chapter, the Department may, at its discretion, certify a production or distribution operation as a certified operation after determining an operation is in compliance with the provisions of the Act and this Chapter. Note: Authority cited: Section 25993, Health and Safety Code. Reference: Sections 25990 and 25991, Health and Safety Code.

## Section 1326.10. General Requirements for Accredited Certifying Agents.

(a) In order to receive and maintain accreditation, a private entity accredited as a certifying agent under this Chapter must:

137a

(1) Have sufficient expertise in covered animal production and covered product distribution techniques to fully comply with and implement the terms and conditions of the certification program established under this Chapter;

(2) Carry out the provisions of the Act and this Chapter, including the provisions of certifying operations as described in sections 1326.3 through 1326.8 of this Article;

(3) Use a sufficient number of adequately trained personnel, including inspectors, and certification review personnel, to comply with and implement the certification program established under this Chapter;

(4) Ensure that its responsibly connected persons, employees, and contractors with inspection, analysis, and decision-making responsibilities have sufficient expertise in covered animal production and covered product distribution to successfully perform the duties assigned;

(5) Provide sufficient information to persons seeking certification to enable them to comply with the applicable requirements of the Act and this Chapter;

(6) Maintain all records pursuant to section 1326.17(b) of this Article and make all such records available for inspection and copying during normal business hours by authorized representatives of the Department;

(7) Not disclose any information collected pursuant to this Article obtained while certifying producers or distributors for compliance with this Chapter to any third-party without approval by the Department. Any request to an accredited certifying agent for rec-

138a

ords or documents must be submitted to the Department for review and approval pursuant to the California Public Records Act (Government Code section 6250 et seq.);

(8) Prevent conflicts of interest by:

(A) Not certifying a production or distribution operation if the certifying agent or a responsibly connected party of such certifying agent has or has held a commercial interest in the production or distribution operation, including an immediate family interest or the provision of consulting services, within the 12-month period prior to the application for certification;

(B) Excluding any person, including contractors, with conflicts of interest from work, discussions, and decisions in all stages of the certification process and the monitoring of certified production or distribution operations for all entities in which such person has or has held a commercial interest, including an immediate family interest or the provision of consulting services, within the 12-month period prior to the application for certification;

(C) Not permitting any employee, inspector, contractor, or other personnel to accept payment, gifts, or favors of any kind, other than prescribed fees, from any business inspected.;

(9) Refrain from making false or misleading claims about its accreditation status, the accreditation program for certifying agents, or the nature or qualities of covered products; and

(10) Submit to the Department a copy of:

139a

(A) Within 14 days of creation, any notice of proposed suspension or revocation and notification of suspension or revocation sent pursuant to section 1326.20 of this Article; and

(B) Annual report as described in section 1326.17(a) of this Article including the name, address, and telephone number of each operation granted initial certification pursuant to section 1326.6 of this Article or an updated certification pursuant to section 1326.8 of this Article, during the preceding year.

(b) A private entity accredited as a certifying agent must:

(1) Hold the Department harmless for any failure on the part of the certifying agent to carry out the provisions of the Act and this Chapter; and

(2) Transfer to the Department all records or copies of records concerning the person's certification activities related to this Article in the event that the certifying agent dissolves or loses its accreditation; provided, that, such transfer shall not apply to a merger, sale, or other transfer of ownership of a certifying agent.

(c) No certifying agent under this Article shall exclude from participation in or deny the benefits of certification to any person due to discrimination because of race, color, national origin, gender, religion, age, disability, political beliefs, sexual orientation, or marital or family status.

(d) A private entity seeking accreditation under this Article must sign and return a statement of agreement prepared by the Department which affirms that, if granted accreditation as a certifying agent un-

140a

der this Chapter, the applicant will carry out the provisions of the Act and this Chapter, including but not limited to all applicable requirements of this section. Note: Authority cited: Section 25993, Health and Safety Code. Reference: Sections 25990 and 25991, Health and Safety Code.

Section 1326.11. Applying for Accreditation as a Certifying Agent.

[Omitted]

Section 1326.12. Applicant Information for Accreditation as a Certifying Agent.

[Omitted]

Section 1326.13. Evidence of Expertise and Ability.

[Omitted]

Section 1326.14. Granting Accreditation.

[Omitted]

Section 1326.15. Denial of Accreditation.

[Omitted]

Section 1326.16. On-site Evaluations.

[Omitted]

Section 1326.17. Annual Report, Recordkeeping, and Renewal of Accreditation.

[Omitted]

Section 1326.18. General Compliance.

(a) As a condition of certification and accreditation as a private certifying agent, the Department may inspect and review certified production and distribution operations and accredited certifying agents that are

141a

private entities for compliance with the Act or this Chapter.

(b) The Department may initiate suspension or revocation proceedings against a certified operation as described in section 1326.20 of this Article:

(1) When the Department has determined a certified operation has violated or is not in compliance with the Act or this Chapter; or

(2) When a certifying agent fails to take appropriate action to enforce the Act or this Chapter.

(c) The Department may initiate suspension or revocation of a private certifying agent's accreditation, as described in section 1326.21 of this Article, if the certifying agent that is a private entity fails to meet, conduct, or maintain accreditation requirements pursuant to the Act or this Chapter.

(d) Each notification of noncompliance, rejection of mediation, noncompliance resolution, proposed suspension or revocation, and suspension or revocation issued pursuant to sections 1326.20, 1326.21, and 1327.2 and each response to such notification must be sent to the recipient's place of business via a delivery service which provides dated return receipts. Note: Authority cited: Section 25993, Health and Safety Code. Reference: Sections 25990 and 25991, Health and Safety Code.

Section 1326.19. Investigation of Certified Operations.

A certifying agent shall report to the Department complaints of noncompliance with the Act or this Chapter concerning production and distribution operations certified as compliant with the Act and this Chapter by the certifying agent. The Department may

142a

at its discretion investigate complaints of noncompliance with the Act and require additional inspections by a certifying agent.

Note: Authority cited: Section 25993, Health and Safety Code. Reference: Sections 25990 and 25991, Health and Safety Code.

Section 1326.20. Noncompliance Procedure for Certified Operations.

(a) Notification. When an inspection, review, or investigation of a certified operation by a certifying agent reveals any noncompliance with the Act or regulations in this Chapter, a written notification of noncompliance shall be sent by the certifying agent to the certified operation. Such notification shall provide:

(1) A description of each noncompliance;

(2) The facts upon which the notification of noncompliance is based; and

(3) The date by which the certified operation must rebut or correct each noncompliance and submit supporting documentation of each such correction when correction is possible.

(b) Resolution. When a certified operation demonstrates that each noncompliance has been resolved within the prescribed time period, the certifying agent shall send the certified operation a written notification of noncompliance resolution.

(c) Proposed suspension or revocation. When rebuttal is unsuccessful or correction of the noncompliance is not completed within the prescribed time period, the certifying agent shall send the certified operation a written notification of proposed suspension or revocation of certification of the entire operation or a

143a

portion of the operation, as applicable to the noncompliance. When correction of a noncompliance is not possible, the notification of noncompliance and the proposed suspension or revocation of certification may be combined in one notification. The notification of proposed suspension or revocation of certification shall state:

(1) The reasons for the proposed suspension or revocation; (2) The proposed effective date of suspension or revocation;

(A) The maximum number of days from date of notification of proposed suspension or revocation and effective date of suspension or revocation is 30 calendar days;

(3) The impact of a suspension or revocation on future eligibility for certification including conditions for reinstatement; and

(4) The right to request mediation pursuant to section 1327.2 of this Chapter or to request a formal hearing pursuant to Chapter 5 (commencing with Section 11500) of Part 1 of Division 3 of Title 2 of the Government Code. The notice of proposed suspension or revocation shall remain in effect pending the outcome of an appeals process.

(d) Willful violations. Notwithstanding (a) of this section, if a certifying agent has evidence that a certified operation has willfully violated the Act or this Chapter, the certifying agent shall send the certified operation a notification of proposed suspension or revocation of certification of the entire operation or a portion of the operation, as applicable to the noncompliance.

144a

(e) Suspension or revocation.

(1) If the certified operation fails to correct the noncompliance according to the prescribed time period, to resolve the issue through rebuttal or mediation, or to file an appeal of the proposed suspension or revocation of certification before suspension or revocation goes into effect according to the notice of proposed suspension or revocation, the certifying agent shall send the certified operation a written notification of suspension or revocation.

(2) A certifying agent must not send a notification of suspension or revocation to a certified operation that has requested mediation pursuant to section 1327.2 of this Chapter or filed an appeal pursuant to Chapter 5 (commencing with Section 11500) of Part 1 of Division 3 of Title 2 of the Government Code, while final resolution of either is pending.

(f) Eligibility.

(1) A certified operation whose certification has been suspended under section 1326.20 of this Article may at any time, unless otherwise stated in the notification of suspension, submit a request to the Department for reinstatement of its certification. The request must be accompanied by evidence demonstrating correction of each noncompliance and corrective actions taken to comply with and remain in compliance with the Act and this Chapter.

(2) A certified operation or a person responsibly connected with an operation whose certification has been revoked under section 1326.20 of this Article will be ineligible to receive certification for a period of two (2) years following the date of such revocation.

145a

(3) A certified operation whose certification is suspended or revoked by a certifying agent has the right to appeal this decision pursuant to section 1327.2 of this Chapter or through a formal hearing pursuant to Chapter 5 (commencing with Section 11500) of Part 1 of Division 3 of Title 2 of the Government Code. The notice of suspension or revocation shall remain in effect pending the outcome of an appeals process.

(g) Notwithstanding (a) through (e) of this section, if the certifying agent is a government entity other than the Department, the noncompliance procedures for certified operations established under the authority of that government entity may be followed in lieu of sections 1326.20(a) through (e) of this Article.

Note: Authority cited: Section 25993, Health and Safety Code. Reference: Sections 25990 and 25991, Health and Safety Code.

Section 1326.21. Noncompliance Procedure for Accredited Certifying Agents.

[Omitted]

Section 1326.22. Government Entity Providing Certification.

(a) A government entity acting as a certifying agent and performing certification of producer or distribution operations for compliance with the Act and this Chapter may:

(1) Register annually with the Department;

(2) Submit to the Department a copy of any notice of proposed suspension or revocation of certification and notification of suspension and revocation of certification sent pursuant to section 1326.20 of this Article; and

146a

(3) Submit to the Department a list, on January 30 of each year, the name, address, and telephone number of each operation granted initial certification pursuant to section 1326.6 of this Article or an updated certification pursuant to section 1326.8 of this Article, during the preceding year.

(b) For issues of certifier noncompliance, the Department will use substantially equivalent procedures to section 1327.2 of this Chapter to resolve any noncompliance in a  government entity's certification activities under this Chapter, and if the government entity fails to correct such noncompliance, to notify the government entity that the Department will no longer accept its certifications for compliance with the Act and this Chapter.

7) Adopt Article 6 and sections 1327.1 and 1327.2 of Chapter 10 of Division 2 of Title 3 of the California Code of Regulations, to read as follows:

Article 6. Informal Hearing and Mediation

[Omitted]

147a

## APPENDIX G

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

NATIONAL PORK PRODUCERS COUNCIL &
AMERICAN FARM BUREAU FEDERATION,
Plaintiffs,
v.
KAREN ROSS, in her official capacity as
Secretary of the California Department of Food &
Agriculture, & SONIA ANGELL, in her official ca-
pacity as Director of the California Department of
Public Health, and XAVIER BECERRA, in his offi-
cial capacity as Attorney General of California,
Defendants.

CASE NO. 19CV2324W AHG

## COMPLAINT FOR DECLARATORY AND
## INJUNCTIVE RELIEF

Plaintiffs the National Pork Producers Council
and the American Farm Bureau Federation allege
upon information and belief as follows:

### I.    INTRODUCTION AND NATURE OF CLAIMS

1.    The market for pork produced in the United
States ("U.S.") is enormous and national and interna-
tional in scope.

2.    It meets a demand for high-quality, afforda-
ble protein.

3.    According to the U.S. Department of Agricul-
ture's Census of Agriculture for 2017, nearly 65,000

148a

farms nationwide sold hogs that year with a market value of more than $26 billion.

4.    During the first nine months of 2019, some 94 million hogs were slaughtered at federally inspected facilities, for a rate of about 125 million hogs slaughtered per year.

5.    Pigs are raised throughout the country, but production is concentrated in the Midwest and North Carolina. The latest Agriculture Census reported that 22.7 million pigs were sold by Iowa farms in 2017, 8 to 9 million each by North Carolina, Oklahoma, and Minnesota farms, 5.25 million by Illinois farms, and 4.5 million by South Dakota farms.

6.    The U.S. is one of the world's top five pork exporters. It has exported over 5 billion pounds of fresh and frozen pork cuts annually to foreign markets, on average, since 2010, principally to Mexico, China, Japan, and Canada.

7.    The U.S. commercial production chain for pork is complex and varied, using principally a segmented production model driven by herd health considerations and to achieve economies of scale.

8.    Sows are female pigs held for breeding that give birth to the piglets that ultimately become hogs sent to market. For disease prevention and efficiency, sows are usually maintained on sow-specific farms that are commonly separated from other hog facilities. On those sow farms, the sows are generally artificially inseminated, litters of piglets are born ("farrowed"), and the piglets are then raised for about three weeks before they are weaned at the weight of approximately 10 pounds.

149a

9.    The overwhelmingly vast majority of sow farms use some type of indoor confinement for these processes. Indoor housing allows year-round production by protecting sows from seasonal weather changes, disease exposure, and predators, while facilitating the management of each sow's health, conditioning, feeding, and reproduction.

10.    Only a small portion of the pigs that are slaughtered for meat are sows that have been kept to reproduce—only 2.2 million in the first nine months of 2019, compared to 91.8 million of their male ("barrows") and female offspring, which are raised as feeder or market hogs. And almost none of the meat from those sows is sold as whole pork cuts; it is instead used in prepared or cooked products and sausages.

11.    The offspring of sows ("market hogs") are raised to market weight in separate, specialized production facilities: (1) feeder pig producers, or nurseries, which raise pigs from weaning to about 40-60 pounds, then sell them for finishing; (2) feeder pig finishers, which buy feeder pigs and grow them to their slaughter weight of about 240-280 pounds; and (3) farrow-to-finish operations, a small percentage of farms that raise hogs from weaning to their slaughter weight. Farrow to finish takes 24-26 weeks.

12.    Once they reach slaughter weight, hogs are sent to packing facilities, which may be local or in other states. Packer facilities receive hogs from multiple farms, operated by multiple producers. These farms may be owned by affiliates of the packer, by producers who have contracts to deliver hogs to the packer, or by independent producers.

150a

13.   A packing facility typically slaughters thousands, or even tens of thousands, of hogs daily. Packers process the slaughtered hogs into whole pork cuts (or send them to separate processing facilities for this and later steps), pack the meat, and deliver it to wholesale or large retail customers throughout the country and abroad.

14.   California's Proposition 12, challenged here, is a ballot initiative that was passed in November 2018 and that amended the California Health and Safety Code.

15.   Proposition 12 has thrown a giant wrench into the workings of the interstate market in pork.

16.   In California itself, there are estimated to be only some 8,000 breeding sows, most of which are in family-focused "4-H" and other county fair and similar show-pig programs.

17.   It is believed that only about 1,500 out of California's 8,000 sows are used in commercial breeding in the state, housed in a handful of very small farms.

18.   Commercial sows typically produce two litters a year of about 10 piglets, so those 1,500 sows may produce around 30,000 offspring a year. Those sows are therefore insufficient even to supply the current in-state farms' annual capacity of approximately 65,000 commercial hog finishing spaces that exist in California, which must therefore be filled from out-of-state sows.

19.   By contrast to the tens of millions of hogs sold by farms in many other states, the Agriculture Census reports that only 208,000 hogs were sold by all farms in California in 2017, including those born (farrowed) outside California.

151a

20. California's pork consumption makes up about 13 percent of the national market. Accordingly, California's in-state sow breeding scarcely puts a dent in the demand for pork consumed in the state. The offspring of about 673,000 sows is required to satisfy California consumers' demand for pork meat annually, compared to the 1,500 sows that are commercially bred in-state.

21. Proposition 12 forbids the sale in California of whole pork meat from hogs born of sows that were not housed in conformity with the law's requirements.

22. A violation of Proposition 12 is a criminal offense punishable by fines and imprisonment, and also the basis for civil liability under California's unfair competition statute.

23. Proposition 12 requires that a sow cannot be confined in such a way that it cannot lie down, stand up, fully extend its limbs, or turn around without touching the sides of its stall or another animal. This requirement is often referred to as "stand up-turn around."

24. Stand-up turn-around effectively requires that producers house their sows together in a group, referred to as "group housing." This housing structure may also be referred to as a "pen." In contrast, individual stalls each hold one sow apiece and do not allow sows to turn around.

25. Proposition 12 bans the use of individual stalls that do not meet standup turn-around requirements, except during the five-day period prior to farrowing and during weaning. It accordingly bars the use of individual stalls during breeding and most of the gestation period.

152a

26.   After December 31, 2021—but with immediate impact now on what producers must do given the lead time needed for building and production changes—each sow must be allotted at least 24 square feet of space in the group pen, subject to the same limited exception for the five-day period prior to farrowing and during weaning.

27.   Only a miniscule portion of sows in the U.S. are housed in compliance with all of Proposition 12's requirements.

28.   Proposition 12 institutes a wholesale change in how pork is raised and marketed in this country. Its requirements are inconsistent with industry practices and standards, generations of producer experience, scientific research, and the standards set by other states. They impose on producers costly mandates that substantially interfere with commerce among the states in hogs and whole pork meat. And they impose these enormous costs on pork producers, which will ultimately increase costs for American consumers, making it more difficult for families on a budget to afford this important source of protein. And they do all this for reasons that are both fallacious and vastly outweighed by the economic and social burdens the law imposes on out-of-state producers and consumers and on the authority of other states over their domestic producers.

29.   Proposition 12 imposes these severe requirements as the result of a ballot initiative drafted by the Humane Society of the United States ("HSUS").

30.   Because Proposition 12 was a ballot initiative, it was passed without any semblance of meaningful legislative deliberation, let alone inclusive input and inquiry into the impacts of its requirements on

153a

national commerce in pork, on the pork production industry, or even the welfare of sows.

31.    Because it reaches extraterritorially to impose California's idiosyncratic and unjustified sow housing requirements on other states and their producers, because it Balkanizes hog production in ways inconsistent with our Federalist system, and because it imposes burdens on interstate commerce that far outweigh any of its benefits, Proposition 12 violates the dormant Commerce Clause and is unconstitutional.

32.    Plaintiffs seek a declaration that Proposition 12's requirements with regard to breeding pigs violate the Commerce Clause and principles of interstate federalism embodied in the U.S. Constitution, and an injunction against the enforcement of Proposition 12's requirements concerning pork.

33.    While Proposition 12 regulates the production of veal, pork, and eggs, the basis of Plaintiffs' challenge here is Proposition 12's extraterritorial reach and market disruption regarding pork production.

## II.    **JURISDICTION**

34.    This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1343 because this case presents a federal question arising under the Commerce Clause of the U.S. Constitution and under 42 U.S.C. § 1983.

35.    This Court has authority to enjoin enforcement of Proposition 12 under 42 U.S.C. § 1983 and to grant declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202.

154a

## III.   <u>VENUE</u>

36.   Venue is proper in this district under 28 U.S.C. § 1391(b) because all Defendants maintain an office and conduct their official duties within this judicial district.

37.   Additionally, substantial events giving rise to this lawsuit occurred and will continue to occur within this judicial district. Plaintiffs' members produce and sell pork that is or may be sold in California (including within this judicial division). Pork produced by Plaintiffs' members inevitably is imported into and consumed within this district, because the roughly 9% of California's population located within this district consumes more pork than can be produced by the approximately 8,000 sows located within California.

## IV.   <u>THE PARTIES</u>

38.   Plaintiff National Pork Producers Council ("NPPC") is a federation of 42 affiliated state associations and other regional and area organizations. NPPC's members include U.S. pork producers along with other industry stakeholders such as packers, processors, companies that serve the pork industry, and veterinarians. NPPC is the global voice of the U.S. pork industry. Its mission is to advocate on behalf of its members to establish reasonable federal legislation and regulations, develop revenue and export-market opportunities, and serve the interests of pork producers and other industry stakeholders. This includes advocating for free market access for pork producers and opposing measures that restrict producers' market opportunities.

39.   Plaintiff American Farm Bureau Federation ("AFBF") is a voluntary membership organization

155a

formed by farm and ranch families in 1919. Today, AFBF represents just under 6 million member families through Farm Bureau organizations in all 50 States plus Puerto Rico. America's largest general farm organization, AFBF represents the people who grow and raise virtually every agricultural product in the United States. AFBF seeks to promote the development of reasonable and lawful public policy for the benefit of farmers and consumers. According to AFBF's mission statement: "We are farm and ranch families working together to build a sustainable future of safe and abundant food, fiber, and renewable fuel for our nation and the world."

40.   Defendant Karen Ross is sued in her official capacity as the Secretary of the California Department of Food and Agriculture ("CDFA"), which is a State of California regulatory entity responsible for jointly issuing regulations to implement Proposition 12.

41.   Defendant Sonia Angell is sued in her official capacity as the Director of the California Department of Public Health ("CDPH"), which is a State of California regulatory entity responsible for jointly issuing regulations to implement Proposition 12.

42.   Xavier Becerra is sued in his official capacity as the Attorney General of California. The Attorney General's office is responsible for enforcing the provisions of Proposition 12 that make its violation a criminal offense.

## V.   <u>STANDING</u>

43.   AFBF and NPPC bring this suit on behalf of themselves and their members. They have each suffered and continue to suffer concrete and particularized injuries that are fairly traceable to Proposition

156a

12. Their injuries will be redressed by a favorable decision. *See Organic Consumers Assoc. v. Sanderson Farms, Inc.*, 284 F. Supp. 3d 1005 (N.D. Cal. 2018).

44. As a result of Proposition 12, AFBF and NPPC have expended substantial resources to understand the obligations, requirements and impacts of Proposition 12, and then to explain to pork producer members the meaning and requirements of Proposition 12 and changes to farming practices that would be necessary to comply with Proposition 12.

45. On NPPC's part, these efforts have entailed fielding inquiries from members regarding Proposition 12 and its expected impact on pork production and the supply chain, developing data sheets that summarize Proposition 12 into audience-friendly information, and holding and participating in meetings and teleconferences with members and industry-stakeholders. *See* Exh. A, Decl. D. Hockman, ¶¶ 21-24.

46. NPPC personnel additionally fielded numerous questions from suppliers, packers, distributors, retailers, and food-service companies regarding the impact that Proposition 12 will have on the supply of pork product. *Id*.

47. AFBF personnel have also hosted and participated in presentations, teleconferences, and other events for purposes of informing members and state Farm Bureau staff about what coming into compliance with Proposition 12 will require. *See* Exh. B, Decl. S. Bennett, ¶¶ 9-11.

48. Both AFBF and NPPC submitted detailed comments to the CDFA on June 3, 2019, explaining how Proposition 12 will negatively impact the pork production industry and is unconstitutional. *See* Exh.

157a

A, Decl. D. Hockman, ¶ 22; Exh. B, Decl. S. Bennett, ¶ 11.

49.    Because of resources they have expended addressing Proposition 12, both AFBF and NPPC have diverted resources from pursuing other matters central to the organizations' missions. *See* Exh. A, Decl. D. Hockman, ¶ 30; Exh. B, Decl. S. Bennett, ¶ 12.

50.    On AFBF's part, this includes time and money that could have been spent advancing other issues critical to AFBF's mission to advance reasonable farm policy. Exh. B, Decl. S. Bennett, ¶ 4.

51.    On NPPC's part, these diverted costs include time and resources that could have been spent pursuing NPPC's core mission of establishing reasonable industry regulation on a nationwide level. Exh. A, Decl. D. Hockman, ¶ 20.

52.    Resources have also been diverted from NPPC's efforts on behalf of its members to address other important issues, including international trade and free access to markets. *Id.* ¶ 30; Exh. C, Decl. H. Roth, ¶¶ 9-12.

53.    Both NPPC and AFBF anticipate that, as California implements Proposition 12, they will need to divert more resources and time from other core organizational priorities to assist members with understanding what is involved in coming into compliance (or not coming into compliance) with Proposition 12. *See* Exh. A, Decl. D. Hockman, ¶ 28; Exh. B., Decl. S. Bennett, ¶ 13.

54.    These organizational injuries would be remedied by the relief sought in this action.

158a

55. In addition, both AFBF and NPPC have associational standing to challenge Proposition 12 on behalf of their members.

56. One or more members of AFBF and NPPC have standing to bring this action in their own right. Plaintiffs are submitting declarations from some of these members as exhibits, attached to this Complaint and incorporated herein by reference. *See* Exh. D, Decl. G. Boerboom; Exh. E, Decl. P. Borgic; Exh. F, Decl. N. Deppe; Exh. G, Decl. M. Falslev; Exh. H, Decl. T. Floy; Exh. I, Decl. T. Hays; Exh. J, Decl. P. Jordan; Exh. K, Decl. C. Leman; Exh. L, Decl. G. Maher; Exh. C, Decl. H. Roth; Exh. M, Decl. R. Spronk; Exh. N, Decl. J. Hofer.

57. Thousands of AFBF and NPPC pork producer members are directly subject to Proposition 12 because they breed or raise pigs that are or may be sold into California. Almost all of these members are currently raising pigs that do not meet Proposition 12's requirements and are suffering and will suffer imminent, concrete and particularized injuries as a result of Proposition 12—either substantial compliance costs or loss of a major market for their products.

58. While all manner of hog farms across the country are harmed by Proposition 12, from large-scale to small, independent farms, a sampling of affected NPPC and AFBF pork producer members who have submitted declarations in support of the Complaint includes the following:

a. Mr. Greg Boerboom is a hog producer on his third-generation farm in Southwest Minnesota. He has lived on that farm since he was born. Mr. Boerboom now owns a total of 10,000 sows, from which he produces around

159a

320,000 market hogs annually. Some of his sows are housed in group pens, and others in individual stalls. But, as a consistent practice since 1988, Mr. Boerboom has always housed his sows in individual stalls for at least seven days between weaning and breeding. He noticed when he held his sows in group pens for these seven days after weaning that they would fight and bite at each other, resulting in rips and permanent damage to the sows' udders. Since keeping sows in breeding stalls during this time, the productivity rate on his farm has increased, and incidences of sow injuries have decreased. Mr. Boerboom is one of the most successful hog producers in the U.S. to operate under a group housing system, which he manages through an incredible amount of hard work and an expensive electronic feeding system developed by a Dutch company, Nedap, that requires skilled labor and training to operate. Despite Mr. Boerboom's great success in managing sows, his farming practices do not comply with Proposition 12, because he does not provide each sow 24 square feet, and he cannot not imagine moving his sows back into a group pen directly after weaning, as Proposition 12 requires. Nor does Mr. Boerboom comply with Proposition 12's requirements as to gilts (young, unbred sows), because he follows the standard industry practice of keeping gilts in individual stalls until they are first bred at about seven months of age, which is past the six months during which Proposition 12 allows use of stalls. Because Mr. Boerboom will not comply with Proposition 12, his product will be barred

160a

from the California market. *See* Exh. D, Decl.
G. Boerboom.

b.  Mr. Phil Borgic is the owner of a family farm
located in Nokomis, Illinois. Mr. Borgic pro-
duces around 225,000 hogs annually and sells
his product under market contracts with
Smithfield Foods ("Smithfield") and JBS USA
("JBS"). Mr. Borgic houses his sows in individ-
ual stalls throughout gestation because, based
on his lifetime of experience raising sows, he
determined that individual stalls are best for
the welfare of his sows and the productivity of
his farm. Mr. Borgic's housing of gilts also
does not comply with Proposition 12. Compli-
ance with Proposition 12 would be cost-pro-
hibitive for Mr. Borgic. It would require him
either to spend around three million dollars on
construction costs expanding his facilities or
to reduce his sow herd by one-third, destroy-
ing his farm's productivity and rendering him
unable to meet delivery performance require-
ments in his contracts with JBS and Smith-
field. It would also result in worse welfare out-
comes for his sows, significantly lower sow
productivity, and increased labor costs. If
Proposition 12 remains in place, Mr. Borgic is
concerned that the price he receives for his
product will drop because whole meat from his
market hogs could not be sold into California.
Mr. Borgic also stands to lose his longstanding
business relationships with JBS and Smith-
field, both of which sell into California. *See*
Exh. E, Decl. P. Borgic.

c.  Mr. Nathan Deppe operates a farrow-to-finish
hog farm in Washington, Missouri, that has

161a

been in his family for generations. He produces around 30,000 market hogs annually, which he then sells to JBS under a marketing contract. Mr. Deppe houses his sows in group pens that provide about 15 square feet per sow for most of gestation. Nevertheless, he also uses individual breeding stalls to help sows regain weight post weaning, to accomplish artificial insemination, and then to house the sows for an additional 28 days until he can confirm that his sows are pregnant before moving them back into the group pens. The changes required to comply with Proposition 12 are too costly for Mr. Deppe's business to survive. Mr. Deppe anticipates Proposition 12's restrictions would significantly damage productivity on his farm and negatively impact the welfare of his animals. Productivity losses, along with construction costs to convert his housing to provide 60% more space per sow to comply with Proposition 12, would be too high for him to bear. Because of Proposition 12, Mr. Deppe has lost the opportunity to sell his whole pork product into supply chains bound for the large California market. *See* Exh. F, Decl. N. Deppe.

d.  Mr. Mike Falslev is an independent hog producer on his farm near Logan, Utah. Mr. Falslev's farm specializes in serving the predominantly Asian-American market for suckling pigs. To satisfy the demand primarily from Asian-American consumers in California, he sells about 600 pigs per week under a five-year contract to a packing plant located in California. Thus, essentially all of his product is bound for California. Currently, Mr. Falslev

162a

houses all of his sows in individual stalls until he confirms that they are pregnant. He keeps some of the sows in individual stalls throughout gestation, but, after confirming that these sows are pregnant, moves others into a hoop barn where they are housed in a group. Changing these practices to comply with Proposition 12's housing requirements would lower productivity on Mr. Falslev's farm by requiring him to move his sows into the hoop barn directly after weaning. He would lose the ability to provide a peaceful environment for the sows to recover and regain weight from their previous litter, and instead be required to subject them to stress and fighting with other animals during the vulnerable time between insemination and before the embryo attaches to the uterine wall. This would seriously damage productivity and conception rates, because his pigs fight for feed and territory when moved into the group pen. It would also make Mr. Falslev's process for artificially inseminating sows much more difficult and increase his labor costs, because it is more difficult for him to care for the sows in the hoop barn. Compliance would also require Mr. Falslev to expend significant construction costs to construct a new barn with open space. Alternatively, constructing enough hoop barns to replace his lost production would cost Mr. Falslev almost as much, and would take up an enormous amount of land. Operating solely out of hoop barns rather than using individual breeding stalls would also significantly increase Mr. Falslev's operating costs. For example, the colder hoop barn requires straw bedding to

163a

provide warmth, and the straw bedding tri-
ples the amount of waste and manure that
needs to be disposed of, requiring a great deal
of additional labor. It also makes it much more
difficult to maintain comfortable tempera-
tures for his sows during the cold of winter
and the heat of summer. If Mr. Falslev does
not bear these significant costs, Proposition 12
will block Mr. Falslev's product from the lu-
crative suckling pig market in California.
Proposition 12 leaves Mr. Falslev with no good
alternatives. *See* Exh. G, Decl. M. Falslev.

e.  Mr. Tom Floy has been an Iowa hog producer
for the past 45 years. Mr. Floy produces 1,500
to 2,000 market hogs annually. He sells his
hogs exclusively to Tyson Foods ("Tyson"),
which in turn sells the resulting product all
over the country and the world. Mr. Floy
houses his sows in individual stalls that do not
allow them to turn around. Compliance with
Proposition 12 would require Mr. Floy to bear
significant construction costs to provide his
sows with around 40% more space. Mr. Floy
would need to expend significant time to select
appropriate equipment and design and edu-
cate himself on how to manage the new sow
housing system. Mr. Floy also expects that
compliance would significantly lower produc-
tivity on his farm and reduce the welfare of his
sows. After moving from open lots to individ-
ual stalls in 1994, Mr. Floy noticed that his
sows experience fewer injuries and produce a
greater number of parities (farrowings). Be-
cause of Proposition 12, Mr. Floy's product
will be barred from the California market. He
is concerned that loss of access to the market

164a

harms the value of his product and will de-
crease its price. *See* Exh. H, Decl. T. Floy.

f.   Mr. Todd Hays is a fifth-generation hog pro-
ducer on a farrow-to-finish farm located in
Monroe City, Missouri, who raises and fin-
ishes approximately 13,500 market hogs per
year. Pursuant to a two-year contract, Mr.
Hays sells ninety percent of these hogs to
Smithfield, which he has been in business
with for the past ten years. Mr. Hays houses
his sows in individual stalls. Mr. Hays antici-
pates that changing his sow housing practices
to comply with Proposition 12 would increase
sow mortality and lameness rates on his farm,
dramatically reduce his productivity rates,
and require more labor and personnel to oper-
ate his farm. These productivity losses and the
costs of either constructing new Proposition
12-compliant facilities or reducing his current
sow population to provide the needed space
per sow are likely greater than his business
could bear, because Mr. Hays would not re-
ceive enough return to cover these large costs.
Because of Proposition 12, Mr. Hays will lose
the opportunity to sell his whole pork product
into supply chains bound for the large Califor-
nia market and his business will become less
attractive to suppliers who choose to comply
with Proposition 12. *See* Exh. I, Decl. T. Hays.

g.   Mr. Phil Jordan is a hog producer on his fam-
ily-owned farm in Ohio, where he produces ap-
proximately 35,000 market hogs annually and
is looking to expand his operations. Mr. Jor-
dan sells his market hogs primarily to JBS un-

165a

der a marketing agreement. He holds the majority of his sows in individual stalls, but is currently in the process of converting his sow housing to a group pen system as required under Ohio regulations by December 2025; however, those group pens will not provide 24 square feet per sow. In addition, as permitted by Ohio's regulations, Mr. Jordan will continue to place all of his sows in individual breeding stalls for the first thirty-five to forty days after weaning until they are confirmed pregnant in order to maximize embryonic welfare. Mr. Jordan does not plan to comply with Proposition 12, because he cannot imagine moving a sow directly after weaning into a group pen in her weakened state rather than protecting the sow in an individual stall and providing her with enough feed to recover from weaning. Further, coming into compliance with Proposition 12 would require Mr. Jordan to significantly downsize his herd or incur steep construction costs to expand his sow housing. It would be very difficult for Mr. Jordan to change his plans to come into compliance with Ohio's regulations by December 2025 to also come into compliance with California's more restrictive regulations at the earlier date of December 31, 2021. Because of Proposition 12, Mr. Jordan will lose the opportunity to sell his whole pork product into supply chains bound for the California market. *See* Exh. J, Decl. P. Jordan.

h.  Mr. Chad Leman is a third-generation hog producer in Woodford County, Illinois. He produces between 90,000 and 100,000 market hogs annually, which he sells under contracts

166a

with Tyson and JBS. Mr. Leman houses two-thirds of his sows in group pens that provide about 19 square feet per sow. These sows are held in farrowing rooms to give birth and wean piglets, and then in individual stalls for approximately thirty-five days after weaning until they are confirmed pregnant, when they are moved into group housing. Mr. Leman houses the remaining one-third of his sows in individual stalls. It would be cost-prohibitive for Mr. Leman to convert his individual sow housing to group housing or to remodel his existing group pen to provide 24 square feet per sow, while maintaining the same number of sows. Because the sows fight each other in the pens and it is more difficult for him to provide care and feed sows according to their needs in the pen, Mr. Leman expects complying with Proposition 12 would be disastrous for productivity on his farm and harmful to sow welfare. Moving sows into the group pens during the vulnerable time directly after weaning would lower conception rates and result in sow injuries. Because he cannot convert to Proposition 12, Mr. Leman stands to lose business with suppliers because his whole pork product is barred from the large California market. He is concerned that activist measures such as Proposition 12 will drive him out of the industry. *See* Exh. K, Decl. C. Leman.

i.  Mr. Greg Maher, a hog producer on his small family farm outside of Monroe City, Missouri, produces around 52,000 pigs annually. He sells many of his pigs to Smithfield, which sells pork in all 50 states, including California. Mr. Maher converted his sow housing five

167a

or six years ago from individual stalls to group pens that provide 16 square feet per sow. As a result of this change, his sow mortality rate skyrocketed and his costs of production increased under the group pen system. For these reasons, Mr. Maher would like to move back to housing all of his sows in individual stalls as soon as possible. He now holds only about 40% of his sows in the group pen, and the remaining sows in individual stalls. For all sows, Mr. Maher makes use of breeding stalls until he confirms that the sow is pregnant in order to allow the embryo to attach before she is moved back into the group pen, where fights between sows risk pregnancy loss. If required to bear construction costs and productivity losses to comply with Proposition 12, Mr. Maher may have to exit the hog production business. *See* Exh. L, Decl. G. Maher.

j.  Mr. Howard "A.V." Roth is a fifth-generation producer who produces hogs on his family farm located in Crawford County, Wisconsin. Mr. Roth's farm produces approximately 72,000 weaned pigs annually. While Mr. Roth previously used a group pen, he now houses his sows in individual stalls that provide about 15 square feet per sow. After he moved from group pens to individual stalls, Mr. Roth's sows experienced far fewer injuries and were much easier to manage. His average litter size also increased from 9.2 to 10.2 piglets per litter. If required to comply with Proposition 12, Mr. Roth expects that he would have to pull out of the hog production business, because it would no longer be sustainable for him. If Mr. Roth moved his sows back to a

168a

group pen and eliminated the use of breeding stalls for the first 30 days after breeding as Proposition 12 requires, Mr. Roth expects his productivity rates would plummet. Mr. Roth would also bear increased labor costs to run his farm, and significant initial construction costs to convert his sow housing. Because of Proposition 12, Mr. Roth's whole pork product will be barred from sale in the California marketplace. *See* Exh. C, Decl. H. Roth.

k.  Mr. Randy Spronk is a third-generation Minnesota farmer and hog producer. Working with his brother, Mr. Spronk produces around 250,000 market hogs annually, mostly under contracts with JBS and Tyson. He also sells a great deal of his product to Hormel. While he previously held his sows in group pens, Mr. Spronk was heartsick watching smaller sows get picked on by the dominant animals, and now houses his sows in individual stalls. Mr. Spronk does not plan to comply with Proposition 12 because Proposition 12's housing requirements would compromise the welfare of his animals, cause productivity rates on his farm to drop, and increase his production costs. Compliance would also require him to undergo costly construction. At some of his barns, there would not be enough space for him to expand sow housing to comply with Proposition 12. Mr. Spronk does not believe that any increased price for Proposition-12 compliant pork in California would recoup his increased production costs, because cuts of pork from his market hogs are shipped to many different end users, most of whom would not value Proposition-12 compliant

169a

pork. Because of Proposition 12, Mr. Spronk's product is barred from the California market. Mr. Spronk is concerned about losing business as a result. *See* Exh. M, Decl. R. Spronk.

l. Mr. Joe Hofer is President and Senior Minister of a Hutterite colony. He speaks on behalf of the roughly 30 pork-producing Hutterite colonies located in Montana, most of which rely on hog production as a major source of income. Much of the pork product that comes from the colonies' hogs is shipped into the State of California. Mr. Hofer's colony, along with eight others, contracts regularly to sell pork to a packer who has demanded that the colonies comply with Proposition 12 for *all* of the product that they provide to it. This is despite the fact that this packer only sells an estimated one-third of the product it receives from these communities into California. If the colonies do not comply, it will disrupt their business relationship with this packer. Because most of the colonies house sows in individual gestation stalls, changing their practices to comply with Proposition 12 would be incredibly costly. The majority of the colonies would need to reduce their sow populations by 20%. The colonies would also need to purchase 20% more replacement gilts to replace sows that are injured in fights between sows held in group housing. The colonies stand to incur substantial costs if required to comply with Proposition 12. If they do not comply, they stand to lose a longstanding business relationship. *See* Exh. N, Decl. J. Hofer.

170a

59.   These farmers' experiences exhibit a common theme: Proposition 12 damages producers whose product is or may be sold into California, regardless of whether they choose to comply with Proposition 12 or not.

60.   To come into compliance with Proposition 12's stand-up turn-around requirements, along with its 24 square foot per sow requirement, members of NPPC and AFBF who operate sow farms would be forced to immediately expend substantial capital costs to build new group housing that provides 24 square feet per sow, or to retrofit existing barns to provide sows with 24 square feet of space each. *See* Exh. E, Decl. P. Borgic, ¶¶ 27-31; Exh. C, Decl. H. Roth, ¶ 26; Exh. J, Decl. P. Jordan, ¶ 14; Exh. K, Decl. C. Leman, ¶ 12; Exh. H, Decl. T. Floy, ¶¶ 2425.

61.   One producer, Mr. Borgic, estimates that construction costs to comply with Proposition 12 for his herd of 10,000 sows would reach around three million dollars. Exh. E, Decl. P. Borgic, ¶ 28.

62.   Another farmer, Mr. Maher, also estimates steep construction costs, as he previously spent a million-and-a-half dollars building a group pen with space for 16 square feet per sow. Exh. L, Decl. G. Maher, ¶ 17.

63.   Exacerbating these costs, sow housing is a decades-long investment. To reconstruct an existing barn is to waste a significant part of that investment. *See* Exh. M, Decl. R. Spronk, ¶ 18.

64.   Cheaper alternatives, such as constructing a hoop barn that would consist of a concrete floor and a tarp, expose sows to extremely cold weather and cold-related injuries and lack cooling measures to maintain comfortable temperatures in summer. Exh. G,

171a

Decl. M. Falslev, ¶ 34. Hoop barns are also less efficient, require more labor, and are more expensive to operate. *Id.*

65.   In addition, because they are colder, hoop barns require a great deal of straw bedding and external heating to provide warmth. Conventional barns, with greater numbers of animals in closer proximity to each other, are warmer and do not require this bedding. The more bedding provided for warmth, the more manure stacks up, increasing the amount of waste and manure the farm needs to dispose of and spiking labor costs. Exh. G, Decl. M. Falslev, ¶¶ 32, 34.

66.   In addition to direct construction costs, producers would be required to obtain various permits and comply with state regulatory requirements. Exh. F, Decl. N. Deppe, ¶ 20; Exh. K, Decl. C. Leman, ¶ 13.

67.   During any construction, many producers would need to depopulate their entire sow barn, which would grind production to a halt. *See* Exh. K, Decl. C. Leman, ¶ 13.

68.   Producers' alternative would be to significantly reduce their production by removing sufficient sows from existing group housing so that each sow has 24 square feet of space. Exh. J, Decl. P. Jordan, ¶ 14; Exh. E, Decl. P. Borgic, ¶ 31; Exh. I, Decl. T. Hays, ¶ 16.

69.   Removing sows from an existing group pen that provides 16 square feet per sow to allow 24 square feet per sow would reduce sow inventories (and increase average fixed costs) by an estimated 33%. *See* Exh. O, Decl. S. Meyer, ¶ 13.

172a

70.   For farmers who do not employ group hous-
ing, going from 14-square-foot gestation stalls to 24
square feet of pen space per sow would drive an esti-
mated 42% reduction in sow inventory and the same
percentage increase of average fixed costs. *See* Exh. O,
Decl. S. Meyer, ¶ 13.

71.   Members would face additional penalties by
taking this route. Many producers operate under
years-long contracts with suppliers that obligate them
to deliver a certain number of market hogs to each
supplier at certain times. If they miss a shipment,
they would be in breach and potentially subject to
monetary penalties. Exh. E, Decl. P. Borgic, ¶ 31; Exh.
J, Decl. P. Jordan, ¶ 16; Exh. K, Decl. C. Leman, ¶ 17.

72.   And whether they chose to drastically reduce
their sow populations or to bear the exorbitant costs
of constructing new sow housing facilities, Proposition
12 would also require farmers to substantially change
their animal husbandry practices—methods of caring
for sows that they have selected as best for the man-
agement of their farms and their animals based on
decades of experience. *See* Exh. I, Decl. T. Hays, ¶¶ 8-
9.

73.   Proposition 12 effectively requires sows be
held in group housing instead of individual stalls, as
a sow would need more than 24 square feet to turn
around in an individual stall without touching the
sides of the enclosure.

74.   These required changes would lower produc-
tivity on members' farms. Producers who must move
sows from individual stalls and into group pens will
experience lower productivity rates because sows in
pens fight each other to establish dominance and ac-
cess to food, leading to serious injuries and fatalities.

173a

*See* Exh. E, Decl. P. Borgic, ¶ 12; Exh. C, Decl. H. Roth, ¶¶ 16-18; Exh. J, Decl. P. Jordan, ¶ 7; Exh. I, Decl. T. Hays, ¶¶ 9-11; Exh. F, Decl. N. Deppe, ¶ 18; Exh. K, Decl. C. Leman, ¶ 14; Exh. G, Decl. M. Falslev, ¶¶ 2, 24-25; Exh. N, Decl. J. Hofer, ¶ 27.

75.    For example, one member noticed that the sow mortality rate on his farm "skyrocketed" after moving from individual stalls to a group pen. Exh. L, Decl. G. Maher, ¶ 9.

76.    Producers also expect lower average litter sizes if required to house gestating sows in a group pen given the stress associated with these fights and lower level of care that sows often receive in a group, as opposed to individual, housing system. Exh. C, Decl. H. Roth, ¶ 21; Exh. F, Decl. N. Deppe, ¶ 19.

77.    Even worse for productivity rates on farms, Proposition 12's restriction on the use of breeding stalls would require producers to move sows into a group pen before pregnancy is confirmed.

78.    As a practice, almost all producers use breeding stalls to artificially inseminate sows and hold them individually at least through the confirmation of pregnancy. To move the sows prior to the confirmation of pregnancy would increase the risk of pregnancy loss. Exh. C, Decl. H. Roth, ¶ 22; Exh. I, Decl. T. Hays, ¶ 14; Exh. G, Decl. M. Falslev, ¶ 28.

79.    Keeping a sow within an individual stall for at least the first five to seven days after breeding is critical to allow the embryos to attach. Exh. C, Decl. H. Roth, ¶ 22; Exh. K, Decl. C. Leman, ¶ 16.

80.    And keeping a sow in an individual stall for the first 30 to 40 or so days after weaning and through the confirmation of the next pregnancy guards against

174a

the high risk of loss of pregnancy caused by fights. Exh. J, Decl. P. Jordan, ¶ 12; *See* Exh. I, Decl. T. Hays, ¶ 14; *See* Exh. M, Decl. R. Spronk, ¶ 11.

81.  It also allows sows to recover from weaning, experience reduced stress levels, and receive a proper amount of individualized feed at a time when they are vulnerable. Exh. J, Decl. P. Jordan, ¶ 12; Exh. F, Decl. N. Deppe, ¶ 16-17.

82.  It is also dangerous to the herd to move sows back into a group pen prior to confirmation of pregnancy. When sows in heat are returned to a group pen, they may fight or injure other sows by trying to mount or ride them. Exh. E, Decl. P. Borgic, ¶¶ 20-21.

83.  Because of additional sow injuries and deaths and lower productivity on farms as a result of these requirements, compliance with Proposition 12 would require members to breed additional replacement gilts or sows each year. Exh. E, Decl. P. Borgic, ¶ 24.

84.  These changes would further disrupt farm management practices, and increase production costs. Exh. C, Decl. H. Roth, ¶15; Exh. J, Decl. P. Jordan, ¶¶ 11-12; Exh. I, Decl. T. Hays, ¶¶ 13-14; Exh. K, Decl. C. Leman, ¶¶ 14-15; Exh. E, Decl. P. Borgic, ¶¶ 10-17; Exh. G, Decl. M. Falslev, ¶¶ 27-29; Exh. H, Decl. T. Floy, ¶¶ 31-32.

85.  Many producers carefully provide each sow with the right amount of feed to achieve the appropriate body condition, which is difficult in a group housing system and especially critical shortly after weaning. Exh. J, Decl. P. Jordan, ¶ 12.

175a

86.   While some producers with a group pen utilize an electronic feeding system to provide individualized feed to each sow, these systems are difficult to manage and cost-prohibitive for smaller producers. *See, e.g.*, Exh. J, Decl. P. Jordan, ¶ 12; Exh. L, Decl. G. Maher, ¶ 12; Exh. D, Decl. G. Boerboom, ¶ 37.

87.   It is also more difficult to provide individualized care to sows when they are housed in a group, including providing immunizations, monitoring sows' feed intake, and noticing when sows require medical care. *See* Exh. I, Decl. T. Hays, ¶ 12; Exh. L, Decl. G. Maher, ¶ 12; Exh. M, Decl. R. Spronk, ¶ 14; Exh. H, Decl. T. Floy, ¶¶ 19.

88.   Housing sows in a group also requires complicated grouping of sows based on their sizes and personalities. Exh. L, Decl. G. Maher, ¶ 12.

89.   Because of the more labor-intensive nature of group pens, some members would have to hire additional farm hands. Exh. C, Decl. H. Roth, ¶ 23; Exh. I, Decl. T. Hays, ¶ 13; Exh. K, Decl. C. Leman, ¶ 15; Exh. E, Decl. P. Borgic, ¶ 33.

90.   Housing sows in a group pen also raises worker safety issues, given the large size of the animals and the need for farm hands to enter the pens with 400 pound animals. *See* Exh. I, Decl. T. Hays, ¶ 11; Exh. M, Decl. R. Spronk, ¶ 15.

91.   Producers carefully manage gilts—young sows that have not yet been bred—to allow them to develop into healthy breeding sows. Proposition 12 allows gilts to be housed in individual stalls or in group pens in which they have less than 24 square feet of space per gilt until six months of age (or until they are bred, if that is earlier).

176a

92.   But gilts are not usually bred until about seven months of age. Exh. D, Decl. G. Boerboom, ¶ 27. A sow farm seeking to comply with Proposition 12 would therefore need to change the way it handles not only its breeding sows, but also its gilts, and would need to ensure that all its replacement sows were Proposition 12 compliant—contrary to current industry practice—during the month or so before first breeding. Entire herds will have to be replaced from Proposition 12 compliant gilts. *See* Exh. E, Decl. P. Borgic, ¶ 25; Exh. D, Decl. G. Boerboom, ¶¶ 26-32.

93.   Some compliance methods will be impossible to achieve for farm-specific reasons (*e.g.*, lack of space or permits to build or retrofit barns). *See* Exh. M, Decl. R. Spronk, ¶ 16.

94.   And for some farmers, the expense of conforming to Proposition 12 will be cost-prohibitive. Many producers would no longer be able to operate if required to comply with Proposition 12. *See* Exh. C, Decl. H. Roth, ¶ 28; Exh. F, Decl. N. Deppe, ¶ 22; Exh. K, Decl. C. Leman, ¶¶ 12; Exh. L, Decl. G. Maher, ¶ 17.

95.   This is due to the costs they would expend converting to comply with Proposition 12, reduced productivity on their farms, and increased labor costs as a result of Proposition 12. *See* Exh. I, Decl. T. Hays, ¶ 17; *see also* Exh. F, Decl. N. Deppe, ¶ 22 (expressing uncertainty as to whether his farm could remain economically viable).

96.   Pork producer members are also concerned that any increased price of pork in California would not offset their increased costs of production from compliance with Proposition 12. This is because pork

177a

product from one hog is cut into primals, meaning different cuts of meat, and then shipped to many different end users across the country and sometimes internationally. There is no expectation that customers outside of California would see any value in Proposition-12 compliant pork. But Proposition 12 dictates changes that increase the costs of production for the entire pig, resulting in higher-cost products that are not of higher value to most consumers. *See* Exh. M, Decl. R. Spronk, ¶ 19.

97.  If producer members do not come into compliance with Proposition 12, they will lose direct access to the California market and stand imminently to lose business with packers that are supplying the California market. *See* Exh, N, Decl. J. Hofer, ¶ at 19; Exh. J, Decl. P. Jordan, ¶ 12; *See* Exh. I, Decl. T. Hays, ¶¶ 17-18; Exh. F, Decl. N. Deppe, ¶ 21-22; ; Exh. K, Decl. C. Leman, ¶ 18; Exh. M, Decl. R. Spronk, ¶ 17; Exh. H, Decl. T. Floy, ¶ 33.

98.  Some AFBF and NPPC members have already received letters from customers with which they have supply contracts explaining that they expect their suppliers to comply with Proposition 12. *See* Exh. A-1, Decl. D. Hockman, (Performance Group Food notice). These producers stand to lose business relationships.

99.  Plaintiffs' members who sell pork into California are also subject to an imminent risk of an enforcement action. The compliance date for Proposition 12's stand-up, turn-around requirement as applied to out-of-state producers is unclear. Thus, members who sell pork into California and who are not in compliance with this mandate are exposed to potential enforcement suits.

178a

100. Some producers have already received letters from animal welfare activists explaining that the activists are aware that most of the pork industry is not in compliance with Proposition 12 and that the activists are committed to ensuring that they comply with Proposition 12. *See* Exh. A, Decl. of D. Hockman, ¶¶ 12-15.

101. Other members have been notified that "every US retailer chain has been notified" about Proposition 12 and that the activists "are going to vigilantly ensure that [Proposition 12's requirements] are followed." *See* Exh. A-3, Decl. of D. Hockman.

102. Plaintiffs' members involved in every segment of the pork production industry face imminent injury from Proposition 12, because its requirements have a dramatic, negative impact on pork production and the pork supply chain as a whole. It steeply increases producers' production costs, some of which will be passed along each segment of the supply chain. And producers who do not comply will need to adjust their businesses to avoid placing pork into a supply chain that does or may result in sales to California.

103. NPPC and AFBF members who operate farms at any stage of the complex pork production process—for example as piglet nurseries, gilt farms, sow farms, or finishing farms, and the packers who purchase hogs that originated from them—face concrete, imminent injury caused by Proposition 12.

104. Operations will need to change dramatically for any producer whose product eventually reaches California, and new, difficult tracing methods will be necessary to determine which products do so.

179a

105. Because of steeper costs, pork products will become more expensive at every step of production and distribution and for the consumer.

106. And because the industry is not currently capable of supplying enough Proposition 12 compliant pork to California to meet California's demand, pork suppliers stand to lose business and face serious product availability issues, at least in the short term.

107. These imminent injuries will be redressed by the injunctive and declaratory relief sought in this action.

108. The interests that NPPC and AFBF seek to protect in this action are germane to the purposes of the organizations. As organizations that advocate for the economic interests of pork producers nationwide, California's regulation of pork production practices and of the interstate market for pork, as well as its interference with farm management practices, is of vital concern to AFBF and NPPC.

109. Neither the nature of the claims nor the forms of relief sought in this action require the participation by the Plaintiff associations' individual members. Plaintiffs' facial challenge to Proposition 12 does not require individualized proof and Plaintiffs seek prospective relief. *See Hunt v. Wash. Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

## VI.    <u>FACTUAL BACKGROUND</u>

## I.  PORK PRODUCTION IN THE U.S.

### A.  The U.S. Pork Market

110. Pork production in the U.S. is an industry that is vital to the agricultural economy and the Nation's overall economy.

111. In the U.S., approximately 65,000 pork producers market around 125 million hogs per year at a total gross income of around $26 billion annually.

112. Iowa alone contains nearly 6,000 hog farms.

113. Other top producing states include North Carolina, Minnesota, Illinois, Indiana, Missouri, Ohio, and Utah.

114. Pork products include fresh products such as whole cuts, pork chops, ribs, or butts, among many others; processed meat such as sausages; further processed, ready-to-eat items such as smoked and cured products; and cooked items.

115. Breeding pigs, referred to as "sows," produce market hogs.

116. Market hogs are raised until they are sent to market, while sows are kept on the farm for the purpose of breeding more market hogs.

117. Typically, a sow will bear about six parities, or litters, and then be culled, meaning removed from the sow farm and sold.

118. Only a small amount of product from sows themselves enters the market: About 125 million head of market hogs are slaughtered per year as opposed to just 2 million head of sows.

119. Almost all sow meat goes into sausage manufacturing, a processed product not subject to Proposition 12.

## B. Pork Producers And The Pork Supply Chain

120. Pork producers include vertically integrated companies, that is, they own breeding farms, raise gilts to breeding age, raise hogs to market weight in

181a

nursery and finishing facilities, slaughter hogs, and process and distribute pork.

121. Producers also include individual farmers who own facilities at one or more but not at all of these stages of production.

122. For example, some producers own only breeding farms and sell all or most of their sows' offspring to feeder nursery or finisher farms.

123. And some packers are vertically integrated while others purchase most of the pigs they slaughter from independent finishers.

124. Packers operate slaughterhouses and then sell pork product to wholesale or large retail customers who distribute pork to consumers.

125. Packers may obtain some of their supply of hogs from affiliated producers. They may obtain other hogs from family farms or other independent producers.

126. Many pork producers enter into supply agreements with packers, some of which are multi-year contracts, such that very little pork product in the U.S. is sold on the open market. Producers who contract with packers do not sell directly to wholesalers or consumers.

127. The number of steps before a product reaches a consumer or business depends on the ultimate purchaser and the amount that a product is processed. Downstream supply chain participants include processors, brokers, distributors, warehouses, retailers, foodservice operators, and other actors.

128. Pork is a particularly difficult product to trace throughout the supply chain because of the multiple and segmented steps in the production process.

182a

129. Because the U.S. Department of Agriculture's Food Safety and Inspection Service already inspects pork meat for wholesomeness, the industry does not closely track production details for the vast majority of commodity pork products.

130. The origin of a market hog is not always clear upon its arrival at packer slaughter facilities. The animals are segmented for slaughter based on a producer's identity, so hogs that were born and raised on a single farm generally can be traced back to their producers. But the origin of a hog is often unclear if it is purchased from a producer that only finishes market hogs, and who in turn had purchased the hog after weaning from a different farm. And while some hogs are purchased from known producers under longstanding contracts, others are bought on the spot market directly at the packing plant.

131. The housing conditions of the sow from which a market pig came are even more uncertain to packers. Sow farms often have different barns with different conditions. And a gilt may have been purchased rather than bred by the sow farm, making the determination of a sow's housing conditions throughout the period it was subject to Proposition 12 even more difficult.

132. After pork comes out of a packing house, it becomes very difficult to ascertain where pork product came from. This is because, when pork product leaves a slaughter facility and enters processing, it is often cut into many parts and combined with product from pigs raised by different producers.

133. It is especially difficult to determine the origin of pork products that are not whole but undergo further processing, such as sausages. These products

183a

run through multiple "touch points" such that tracing the original farm where a product originated becomes extremely difficult.

134. To determine if pork product is Proposition 12 compliant, the entire product line would need to be segregated.

135. This burden to segregate product will fall on farmers at every stage of pork production as well as packers.

## C. The Steps Involved In The Production Of Pork

136. Pork production in the U.S. is complex and driven by herd health and efficiency considerations.

137. Throughout the production process, pigs are carefully grouped to form herds with similar health status. This minimizes the need for treatment with vaccines or antibiotics. Producers also keep pigs in groups of the same age and with a similar diet.

138. For herd health reasons as well as economies of scale, the production process is segmented. This means that most farms hold pigs at a specific phase or phases in the production process, and they are moved between farms as they develop.

139. Breeding farms contain sows, female pigs that produce piglets.

140. Farms strive to locate sow breeding farms in isolated areas with low concentrations of pigs. Their remote location is a biosecurity measure to protect sow herds from disease. Biosecurity is a set of preventive measures to help avoid the transmission of infectious diseases in livestock.

184a

141. Sows deliver piglets in farrowing stalls on breeding farms.

142. After being weaned at about 21 days in the farrowing stall, piglets are moved away to nursery farms in a separate location. These locations are often removed from breeding farms for biosecurity and other concerns.

143. Piglets are kept in nursery farms until they weigh approximately 50 pounds at about 6-8 weeks, at which point they are referred to as "feeder pigs" and are transferred to separate finishing facilities.

144. Pigs spend 16-17 weeks at a finishing farm, where they develop and gain weight before being sent to markets and packers, where they are slaughtered.

145. A small percentage of farms are structured as "wean to finish," meaning that pigs are held at the same farm rather than transferred between farms as they develop throughout the production process.

### D. Sow Housing At Breeding Farms

146. A breeding farm houses sows that are bred, usually by artificial insemination, to produce piglets.

147. Determining how to house sows is a critical farm management decision.

148. Sow housing affects the ability of farm management to provide appropriate care to sows, maintain sow and herd health, and appropriately sequence sows through farrowing stalls where they give birth, and it is critical to farm productivity.

149. Thus, at breeding farms, many production and animal welfare considerations go into determining how to house sows.

185a

150. Most types of sow housing fit into one of two categories: individual or group housing.

151. Individual stall housing is the most common housing method in the industry. Individual stalls may be referred to as "breeding stalls," meaning individual stalls where a single sow is held after weaning piglets until confirmation of another pregnancy, or as "gestation stalls," meaning individual stalls where a single sow is held after confirmation of pregnancy.

152. Individual stalls typically provide around 14 square feet per sow. *See* Exh. O, Decl. S. Meyer, ¶ 11.

153. Individual stalls serve important animal health and efficiency purposes, because when using breeding and gestation stalls, it is easier to feed, treat, and observe sows.

154. Throughout breeding and gestation, producers typically confine sows to these individual stalls.

155. The stalls prevent a sow from turning around, such that a pig is fed only at one end of the stall and defecates only at the other end. This prevents the sow from eating feces.

156. The stalls allow the sow individual access to critical resources, including water and feed, without competition from other sows.

157. And they facilitate nutrition tailored to the needs of the individual sow to recover peacefully from the stress and strain of delivering and nursing their previous litter and allow the sows to regain body weight and prepare to be re-bred.

158. Individual stalls also provide a sow with easy access to veterinary care.

186a

159. They further protect sows from aggression and injury from other sows.

160. Consumer demands from purchasers of pork to increase space for sows during gestation has led roughly 28% of the industry to convert from individual gestation stalls to group housing.

161. Group housing for sows is defined as a housing environment for more than one sow in which the sow has the ability to lie down and stand up and to turn around unimpeded.

162. Group housing generally provides around 16 to 18 square feet per sow. *See* Exh. O, Decl. S. Meyer, ¶ 11.

163. Many variables can negatively impact sow welfare and productivity when they are held in groups rather than individual stalls.

164. It is more difficult for producers to identify and remove sick sows for medical care in group housing, and to ensure that each sow receives appropriate nutrition tailored to its individual needs to achieve and maintain a healthy body condition.

165. Group housing systems increase the chance that a sow will be injured from aggressive interactions with other sows. Anytime a new group of sows is formed, there will be significant stress and injuries, because the sows will fight to establish their social order in group housing.

166. Sows also compete for feed in group housing, which risks dominant sows becoming overweight and subordinate sows becoming underweight.

187a

167. The welfare of sows held in group housing depends more heavily than that of sows held individually on the care and skill of the producers who tend to them.

168. Farm management using group housing must make a variety of decisions to attempt to alleviate this aggression among sows and to ensure that sows receive appropriate nutrition.

169. This requires flexibility in housing type and design to appropriately care for and ensure the productivity of sows held in group pens.

170. As an example, producers select peer groups of sows based on both the size of their operation and how sows will fit into farrowing room sequencing when they give birth and nurse piglets.

171. The size of the group may range from five to more than 100 sows per pen.

172. Producers must also consider whether the group-housed sow population will be dynamic, meaning that different sows will be regularly added or removed from the group to retain stocking levels in pens, or static, meaning that the same group of sows will be kept together.

173. Another factor managers consider is the feeding system employed. The choice of feeding method is critical in group housing because the producer is not able to tailor the nutrition provided to each sow as with individual stalls. The system employed can also influence the level of aggression and competition between sows for feed. The appropriate feeding system will be influenced by the size and make-up of the group, as well as the size of the pen.

188a

174. Feeding practices range from floor feeding, meaning that feed is simply dropped on the floor at one time; feeding in free access stalls, which allow sows to enter stalls that close behind them to eat individually; electronic sow feeding systems, which can be employed in larger pens where sows are directed to eat and given an individualized ration based on a tag on the sow's ear; and "trickle" feeding, meaning that feed is slowly released into feeding sites.

175. The type of flooring used is another decision that can impact hygiene and sow injuries. While solid flooring with bedding can increase sow comfort, slatted flooring to clear away manure can improve hygiene.

176. Another housing permutation is whether to provide free access stalls within the group housing. When a sow voluntarily enters a free access stall, the stall will close behind the sow and prevent other sows from entering. The sow within the free access stall cannot turn around, but it can voluntarily leave the stall by backing out.

177. All of these factors will impact sows' ability to avoid aggressive encounters that could result in injury and reduce farm productivity.

178. Producers require flexibility in housing design to make these decisions.

179. The "best" housing design, including space per sow, will depend on the interplay between each of the above factors as well as producer experience and preferences.

180. Housing features that work well for one producer may fail to secure sow welfare and negatively impact sow productivity in a different setting.

189a

### E. The Importance Of Individual Stalls During Breeding And Gestation

181. The overwhelmingly vast majority of producers, even if they use group housing at other stages, hold sows in individual breeding stalls for approximately 30 to 40 days between the time a sow finishes weaning through the time it enters estrus, it is bred, and pregnancy is confirmed.

182. After weaning piglets for about 21 days, a sow will generally enter estrus five to seven days later.

183. Once a producer confirms that a sow has entered estrus, the sow will be bred, typically by artificial insemination.

184. Pregnancy is confirmed around 21 days later.

185. The use of breeding stalls for around 30 to 40 days after weaning is a widely accepted industry practice that is endorsed by veterinarians.

186. It is also critical to managing sows for breeding and productivity.

187. Breeding stalls assist producers with detecting when a sow is in estrus to determine when it is time to breed the sow.

188. Commonly, producers will expose sows to a boar to assist with estrus detection by walking a boar along the side of the pen or stalls.

189. It is much more difficult to ensure that each sow is adequately exposed to the boar in order to detect estrus in a group pen setting as compared to individual stalls.

190a

190. Additionally, the separation of sows into individual stalls during estrus reduces the risk of injuries to sows and to human caretakers.

191. A sow's normal behavior during this time period is to attempt to mount or ride other sows, which can place farm workers at great risk of injury. Thus, keeping sows in group settings during this time presents safety concerns.

192. Use of breeding stalls after implantation and prior to confirmation of pregnancy ensures that the embryo properly attaches.

193. It also guards against the risk of the loss of pregnancy or a drop in litter size due to the stress of socialization in the group setting, as well as the risk of aggression from other sows.

194. Sows in stalls do not face the risk of aggression or jostling that occurs in group settings.

195. Sows placed immediately in a group housing setting after weaning have lower conception rates.

196. Breeding stalls also assist producers in confirming that the sow is pregnant. It is challenging in a group-housing setting to detect whether a sow is pregnant. While producers can use ultrasound technology, the ability of the sow to move around in a pen complicates the confirmation of pregnancy. Even with ultrasound technology, it is difficult to confirm pregnancy prior to 30 or 40 days after breeding.

197. Production management also benefits greatly from the ability to keep a sow in a stall until confirmed pregnant such that, if the sow does not conceive, it can be easily re-bred once it returns to estrus.

198. After pregnancy is confirmed, some pork producers transfer sows to group housing.

191a

199. Of these sows, some will not adapt healthily to the group setting and will be moved back to an individual stall.

200. As a farm management decision, most producers elect to hold sows continually in breeding or gestation stalls throughout pregnancy rather than to move sows into group housing facilities after pregnancy is confirmed.

201. Although the first several weeks after breeding are most critical and present the highest risk of embryo mortality, stress from a group setting at any stage of the production process may result in a pregnancy loss.

202. Breeding stalls protect gestating sows from aggression that is common when sows are moved from stalls into a group housing setting.

203. When mixed into groups, sows experience increased levels of fighting, cortisol, lameness, and body and vulva lesions as compared to sows housed in stalls. These conditions directly erode animal health.

204. The worst parts of this aggression occur for the first several days while the sows establish their social order.

205. Producers report a higher rate of injuries and fatalities in group than in individual housing.

206. Breeding stalls also enable farm managers to provide each sow with the proper nutrition during gestation. Producers can better ensure that sows that lost weight during lactation or those that have excessive body weight receive the correct amount of feed when they are housed in individual stalls.

192a

## II. PROPOSITION 12

### A.  The History Of Proposition 12

207. On November 6, 2018, California voters approved Proposition 12, a ballot initiative that amends the California Health and Safety Code with prescribed requirements for housing covered farm animals, including breeding pigs, calves raised for veal, and egg-laying hens.

208. Proposition 12 was drafted and sponsored primarily by the HSUS as well as supported by various other animal rights activists.

209. Proposition 12's requirements were driven by activists' conception of what qualifies as "cruel" animal housing, not by consumer purchasing decisions or scientifically based animal welfare standards.

210. The Proposition states that its "purpose ... is to prevent animal cruelty by phasing out extreme methods of farm animal confinement, which also threaten the health and safety of California consumers, and increase the risk of foodborne illness ...."

211. Proposition 12's requirements add to and amend those previously imposed by another ballot initiative, Proposition 2, titled *Standards for Confining Farm Animals*, which was also sponsored by the HSUS.

212. Passed November 4, 2008, Proposition 2 imposed animal housing requirements *on California producers* based on activists' conception of ideal animal housing.

213. Proposition 2 required that egg-laying hens, breeding pigs, and calves raised for veal *in California* must be housed in a manner that allows the animals

193a

to "turn around freely, lie down, stand up, and fully extend their limbs," subject to limited exceptions.

214. The effective date of Proposition 2 was January 1, 2015, over six years after Proposition 2 passed.

215. To come into compliance, Proposition 2 obligated California producers to undergo major, costly changes in their production practices that required millions of dollars' worth of investments in capital improvements to their animal housing facilities.

216. Recognizing the economic impact Proposition 2 would impose on California producers and eager to level the playing field, the California legislature enacted Assembly Bill 1437 (AB 1437).

217. AB 1437 exported Proposition 2's requirements to apply to all sales of eggs in California, even if the eggs were produced entirely outside of California. AB 1437 also had an effective date of January 1, 2015.

218. AB 1437 did not apply to pork.

219. AB 1437 was subject to legal challenge by six states as in violation of the Commerce Clause of the U.S. Constitution, but the lawsuit was dismissed for lack of *parens patriae* standing.

220. Through Proposition 12, activists have now imposed even more stringent requirements for housing to an expanded range of farm animals, to the detriment of animal health and the success of small family farms.

221. Proposition 12 redefines supposedly "cruel" animal confinement, dictating the amount of space and type of housing that producers must provide to breeding pigs, calves raised for veal, and egg-laying hens.

194a

222. This time, activists drafted the ballot initiative so as to require *all* producers to follow the requirements of Proposition 12 in order for their products to be sold in California, regardless of whether the product was produced inside or outside of California.

223. Thus, their intent was to have Proposition 12 impose an extra-territorial effect on interstate commerce.

224. Indeed, multiple statements confirm the activists' intent to reach out-of-state production through Proposition 12, as well as their awareness of Proposition 12's extraterritorial impact.

225. For example, in an editorial to support passage of Proposition 12 sponsored by a committee of HSUS, the activists explained that California does not have a sizable pork industry, and that the proposition would ban sales from other states not meeting California's standards. "Editorial: Vote Yes on Prop. 12 to Give Farm Animals a Cage-Free Life," *Mercury News* (September 4, 2018), https://perma.cc/45Y7-WVFX.

226. HSUS officials and other activists explained how Proposition 12 would have an out-of-state impact, forcing producers outside of California to meet its "historical" standards in order to reach the California market. *See, e.g.*, Charlotte Simmonds, "'History in the Making': California Aims for World's Highest Farm Animal Welfare Law", *The Guardian* (March 7, 2018), https://perma.cc/6RL3-99ZL (The vice-president of farm animals protection for HSUS claims that Proposition 12 "is history in the making"); Anna Keeve, "Farm Animal Rights Bill, Proposition 12: Everything You Need to Know", *LA Progressive* (August 30, 2018), https://perma.cc/6G64-AHUZ, (Humane

195a

League activist states that Proposition 12 "has the potential to be the biggest legislative victory for animals in history, not just in the state but in the country."); *see also* Nicole Pallotta, "Wins for Animals in the 2018 Midterm Election", *Animal Legal Defense Fund* (January 5, 2019), https://perma.cc/J7T5-98XP (Proposition 12 is "being called the strongest law of its kind in the world").

227. Thus, as is the intent behind Proposition 12, producers outside of California who wish to sell in the California market must comply with Proposition 12.

228. A report regarding Proposition 12 prepared by the Legislative Analyst Office for the Attorney General for the State of California (LAO Report) also recognized that Proposition 12 inevitably regulates extraterritorial conduct with regard to pork. The LAO Report explained that most of the pork that Californians purchase is produced in other states.

229. The LAO Report further anticipated that in response to Proposition 12, California farmers would stop or reduce their production, potentially causing a decrease of millions of dollars of state tax revenue that California collects annually.

230. In addition, the LAO Report explained that consumer prices for pork would likely increase as a result of Proposition 12.

231. The LAO Report explained that Proposition 12 will require many producers—including those "in California **and other states**" —to remodel existing housing or build new housing for animals to satisfy the new definition of "cruel" animal confinement.

232. Further, the LAO Report explained that it could take several years for producers to change their

196a

housing systems to come into compliance with Proposition 12. Demand for Proposition 12-compliant products in California would outpace supply.

233. The LAO Report also anticipated a $10 million cost to California annually in ensuring that products sold in California, whether produced in-state or out-of-state, comply with Proposition 12.

234. The LAO Report did not quantify the costs that Proposition 12 imposes outside of California.

235. Because Proposition 12 was a ballot initiative, it passed without legislative debate or legislative hearings to investigate the impact it would have on interstate commerce, on the pork industry, or on sow welfare.

236. Proposition 12 passed with approval of 62.66% of participating California voters.

## B. Proposition 12's Space Requirements As Applied To Breeding Pigs

237. Proposition 12 prohibits "confining [breeding pigs] in a manner that prevents the animal from lying down, standing up, fully extending the animal's limbs, or turning around freely."

238. This means that a sow must be able to fully extend all of its limbs "without touching the side of an enclosure or another animal," and must be able to "tur[n] in a complete circle without any impediment, including a tether, and without touching the side of the enclosure or another animal."

239. These requirements mean that meat from the offspring of sows housed in individual stalls may not be sold in California.

197a

240. Proposition 12 permits only narrow exclusions from this requirement that breeding pigs not be housed in individual stalls. Individual stalls may be used:

a.  for five days before a breeding pig is expected to give birth, and any day a pig is nursing piglets;

b.  for animal husbandry purposes, limited to six hours in any 24 hours, and not more than 24 hours in any 30 days;

c.  for "examination, testing, individual treatment, or operation for veterinary purposes";

d.  for medical research; and

e.  during transportation, during shows, during slaughter, at establishments where federal meat inspection takes place, and at live animal markets.

241. These exclusions do not allow the housing of sows in individual breeding stalls to detect estrus or to ensure that a pig is pregnant and that the eggs have properly attached.

242. They also do not allow a sow to recover peacefully from the strain of delivering and weaning her last litter of piglets, protected from fighting and competing against dominant and aggressive sows.

243. Subject to the same narrow exceptions, Proposition 12 also prohibits, after December 31, 2021, "confining a breeding pig with less than 24 square feet of useable floor space per pig." "Usable floor space" is defined as the total square footage of floor space divided by the number of animals in the enclosure.

198a

## C. Proposition 12's Space Requirements As Applied To Gilts

244. Proposition 12's requirements apply to breeding pigs, which it defines as "any female pig of the porcine species kept for the purpose of commercial breeding who is six months or older or pregnant." Gilts which are not pregnant are therefore exempt until they are six months old.

245. However, standard industry practice is not to breed gilts until they are about seven months old.

246. Accordingly, gilts over six months old must be housed in compliance with Proposition 12.

247. Virtually no gilts currently are housed that way.

248. Many sow farms raise their own gilts. Others buy their sows, or some sows, from gilt producers.

249. In order to be Proposition 12 compliant, even a sow farm that complied with Proposition 12 for its breeding pigs would also need to ensure that all its sows were raised as gilts in compliance with Proposition 12. And currently non-compliant herds would need to be entirely replaced using compliant gilts.

## D. The Scope Of Proposition 12

250. Proposition 12's requirements apply to sales of covered products in California even if the product derives from a farm animal raised entirely outside of California. Specifically, covered products from a breeding pig or from the offspring of a breeding pig cannot be sold in California if the breeding pig was ever confined in conditions that do not satisfy Proposition 12.

199a

251. This restriction covers business owners and operators who know or should know that covered product does not comply with Proposition 12.

252. There is a defense to a violation of Proposition 12 if the seller proves that it did not know, and should not have known, that the product was from an animal that did not meet Proposition 12's confinement mandates, or if the seller proves that it relied in good faith upon certification "by the supplier" that the product was not from an animal confined in conditions that fail to meet Proposition 12's requirements.

253. The products covered by Proposition 12 are uncooked, whole pork meat comprised entirely of pork intended for human consumption.

254. "Whole pork meat" means any uncooked cut of pork that is comprised entirely of pork meat, or of pork meat with very basic additives, such as seasoning, curing agents, coloring, and preservatives. Examples of covered products include "bacon, ham, chop, ribs, riblet, loin, shank, leg, roast, brisket, steak, sirloin, or cutlet."

255. This definition "does not include combination food products" that consist of more than pork meat and such basic meat additives, such as "soups, sandwiches, pizzas, hot dogs, or similar processed or prepared food products."

256. In the industry, a "processed" product generally refers to a product that is ready to eat and need not be cooked for food safety reasons.

257. A covered sale is the commercial sale of a covered product in California, deemed to occur where the buyer takes physical possession of the item. It does

200a

not include sales that occur at facilities that are federally inspected pursuant to the Federal Meat Inspection Act.

258. Because there is no exclusion for pork raised outside the country, Proposition 12 applies to foreign producers as well as the entire U.S. pork market.

### E.  Implementation Of Proposition 12

259. A sale of pork in California that does not comply with Proposition 12 is a criminal offense that carries a penalty of up to a $1,000 fine or 180 days imprisonment.

260. A violation is also defined as "unfair competition" under the California Business & Professional Code § 17200. This definition subjects a seller to a civil action for damages or injunctive relief by any person injured in fact by the violation.

261. Proposition 12 charges the CDFA and the CDPH with jointly promulgating regulations to implement Proposition 12.

262. The CDFA is in the process of developing this regulatory framework. Proposition 12 required CDFA and CDPH to produce final regulations by September 1, 2019.

263. On April 2, 2019 the CDFA issued a Notice of a Request for Information.

264. CDFA explained that Proposition 12's implementing regulations may include "production facility registration, certification, verification audits or inspections, border station inspection, and a penalty matrix for violations including an appeal process."

201a

265. On June 3, 2019, Plaintiffs AFBF and NPPC submitted comments in response to the CDFA's Request for Information. In these comments, the NPPC explained that the production of pork in the U.S. is driven by a complex industry that is vastly different from the egg and dairy industries.

266. Both Plaintiffs further explained that the arbitrary housing requirements in Proposition 12 have no connection to animal welfare, that the costs of compliance will force producers to choose between incurring untenable compliance costs or losing access to the California market, and that Proposition 12 violates the Commerce Clause.

267. As of the filing of this lawsuit, no regulations have been promulgated.

## F. The Proponents' Justifications For Proposition 12

268. The purported justifications for the section of the California Health and Safety Code that Proposition 12 amends is to "prevent animal cruelty by phasing out extreme methods of farm animal confinement, which also threaten the health and safety of California consumers, and increase the risk of foodborne illness and associated negative fiscal impacts on the State of California."

269. The Proposition 12 Official Voter's Guide did not explain how Proposition 12 has anything to do with pork product safety. And its discussion of animal cruelty with regard to pork production reflected a misunderstanding of industry practices.

270. Proponents of Proposition 12 stated in the Voter Guide: "Voting YES prevents . . . mother pigs . . . from being crammed inside tiny cages for

202a

their entire lives. It will eliminate inhumane and un-safe products from these abused animals from the California marketplace. Voting YES reduces the risk of people being sickened by food poisoning . . . ."

271. In the Voter Guide proponents also stated: "A mother pig shouldn't be locked in a tiny, metal cage where she can barely move. She's trapped, forced to live in this small amount of space for *nearly four years.*"

272. Proponents also stated in the Voter Guide: "Scientific studies repeatedly find that packing animals in tiny, filthy cages increases the risk of food poisoning."

273. These proponent statements in support of Proposition 12 in the Voter Guide that concern breeding pigs are inaccurate. They arise from misconceptions about the industry and housing practices.

274. The proponents did not explain why 24 square feet per sow are needed to prevent animal cruelty, or have anything to do with it.

275. Their arguments relied on inaccurate depictions instead of prevailing industry standards of space provided per sow.

276. They made no reference to the reasons for the use of breeding stalls, or the ways and periods in which breeding stalls are used.

277. And they did not explain or point to scientific studies that show how sow housing can affect public health when the pork sold to consumers comes almost exclusively from pigs raised and slaughtered in other facilities.

278. The proponent statements in the Voter Guide are inaccurate, and fail to take into account the

203a

benefits to animal health of limiting group housing of sows.

## III. PROPOSITION 12 REGULATES WHOLLY OUT-OF-STATE CONDUCT

### A. Proposition 12 Requires Massive Changes In Pork Production Practices Nationwide

279. A 24-square-foot-per-sow requirement and severe restriction on—indeed almost complete elimination of—the use of breeding stalls is entirely inconsistent with current industry best practices.

280. While a handful of states have passed laws requiring that pregnant or gestating sows be confined in conditions that permit them to stand up, fully extend their limbs, and turn around, Proposition 12's ban on breeding stalls prior to pregnancy and its square-foot-per-sow requirement are singular in the U.S.

281. Even more, these other state regulations that require stand-up turn-around have only imposed these requirements on in-state producers. Only Massachusetts has passed a law that, once in effect, will similarly export its requirements to out-of-state producers. That law was also passed via ballot proposition, and lacked any semblance of legislative investigation, debate, or deliberation.

282. Agreed-upon industry standards developed in collaboration with veterinarians and other industry stakeholders recognize that a variety of housing systems can adequately provide for the welfare of sows and do not require one type of housing system, let alone set one prescriptive space-per-sow numerical requirement or end the use of breeding stalls.

204a

283. Compliance with Proposition 12 will require massive changes in production practices nationwide.

284. Although approximately 28% of the U.S. market houses sows in group housing systems, only a miniscule portion meets all of the housing requirements prescribed by Proposition 12. Exh. A, Decl. D. Hockman, ¶ 9.

285. Of the approximately 28% of the market that uses group housing, those facilities generally house sows with anywhere from 16-18 square feet per sow. *See* Exh. O, Decl. S. Meyer, ¶ 11.

286. Approximately 72% of U.S. pork producers house sows in individual stalls throughout gestation. Exh. A, Decl. D. Hockman, ¶ 9.

287. The overwhelmingly vast majority of producers typically use individual breeding stalls for the first 30 to 40 days between the time a sow finishes weaning through the time it enters estrus, is bred, and pregnancy is confirmed. Exh. A, Decl. D. Hockman, ¶ 9.

288. None of these pork producers are in compliance with the stand-up turn-around requirements or the 24-square-foot-per-sow group housing space requirement of Proposition 12.

289. Demonstrating the massive changes that Proposition 12 requires, almost the entire industry is out of compliance with Proposition 12.

**B. By Dictating Producers' Production Practices Outside Of California, Proposition 12 Disrupts The Interstate Pork Supply Chain**

290. The inevitable effect of Proposition 12 is to regulate out-of-state production.

205a

291.  Proposition 12 targets an industry whose production occurs almost entirely outside of California, in other states and countries.

292. California's consumption of pork is hugely disproportionate to its production. California consumes about 13% of the pork sold in the U.S. But pork production inside California is minimal. There are approximately 8,000 sows in California, and only approximately 1,500 of those are in commercial production. Yet, California annually consumes the pork from approximately 673,000 sows.

293. Accordingly, the inevitable effect of Proposition 12 is to project California's required methods of production into other states and countries that allow different methods of production, and to force costly and unwanted changes in production methods that producers believe are both inefficient and harmful to their sows.

294. The extraterritorial reach of Proposition 12 is a substantial barrier to interstate commerce, which functions through a well-established and complex supply chain in which virtually no participant is Proposition 12 compliant.

295. Proposition 12 will remove from the California market pork product derived from the offspring of sows whose producers provide for animal welfare but do not meet Proposition 12's prescriptions.

296. Out-of-state producers must submit to California's mandated production methods or lose access to California's large market.

297. In addition, because of the difficulty of tracing pork products back to sows and gilts housed in particular facilities, Proposition 12 disrupts the entire U.S. pork chain of supply. Absent tracing individual

206a

cuts of whole pork product throughout that chain of supply back to particular sow facilities (indeed, particular sow housing), and segregation of any Proposition 12 compliant hogs and individual pork meat cuts at slaughter and processing facilities, it will be impossible to sell any commercially produced pork into California.

298. As an alternative to tracing and segregation, producers will be forced to change their production practices for pork intended for other, non-California markets in order to make all of their production Proposition 12-compliant.

299. End of chain suppliers who sell pork into California will likely force their pork suppliers to produce *all* product they provide to those suppliers in compliance with California's specifications, or to carefully segregate products.

300. Furthermore, some buyers will require that all products they receive from suppliers meet the same specifications and therefore avoid the need to segregate products. *See, e.g.*, Exh. N, Decl. J. Hofer, ¶¶ 18-21 (explaining that a packer with whom nine Hutterite colonies contract demanded that the colonies meet California's specifications for all pork product they sell to it); Exh. A, Decl. D. Hockman, ¶¶ 16-19.

301. Thus, even sow farms developing all or most of their product primarily for sale outside of California will likely be required to meet Proposition 12's strictures in order to sell their products to packers who supply those customers.

302. Confirming the extraterritorial nature of Proposition 12, it is impossible to conceive how CDFA will ensure compliance with Proposition 12 unless it

207a

certifies facilities in other states through direct field verification audits or inspections by state employees or third party auditors. Indeed, CDFA explains on its webpage regarding the implementation of Proposition 12 that certification and verification audits are among the methods it is considering for policing compliance.

303. By imposing drastic changes in production on an industry that is national in scope, and in which whole cuts of pork are shipped around the country, Proposition 12 interferes with the functioning of $26 billion a year in interstate commerce.

304. By imposing drastic changes that regulate how producers house sows in other states, California is directly challenging the sovereignty of other states to regulate their own citizens' animal husbandry practices.

## IV. PROPOSITION 12 IMPOSES AN EXCESSIVE BURDEN ON INTERSTATE COMMERCE

### A. Proposition 12 Imposes Substantial Costs On Out-of-State Producers

305. The overwhelmingly vast majority of the market is not in compliance with Proposition 12.

306. Producers who attempt to alter their practices to comply with Proposition 12 face severe and costly burdens.

307. To come into compliance with Proposition 12, the minority of producers who currently use group sow housing will need to decrease their production by removing sows from barns until the 24 square foot requirement is met, retrofit barns to increase available group housing space, or build new group housing barns, all with no corresponding financial benefit.

208a

Exh. F, Decl. N. Deppe, ¶ 20; Exh. K, Decl. C. Leman, ¶ 12; Exh. J, Decl. P. Jordan, ¶ 14.

308. Farms with group housing currently provide around 16-18 square feet per sow. These farms will need to reduce their sow inventories by 33% to come into compliance with Proposition 12. *See* Exh. O, Decl. S. Meyer, ¶ 13.

309. To comply with Proposition 12, producers who currently use individual sow housing will need to reduce their sow inventory by 42%, or build new or convert existing barns to group sow housing that provides 24 square feet per sow. *See* Exh. O, Decl. S. Meyer, ¶¶ 13, 14; Exh. E, Decl. P. Borgic, ¶ 31; Exh. C, Decl. H. Roth, ¶ 26.

310. In addition to the direct costs of renovation and reconstruction, the process will also require producers to shut down their existing farms while the farms are retrofitted. *See, e.g.*, Exh. H, Decl. T. Floy, ¶ 28; Exh. K, Decl. C. Leman, ¶¶ 13.

311. New construction costs will for some hog producers reach millions of dollars, and those costs will be in addition to any costs that some producers have already incurred in prior barn renovations transitioning to group housing.

312. As an example, Smithfield, a vertically-integrated pork processor and hog producer, already spent $360 million over a ten-year period to convert from individual stall housing to group housing. *See* Decl. of Robert Darrell, *North Am. Meat Inst. v. Becerra, et al.*, 2:19-cv-08569-CAS, Dkt. 15-7 (C.D. Cal. Nov. 18, 2019). Smithfield estimates that retrofitting its barns to meet Proposition 12's 24–square-feet-per-sow requirement for all of its company-owned sows would in

209a

turn cost an additional $100 million in capital invest-
ments and increased operating costs. *See* Decl. of Rob-
ert Darrell, *North Am. Meat Inst. v. Becerra, et al.*,
2:19-cv-08569-CAS, Dkt. 15-7 (C.D. Cal. Nov. 18,
2019). Clemens, a vertically coordinated company
that produces, processes, and distributes pork, esti-
mates that restructuring its company-owned sow
farms as well as those of its suppliers to comply with
Proposition 12 would require a capital investment of
over $45 million. *See* Decl. Joshua Rennells, *North
Am. Meat Inst. v. Becerra, et al.*, 2:19-cv-08569-CAS,
Dkt. 15-9 (C.D. Cal. Nov. 18, 2019).

313. Smaller operations also face steep construc-
tion costs and have less ability to meet them. Illinois
hog producer Mr. Borgic estimates that construction
costs to comply with Proposition 12 for his herd of
10,000 sows would reach around $3 million. Exh. E,
Decl. P. Borgic, ¶ 28. Missouri hog producer Mr. Ma-
her explains that he previously spent $1.5 million
building a group pen with space for 16 square feet per
sow. Exh. L, Decl. G. Maher, ¶¶ 7,17.

314. Some farms will not have the capital availa-
ble to meet these costs. *See* Exh. O, Decl. S. Meyer,
¶ 16.

315. Permits to construct new or retrofit existing
barns are difficult to obtain in many states and re-
stricted by state regulation. Available space for new
facilities is also limited by zoning regulation, and of-
ten subject to significant construction or litigation de-
lays.

316. Producers that elect to undergo these steep
construction costs will need to secure financing, which
will also likely require them to negotiate revised, long-

210a

term contracts with suppliers. Exh. F, Decl. N. Deppe, ¶ 20.

317. The timeline for producers to come into compliance with Proposition 12's spacing requirements is abbreviated and requires action now. Exh. C, Decl. H. Roth, ¶ 10.

318. Before beginning construction, producers will need to consult with equipment manufacturers and experts regarding how to design the group housing and select appropriate equipment and fixtures. Exh. H, Decl. T. Floy, ¶¶ 26-33.

319. Producers who intend to retrofit or build new barns to meet Proposition 12's 24-square-foot-per-sow requirement by the December 31, 2021 deadline would likely have needed to start planning and contracting for construction during 2019.

320. By early 2020, pork producers who intend to construct new barns or retrofit their facilities will need to begin construction on new sow housing units.

321. Thus, Plaintiffs' members must begin retrofitting or constructing new barns to come into compliance now, or be prepared to lose certain customers and access to the California market. Exh. C, Decl. H. Roth, ¶ 10.

322. Compliance with Proposition 12 will require entirely new and less efficient methods of animal husbandry that will increase operating, staff training, and veterinary costs.

323. Proposition 12 significantly interferes with production by taking farm management practices out of the hands of the farmers who are most informed about animal care. The impact of this intrusion will

211a

also jeopardize animal health (as previously explained), increase production costs, and decrease productivity. Exh. C, Decl. H. Roth, ¶¶ 15-26; Exh. J, Decl. P. Jordan, ¶¶ 12-14; Exh. I, Decl. T. Hays, ¶¶ 9-10, 14; Exh. K, Decl. C. Leman, ¶¶ 14-16; Exh. E, Decl. P. Borgic, ¶¶ 10-22; Exh. G, Decl. M. Falslev, ¶¶ 27-29; Exh. H, Decl. T. Floy, ¶¶ 16-18.

324. Proposition 12 eliminates the use of breeding stalls on which the vast majority of producers rely for managing the breeding of sows based on generations of experience. Those farmers will need to completely change their methods of operation to accommodate sows in estrus and during breeding and early pregnancy in group housing, which will require changes in the sow population and/or in the physical plant.

325. Proposition 12 will also require virtually all farms to change the way they acquire or raise and first breed gilts.

326. In an expedited timeframe, Proposition 12 upends generations of animal husbandry, training, and knowledge.

327. It will be significantly more difficult for producers to oversee the production process with restricted breeding stall use.

328. It will be much more difficult for many producers to artificially inseminate their sows under the limited animal husbandry exceptions permitted under Proposition 12. *See* Exh. I, Decl. T. Hays, ¶¶ 9-10.

329. Sow productivity will drop and sow injuries will increase without farm management's ability to place sows in breeding stalls during estrus, implantation of the embryo, and confirmation of pregnancy.

212a

Exh. C, Decl. H. Roth, ¶¶ 22; Exh. I, Decl. T. Hays, ¶ 14; Exh. G, Decl. M. Falslev, ¶ 28.

330. Producers will need to expend resources to provide additional training to stockpersons on how to properly care for gestating sows held in groups rather than individual stalls. Exh. I, Decl. T. Hays, ¶¶ 12-13; Exh. K, Decl. C. Leman, ¶ 15; Exh. E, Decl. P. Borgic, ¶ 33.

331. Stockpersons will need to be differently trained to recognize sows that require specific nutrition or care and remove them from a group housing setting, and to confirm more carefully when a sow is in estrus or whether a sow is pregnant. Exh. I, Decl. T. Hays, ¶¶ 12-13; Exh. K, Decl. C. Leman, ¶ 15; Exh. E, Decl. P. Borgic, ¶ 33; Exh. G, Decl. M. Falslev, ¶ 29.

332. Proposition 12 forces farmers to utilize group housing even when their animal care, staff knowledge, and farm management practices are best suited to individual stall systems.

333. The decrease in farm productivity driven by Proposition 12 will cause producers to lose revenue. Small farms are more likely to cease operations than large farms, due to a lack of adequate capital to undertake the massive investment required to meet Proposition 12's requirements.

334. As a conservative estimate, farrowing rates will decrease on farms that comply with Proposition 12 and eliminate the use of breeding stalls by around 9%. *See* Exh. O, Decl. S. Meyer, ¶ 20.

335. For some farmers, the economic and productivity costs described above will be too steep to come into compliance with Proposition 12. *See* Exh. F, Decl.

213a

N. Deppe, ¶ 20; Exh. I, Decl. T. Hays, ¶¶ 17-18; Exh. E, Decl. P. Borgic, ¶ 35.

336. Proposition 12 will also cause producers who are unable to comply with Proposition 12 to lose business, including for sales that occur entirely outside the State of California. Some of this lost business may be from suppliers with whom producers have contracted for many years. *See* Exh. G, Decl. M. Falslev, ¶ 9; Exh. H, Decl. T. Floy, ¶ 33; Exh. J, Decl. P. Jordan, ¶ 9.

337. Producers have already received letters from suppliers demanding compliance with Proposition 12. *See* Exh. A, Decl. D. Hockman, at ¶ 12-15.

338. Producers may be forced to satisfy Proposition 12 to continue the supply relationship with suppliers that intend to sell pork product in California, even if their sale of product to those suppliers takes place outside of California.

339. Some suppliers will set specifications that must be met for all of their pork product across the board, regardless of what market it is sold into. Producers thus may be forced to comply with Proposition 12 to continue a supply relationship with these suppliers, even if most of their product is not bound for California.

340. These changes in physical plants and operations required in order to comply with Proposition 12 impose serious financial hardship on pork producers.

341. The consequences of this would likely include further consolidation of the pork industry, as larger farms with greater capital are able to adapt and smaller farms are forced to cease operation.

214a

## B.  Proposition 12 Substantially Interferes with Interstate Commerce in Pork

342. Producers who comply with Proposition 12 will need to spend at least an estimated $293,894,455 to $347,733,205 of additional capital in order to reconstruct their sow housing and overcome the productivity loss that Proposition 12 imposes. *See* Exh. O, Decl. S. Meyer, ¶ 24.

343. Plaintiffs expect that compliance with Proposition 12 will increase production costs per pig by over $13 dollars per head, a 9.2% cost increase at the farm level. *See* Exh. O, Decl. S. Meyer, ¶ 25.

344. Proposition 12 will impact sales of pork that take place entirely outside of California.

345. Because of the small in-state production of sows in California compared to California's greater consumption of pork, the majority of the costs and operational changes to supply the California market will necessarily be incurred by producers operating entirely out-of-state.

346. Selling a cut from a pig to California means the entire pig must be raised according to Proposition 12's requirements, regardless of where the other cuts are sold. *See* Exh. A, Decl. of D. Hockman, ¶ 17; Exh. O, Decl. S. Meyer, ¶ 8.

347. As a consequence, producers will be required to conform to Proposition 12's requirements even for pork product that is bound for other markets, even though there is no consumer demand in other states for Proposition 12 compliant pork.

348. Further, segregating pork product throughout the supply chain is very difficult and complicated. *See* Exh. A, Decl. D. Hockman, ¶¶ 17-18, 28.

215a

349. Thus, some packers and food distributors will require all of the product that they receive to comply with Proposition 12, regardless of where they sell it. *See* Exh. N, Decl. J. Hofer, ¶¶ 18-21; Exh. A, Decl. D. Hockman, ¶¶ 16-19.

350. This has already been the experience of NPPC members who operate sow farms on Hutterite colonies in Montana, who have been told by a packer that sends only an estimated one third of its pork to California that all hogs it buys must be Proposition 12-compliant. Exh. N, Decl. J. Hofer, ¶¶ 18-21.

## V. THERE IS NO SOW WELFARE BENEFIT FROM MANDATING 24 SQUARE FEET PER SOW OR RESTRICTING THE USE OF BREEDING STALLS

### A. The Concept Of Sow "Welfare"

351. Proposition 12 will not advance sow welfare.

352. Sow welfare depends on an assessment of the individual sow and the care that is provided to that sow, not an arbitrary, prescriptive housing space number.

353. To assess sow welfare, farmers, veterinarians, and other industry stakeholders consider a variety of objective factors.

354. The industry uses voluntary, third party audits that consider objective physical criteria developed in collaboration with veterinarians. These factors include body condition scoring, lameness scoring, nutrition, and water provided to the sow.

355. Veterinarians also consider whether the needs of the sow are provided for in order to enable the sow to produce.

216a

356. Human management, not a prescriptive space requirement, is the most important factor determining sow welfare.

357. Care from dedicated, knowledgeable farmers leads to the best welfare results for sows. This is because the best individual to determine how to raise and house a sow is the person who is caring for it, taking into account the barn and the specific animals involved.

358. A variety of farm management factors impact the care and attention that a sow receives, including the producers' knowledge, the feeding system used, the type of stall, the number of sows in the pen, the size of the operation, and the ease of human access in and out of stalls.

359. Further, a sow's needs change throughout production, from the time it is weaned through inception and gestation.

360. And a sow's welfare needs are unique to the particular sow. One mandatory practice may harm many sows, while advancing the welfare of others.

**B. Sow Welfare And Housing**

361. Research repeatedly demonstrates that there is no single "best" method for housing sows to provide for sow welfare.

362. Indeed, based on their lifelong experience producing hogs, AFBF and NPPC members rely on various methods of caring for and housing their sows. *See, e.g.*, Exh. D, Decl. G. Boerboom, ¶¶ 20, 24, 37; Exh. E, Decl. P. Borgic, ¶ 10; Exh. F, Decl. N. Deppe, ¶ 10; Exh. G, Decl. M. Falslev, ¶¶ 15, 20; Exh. H, Decl. T. Floy ¶ 23; Exh. I, Decl. T. Hays, ¶¶ 3, 20; Exh. J, Decl. P. Jordan, ¶ 11; Exh. K, Decl. C. Leman, ¶ 5;

217a

Exh. L, Decl. G. Maher, ¶¶ 6-8; Exh. C, Decl. H. Roth, ¶ 15; Exh. M, Decl. R. Spronk, ¶¶ 6-8, 21.

363. The American Veterinary Medical Association has concluded that "[t]here are advantages and disadvantages to any sow housing system."

364. Within a group housing system, the amount of space a sow needs depends not on a prescriptive number, but instead on the type of group housing system used, the quality of the space, and the make-up of the group in terms of size, age, parity, and type of sow.

365. It is disastrous to farm management and sow welfare to prescribe one specific number without considering these factors.

366. For example, gilts and younger sows are smaller than older sows, and need less space than mixed groups or groups comprised solely of older sows.

367. As another example, group size will directly influence quality of space and the social interactions among the sows. The larger the group, the greater the number of sub-groups that develop among dominant, intermediate, and submissive sows. In a large group setting, the design of the feeding space becomes particularly critical to prevent submissive sows from being displaced from the feeding space and to mitigate sow aggression.

368. Quality of space provided to sows is much more important than quantity of space per sow.

369. Elements dictating quality of space include not only space per sow, but also design of the housing system, flooring type, group size, bedding, nutrition, the feeding mechanism, and the training of farm staff in removing sows that need individual care.

218a

370.  Because the amount of space a sow needs depends on a variety of situation-specific factors, a prescriptive requirement will not be appropriate in all cases.

371.  Many guidelines produced by collaboration between industry stakeholders and veterinarians regarding appropriate care and housing of sows to secure sow welfare recognize that a variety of factors determine what amount of space is appropriate and do not prescribe one specific number in sow housing requirements.

372.  For example, the Common Swine Industry Audit is a third party, voluntary audit based upon standards developed by a task force of industry stakeholders, including veterinarians, producers, animal scientists, packers, processers, and retail and food service representatives. The audit reviews 27 aspects of swine care and pre-harvest pork safety.

373.  One animal well-being topic reviewed by the audit considers space allowance per sow. Instead of tying space per pig to an arbitrary number, the Common Swine Industry Audit assesses whether a sow has the ability to easily lie down fully and stand back up within the housing. The Audit also considers body condition scores, the number of pigs with lameness or lesions, air temperature, feed and water access, and caretaker training, among other factors.

374.  The Pork Checkoff's 2018 Swine Care Handbook, drafted by academics, producers, and veterinarians, also creates recommendations for group housing space allowances. Regarding sow housing during breeding and gestation, the Handbook notes that pregnant sows can be kept "in a variety of housing situations," and that the management system should

219a

provide access to appropriate feed, water, sanitation, and air quality, facilitate the observation of individual sows to assess their well-being, and provide adequate quality and quantity of space to permit sows to "assume normal postures and express normal patterns of behavior," among other factors. It states that there are disadvantages and advantages to any sow-housing system, and that each system should be weighted based on scientific evidence, veterinary professional judgment, and caretaker management abilities. The Handbook also explains that group housing systems are less restrictive than individual stalls but "could lead to increased lameness," as well as aggression and competition for resources.

375. With regard to space allowance recommendations in indoor group housing, the Handbook does not require one prescriptive number. Instead, it explains that space requirements are influenced by "feeding method, group size, flooring type, pen design, management practices and other factors." It states that adequate space in group housing will allow sows space for full lateral recumbency and minimize the risk of injury.

## C. There Is No Scientific Basis For The Belief That The 24-Square-Feet-Per-Sow Requirement Promotes Sow Welfare

376. The requirement of 24 square feet per sow is an arbitrary number.

377. It has not been scientifically shown to improve sow welfare.

378. To compare sow welfare under different housing systems, studies look at stress hormones (cortisol), injury levels, the number of fights between

220a

sows, the ability of sows to get enough feed, the ability to maintain pregnancy, and sow longevity.

379. In terms of square footage, at most, the science suggests that sows need room for lying down separate from room for defecating, and that less than 15 square feet per sow may compromise sow welfare in terms of longevity and risk of injury.

380. U.S. producers typically provide at least 16 square feet per sow, with the average being 18-19 square feet per sow in group housing.

381. There are no marginal gains to sow welfare from increasing space allowances per sow from 16-19 square feet per sow to 24 square feet per sow.

382. Providing too large an area may decrease sow welfare. It may lead to sows defecating in the lying area, rather than the dunging area, thus compromising hygiene. *See* Exh. M, Decl. R. Spronk, ¶ 13.

383. And additional floor space may permit more room for fighting, thereby increasing sow stress levels and negatively impacting sow welfare.

384. In large floor spaces, there is often a great deal of wasted space. Given the option, many sows choose to spend their time in a more confined pen.

385. On the other hand, the selection of one prescriptive number is detrimental to animal welfare and farm management.

386. The blanket 24 square feet requirement limits the ability of farm management to make housing adaptations to best address the welfare of their sows.

387. In imposing an arbitrary square foot per sow requirement, Proposition 12 requires producers to di-

221a

vert costs that could be spent on more direct influencers of sow welfare such as optimal nutrition, stockperson training, and advanced feeding systems to an arbitrary square feet per sow number.

388. Blindly imposing a single square foot per sow requirement on all farms denies producers the ability to manage their farms to optimally manage production while providing for sow welfare.

### D. Limiting The Use Of Breeding Stalls Harms Sow Well-Being

389. Proposition 12 prohibits the use of individual stalls except during the period from five days before farrowing and while nursing piglets, and in certain additional narrow circumstances. It therefore prohibits the industry's almost universal practice of using breeding stalls until pregnancy is confirmed, as well as the use of individual stalls to ensure the welfare of specific sows.

390. Restrictions on the use of breeding stalls decrease sow welfare during breeding and gestation.

391. Farmers who transitioned from group pens to individual stalls noticed that the sows appeared calmer and healthier in individual stalls. *See* Exh. C, Decl. H. Roth, ¶ 19; Exh. G, Decl. M. Falslev, ¶ 19; Exh. H, Decl. T. Floy, ¶¶ 20-22.

392. Sows held in individual stalls lasted on average for a greater number of parities, or farrowings, than when held in the group pen. Exh. H, Decl. T. Floy, ¶ 18.

393. Group housing exposes sows to aggression and fights, leading to a greater incidence of injuries. The sows tear at each other's vulvas and ears, leading

222a

to serious injuries that can render sows unable to continue to farrow, as well as fatalities. *See* Exh. E, Decl. P. Borgic, ¶ 12; Exh. I, Decl. T. Hays, ¶ 9; Exh. N, Decl. J. Hofer, ¶ 33. These fights occur regardless of the number of sows held in the pen. Exh. F, Decl. N. Deppe, ¶ 18.

394. Producers that transitioned from individual stalls to group housing experienced higher cull rates and sow injuries. *See* Exh. L, Decl. G. Maher, ¶ 9.

395. Conversely, producers that transitioned from group housing to individual pens experienced the opposite. *See* Exh. E, Decl. P. Borgic, ¶¶ 14-15; Exh. C, Decl. H. Roth, ¶ 16; Exh. G, Decl. M. Falslev, ¶ 20; Exh. H, Decl. T. Floy, ¶¶ 14-18. One farmer noticed that despite tripling his herd size at the time that he transitioned from a group pen to individual stalls, the number of sows culled due to serious injuries remained constant—even with three times as many animals. Exh. C, Decl. H. Roth, ¶ 16. Thus, the percentage of injured sows sharply decreased on his farm.

396. Because of these fights, sows experience greater stress in group housing than in individual stalls.

397. The consequences of stress and fights are particularly severe to sow welfare prior to the confirmation of pregnancy and in the early stages of gestation.

398. Mixing sows into a group setting after weaning results in higher levels of stress than mixing sows into a group setting after pregnancy is confirmed. *See, e.g.*, Exh. M, Decl. R. Spronk, ¶ 11.

399. By preventing the use of breeding stalls during the 30 to 40 day period between weaning and confirmation of pregnancy, Proposition 12 puts sows at greater risk of injury and stress during the vulnerable stages of breeding and gestation.

400. The stress and fights in the group pen increase the chance that a sow's embryo will fail to attach following implantation, or that a sow will lose a pregnancy or drop a litter size. Exh. E, Decl. P. Borgic, ¶ 22-23; Exh. F, Decl. N. Deppe, ¶¶ 18-19; Exh. H, Decl. T. Floy, ¶ 16; Exh. K, Decl. C. Leman, ¶ 16.

401. As one farmer explained, Proposition 12's restriction on the use of breeding stalls after weaning until the confirmation of pregnancy would effectively "kill piglets." Exh. C, Decl. H. Roth, ¶ 22; *see also* Exh. M, Decl. R. Spronk, ¶ 11.

402. Proposition 12 will also cause sows still in heat to be moved back into a group pen. This is dangerous to the individual sow, the herd, and workers, because the sow in heat may attempt to mount or ride other sows and farm hands and cause injury. Exh. E, Decl. P. Borgic, ¶¶ 19-21.

403. Proposition 12 also prohibits many producers' practice of relying on breeding stalls to allow sows to recover peacefully from their pregnancies and gain back needed weight when in a weakened and vulnerable state after weaning. Exh. E, Decl. P. Borgic, ¶ 19; Exh., F, Decl. N. Deppe, ¶¶ 16-17; Exh. K, Decl. C. Leman, ¶ 16.

404. It is much harder to provide a sow with individualized nutrition appropriate to its body condition and stage of pregnancy in a group setting.

224a

405. Appropriate nutrition is especially critical for sows coming out of farrowing and prior to a new pregnancy. Sows may have lost weight during lactation or gained excessive weight, and require tailored nutrition to recover. *See* Exh. E, Decl. P. Borgic, ¶ 19; Exh. F, Decl. N. Deppe, ¶¶ 16-17.

406. Thus, it is a cruel practice to move a sow back into a group setting directly after weaning when it is weak and vulnerable.

407. In addition to providing benefits during breeding and gestation, individual stalls advance the welfare of sows that do poorly in group housing.

408. Group housing is particularly detrimental to the welfare of submissive sows, which are bullied by more aggressive sows and can be cut off from food sources. Exh. I, Decl. T. Hays, ¶¶ 9-10; Exh. H, Decl. T. Floy, ¶ 14.

409. A pig that is not growing will receive better care in an individual stall than in a group setting, as the stall permits more individualized attention and care. Exh. M, Decl. R. Spronk, ¶¶ 11-12; Exh. H, Decl. T. Floy, ¶ 19.

410. It is more difficult for producers to identify ill or injured sows in a group setting and remove them to stalls for individualized care. Exh. I, Decl. T. Hays, ¶ 12.

**E. Policing Compliance With Proposition 12 Threatens Sow Welfare**

411. CDFA explains that it may regulate compliance with Proposition 12 through verification audits. Verification audits or inspections would require auditors to visit the sow farms to inspect producers' practices.

225a

412. Direct inspections threaten the health and welfare of sows due to biosecurity concerns.

413. Contagious diseases can quickly decimate herds and present a serious problem for the welfare of sows housed on breeding farms.

414. Farms take careful measures to prevent the potential of any pathogen entry, including filtering air that enters the barn.

415. Breeding farms are intentionally constructed in remote areas to prevent the spread of diseases.

416. A critical biosecurity measure on farms is to limit access to the farm by unnecessary persons, which is considered a hazard to herd health.

417. Persons who have recently visited other hog farms of unknown health status present a serious threat to biosecurity and herd health. Inspectors who visit multiple farms of unknown health status may compromise the biosecurity of breeding farms by spreading contagious diseases among breeding farms.

418. In this manner, CDFA's likely method of verifying compliance with Proposition 12 poses a direct threat to the welfare of sows.

## VI. AT LEAST AS APPLIED TO PORK, PROPOSITION 12 OFFERS NO HUMAN HEALTH OR SAFETY BENEFIT

### A. Proposition 12 Has No Relation to Foodborne Illness or Human Health

419. Contrary to the proponents' claims, there are no human health benefits to Proposition 12 as applied to pork.

420. Proposition 12 is unnecessary because under the Federal Meat Inspection Act, the U.S. Department

226a

of Agriculture's Food Safety and Inspection Service (FSIS) inspects meat product shipped into California to ensure that the product is safe. Indeed, 488 FSIS employees operate specifically in California to protect food safety.

421. FSIS ensures product safety by issuing regulations that require establishments to adopt Hazard Analysis and Critical Control Point Plans governing safe slaughter and production practices. FSIS also tests samples of products at facilities to ensure that the products are safe and wholesome.

422. Proposition 12 will not provide any additional protection against the threat of foodborne illness in pork products, because it has no relation to food safety.

423. First, Proposition 12 addresses only *sow* housing practices at breeding farms. But sows do not generally enter the food chain, and when they do it is as cooked or processed pork that is not covered by Proposition 12.

424. The pork products that enter the market and present some risk of causing foodborne illness derive almost entirely from the *offspring* of sows, not from the sows themselves. Proposition 12 does nothing to address the safety of these products.

425. The idea that the square footage provided to sows has bearing on the safety of the food product derived from their offspring is incredible.

426. A foodborne risk to human health from uncooked pork would generally result from pathogen transmission. Salmonella is the most common pathogen in pork products that might cause human illness,

227a

as well as the most researched. Around 90 percent of the scientific literature is focused on salmonella.

427. Pigs rarely become ill from most types of salmonella.

428. If a sow contracted salmonella, the salmonella would only potentially transmit to its offspring if the sow was shedding pathogens in the farrowing stall when she gave birth.

429. Even if a sow passed salmonella on to her piglets, this transmission would not pose a threat to human health. There is almost no likelihood of the offspring carrying the salmonella to market.

430. Piglets are separated from the sow after three weeks of nursing in the farrowing stalls. And during much of nursing, piglets have maternal antibody protection that would stem disease transmission.

431. After weaning, piglets are transferred to nurseries or wean-to-finish barns and are physically separated from the sows.

432. This separation is done deliberately to prevent diseases from being transmitted from the sow to the offspring while the piglets develop.

433. There is a six month lapse between the birth of offspring and the slaughter of market hogs. Any salmonella the offspring received from the sow would have run its course by the time the sows reached market. Any infection held early in life is not likely to be present even several months later.

434. Thus, even if a sow transmitted salmonella to her offspring, the transmission would not pose a realistic threat to human health.

228a

435. Second, even putting aside that Proposition 12 does not address the housing of market hogs, the animals that actually enter the market, the scientific evidence does not support a causal link between swine housing and food safety characteristics of pigs.

436. Interventions taken on farms to prevent the spread of salmonella into food products are only minimally effective, because salmonella that may infect the food supply is more commonly contracted at plants than on farms.

437. Strains of salmonella found in food products at grocery stores are more commonly traced to strains of salmonella found at slaughter and processing plants than at farms.

438. Further, there is no connection between requiring 24 square feet per sow and sow health, let alone the health of piglets or humans.

439. The majority of research analyzing any link between space provided to pigs and their health analyzes the health of growing animals such as market hogs and finishing pigs, not breeding animals such as sows.

440. Although some of these studies suggest that lower stocking density correlates with lower salmonella rates among growing pigs, those studies do not apply to sows. Growing pigs are generally held in much different space allocations than sows.

441. Even assuming that research related to housing conditions for market hogs and finishing pigs applies to sows, no studies establish that a move from 16 to 24 square feet per sow in open housing impacts health, let alone in any way that would transfer to food products

229a

442.  There is no link between Proposition 12's sow housing requirements and food safety or foodborne illness.

## B.  If Anything, Proposition 12 Will Increase Pathogen Transmission

443.  Studies show that sows housed in groups rather than in individual stalls have a higher incidence of salmonella. This worse health outcome is likely due to the fact that sows in group housing, unlike animals confined in stalls, have the opportunity to eat manure, which spreads pathogens and disease. Thus, restricting the amount of time that a sow can spend in an individual breeding stall may increase the risk of pathogen transmission among the sows.

444. Proposition 12 will likely lead to more pigs being housed outdoors in pastures, rather than in indoor open housing that must comply with Proposition 12.

445. Studies demonstrate that pigs housed outside, where they have the opportunity to wallow in mud, exhibit greater incidence of pathogens than those housed indoors. Thus, the greatest risk of pathogen transmission is from pasture-raised sows.

446. If Proposition 12 does result in pigs being moved outside, we can expect an increase in other kinds of pathogens that create a greater risk to human health than salmonella, including one called Trichinella, and another called Toxoplasma.

447. Trichinella can lead to trichinosis in humans, a disease caused by infection from the Trichinella roundworm. Trichinella results in diarrhea, abdominal cramps, nausea, and vomiting in humans.

230a

448. When the industry moved pigs inside to barn housing, issues with this pathogen were largely eliminated. Indeed, the Centers for Disease Control and Prevention reports that between 2008 and 2012, there were only 10 cases nationwide from commercial pork. Other cases of trichinosis resulted from wild game or home-raised pork.

449. Re-introduction of outdoor housing could revive incidences of Trichinella.

450. It could also increase incidences of Toxoplasma. The infective oocysts of Toxoplasma are shed in the feces of infected cats and are transmitted to mammals through ingestion of cat feces.

451. Interaction with cats and their feces is more likely for pigs that are held outdoors.

452. Many studies widely consider Toxoplasma in the top five causes of death due to foodborne illness

453. There is no possibility that Proposition 12 will improve human food safety.

## VII.  FIRST CLAIM FOR RELIEF

### (Impermissible Extraterritorial Regulation)

454. Plaintiffs re-allege and incorporate by reference all of the preceding paragraphs.

455. The Commerce Clause affirmatively grants Congress the power to "regulate Commerce ... among the several States." U.S. Const. art. I, § 8.

456. The dormant Commerce Clause in consequence restricts states from engaging in extraterritorial regulation.

231a

457. A state law that has the practical effect of regulating commerce occurring outside the state is invalid under the Commerce Clause.

458. Proposition 12 violates the Commerce Clause and principles of interstate federalism by regulating pork producers and the pork market outside the State of California.

459. Proposition 12 extends California's police powers beyond its borders by regulating conduct that occurs outside the state.

460. Defendants are purporting to act within the scope of their authority under state law in implementing Proposition 12.

461. Defendants are liable to Plaintiffs for proper redress under 42 U.S.C. § 1983 because Proposition 12 deprives Plaintiffs' members of the rights, privileges, and immunities secured by the Commerce Clause of the U.S. Constitution and principles of interstate federalism embodied in its structure.

462. Absent declaratory and injunctive relief, Plaintiffs will suffer irreparable harm.

## VIII.  <u>SECOND CLAIM FOR RELIEF</u>

### (Excessive Burden on Interstate Commerce in Relation to Putative Local Benefits)

463. Plaintiffs re-allege and incorporate by reference all of the preceding paragraphs.

464. The Commerce Clause restricts states from placing burdens on interstate commerce that are clearly excessive when compared with putative local benefits.

232a

465. Proposition 12 places excessive burdens on interstate commerce without advancing any legitimate local interest.

466. Proposition 12 is not justified by any animal-welfare interest.

467. Proposition 12 has no connection to human health or foodborne illness.

468. Defendants are purporting to act within the scope of their authority under state law in implementing Proposition 12.

469. Defendants are liable to Plaintiffs for proper redress under 42 U.S.C. § 1983 because Proposition 12 deprives Plaintiffs' members of the rights, privileges, and immunities secured by the Commerce Clause of the U.S. Constitution.

470. Absent declaratory and injunctive relief, Plaintiffs will suffer irreparable harm.

## IX. <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs respectfully request the following relief:

A. A declaratory judgment, pursuant to 28 U.S.C. § 2201, that Proposition 12 is invalid because it violates the U.S. Constitution and is unenforceable;

B. A permanent injunction enjoining the Defendants from implementing or enforcing Proposition 12;

C. An order awarding Plaintiffs their costs and attorneys' fees pursuant to 42 U.S.C. § 1988; and

233a

D. Such other and further relief as the Court
deems just and proper.

Dated: December 5, 2019     MAYER BROWN LLP
Timothy S. Bishop
C. Mitchell Hendy


By: *s/ C. Mitchell Hendy*
C. Mitchell Hendy

Attorneys for Plaintiffs

234a

**Exhibit A**

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA**

[Caption omitted]

**DECLARATION OF DALLAS HOCKMAN
OF THE NATIONAL PORK PRODUCERS
COUNCIL**

Pursuant to 28 U.S.C.§ 1746, I hereby declare as follows:

1.    I am the Vice President for Industry Relations of the National Pork Producers Council (NPPC).

2.    NPPC is a trade association that consists of 42 affiliated state associations. NPPC members include U.S. pork producers and other industry stakeholders who are directly and adversely impacted by Proposition 12. In addition to pork producers, allied NPPC members include packers, processors, affiliated industry companies, and veterinarians.

3.    NPPC is the global voice of the U.S. pork industry. NPPC has a dedicated staff located in Washington, D.C. and Des Moines, Iowa that works to protect the livelihood of America's 60,000 pork producers. Through public-policy outreach, NPPC expends a great amount of resources to advocate on behalf of its members to establish reasonable federal legislation and regulations, develop revenue and export-market opportunities, and serve the interests of pork producers and other industry stakeholders.

4.    A critical part of NPPC's mission is to advocate for free market access for pork producers. To that end, NPPC supports a uniform national approach to food safety and animal welfare grounded in science,

235a

and it opposes regulations that restrict producers' market access. State regulations that impose affirmative, unique, and costly requirements hinder NPPC's mission to develop uniform national standards and promote free-market access for its members.

5.    California's recently passed ballot initiative, Proposition 12, significantly harms NPPC's members. Subject to limited statutory and regulatory exceptions, Proposition 12 requires that sows be provided with enough space to lie down, stand up, fully extend their limbs without touching the side of the enclosure, and turn around freely. After December 31, 2021, Proposition 12 requires that sows be confined with at least 24 square feet of usable floor space per sow. If a sow is not housed in a manner that meets these requirements, covered pork product derived from the sow or her offspring is barred from the California market.

6.    Proposition 12 has adverse effects across the entire pork industry. Its impact will touch all components of the industry, from producers, packer processors, state organizations, and distributors, to retail and food-service actors.

7.    NPPC has a substantial organizational interest in addressing the injuries that Proposition 12 imposes on its members nationwide.

8.    Proposition 12 requires producers, which are mainly located outside California, to meet prescriptive, costly requirements that are not grounded in science or experience and that interfere with the ability of producers to manage their own farms. Its restrictions limit the use of breeding stalls and impose an arbitrary square-footage-per-sow requirement.

236a

9. Most pork producers are currently unable and unwilling to meet these restrictions, because the existing state regulations imposed on the industry are nowhere near as strict as Proposition 12. NPPC estimates that approximately 72% of commercial sows in the U.S. are housed in individual pens throughout gestation. Of the remaining 28% of commercial sows which are in group housing, either new construction or conversion of old facilities, nearly all of these farms house sows in individual breeding pens for 30 to 45 days after breeding until they are confirmed pregnant. In addition, the average square footage of these group housed sows is significantly less than the proposed 24 square foot requirement of Proposition 12.

10. Proposition 12 directly impacts the fixed-asset structure of pork producers' operations by imposing a costly, physical and operational change nationwide that reverses decades of industry progress and development for which it will take producers a substantial amount of time and money to come into compliance, if it is even possible for most producers to comply on a commercial production scale. Prescriptive state regulations that impose unique standards render compliance for industry members incredibly difficult and costly—particularly those such as Proposition 12 that lack grounding in science or producer experience and that are not supported by federal-government agencies.

11. For many producers, the changes required under Proposition 12 will be cost-prohibitive. For producers who wish to continue participating in the California market, Proposition 12 forces them either to undergo these costly and difficult housing and operational conversions (provided they can afford the conversions and can develop new operational systems to

237a

effectively comply with the mandates of Proposition 12 at all), or to significantly reduce their sow production—with no corresponding gain to the producer. The producers' only other alternative is to lose access to the very large California market for their covered pork products.

12.  NPPC members have brought to my attention a notice from a major food distributor based out of Richmond, Virginia, Performance Food Group. The notice explains that Performance Food Group will require all of its suppliers to fully comply with Proposition 12 "and will hold them accountable for any fines, penalties, or fees incurred by PFG if [they] do not comply with Proposition 12 by the implementation dates." Ex. A-1.

13.  NPPC members also face significant pressure from activists. This summer, members forwarded me emails they received from an animal rights activist organization, Animal Equality, letting them know that the organization is aware that most of the industry is not in compliance with Proposition 12 and that Animal Equality is committed to ensuring compliance. *See, e.g.,* Ex. A-2 (July 24, 2019 email from Animal Equality to Iowa Select). Many additional producers received a similar email from Animal Equality.

14.  Animal Equality followed up, again, in October, explaining it was circling back "due to the fact that numerous animal protection organizations are aware that many companies are not yet in compliance with these new standards." *See* Ex. A-3 (October 29, 2019 email from Animal Equality to Tosh Farms). I believe these emails are a clear warning that animal rights activists intend to aggressively enforce Proposition 12 against our members across the country.

238a

15. Indeed, NPPC members recently forwarded me emails they received from another animal rights activist organization, The Humane League, showing that the Humane League plans to force industry compliance with Proposition 12. *See, e.g.,* Ex. A-4 (October 28, 2019 email from The Humane League to Reicks View Leadership). The Humane League explained that "every US retailer chain has been notified" about Proposition 12. As evidence, it also forwarded to these producers emails The Humane League had previously sent to Walmart, in which The Humane League explained that Proposition 12 forbids the sale of pork in California no matter where the production took place if the producer used individual stalls, or did not provide 24 square feet per sow, subject to only limited exemptions. *See id.* These exemptions, as laid out by The Humane League, would not permit producers to use stalls throughout gestation, or even to use breeding stalls to confirm that their sows are pregnant before moving them back into group pens. The email threatened "we are going to vigilantly ensure that [Proposition 12's requirements] are followed and hold companies accountable if they are found to be in violation. We're writing just to let you know in advance how important this issue is to us." *Id.* Several other pork producers received this email.

16. I have no doubt based on my long experience in the industry that Proposition 12's effects will not be limited to California but will require changes in the supply chain in other States. In a national market with a complex supply chain, changes in the requirements to supply such a large portion of the market as California will inevitably affect production in other States.

239a

17. For example, market hogs are delivered to packers, but after slaughter those hogs are broken down into many different cuts. Market demand means that even if some of those cuts go to California, others will be sent to supply demand elsewhere. Accordingly, hogs will need to be Proposition 12 compliant even though some or even most of the cuts from a hog are sold in other States.

18. Other examples of Proposition 12's impact on the domestic supply chain outside California are predictable. For example, some packers—smaller packers in particular—will not be able to incur the cost of or operationally manage segregating Proposition 12 compliant hogs and cuts from non-compliant hogs and cuts and will demand that their hog suppliers all comport with Proposition 12 requirements, even though much of the pork they the packer sells goes to other States.

19. Some multi-state food distributors and retailers may well impose similar Proposition-12 only requirements on their suppliers rather than engage in the costly changes necessary to segregate and monitor California-bound pork.

20. Proposition 12 has also imposed costs directly on NPPC. It has obstructed and will continue to obstruct NPPC's organizational mission. Proposition 12 has a sweeping impact across the entire pork supply chain that has generated massive amounts of additional work for NPPC. NPPC has already diverted inordinate time and resources away from its core mission of establishing reasonable federal legislation and regulations on a nationwide level, and towards addressing the negative impacts that a state regulation, Proposition 12, imposes and will continue to impose on its members.

240a

21. I estimate that, over the past year, NPPC staff addressing Proposition 12, including myself, have devoted roughly 15 to 20 percent of their time solely to Proposition 12.

22. NPPC's efforts have included communicating with the California Department of Food and Agriculture (CDFA). NPPC submitted detailed comments to CDFA on June 3, 2019, explaining the devastating impact of Proposition 12 on the U.S. pork industry. NPPC further engaged in numerous phone conversations and other outreach to CDFA, including attending meetings to educate regulators and other officials in California on the pork-production industry and to explain the deleterious impacts that Proposition 12 will impose across the pork supply chain. NPPC anticipates that additional visits with CDFA regulators will be necessary closer to the compliance date.

23. NPPC has also engaged in significant outreach to spread awareness of the implications of Proposition 12 among members. This has included discussing Proposition 12 extensively with its affiliated state organizations, developing data sheets that summarize Proposition 12 in an audience-friendly way, and attending meetings and events with members to explain the scope and impact of Proposition 12. In recent times, whenever the NPPC CEO has given a presentation, Proposition 12 has been one of the topics that he discussed. And time at almost every recently held NPPC conference has been devoted to Proposition 12.

24. In addition, NPPC has spent substantial time fielding questions from members and customers regarding Proposition 12 and its expected impact on pork production and the supply chain. Because Proposition 12 imposes a unique requirement in a key market, all parts of the industry are turning to NPPC to

241a

explain what Proposition 12 will require, when it will go into effect, and what impact it will have on supply. Producers, packers, distributors, retailers, and food-service companies have come to NPPC asking these questions. NPPC's efforts to address Proposition 12 accordingly have required it to provide all sectors of the industry with constant updates.

25.  NPPC's efforts have expanded from spreading initial awareness of Proposition 12 in the industry to updating stakeholders on where the industry currently stands in terms of compliance.

26.  While it is clear that the current supply chain is unable to meet the requirements of Proposition 12, NPPC is working with producers to determine the feasibility and economic consequences of transforming their operations to come into compliance with Proposition 12, including the economic impact that Proposition 12 will have on their operations and whether they will comply to make supply available to packers. These efforts have included visits with members to determine whether it is viable for them to comply with Proposition 12.

27.  Proposition 12 impacts product availability and supply-chain management. Thus, NPPC has spent substantial time in meetings and webinars with retail and food-service companies addressing Proposition 12. NPPC has worked with the supply chain to discuss the feasibility of complying with Proposition 12, spoken about Proposition 12 at a supply-chain conference, and held meetings with suppliers, retailers, and food-service companies to discuss supply-chain-management concerns.

242a

28. NPPC will continue to expend substantial resources to address Proposition 12. As the implementation date nears, NPPC will face more questions from members about how they can come into compliance. Indeed, as I have continued to address Proposition 12 through my work at NPPC, I have observed an increasing sense of urgency in the industry. The urgency has been heightened because CDFA has not yet issued regulations clarifying how it will implement Proposition 12, and yet activists have begun to contact producers about the need to comply. NPPC will also need to continue engaging in supply-chain-management discussions to ascertain how Proposition 12 will impact product availability and where and how industry members will be able to find their supply. Thus, continued communications with NPPC's members and industry stakeholders will be necessary. NPPC also anticipates sending staff to California for additional meetings with impacted producers in the state.

29. NPPC continues to strategize on how it can minimize the disastrous consequences of Proposition 12 for its members. These efforts will involve any steps NPPC can take to delay the implementation date of Proposition 12 to allow producers a more realistic time to come into compliance.

30. NPPC's efforts to address Proposition 12 have diverted NPPC's time, personnel, and other resources from its organizational priorities. For example, issues related to trade, free access to markets, labor, and responding to the risks and dangers posed by diseases are of great importance to NPPC's members, as well as its mission to promote the livelihood of pork producers. Instead of devoting its attention to these core issues, NPPC is required to spend time addressing a

243a

California state regulation. Few state-level regulations attract producers' attention to the extent that Proposition 12 has. Under normal circumstances, NPPC would not become heavily involved in addressing a state regulation but would leave that effort to an affiliated state member. But because Proposition 12 imposes affirmative requirements that restrict market access to California nationwide, effectively exporting California's requirements outside the state, it presents a nationwide issue that requires additional effort from NPPC. NPPC accordingly has taken a leadership position within the pork industry in addressing Proposition 12. The uniquely far-reaching impact of Proposition 12 beyond state borders, coupled with its prescriptive, costly requirements, has necessitated this additional attention. NPPC's efforts are particularly necessary given the size and make-up of the California market, which consumes more pork than it produces.

31.  These ongoing costs and injuries would be redressed by a decision declaring Proposition 12 unconstitutional and/or vacating Proposition 12.

32.  I declare under penalty of perjury that the foregoing is true and correct.

Executed on this  5  day of  Dec  2019.

*/s/ Dallas Hockman*
Dallas Hockman

244a

**Exhibit A-1**

[Logo Omitted]                     12500 West Creek Parkway
                                   Richmond, Virginia 23238
                                   Direct: 804-484-7700

## **Proposition 12 Compliance Policy**

Proposition 12, known as the Farm Animal Confinement Initiative, was enacted by ballot measure in California in November 2018. The Initiative requires generally that all eggs sold in the state of California after a specified date must come from cage-free hens, as well as banning the sale of pork and veal in California from farm animals raised in cages that do not meet the new minimum size requirements. There are different implementation dates under the new law, and suppliers should ensure they are aware of the new law's requirements and timeframes. The Initiative makes the California Department of Food and Agriculture and the California Department of Public Health responsible for implementation with violations of the law resulting in potential fines of up to $1,000 per violation.

While Performance Food Group, Inc. ("PFG") written terms & conditions require PFG's suppliers and packers to satisfy and comply with all federal and state laws and regulations, PFG is taking additional steps to communicate with its suppliers to ensure they are aware of this new law. As such, we are writing to all of our egg, pork, and veal suppliers to let them know that we expect them to fully comply with the new Proposition 12 requirements and will hold them accountable for any fines, penalties, or fees incurred by PFG if you do not comply with Proposition 12 by the implementation dates.

245a

PFG's customers may require additional information or certification about Proposition 12. We will send these customer requirements to you as we receive them and expect your prompt attention and response to our mutual customers.

Thank you for your time and consideration of this serious matter.

| /s/ J. Keith Jackson | /s/ Scott Barnewolt | /s/ Bob Barrett |
|---|---|---|
| J. Keith Jackson, PhD<br>PFG VP Quality Assurance | Scott Barnewolt<br>PFS SVP Procurement | Bob Barrett<br>PFG Legal |

246a

## Exhibit A-2

**From:** Katie Arth [mailto:katiea@animalequality.org]
**Sent:** Wednesday, July 24, 2019 12:14 PM
**To:** Hansen, Jeff <Jhansen@IowaSelect.com>
**Cc:** Foley, Bill <Bfoley@IowaSelect.com>
**Subject:** Iowa Select Farms' Compliance With New Animal Welfare Laws in CA and MA

Dear Mr. Hansen,

My name is Katie Arth and I am the International Director of Corporate Outreach for Animal Equality, an animal protection organization. While I am based here in the United States, Animal Equality has offices in eight countries, across four continents.

I am writing to you to make sure that you know that as of January 1st, 2022 the laws will be changing for how pigs are raised for pork to be sold in California and Massachusetts. For pork sold in either state—no matter where it is produced— the meat cannot come from a supply chain that uses gestation crates. Moreover, in California, there is a minimum requirement of 24 square feet per sow.

*Any* confinement of sows where they can't turn around—including confinement after insemination, post-weaning and pre-insemination— will be illegal with some exceptions such as those described below.

I've included more detail on each law below:

California's Proposition 12 and Gestation Crates: Beginning on January 1st, 2022 onward 24 square feet of floor space for breeding pigs is required for companies to sell their pork products in the state of California.

Massachusetts's Question 3 and Gestation Crates: Beginning on January 1st, 2022, "whole pork

247a

meat that the business owner or operator knows or should know is the meat of a covered animal that was confined in a cruel manner, or is the meat of the immediate offspring of a covered animal that was confined in a cruel manner" will not be allowed to be sold in the state of Massachusetts, with very limited exceptions.

**There are exceptions to these two laws in rare circumstances such as:** The law shall not apply to a breeding pig during the five day period prior to a breeding pig's expected date of giving birth, any day that the breeding pig is nursing piglets, and during temporary periods for animal husbandry—with a confinement limit of 6 hours within a 24 hours in any 30 day period.

Animal protection organizations are aware that most of the industry is not yet in compliance with these laws, so you will be hearing from other groups who are equally committed to ensuring Iowa Select Farms' compliance. We hope your company is already adhering or transitioning to these standards. In the event you are not, I want to offer myself as a resource to answer any questions or provide assistance in achieving your company's compliance with these laws. My role at Animal Equality affords me the opportunity to liaise with animal industry professionals on a daily basis and I would be happy to work with you in the future as well.

Again, please contact me if you have any questions or need assistance to comply and I can gather resources and contacts for you to make this transition smoother for Iowa Select Farms.

Thank you for your attention to this important matter.

248a

Sincerely,

Katie Arth
International Director of Corporate Outreach
424-347-2126

Facebook | Twitter | YouTube | Instagram

Voted a "Top charity" by Animal Charity Evaluators

Animal Equality is an international farmed animal advocacy organization that is dedicated to defending all animals through corporate outreach, public education, campaigns and investigations.

249a

## Exhibit A-3

**From:** "Maral Cavner, Animal Equality" <maralc@animalequality.org>
**Date:** October 29, 2019 at 12:48:36 PM EDT
**To:** Jtosh <jtosh@toshfarms.net>
**Cc:** Thilton <thilton@toshfarms.net>,
Sarah Hanneken <sarahh@animalequality.org>
**Subject:** Tosh Farms and Compliance With New Laws in CA and MA

Dear Jimmy,

I hope this message finds you well. I'm following up on my colleague Katie Arth's email from July in which she alerted you that as of January 1st, 2022 the laws will be changing for how pigs must be raised in order for their pork products to be sold in California and Massachusetts.

As the new Corporate Outreach Manager for Animal Equality, I wanted to circle back to you on this important issue, due to the fact that numerous animal protection organizations are aware that many companies are not yet in compliance with these new standards.

As was explained in our previous email, for pork sold in either state, regardless of where it is produced, the meat cannot come from a supply chain that uses gestation crates or confines breeding pigs in any manner that prevents them from lying down, standing up, fully extending their limbs, or turning around freely. Moreover, in California, the requirements are even more specific: Pork sold in the state must come from suppliers that provide their breeding pigs with a minimum of 24 square feet per animal.

250a

I'm copying our legal counsel, Sarah Hanneken, on this email. Sarah can provide more information about the statutes generally. For details about how the laws will affect Tosh Farms in particular, you will need to consult your own attorney, but if your attorney has questions, Sarah is happy to speak to them as well.

Additionally, I want to offer myself as a resource to provide assistance in achieving your company's compliance with these laws. Given that Tosh Farms must be compliant by the beginning of 2022, and my role is to secure higher welfare for animals, I would be happy to work together towards this mutual goal now to avoid any difficulties down the road.

Are you available for a call next week or the following when we can discuss this significant matter further?

Sincerely,

Maral G. Cavner, Esq.
Corporate Outreach Manager (U.S.)
Animal Equality
maralc@animalequality.org
424-305-0113

Facebook | Twitter | YouTube | Instagram

Voted a "Top charity" by Animal Charity Evaluators

Animal Equality is an international farmed animal advocacy organization that is dedicated to defending all animals through corporate outreach, public education, campaigns, and investigations.

251a

**Exhibit A-4**

**Subject:** FW: New Laws Affecting Walmart
From: **Beth Anne Hendrickson**
<bhendrickson@thehumaneleague.org>
Date: Mon, Oct 28, 2019, 8:01 AM
Subject: Fwd: New Laws Affecting Walmart
To: <dreicks@reicksview.com>,
<lreicks@reicksview.com>,
<breicks@reicksview.com>,
<kreicks@reicksview.com>,
<jhankins@reicksview.com>,
<afogarty@reicksview.com>,
 <polsen@reicksview.com>

Dear Reicks View Leadership:

I wanted to let you know that every US retailer chain has been notified about the upcoming laws affecting all pork sold and/or produced in California and Massachusetts. Please see my forwarded email below to Walmart, and I'll pass along my previous email to Kroger as well for your reference. If you have any questions, please let me know.

Thank you,

**BETH ANNE HENDRICKSON**
Corporate Relations Specialist
*p:* +1 816.945.2757 *w:* thehumaneleague.org

252a

-----Forwarded message-----

From: **Beth Anne Hendrickson** <bhendrick-son@thehumaneleague.org>
Date: Wed, Aug 7, 2019 at 6:55 AM
Subject: New Laws Affecting Walmart
To: <doug.mcmillon@walmart.com>,
<greg.foran@walmart.com>,
<john.furner@samsclub.com>,
<marc.lore@walmart.com>,
<dan.bartlett@walmart.com>,
<brett.biggs@walmart.com>,
<rachel.brand@walmart.com>,
<steve.bratspies@walmart.com>,
<ashley.buchanan@walmart.com>,
<michael.dastugue@walmart.com>,
<todd.harbaugh@walmart.com>,
<jamie.iannone@samsclub.com>,
<kathryn.mclay@walmart.com>,
<charles.redfield@walmart.com>,
<barbara.messing@walmart.com>,
<karen.roberts@walmart.com>,
<greg.smith@walmart.com>

Dear Walmart Leadership:

I thought I'd reach out regarding new laws governing pork sales/production that take effect by the end of 2021.

For pork sold in California and Massachusetts—*no matter where the production took place*—the meat cannot come from a supply chain that uses gestation crates. And, in California, there is also a minimum space standard of 24 square feet per sow. I know that some pork producers are now group-housing sows for part of their lives but still crate-confining them for

253a

several weeks at a time. To be clear, that will also be illegal. In fact, the **\*only\*** exemptions are:

1. for the five day period prior to a sow's expected date of giving birth;
2. any day that a sow is nursing piglets; and
3. during temporary periods for animal husbandry—with a confinement limit of six hours in any 24-hour period, and no more than 24 hours total in any 30 day period.

So all in all, what will be illegal is *any* confinement of sows where they cannot turn around—including confinement after insemination, post-weaning, and pre-insemination—except for the three exemptions above. And also to be clear: these laws' standards apply not only to the production of pork but also the sale of pork.

As with any animal cruelty laws, we are going to vigilantly ensure they are followed and hold companies accountable if they are found to be in violation. We're writing just to let you know in advance how important this issue is to us, for the sake of full transparency. If you have any questions, please let me know.


Thanks,

**BETH ANNE HENDRICKSON**
Corporate Relations Specialist
***p:*** +1 816.945.2757 ***w:*** <u>thehumaneleague.org</u>

254a

**Exhibit B**

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA**

[Caption omitted]

**DECLARATION OF SCOTT BENNETT OF THE
AMERICAN FARM BUREAU FEDERATION**

Pursuant to 28 U.S.C.§ 1746, I hereby declare as follows:

1. My title is Director of Congressional Relations at the American Farm Bureau Federation (AFBF).

2. AFBF is a voluntary membership organization formed in 1919. It represents about six million member families through Farm Bureau organizations in all 50 states plus Puerto Rico, including members who are directly and adversely affected by Proposition 12. Each state Farm Bureau is an independent entity, affiliated with AFBF though a membership agreement. County Farm Bureau organizations are members of the state Farm Bureau organizations. County Farm Bureau organizations, as well as individual and family Farm Bureau members, are associate members of AFBF.

3. Representing farm and ranch families who grow and raise virtually every agricultural product in the United States, AFBF is America's largest general farm organization. AFBF has a dedicated staff and devotes its resources to protecting and advancing the interests of farmers and ranchers, including through advocacy on many issues before Congress, the Executive Branch, and federal courts.

255a

4.    AFBF seeks to promote the development of reasonable and lawful public policy for the benefit of farmers and consumers. According to AFBF's mission statement: "We are farm and ranch families working together to build a sustainable future of safe and abundant food, fiber, and renewable fuel for our nation and the world."

5.    Proposition 12, a ballot initiative recently passed in California that imposes prescriptive requirements on sow farms, stands to significantly harm the interests of AFBF members. Except at certain narrowly prescribed times, Proposition 12 requires that sows be provided with enough space to lie down, stand up, fully extend their limbs without touching the side of the enclosure, and turn around freely. As of December 31, 2021, Proposition 12 requires that sows be confined with at least 24 square feet of usable floor space per sow. If a sow is not housed in a manner that meets these requirements, covered pork product derived from the sow or her offspring cannot be sold in California.

6.    Proposition 12 will harm AFBF members who own and operate sow farms. It requires them to follow prescribed production practices or lose access to the California market for any covered pork product derived from their sows or from their sows' offspring. AFBF has a substantial interest in addressing these negative impacts that Proposition 12 imposes on its members. These required practices limit producers' use of breeding stalls and set an arbitrary square-footage-per-sow requirement that will force AFBF members who want to maintain access to the California market either to undergo costly housing conversions (provided members can afford these conversions at

256a

all) or to reduce their sow production—with no corresponding gain to the producer. These unreasonable housing requirements significantly interfere with the ways in which farmers manage their own farms.

7.    My colleagues and I at AFBF have spoken with state Farm Bureau staff and individual members regarding the significant harms that Proposition 12 is likely to inflict upon AFBF members. On the one hand, compliance with Proposition 12 is not economically feasible for many sow farmers and could destroy their businesses. On the other hand, if they do not comply, they will lose access to the California market for the pigs they produce and raise. My colleagues and I at AFBF have learned through discussion with state Farm Bureau staff and individual members that farmers fear that coming forward and publicly explaining the harms that Proposition 12 will inflict on their livelihoods will cause retaliation from animal-rights activists.

8.    Proposition 12 has also obstructed, and will continue to obstruct, AFBF's organizational mission to promote lawful public policy affecting farms and farming practices. AFBF has already expended substantial resources toward combatting the negative impacts of Proposition 12 on AFBF members.

9.    AFBF has hosted presentations and conference calls, sent employees to conferences, and organized an Issue Advisory Committee (IAC) event for purposes of informing members and state Farm Bureau staff about what compliance with Proposition 12 will require. As one example, an AFBF employee spoke about Proposition 12 in February 2019 at an IAC meeting held with our members. IAC meetings address topics of special interest to the industry. As another example, on March 12, 2019, AFBF organized

257a

a call with state Farm Bureau national affairs coordi-
nators and lawyers to identify and discuss the ramifi-
cations of Proposition 12 for farmers. There was a very
high interest in this call: 60 to 80 people participated.
The call was the first time that many had heard about
Proposition 12. I was astounded by the strong interest
and concern. Due to the high level of concern our
members expressed regarding Proposition 12, AFBF
determined that it was critical to pursue additional ef-
forts to better understand Proposition 12, educate our
members regarding its ramifications, and attempt to
mitigate its adverse impacts on farmers. As a third
example, in May 2019, AFBF sent 8-10 employees to
a gathering of state and national Farm Bureau staff
in Raleigh, North Carolina, to present and exchange
information on Proposition 12 and its impacts.

10. In addition, AFBF has spent considerable
time and resources to understand the restrictions im-
posed by Proposition 12 and how they might affect its
members and pork production nationwide. To that
end, AFBF staff have spent untold hours studying the
law and its likely implementation and enforcement
and had numerous calls and meetings with the staff
of at least ten different state Farm Bureau organiza-
tions in an effort to better understand the impact of
Proposition 12 in those states. AFBF staff have also
spoken with numerous members to understand how
Proposition 12 will adversely affect their sow farms.

11. AFBF also submitted detailed comments to
the California Department of Food and Agriculture on
June 3, 2019, explaining how Proposition 12 will neg-
atively affect the nationwide market for pork as well
as individual AFBF farmer members. The comments
also advocated for a more reasonable time period to

258a

enable farmers to come into compliance with Proposition 12.

12. These efforts have diverted AFBF resources that would have been spent pursuing other issues critical to AFBF's mission.

13. I anticipate that addressing Proposition 12 will continue to require the diversion of AFBF resources from other AFBF priorities as the compliance date comes closer.

14. These ongoing costs and injuries would be alleviated by a decision declaring Proposition 12 unconstitutional and/or vacating Proposition 12.

15. I declare under penalty of perjury that the foregoing is true and correct.

Executed on this  4  day of  Dec.  2019.


*/s/ Scott Bennett*
Scott Bennett

259a

**Exhibit C**

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA**

[Caption omitted]

**DECLARATION OF HOWARD A.V. ROTH**

Pursuant to 28 U.S.C.§ 1746, I hereby declare as follows:

1.   I am over eighteen years of age and suffer from no disability that would preclude me from giving this declaration.

2.   I am a fifth generation farmer and pork producer from Wauzeka, Wisconsin. I own shares in several farms, as well as a family farm located in Crawford County, Wisconsin. My home farm in Crawford County is a century farm, meaning that it has been in operation for over 100 years. My great-great-grandfather homesteaded the farm at that time, and it has remained in my family ever since. For almost as long, my family has produced hogs on our farm. I place my heart and soul into producing pork and look forward to my daughters also having the opportunity to raise pigs on our family farm.

3.   While I grew up, I helped my father run our farm as a 500 sow farrow-to-feeder farm where we fed the piglets that the sows produced until they reached a large enough size that we would sell them to other farmers who would finish them to market weight. During that time, we housed our sows in a pen and bred them naturally with a boar, rather than through artificial insemination.

4.   When I took over the farm from my father, I worked hard to expand our operations. By 2000, I had combined herds held on other farms to create a herd

260a

of 1,500 sows. As of 2008, I expanded to 3,000 sows, which is the number of sows that remains on my home farm today. I am still looking to expand my operation to contain up to another 5,000 sows.

5.  I now operate our family farm as a farrow-to-wean operation with two farrowing barns, two gestation barns, and one growing gilt barn. From my 3,000 sows, my farm produces approximately 72,000 weaned pigs. I have a contract with Big Gain, a feed company located in Mankato, Minnesota, to place my weaned pigs to twelve different farms located across Wisconsin, Minnesota, and Iowa for finishing. These independent farms sell the resulting market hogs to packers for processing.

6.  I currently serve as President-elect and a member of the National Pork Producers Council (NPPC). In March 2020, I will become the President of NPPC and serve in that role for one year. I additionally have memberships in the Wisconsin State Pork Producers Association, the American Farm Bureau Federation, the Wisconsin Farm Bureau, and the Crawford County Farm Bureau, for which I have served on several task forces.

7.  When I become President of NPPC in March, my role will be to help all pork producers in any way that I can. I am aware of a ballot initiative recently passed in California, called Proposition 12, that will obstruct my work as President of NPPC because it stands to seriously damage pork producers and the pork production industry.

8.  My understanding is that Proposition 12 bars from the California market covered pork product derived from a sow or her offspring unless the producer complied with its costly restrictions for housing

261a

sows—even if the pork was produced entirely out of state. Specifically, subject to certain statutory and regulatory exceptions, Proposition 12 requires sows be provided with enough space to lie down, stand up, and turn around, and that as of December 31, 2021, Proposition 12 requires that sows be confined in housing that provides at least 24 square feet per sow. These restrictions effectively require producers to keep sows in pens rather than individual stalls throughout gestation, even prior to confirmation that the sow is pregnant and with very limited exceptions.

9.   Proposition 12 directly obstructs our mission at NPPC to advocate for free-market access for pork producers. The overwhelming majority of pork producers do not currently comply with Proposition 12's requirements. Changing their operations to come into compliance would be incredibly costly, if not cost prohibitive, for these producers. Thus, Proposition 12 effectively bars most pork producers' product from the California market.

10.   Further, it will be nearly impossible for many pork producers like myself to come into compliance with Proposition 12 on time. I have noticed during the course of my work for NPPC that many producers are currently unaware of the requirements imposed by Proposition 12. I believe this is because the California Department of Food and Agriculture (CDFA) has not conducted any outreach to producers in my area letting them know about the regulations or how to comply. It is also because Proposition 12's prescriptive requirements were passed very suddenly, and with little warning and no industry engagement, after an activist campaign that focused almost solely on standards for producing eggs rather than pork. The situation is made even more difficult for pork producers because

262a

CDFA has not published regulations explaining exactly how Proposition 12 will be implemented. On top of this, the timeframe to allow producers to convert their operations to come into compliance is incredibly short. Further, while some in the industry are aware of Proposition 12's minimum requirement of 24 square feet per sow, most believe this applies only to the use of group housing during gestation. Only a very few are aware that Proposition 12 actually outlaws the use of individual breeding stalls, something that the overwhelming vast majority of the industry—even those who currently utilize group housing systems—still rely on for the safety and welfare of sows during the process of recovering from birth and breeding.

11. NPPC has engaged in a fully-fledged effort to address Proposition 12, which has diverted resources from our key mission at NPPC to facilitate free market access and trade opportunities for pork producers. Proposition 12 has been raised at every NPPC conference that I have attended recently, as well as discussed extensively with NPPC's affiliated state organizations. I have personally spoken with producers to spread awareness regarding Proposition 12.

12. My tenure as President of NPPC will coincide with the effective date for Proposition 12's 24 square feet per sow requirement. I will need to devote a significant portion of my time as President of NPPC toward addressing Proposition 12 to make sure that all producers are aware of its requirements and ramifications. This is time that will be taken away from what I see as my main task as the President of NPPC: to facilitate trade opportunities for pork producers, which foster tremendous growth. Were it not for the need to prepare producers for the negative impacts that Proposition 12 will impose on the industry, more

263a

of my resources and time as President-elect and President of NPPC would be spent preventing foreign animal diseases and opening up trade opportunities.

13. Apart from its drain on NPPC's efforts to promote trade opportunities for pork producers, Proposition 12 also stands to seriously harm my business as a hog producer.

14. The way that I run my farm does not comply with Proposition 12, and I do not intend to change my practices to comply. This is because Proposition 12's requirements would damage my farm and my sows.

15. I have determined how to best raise my animals and operate my farm based on my lifelong experience and the skills I have learned from previous generations who raised livestock before me. Before expanding my farm from 500 to 1,500 sows in 2000, I moved my sows from a group pen and into individual stalls that provide about 15 square feet per sow. Based on my experience raising sows under both housing systems, it is clear to me that individual stalls are best for the animals and best for the farm. I would not return to a pen system unless I absolutely had to do so.

16. I have seen that housing sows in stalls throughout gestation leads to far fewer injuries. The year after I increased my herd size from 500 to 1,500 sows and moved my sows from a group pen into individual stalls, the number of sows I culled due to serious injuries remained roughly the same. That is, despite tripling my herd size, the rate of injuries suffered by sows on my farm remained constant. Sows are injured at a much higher rate in a group pen because they fight each other, often for feed. In the group pen, we would drop feed the sows, who would then fight for the food, jabbing their teeth into each other

264a

and causing serious injury. The dominant or "boss" sows would overeat, and some weaker sows could not eat at all.

17. Any injuries that now occur usually happen only when I move my sows from the individual stalls and into a group pen. For example, sometimes when certain sows do not enter heat, I will place them in a pen with a boar to trigger estrus. It is when I place the sows into this group pen that they fight each other and get injuries, including bite marks on their ears and tails.

18. Apart from the higher injury and culling rate, I also noticed that the sows were more stressed in the pen, constantly scared and harder to manage. I recall being worried about the risk of being knocked over by a frightened sow. This is a serious risk: sows on average weigh 500 pounds. In contrast, my sows are much calmer now that they are held in stalls and are individually hand fed.

19. I was originally worried about the social aspect for my sows from transitioning out of a pen and to individual stalls. I did not see one. The boss sows at first banged on their stalls, trying to receive more feed, until they became used to receiving a proper amount. Apart from this initial transition for the boss sows, who have since that time settled in, the other animals have been less scared and calmer in the stall system.

20. My observations align with those of other farmers. While I am aware of buyers that want to purchase offspring from sows that were housed in pens, I am also aware of buyers who prefer to purchase offspring from sows housed in stalls because they are

265a

concerned that group pens raise animal welfare concerns.

21.  I expect that if I moved back to a group pen, I would have to cull many more sows due to injuries and that my sows would experience more stress. This would reduce the productivity on my farm. Indeed, my experience has been that productivity is lower when sows are held in a pen. When I moved my sows from a pen and into individual stalls, I noticed that my average litter size increased from 9.2 to 10.2 piglets per litter.

22.  A pen system such as that imposed by Proposition 12 that did not allow me to keep sows in a stall for at least the first 30 days after breeding would effectively kill piglets. The first five to seven days after breeding is the timeframe when embryos settle, and the absolute worst time to move sows. As a practice, will not move my sows from breeding stalls for the first thirty days after breeding until I have confirmed that they are pregnant. This is to reduce the risk of pregnancy loss.

23.  Another reason that I will not transition my sows to a pen unless I am required to do so is because of the impact on my employees. When I used a group pen, my handlers were placed in greater danger. They were at risk of instigating a fight between the sows or being knocked over by a boss sow when they entered the pen. It is also harder for handlers to provide care to sows in a pen, such as taking blood for medical reasons. I expect that if I transitioned back to a group pen, I would have to hire additional help.

24.  If I were to convert back to a group pen from stalls, I believe that some of my workers would quit given their concern for the welfare of the animals.

266a

Currently, there is very little turn-over on my farm; indeed, one worker has been with me since 1985.

25.  It is my understanding that one justification for Proposition 12 is a purported link to human health and food safety. My experience suggests that the opposite is true. Using my stall system, diseases spread less frequently than in the pen. From a general cleanliness standard, individual stalls that do not allow the sows to easily turn around are much healthier for the sows. When I housed my sows in a pen, I used a straw bed system. This led to unbelievable levels of dust that was impossible to clean. In the pen, the sows would also eat close to the same place where they defecated, creating unsanitary conditions. In contrast, in the stalls, sows keep their heads in the front of the stall where they are fed, and defecate in the back.

26.  Converting my barns to comply with Proposition 12 would also impose significant construction costs. My stalls currently provide 15 square feet per sow. Thus, providing 24 square feet per sow would require that I significantly increase the amount of space that each animal has right now. While I designed my barn in a way that would allow me to convert to a group pen if I needed to return to a group pen system, if I moved from stalls to a pen it would only provide about 17 to 18 square feet per sow without constructing a larger building footprint. I anticipate that to do just this conversion, without expanding my building footprint, I would need to spend over $200,000 dollars. Then, to come into compliance with Proposition 12, I would further need to reduce the number of sows in my group pens by ten to fifteen percent. This would decrease my farm's productivity and would result in a significant reduction in my farm's income. It would

also be directly contrary to my goal to expand and purchase additional sows. To maintain the same number of sows and comply with Proposition 12, I would have to construct a larger building. I anticipate that this would increase the cost of construction by 35%. The construction would also require larger set-backs and a larger building base, which would require me to comply with Wisconsin livestock facilities siting rules.

27. Because of all of these costs to my farm and to my animals, I do not intend to comply with Proposition 12. Therefore, Proposition 12 bars my pork from sale in the California marketplace. This loss troubles me, because of the large California market size.

28. If I was required to comply with Proposition 12 to stay in business, I would have to pull out of the hog production industry. It would not be a sustainable business for me if I could not sell my hogs for more than my costs of production. As a fifth generation hog farmer, this result would be devastating to me. I want to stay in the hog production business, as my family has done for generations, and hope to pass off my farm one day to my daughter.

29. It is alarming to me that through Proposition 12, people who have no background or experience in livestock production, and are not around hogs on a daily basis, are attempting to tell me how to best raise my animals and manage my farm. Nobody knows the animals better than the producers on the farm.

30. My ongoing injuries would be redressed by a decision declaring Proposition 12 unconstitutional and/or vacating Proposition 12.

31. I declare under penalty of perjury that the foregoing is true and correct.

268a

Executed on this <u>3</u> day of <u>Dec.</u> 2019.

<u>/s/ Howard A.V. Roth</u>
Howard A.V. Roth

269a

**Exhibit D**

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA**

[Caption omitted]

**DECLARATION OF GREG BOERBOOM**

Pursuant to 28 U.S.C. § 1746, I hereby declare as follows:

1.   I am over eighteen years of age and suffer from no disability that would preclude me from giving this declaration.

2.   I am a member of the National Pork Producers Council, and the President of the Minnesota Pork Producers Council, on which I served on the Board of Directors for eight years. I am also a member of the American Farm Bureau Federation, and the Minnesota Farm Bureau Federation.

3.   I am a hog farmer on my farm in Southwest Minnesota. I have lived on this farm for 64 years, since I was born.

4.   Our farm, Boerboom Ag Resources, is a family operation and third-generation farm. My parents operated the Boerboom farm before me. I now own and operate the farm with my wife, Paula, along with our children Laurie, Mike, and Matt, who work as our partners. We run our farm in a progressive manner to produce high-quality food while treating people, animals, and the land with appropriate respect.

5.   Our farm focuses on raising pigs from wean to market. We have worked hard to expand our operations over the years. Currently, we own 10,000 sows.

6.   From our sows, we market around 320,000 market hogs per year. We sell most of our product to

270a

Tyson at a plant in Iowa, and some to John Morell, a part of Smithfield, in South Dakota. We have made an investment into Wholestone Farms, which purchased a former Hormel Foods plant. A portion of our market hogs are harvested at the Wholestone Plant. Under a three year agreement, Hormel (through Wholestone) is our only customer for pork from that plant. My understanding is that Hormel has a big presence in California.

7.  We directly manage the care for 5,000 of our sows at two farm locations, one with 1,700 sows, and another with 3,700 sows. The remaining 5,000 sows are managed by the Pipestone System at two additional locations in which we own shares.

8.  Between the four farms on which my sows are held, two of these farms use only individual stalls throughout gestation, and two use open pen gestation. Of the two farms using open pen gestation, one is a sow unit operated by Pipestone called Kodiak Pork Farm, and the other farm is my own, Redwood Sow Farm, which I built two years ago.

9.  In recent time, I noticed the market moving from housing sows in individual stalls toward housing sows in groups in open pens. I determined that the changes were desired by retailers such as Walmart, Costco, and others, and I decided to utilize open gestation in our new sow farm. About half of the pens in this unit provide 24 square feet per sow, and the other half provide around 21 square feet per sow.

10.  The market hogs derived from these sows are sold to Tyson. Driven by market opportunity, some hog processors are requesting market hogs which come from sows in open pen gestation.

271a

11. I keep these sows in farrowing stalls for 21 days to deliver and wean piglets. After weaning, I move the sows to breeding stalls, which I keep them in for seven days. During the first five days, they are re-bred through artificial insemination. I leave them in the stalls an additional two days while they are still in "standing heat." When a sow is in standing heat, she is at risk of being injured because other sows will try to ride and mount her.

12. It is only after these seven days that I move the sows back into the group pens, which hold around 65 sows per pen.

13. I would never move a sow back into a group pen before those seven days after weaning have passed.

14. I built my first stall barn in 1988 for the sole purpose of housing my sows in individual stalls during this time between weaning and breeding. That decision was strictly based on the safety of the sows. When sows are held in pens right after weaning, their fights result in rips and permanent damage to their udders which because of scar tissue inhibits the injured sow's ability to nurse another litter. In 1988, 1 had 200 sows and would wean around 36 at a time. About 20% would end up with scar tissue wounds on their udders. Because of the damage to their udders, I would have to send these sows to market.

15. Since keeping sows in individual stalls for the seven days between weaning and breeding, I have noticed that my productivity rates have gone up and these injuries have almost completely disappeared.

16. Sows will fight each other to establish their pecking order for about the first two days after they are moved back into the pen. This is a fact, and it is

272a

not preventable. Because implantation of the embryo occurs around day four or five after breeding, and fights during that time-period risk that the embryos will fail to attach, I need to be diligent in moving my sows at day two after breeding, or else wait until day 30 when the embryos are firmly attached.

17. In the open pen, we use an Electronic Sow Feeding (ESF) system, developed by a Dutch company, Nedap. To operate the ESF, each sow is given an electronic tag that records how much feed she needs based on her stage of pregnancy and her body condition. The sow will walk into what looks like a stall to receive her feed, and a hydraulic gate will close behind her. Reading her tag number, the system will meter the proper amount of food for the sow, which is usually around four pounds. The gate will remain closed while the sow is eating and then open to allow the sow to leave after she stops eating for a certain amount of time. It usually takes the sow around twelve minutes to eat.

18. It is expensive to purchase this system, and it takes more skilled labor to operate than individual stalls because of the technological skill required beyond normal animal husbandry. Thus, labor costs are around 20% higher than keeping the animals in individual stalls. It is easier and uses less skilled labor to feed animals in individual stalls.

19. We are one of the few farms in the U.S. using this system. I believe that we are doing a better job of managing an open pen system than other farms in the U.S., having some of the best performance of any farm in the U.S. using ESF. We perform this well through an incredible amount of hard work and time.

273a

20.  While we are successful and protect sow welfare, my current production practices do not comply with all of the requirements in a law recently passed in California referred to as "Proposition 12." My understanding is that Proposition 12 bars from the California market pork product derived from a sow or her offspring unless the producer complied with its restrictions for housing sows—even if the pork was produced entirely out of state. Specifically, subject to certain statutory and regulatory exceptions, Proposition 12 requires sows be provided with enough space to lie down, stand up, and turn around. Also, as of December 31, 2021, Proposition 12 requires that sows be confined in housing that provides at least 24 square feet per sow.

21.  Proposition 12 was driven by activists concerned with animal welfare; however, I do not believe that my sows are happier in a pen rather than an individual stall. I have noticed that my sows in the open pen actually prefer to sleep in protected bays, not open areas. Because of this, I have had to construct small protected areas that are 6 feet long by 8 feet wide in the open pen. Four sows will lay side by side in these bays.

22.  It is my understanding that the limited exceptions under Proposition 12 would not allow me to house my sows in breeding stalls for the seven days after weaning unless those stalls complied with Proposition 12's restrictions.

23.  It would increase my labor costs to stop using individual stalls for the seven days after weaning to breed my sows. Breeding sows in pens is much more dangerous and labor-intensive, and would increase my costs dramatically. When using breeding stalls, my technicians are able to safely walk down the row

274a

of stalls in the barn to artificially inseminate the sows. Doing so in a pen would create a dangerous situation. I would not manage my farm in that way.

24. I would not move a sow right back into a group pen after weaning for productivity as well as animal welfare. Because of the injuries to feet, legs, and udders described above, the cruelest thing to do is to move a newly-weaned sow back into a pen.

25. For these reasons, complying with Proposition 12 by moving sows directly back into a pen is never something I would consider. Alternatively, complying with Proposition 12 by constructing large individual stalls that comply with Proposition 12's space restrictions would likely require much more space than 24 square feet per sow, and is economically unworkable in today's market.

26. In addition, Proposition 12 would also require me to change how I care for gilts, which are young, unbred sows. It is my understanding that Proposition 12's requirements apply to gilts as soon as they are bred or reach six months. This exception does not take into account the reality of how the majority of the industry cares for gilts, or when the majority of gilts are bred.

27. None of my gilts are bred at six months old; rather, they are bred mostly around seven months. That is standard in the industry.

28. I purchase my gilts at around four weeks old, and house them in pens that provide around 3 square feet per animal. I provide them more square footage as they grow.

29. At around 180 to 200 days, I will move my gilts into stalls that provide 14 square feet per sow.

275a

30.  Once they are housed in stalls, I expose my gilts to a boar and record when they enter estrus. By the second or third time that a gilt returns to estrus, she is ready to be bred. The ideal target date to breed a gilt for the first time is at about 210 days old.

31.  I keep my gilts in the individual stall from 180 days old until two days after they are bred. Keeping a gilt in a stall for this time period allows her to become accustomed to it and prepared for time spent in a farrowing stall. She will learn to be relaxed in a farrowing crate rather than stressed, because she will remember the time she previously time spent in a stall.

32.  Because it treats unbred gilts the same as sows at the time they reach six months, compliance with Proposition 12 would require me to change how I care for and breed gilts in a way that I do not believe is best for the welfare of the gilts. Making this additional change would also increase my production costs.

33.  I do not plan to comply with Proposition 12 because of these costs and because its requirements are not consumer-driven. I am not aware of market demand for Proposition 12-compliant product.

34.  Because I do not plan to comply with Proposition 12, I understand that it will prevent my product from entering the California market.

35.  I am concerned that Proposition 12 will harm my business by closing off access to a market and impacting the price I receive for my pork.

36.  On a broader level, I am also concerned that Proposition 12 will raise the production costs of producing pork. Right now, the U.S. produces pork more cheaply than anywhere else in the world. Proposition

276a

12 stands to increase production costs and restrict the availability of a low-cost, high-quality protein.

37. I anticipate that the majority of the industry would not experience the same success that I have had with a group housing system and would experience even greater costs if they converted their operations to comply with Proposition 12. This is because costs would be higher if I were unable to purchase and use ESF, a restriction many smaller operations may experience. I also believe that costs would be higher if an operation was much larger and required to operate under more fixed protocols. They would have a more difficult time managing it, and their productivity rate might be 10% lower than ours. As a comparatively smaller operation, we have the flexibility to learn and adjust our practices, unlike many larger farms that use strict standard operating procedures.

38. These ongoing costs and injuries would be redressed by a decision declaring Proposition 12 unconstitutional and/or vacating Proposition 12.

39. I declare under penalty of perjury that the foregoing is true and correct.

Executed on this _29_ day of _Nov._ 2019.

_/s/_ Greg Boerboom
Greg Boerboom

277a

**Exhibit E**

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA**

[Caption omitted]

**DECLARATION OF PHIL BORGIC**

Pursuant to 28 U.S.C. § 1746, I hereby declare as follows:

1.   I am over eighteen years of age and suffer from no disability that would preclude me from giving this declaration.

2.   I am a member of the National Pork Producers Council (NPPC) Board of Directors. I also serve on various NPPC Committees and hold multiple positions within the Illinois Pork Producers Council. I am also a member of the Illinois Farm Bureau, the Illinois Corn Growers Association, and the Montgomery County (IL) Farm Bureau.

3.   I am the owner of Borgic Farms, Inc., a family farm located in Nokomis, Illinois. Borgic Farms, Inc. includes a sow herd and 210 acres of corn, soybeans, and wheat. I have experience as a pork producer for the past forty or fifty years. My father owned and operated this farm before me.

4.   I am aware of California's recently-passed ballot initiative referred to as "Proposition 12." I have thought about how I would need to change my farming practices in order to come into compliance with Proposition 12, and damage to my hog production business that failure to comply with Proposition 12 would cause.

278a

5.    My sow herd on Borgic Farms, Inc. currently comprises around 10,000 sows. I produce approximately 225,000 hogs on an annual basis. The hogs are transferred to Borgic Pork Partners for finishing. From that point, I sell roughly 80% of my product under marketing contracts to Smithfield Foods, and the remaining 20% to JBS.

6.    Under my marketing contracts with JBS and Smithfield, I agree to deliver a certain number of hogs to each supplier per week. The price that I receive in return varies by market rate. If I do not meet the weekly agreed-upon amount, I am subject to monetary penalties under the marketing contracts. The contracts also require me to comply with all federal and state regulations.

7.    My contract with JBS operates for a three-year term. I must give one-year notice to exit the contract. My contract with Smithfield operates as if it were an eight-year contract. I am obligated to the contract for a five-year term. To unwind the contract, I would be required to give one-year notice at year five. Then in years six, seven, and eight each, I would gradually be required to produce one-third fewer hogs per year.

8.    I do not have any doubt that some of my product is ultimately sold into the California market. I have no question given California's overall market share for pork as well as the size of the operations at JBS and Smithfield and the national and international scope of the markets they serve.

9.    In May 2018, my farm was subject to a catastrophic fire that required reconstruction of my sow housing facilities. After a costly re-construction process that required me to transfer my sows to an off-

279a

site farm, I rebuilt my farm and resumed operations in June 2019.

10. Based on my decades of experience as a pork producer, I determined to rebuild my sow housing facilities to house sows solely in individual stalls that measure 23 inches by 7 feet, or in farrowing stalls prior to anticipated delivery and until weaning.

11. I selected individual stalls because I believe based on my lifetime of experience as a pork producer that individual stalls are best for sow welfare and productivity on my farm. Over the course of my experience, I have housed sows in a variety of systems. Up until around the 1970s, my father and I housed sows in mud lots. Over the years, we have also housed sows in small pens, crates, and group pens with an Electronic Sow Feeding (ESF) system. Under the ESF system, my sows were housed in group pens but then entered private stalls to receive a prescribed amount of feed.

12. I did not select a group housing system when rebuilding following the fire because group housing led to poor sow welfare and productivity outcomes. The sows fought in pens to establish dominance and injured each other. Sows housed in a group pen step on or bite each other, leading to bruising and other injuries, even fatalities. Due to these fights and associated stress, sows in a group pen also generally give birth to fewer piglets per litter each time that they farrow, further reducing a farm's productivity.

13. Sows held in a group pen also often have larger than healthy body weights. This is because they must be given extra feed in order to mitigate their aggression and fighting. But their larger size damages their reproductive health.

280a

14. I firmly believe that sows receive better care in individual stalls. In my experience, this system results in fewer injuries—less bites and less scratches, lower mortality rates, as well as better sow body conditions. The industry has evolved throughout the last forty to fifty years to the individual stall system because it results in better animal care.

15. I have also learned that placing sows in the calmer environment provided by an individual stall rather than in a group pen will lead to healthier and more prolific sows—meaning that they will produce more healthy piglets per litter and more litters per year.

16. Further, individual stalls are safer for my staff. Housing sows in a group pen increases the risk of injury to farm hands who must enter the pens to care for the animals.

17. It is my understanding that my farm management decision to house sows in individual stalls does not comply with the requirements of Proposition 12, because that law mandates that sows be housed so that they can stand up and turn around (except for a few days prior to farrowing and during weaning), and mandates that by the beginning of 2022 each sow have at least 24 square feet of space.

18. Based on my experience, changing from the individual stalls I currently use to the group housing required by Proposition 12 would result in worse welfare outcomes for sows and significantly lower sow productivity on my farm.

19. To comply with Proposition 12, I would also lose the ability to use individual breeding stalls to help sows to recover peacefully from their previous pregnancy without the need to defend themselves

281a

against other aggressive sows, to gain weight, and to come back into estrus for rebreeding.

20. The restriction on the use of breeding stalls before a sow is bred is dangerous for sow welfare (and a risk to the health and welfare of her piglets) —for both the individual sow and other sows in the herd. After a sow is weaned, she typically returns to heat in about five days. When a sow in heat is housed in a group pen, she can injure other sows through fighting or by mounting and attempting to ride other sows.

21. A sow in heat—which may weigh 400 or more pounds—is also dangerous to farm personnel. The sow will try to ride each other and can inflict severe injuries by biting, crushing, knocking down, or stepping on a handler in the pen.

22. Housing a sow in a group pen shortly after breeding will also increase the risk that the sow will lose her pregnancy due to increased fighting and associated adrenaline.

23. For these reasons, I have not housed freshly weaned sows in an open pen since 1977, and I consider such a practice both unadvisable and detrimental to herd welfare. I do not know of any commercial operation that does not house sows in breeding stalls for at least five to seven days following weaning. And most farms keep sows in individual stalls longer, up to about a month and a half, until the sow is confirmed to be pregnant. While confirming pregnancy before that is technically possible, using ultrasound, it is far more costly and labor intensive than waiting to see if the sow has cycled again.

24. Based on the anticipated additional sow injuries and deaths and lower sow productivity on my

282a

farm, I also anticipate that compliance with Proposition 12 would require me to obtain additional Proposition 12-compliant replacement gilts every year. Gilts are young, unbred, sows.

25. Under Proposition 12, these gilts would also need to have been kept in pens that afforded 24 square feet of space per animal, as soon as they are bred or reach 6 months. But gilts are bred later than 6 months, at seven months through 8½ months. During the period between 26 weeks and 30 weeks, I hold gilts in a group pen that provides eighteen square feet per sow. Thus, Proposition 12 would require me to change how I care for my gilts before they are ever bred.

26. Apart from the significant productivity loss and detrimental impact that Proposition 12 would cause to sow welfare on my farm, compliance with Proposition 12 is cost prohibitive for me.

27. Proposition 12 would require that I rebuild and re-equip my current sow housing units from individual stalls to pens. If I knocked down my individual stalls to construct a group pen, utilizing all of the existing space in the building, my sow housing would provide 18- to 19- square-feet-per-sow. Thus, in order to meet the 24-square-feet-per-sow requirement, I would need to add an additional one-third more space to my sow housing, or cut down my herd size by one-third.

28. If I elected to re-construct my existing sow housing facilities as described above, I anticipate that the base cost of expanding my facility would reach around three million dollars. Because a creek surrounds my current sow housing, finding room to add one-third more space would be exceedingly difficult. It

283a

would require me to remove my family home and machine shed to make space.

29. Further, to reconstruct my barn, I would be required under Illinois law to obtain permits. First, I would be required to design the facility and work with the Illinois Department of Agriculture to obtain approval of the facility design. I would also need pre-approved permits for my method of groundwater protection and manure storage. Then, all of my construction plans would need to be approved by an engineer. I anticipate that the construction and permitting process for the changes required to enable me to comply with Proposition 12 would take around 2 years.

30. During construction, my farm's productivity would be reduced. If I complied with stand-up turn around during construction, my production would be entirely shut down. This would risk that I incur a monetary penalty for failing to deliver the required number of hogs under my contracts with JBS or Smithfield.

31. The only other alternative for me to come into compliance with Proposition 12, reducing my herd size by one-third, would substantially lower my farm's production and profits. It would also mean that I likely could not meet the delivery performance requirements in my contracts with JBS and Smithfield, which would result in me incurring a monetary penalty.

32. In addition to these costs, moving to a housing system that complies with Proposition 12 would require that I employ new feeding systems and employee protocols, incur operational costs implementing these changes, and expend labor moving sows from existing barns.

284a

33. If I used a group housing system as required under Proposition 12, I would also need to employ an extra herdsman per 2,500 sows in order to ensure that the sows receive the care that they require. A herdsman is a trained individual with the proper knowledge to care for sows. It is exceedingly difficult to find an individual to work on my farm, let alone an individual who is properly trained as a herdsman to care for sows in group housing.

34. I also understand that California state agencies anticipate ensuring compliance with Proposition 12 through verification audits or inspections. It is a significant herd health concern to have anyone visit my farm who has been around other swine in the last 48, or in some cases 72, hours. Having auditors visit the farm would also increase my labor costs, because I always escort visitors around our farm for safety reasons.

35. It is my understanding that because I am not able to comply with Proposition 12, my product will lose access to the California market. This loss troubles me, because of the large California market size.

36. If the Court does not invalidate Proposition 12, I am concerned that because I cannot become Proposition 12-complaint, I will lose my business with suppliers JBS and Smithfield. I am also concerned that the price I receive for my pork will drop because whole meat from my market hogs cannot be sold in California.

37. My ongoing injuries would be redressed by a decision declaring Proposition 12 unconstitutional and/or vacating Proposition 12.

38. I declare under penalty of perjury that the foregoing is true and correct.

285a

Executed on this __4th__ day of __Dec__ 2019.

_/s/ Phil Borgic_
Phil Borgic

286a

**Exhibit F**

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA**

[Caption omitted]

**DECLARATION OF NATHAN DEPPE**

Pursuant to 28 U.S.C. § 1746, I hereby declare as follows:

1.  I am over eighteen years of age and suffer from no disability that would preclude me from giving this declaration.

2.  I am a member of the American Farm Bureau Federation and the Chairman of the Pork Advisory Committee of the Missouri Farm Bureau. I am also a member of the National Pork Producers Council.

3.  I am a hog farmer on a farrow-to-finish farm in Washington, Missouri that has been in my family for generations. My children will be the fifth generation of my family to own it.

4.  As a producer, I am someone who cares about my animals. It is my livelihood to treat my animals well, and I do as good as I can for them.

5.  A farrow-to-finish hog farm is one that has a herd of sows which are bred to produce piglets that are then fed (finished) until they are market weight. Our farm contains a sow herd of around 1,300 sows. From those sows, we finish around 30,000 market hogs annually.

6.  We have always sold the bulk of our animals to JBS under a marketing contract. Under the contract, JBS offers me a premium to house my sows in group pens that allow them to stand up and turn

287a

around, so after breeding and confirmation of pregnancy, I move my sows into a group pen during their gestation. The contract does not impose any particular space requirements. I believe that my pens provide about 15 square feet per sow on average. The number of sows in my pens and the size of the pens varies. Some pens contain as few as 5 sows, and some up to 15 sows.

7.   In compliance with my contract with JBS, I move my sows from the group pen to farrowing stalls about four or five days before birthing begins and throughout farrowing. After the piglets are weaned, I move the sows into a breeding stall for them to recover and eventually to return to estrus for breeding. Breeding is accomplished through artificial insemination. Once the sows are bred, we keep them in the breeding stalls for an additional 28 days to allow me to confirm that the sows are pregnant before they are moved back to the group pen for the remainder of gestation.

8.   JBS sends auditors to inspect my farm practices and ensure that I remain in compliance with our contract. I deliver my product to JBS at a plant in Beardstown, Illinois on Mondays, Thursdays, and Fridays. My hogs are marked with my farm identification number that permits them to be segregated from other product.

9.   I am aware that my current housing practices do not comply with a recently passed ballot initiative in California called Proposition 12. It is my understanding that Proposition 12 prohibits the sale of whole pork product in California derived from a sow or her offspring that was not confined in compliance with Proposition 12's requirements. I understand that, subject to certain statutory and regulatory exceptions, Proposition 12 requires sows to be provided

288a

with enough space to lie down, stand up, and turn around, and that as of December 31, 2021, Proposition 12 requires that sows be confined in pens that provide at least 24 square feet per sow. It is also my understanding that Proposition 12 prohibits the confinement of sows in individual breeding stalls—even from the time period from when a sow is bred until it is confirmed pregnant.

10. I do not plan to change my current practices to come into compliance with Proposition 12. Based on my experience, I believe that compliance with Proposition 12 would negatively impact sow welfare on my farm as well as lower my farm's productivity.

11. I believe it is critical to keep sows in individual stalls from farrowing through artificial insemination and confirmation of pregnancy. This is for sow welfare reasons: in individual stalls, sows are provided with their own feed, there is no fighting amongst sows or associated injuries, and the embryos are better able to attach. But this is also for productivity reasons: because of the improved welfare of the sow in an individual breeding stall, the number of pigs per sow increases.

12. The stalls that I keep my sows in for the roughly eight to nine weeks during farrowing, artificial insemination, and confirmation of pregnancy do not allow the sows to turn around. I believe that this is healthiest for the sows. While I was a student at the John Wood Community College in Quincy, Illinois, other students and I cared for sows housed in turn-around crates at the school. The sows would defecate in their food and water trough, creating less healthy housing conditions and causing production to go down.

289a

13.  I believe that it is best to breed sows through artificial insemination while they are held in individual stalls. I understand that Proposition 12 permits only a temporary animal husbandry exception from its requirements, which applies for no more than six hours in any 24-hour period, and no more than 24 hours in any 30-day period. The loss of the ability to house sows individually for several days during artificial insemination would render breeding very difficult on my farm, and increase my production costs. I will wean my sows on a Wednesday, begin daily heat checks on Sunday, and then breed them on a Monday. My labor costs would significantly increase were I unable, under Proposition 12, to individually house sows during this time, but had to transfer them back and forth from the group pen.

14.  It would also be more difficult to determine when a sow is in heat and ready for breeding if it is held in a group pen. And if I miss too many cycles, I risk that the sow will become unproductive.

15.  An alternative, natural reproduction with a boar in a group pen, results in serious injuries to sows that often require the sows to be placed in hospital pens, as well as fighting among the animals in the pen.

16.  It is also critical to house sows in breeding stalls until they are confirmed pregnant. Proposition 12's restriction on the use of a breeding stall during this time would cause serious productivity issues, increase my production costs, and negatively impact sow welfare.

17.  The reason that I use breeding stalls for 28 days is that, after suckling every day, sows require a lot of food to replenish. In the individual stall, I can

290a

feed sows exactly what they need through individual feeders. This allows sows to get back to the weight that they need.

18.  Only after a pregnancy check to ensure that the sows are bred do I return them to the pens where they are grouped by age and size. Every time I return the sows to the pen, they fight to establish a "boss" pig. These fights are unavoidable and a result of mother nature. They occur regardless of group size. No matter what, the dominant sow will push one or more sows back, intimidating them so that they do not receive enough food under the drop feeding system I use in my group pens. It would be harmful to a sow to return to this group setting immediately after insemination, when it is weakened from weaning.

19.  Because of these fights, if I return my sows to the group pen shortly after artificial insemination, it will also be very difficult for the embryos to properly attach. Because of this, I expect that compliance with Proposition 12 would decrease the litter sizes on my farm. This, in turn, would lower my farm's productivity.

20.  Apart from these sow welfare concerns, Proposition 12 would also be too costly for me. The real estate I would have to create on my farm to comply with Proposition 12 and house 1,300 sows with 24 square feet per sow would be unbelievable. It would require that I provide roughly 60% more space in my housing. This construction would be incredibly costly. And it would entail many more costs than just that of the actual construction: in order to construct new facilities, I would have to obtain various permits, prepare construction specifications, and comply with other state

291a

regulatory requirements, which would vary dependent on the number of animal units I intended to construct.

21.  It is my understanding that because I am not able to comply with Proposition 12, my product will lose access to the California market. This loss troubles me, because of the large California market size.

22.  If JBS required me to comply with Proposition 12 to continue conducting business, I would have to consider if I would even be able to remain in business while meeting these costly requirements, even if JBS provided me with a premium.

23.  My ongoing injuries would be redressed by a decision declaring Proposition 12 unconstitutional and/or vacating Proposition 12.

24.  I declare under penalty of perjury that the foregoing is true and correct.

Executed on this  2nd  day of  12  2019.

*/s/ Nathan Deppe*
Nathan Deppe

292a

**Exhibit G**

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA**

[Caption omitted]

**DECLARATION OF MIKE FALSLEV**

Pursuant to 28 U.S.C. § 1746, I hereby declare as follows:

1.   I am over eighteen years of age and suffer from no disability that would preclude me from giving this declaration.

2.   I am a member of the National Pork Producers Council and the Utah Pork Producers Council.

3.   I am an independent hog producer on my farm near Logan, Utah. I purchased my farm from my father who raised chickens, and started raising hogs in the eighth grade on a bet. I intend to give my farm to my son after me.

4.   My farm contains a herd of approximately 2,000 sows.

5.   I sell about 600 pigs per week into the specialty niche market for sucklings.

6.   Sucklings are pigs that are around five to six weeks old and weigh about 16 to 25 pounds. They are bred specifically as shorter, thick pigs to be the right size pig and the right amount of meat for their market.

7.   About two or three years ago, I had only 700 sows, but I increased my herd size over the past few years to ramp up my output to the market for suck-

293a

lings. Sucklings are very popular among Asian-Americans in California, and, at several months during the year, demand outpaces my ability to supply sucklings.

8.   I sell almost all of my sucklings to a packing plant in California under a five-year contract. Thus, almost all of my product is bound for the California market.

9.   I also sell some of my product locally, here in Utah.

10.  I am also currently constructing my own processing and packing facility to produce pork to sell locally in Utah as well. However, my primary market will remain California.

11.  I am aware of a ballot initiative recently passed in California, called Proposition 12, that stands to bar my product from continuing to reach customers in California, because my farming practices do not comply with its harsh requirements.

12.  My understanding is that Proposition 12 bans covered pork product from the California market that is derived from a sow or her offspring unless the producer complied with its costly restrictions for housing sows—even if the pork was produced entirely out of state. Specifically, subject to certain statutory and regulatory exceptions, Proposition 12 requires sows be provided with enough space to lie down, stand up, and turn around. As of December 31, 2021, Proposition 12 requires that sows be confined in housing that provides at least 24 square feet per sow.

13.  My understanding is that activists supported Proposition 12 in an effort to promote animal welfare. But these animal welfare activists do not understand how to care for sows. I have seen that sows receive

294a

better care and more humane treatment when they are housed in individual gestation stalls. In the stalls, the sows are warmer, protected from fights with other sows, and receive individualized care and feed. In contrast, pigs held in groups have to fight for feed and territory.

14. I am concerned that Proposition 12 will harm my business by blocking my product from the lucrative Asian-American market for suckling pig in California.

15. Nonetheless, I do not intend to change my practices to comply with Proposition 12, because its requirements lead to *less* humane treatment of sows and would lower productivity on my farm.

16. I used to house my sows outside in open lots with sheds and cemented floors. I bedded the lots with straw. When I took the sows out for weaning and then returned them back into the open lots, the sows would engage in vicious fighting to establish dominance. They would also fight each other for feed. They would tear each other's feet and vulvas, leading to terrible injuries and mortalities. In the winter when the sows were exposed to the cold and the elements, including weather that can reach 40 degrees below zero, the sows ears would sometimes freeze and fall off.

17. I determined it was more humane to house sows indoors and in individual stalls. This is for the safety and comfort of the sows, and to protect them from being torn up by these injuries. Thus, in 2013 I decided to build a gestation barn, which I completed in 2014.

18. My completed gestation barn has individual breeding stalls that provide about 14 square feet per

295a

sow and that allow the sows to stand up and lay down, but not to turn around. It can hold 1,000 head of sows.

19.  When my barn was first completed, I finished loading my sows into it at 3 p.m. When I came back by at 5 p.m., it was shockingly quiet. None of the sows were trying to get out. In fact, all of them were laying down in the stalls. It appeared to me that they preferred the stalls to the group housing. Now that I have seen both systems, I am convinced that individual, indoor stalls are far more humane.

20.  I currently use these individual breeding stalls to house and artificially inseminate my sows. The sows will come into heat within a few days of each other. I collect boars and walk them along the stall lines to determine which sows are in heat, and then artificially inseminate them. The conception rate on my farm increased immensely from the use of breeding stalls. I also consider artificial insemination in breeding stalls more humane. It is much more time consuming, dangerous and difficult to check for heat and inseminate sows while they are held in a group pen.

21.  I keep sows in the individual stalls until I confirm that they are pregnant. One sow cycle takes 18 to 21 days. To ensure that a sow is pregnant, I will sometimes wait for two cycles to pass. Waiting gives time for the embryo to attach before the sow is moved.

22.  While I keep some sows in the individual gestation stalls, I move others into hoop barns after breeding them and confirming that they are pregnant. The number moved to the hoop barns will depend on how many sows are currently being cycled through farrowing crates (where my sows deliver and wean), and how full my breeding stalls are at the time.

296a

23. In the hoop barns, I house sows in groups of around 50 sows. Unlike the individual stalls, the hoop barns require straw bedding, because they are much colder than individual stalls. Because the hoop barn gets cold even with the straw bedding, the pigs will stack on top of each other in a pile. The sow at the bottom of the pile may prolapse, which leads to death. The sows will also often step on each other, leading to serious injuries.

24. Whenever I put sows back into the hoop barn, they will vigorously fight each other for the first few days to establish dominance.

25. They also fight each other in the hoop barns for feed. In the hoop barns, it takes two people to feed the animals, but you can't ever be too sure that each animal gets a sufficient amount of feed. The boss sow will claim its territory while feeding, chasing the other sows away.

26. In contrast, while held in individual stalls, the sows are fed individually each day. The feed goes straight to each sow through a pull cable. I am able to tailor the nutrition to what each individual sow needs, and the sows do not need to fight each other for the feed.

27. For these reasons, I believe it is more humane to keep the sows in individual stalls during all or part of gestation.

28. If I were to comply with Proposition 12 and move sows directly after weaning into the hoop barns instead of waiting for confirmation that the sows are pregnant first, I expect that productivity rates would seriously drop. This is because the sows will fight each other all over again when they are moved back into the pen. This is damaging to conception rates during

297a

the early phases of pregnancy when the sows are most vulnerable and before the embryo has attached.

29. Apart from a drop in productivity, I would expect my labor costs to increase were I to comply with Proposition 12, because it is more difficult to care for sows in the hoop barn than in individual stalls. For one thing, it is harder to tell if a sow in a hoop barn is ill and requires care. It is also difficult to notice in a hoop barn whether or not a sow has eaten.

30. I would also face construction costs if I were to comply with Proposition 12. This would include the costs of reconstructing my barn with open space and 24 square feet per sow, along with associated labor costs, county fees, and a significant spike in property taxes.

31. If I were to reconstruct my breeding barn with open space for the sows, I would need to provide double the space that I currently provide for gestation, which would require around half a million dollars. And if I hired someone else to complete that construction rather than doing it myself, you can multiply those projected costs by two. Apart from these construction outlays, I would need to hire additional labor to staff the new barn. All in all, a free style barn costs an astronomical amount of money and would be cost-prohibitive.

32. Alternatively, I could construct hoop barns, but the construction costs would be almost as much. I anticipate it would cost me around $400,000 to construct enough hoop barns to replace my lost production due to Proposition 12. It would require me to build at least 20 hoop barns, at about $20,000 each. These hoop barns would take up an enormous amount

298a

of land, far more than what my current operation covers, requiring me to also purchase that additional land which I estimate will cost about $100,000. Moving into hoop barns will increase both my labor costs as well as operating costs. It would also complicate our manure management system as the increased straw bedding would greatly expand the volume of manure that needs to be handled, stored and transported to fields for application. I would also face additional county fees and taxes.

33. There are also major negatives to operating solely out of a hoop barn rather than using the breeding stalls. Farmers operating out of a hoop barn cannot compete with huge operations in the market hog business. Indeed, I would consider hoop barns fine for farmers just starting out in the business, but not a viable model to rely on for farmers that want to be in the hog production business more seriously. And, in the long run, a hoop barn will cost the same amount as a finishing barn.

34. The steep additional costs of operating a hoop barn arise from three main causes: the management of the manure they generate, the higher labor costs they require, and the additional equipment they need. Because they are colder, hoop barns require a great deal of straw bedding to provide warmth. Other barn models, such as individual stalls, are warmer and do not require this bedding. The more bedding provided to deal with warmth issues, the more manure stacks up. Indeed, the straw bedding triples the amount of waste and manure that needs to be disposed of. It is very expensive to clean this manure out. It requires additional equipment, including a shift loader, and a tremendous amount of time and labor compared to conventional housing methods. It also causes farms to

299a

run into regulatory restrictions on the amount of phosphorus that they can dispose of. Straw bedding, especially once it becomes moist, can be one of the biggest fire risks on the farm.

35. Proposition 12 leaves me with no good alternatives. I am very concerned about whether I can continue my current business relationships in light of Proposition 12. But compliance would be incredibly costly, and damaging to my farm and my animals.

36. My ongoing injuries would be redressed by a decision declaring Proposition 12 unconstitutional and/or vacating Proposition 12.

37. I declare under penalty of perjury that the foregoing is true and correct.

Executed on this _3_ day of _Dec_ 2019.

_/s/ Mike Falslev_____
Mike Falslev

300a

## Exhibit H

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

[Caption omitted]

## DECLARATION OF TOM FLOY

Pursuant to 28 U.S.C.§ 1746, I hereby declare as follows:

1.   I am over eighteen years of age and suffer from no disability that would preclude me from giving this declaration.

2.   I am a member of the National Pork Producers Council, and the Iowa Pork Producers Association. I served as President of the Iowa Pork Producers Association in 1994.

3.   I have been a hog farmer on my farm in Iowa for the past 45 years. As a producer, I want to provide the best possible environment for my sows, and I care for my animals to the best of my ability.

4.   On my farm, I produce and raise 1,500 to 2,000 market hogs annually from my 110 sows. I sell all of my market hogs to a plant owned by Tyson Foods in Waterloo, Iowa. On the understanding that I commit my product to Tyson, I receive a better dollar figure per hog.

5.   The plant in Waterloo processes around 18,000 hogs per day, and the resulting product is sent into the marketplace all over the country and the world.

6.   My family members alerted me to a ballot initiative in California called Proposition 12. My under-

301a

standing is that Proposition 12 excludes from the California market covered pork product derived from a sow or her offspring unless the producer complied with its costly restrictions for housing sows—even if the pork was produced entirely out of state. Specifically, subject to certain statutory and regulatory exceptions, Proposition 12 requires sows be provided with enough space to lie down, stand up, and turn around, and, as of December 31, 2021, Proposition 12 requires that sows be confined in housing that provides at least 24 square feet per sow.

7.    My current sow housing practices do not comply with these restrictions. I house my sows in individual gestation stalls that do not allow them to turn around. I then move them to farrowing stalls shortly before they are expected to give birth, where they are held through weaning.

8.    I do not plan to comply with Proposition 12, in part because the restrictions imposed under Proposition 12 are regressive for both farm management and animal welfare.

9.    Based on my experience caring for sows for the last 45 years, I have developed an understanding of my animals. I've learned that the animals can communicate with you, and you can learn how to read their signals. I know from my experience working with them that my sows are better off in the individual stalls that I provide.

10.  I have seen the evolution of how producers have cared for sows for decades. I recall observing my father raising hogs in the 1960s and being fascinated. I also took part as a child in caring for sows through the 4H club. We would feed the sows on cement flooring next to the farrowing stalls that they were housed

302a

in. Over time, there have been tremendous changes in our ability to give the animals the best living conditions.

11.  When I first began raising my own sows after college, I held them in open lots with concrete flooring. The pens were large and provided between 50 to 75 square feet per sow easily. I would feed the sows from a bucket on the concrete floor. Because these open lots were cold, I would need to bed the sows with straw in the winter.

12.  I wanted to start using sows from a genetic line with better maternal instincts to increase my productivity rate. These sows, known as "white line sows" need much more feed and do not do well when exposed to too much cold.

13.  For these reasons, I constructed a new building in 1994 to hold the sows in individual stalls. The individual stalls allow me to feed the sows individually, according to their body conditions. They also stay consistently around 68 degrees through winter. This is better for the sows, especially compared to the often extreme cold in the open lots in winter.

14.  Additionally, the individual stalls protect the sows from fights. When I held my sows in groups, a bully or dominant sow would often pick on the weaker animals and prevent them from receiving enough feed. These weaker sows would get thinner and their body's condition would deteriorate. The sows would also frequently fight and bite at each other's ears and vulvas.

15.  Apart from protecting the sows from bully sows, my barn with individual stalls provides better working conditions and is now my favorite building to work in. The sows in individual stalls are docile,

303a

happy, and quiet. Unlike in the open lots, they do not have to spend all of their energy trying to keep warm and safe.

16. Individual stalls lead to better productivity rates. Providing individual stalls shortly after breeding is especially important to productivity. If sows are held in a group environment in the first three to four weeks after breeding, the fights and stress that they are exposed to can cause the embryo to fail to implant and the sow to return to estrus. I understand that Proposition 12 would not allow producers to house sows in individual stalls that do not meet its requirements during that critical period.

17. I have also seen that when sows are held in a group, there is always "fallout"—meaning that one or more sows are seriously injured during fights and therefore must be culled. Injuries from these fights can account for up to 25% of culled sows and clearly cause the size of the sow herd to drop.

18. Since I switched from open lots to individual stalls that keep my sows warmer and protect them from fights with bully sows, I have also noticed that I can keep my sows for more parities, or farrowings, until they are no longer able to reproduce. In the open lots, sometimes sows would only last for one or two parities. Now, I keep sows for six parities on average, and I have had some sows last for 10 to 12 parities. These results show me that the individual stalls and current system that I am using are good for the health of sows.

19. It is easier to manage sows when they are held in individual stalls. For one thing, it is easier to use artificial insemination and control which sow is

304a

bred to which genetic line. It is also easier to pregnancy test each sow and confirm that they are pregnant. And it is much easier to vaccinate and provide medical care to the sows. For example, sows need worm shots, injections to guard against lice and mange, and pre-farrowing shots to protect their piglets against bacterial scours. As another example, it is also easier to keep on the ears of each sow proper identification tags that provide each animal's farrowing data. And it is easier to provide a sow the proper amount of individualized feed in an individual stall. It is damaging to the sow and the animal's productivity to provide it with too much or too little food. All of these small examples add up. It is absolutely critical to farm management and sow health that many of these practices are done on a day-to-day basis, and it is much more difficult to accomplish these tasks when sows are held in a group.

20.  While sows are pack animals, their primary instinct is to find food and safety. This means, but based on what I have seen, my sows prefer housing in individual stalls because they know that they will not be picked on by a bigger animal and will not have to compete with other more aggressive sows for food.

21.  Sometimes, a sow will play with and open the front gate of its stall and go exploring in the alley for more food. But those sows will then try to get back in to their stalls, and if they cannot, they will lay close to the stall.

22.  I used to hear a sow scream roughly every 15 minutes when they were held in a group in the open lot. This was very difficult to hear, because when a sow screams, it is voicing discomfort. Since I moved sows into individual stalls, I have experienced nothing like that.

305a

23.   The changes required by Proposition 12 require throwing out these practices that producers have learned over time to both better care for the animals and improve farm productivity. Proposition 12 is a regression that would take us back decades. Because of my experience, I know that individual stalls are better for the welfare of my sows and management of my farm than the restrictions imposed under Proposition 12.

24.   Apart from decreasing productivity and animal welfare on my farm, Proposition 12 would also require that I bear construction costs to build Proposition-12 complaint housing, along with various costs related to learning and implementing a new production system.

25.   For one thing, I would need to construct new sow housing to keep the same productivity numbers, because I am currently 40% short on space per sow. I am not certain of the exact construction price per square foot, which would require I engage in research, but my cost outlays would be much greater than just the actual construction.

26.   Before I could proceed, I would need to educate myself on how to set up the new housing. I expect it would take at least a year for me to consult with equipment manufacturers and experts on how to design the housing.

27.   I would also need to select appropriate equipment for the new housing. As just one example, I would need to select a proper gating system. Because gating systems are made from steel, they are difficult to retrofit, so I would need to get the design right. And

306a

there are many more details that I would need to assess; for example, how to plan to move animal traffic across the barn.

28.  During construction, I anticipate that I would not be able to continue producing hogs, but would have to depopulate my sow barn for around four to five months while converting the building to the new housing system.

29.  After those four to five months, I would have to procure new sows or gilts, I believe that these sows would need to be Proposition 12 complaint. But I have no idea where I could find these animals.

30.  Once I found sows compliant with Proposition 12, I would need to mate them, and get my operations running again. In total, I believe I would lose at least a year's worth of production, and maybe longer.

31.  But my costs would not end there. I would also need to consult with industry experts and educate myself on how to properly manage this sort of a sow housing system. For example, I would need to understand how many sows it is socially best to hold in one group. It is not clear to me if ten, or twenty, or fifty sows is the best number. I would also have to determine the best feeding method to use with the new system. It is likely I would have to try multiple different methods before identifying one that works well. And I would face a learning curve as I changed my management style, and that it would take me around six months to understand how to best manage sows in a Proposition-12 complaint system.

32. Between construction and educating myself on how to manage the sows, I anticipate it would take me around two to three years to understand how to make the system work.

307a

33.  Even though I do not currently plan to comply, Proposition 12 harms me and my farm, because it bars my product from the California market. It is detrimental to the value of my product to lose access to a substantial market. I am also concerned that Proposition 12 will harm the price of my pork product and further decrease its value.

34.  These ongoing costs and injuries would be redressed by a decision declaring Proposition 12 unconstitutional and/or vacating Proposition 12.

35.  I declare under penalty of perjury that the foregoing is true and correct.

Executed on this  2ⁿᵈ  day of  December  2019.

*/s/ Tom Floy*

Tom Floy

308a

## Exhibit I

### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF CALIFORNIA

[Caption omitted]

### DECLARATION OF TODD HAYS

Pursuant to 28 U.S.C.§ 1746, I hereby declare as follows:

1.  I am over eighteen years of age and suffer from no disability that would preclude me from giving this declaration.

2.  I am a member of the American Farm Bureau Federation, the Vice President of the Missouri Farm Bureau, and a member of the Marion County Farm Bureau. I am also a member of the National Pork Producers Council and the Missouri Pork Association.

3.  I am a fifth-generation hog farmer on a farrow-to-finish farm in Monroe City, Missouri. A farrow-to-finish hog farm is one that has a herd of sows which are bred to produce piglets that are then fed (finished) until they are market weight. My family has farmed the property for more than a century. My farm contains two breeding and gestation barns, in which I hold 600 sows. From these sows, I raise and finish approximately 13,500 market hogs per year.

4.  I sell ninety percent of these hogs to Smithfield Foods ("Smithfield") under a marketing agreement. I have been contracting with Smithfield for the past ten years. My latest agreement with Smithfield lasts for two years. It requires that six other producers and I together deliver to Smithfield annually a certain number of pigs, which I estimate is around 50,000 to

309a

100,000 pigs. We usually deliver our pigs to Smithfield's plant in Milan, Missouri.

5. The six producers and I negotiated this agreement together to increase our bargaining power with Smithfield. The agreement benefits us because it provides us with a guaranteed price to market our pigs. The agreement in turn allows Smithfield to audit my farm to verify my processes. Smithfield may audit my farm to review, for example, my daily logs, cleanliness, equipment, and documentation of the veterinary care I provide to sick animals. Smithfield may also audit my farm to make certain that it meets Pork Quality Assurance Plus ("PQA+") standards to ensure my sows meet appropriate body condition scores and other welfare indicators. PQA+ is an education and certification standard developed by the United States Department of Agriculture's National Pork Board that covers a range of areas from food safety to animal welfare as well as labor and environmental protection.

6. The agreement with Smithfield does not dictate what type of housing I must use for my sows. Based on my experience as a hog producer, I have determined it is best to hold my sows in individual stalls. Shortly before farrowing, I move my sows into farrowing stalls. After weaning the piglets, I move my sows to gestation stalls that are approximately 24 inches by 8 feet long, where they remain throughout gestation. Some of my gilts, unbred sows that are kept to eventual breeding purposes, are held in pens until they are 20-weeks old, at which point I move them to individual stalls for breeding.

7. I heard about Proposition 12, a recently-passed California ballot initiative, from my brother, who is also a hog farmer and serves on the Board of the National Pork Producers Council. I understand

310a

that my current farming practices are not in compliance with Proposition 12. I am aware that Proposition 12 prohibits the sale of whole pork product in California derived from a sow or her offspring that was not confined in compliance with Proposition 12's requirements. I understand that, subject to certain statutory and regulatory exceptions, Proposition 12 requires sows be provided with enough space to lie down, stand up, and turn around, and that as of December 31, 2021, Proposition 12 requires that sows be confined in pens that provide at least 24 square feet per sow. It is also my understanding that Proposition 12 prohibits the confinement of sows in individual breeding stalls—even from the time period that a sow is bred until it is confirmed pregnant.

8.   I consider Proposition 12's requirements alarming, and other producers and I were taken aback by them. I believe that Proposition 12 is the result of advocacy from individuals who do not have any experience raising livestock and have not seen group housing and do not understand its adverse consequences.

9.   I have had experience with group housing, both from observing my dad and uncle's farm and from growing up on a farm where animals were housed outside in large pens. I noticed that animals are more aggressive in large pens. They will fight and bite at each other, regardless of the number of sows contained in the pen. Whenever a new group is established in a pen, the fighting is worse and the animals will tear at each other's vulvas and ears. Holding sows in the group pen led to more lameness and other injuries. Thus, I expect that if I changed to group housing from individual stalls to comply with Proposition 12, my sow mortality and lameness rates would increase.

311a

These injuries would reduce the number of pigs I could wean on my farm.

10. Based on my experience, I have noticed that group pens also create issues for feeding sows. The bigger sows intimidate the others and consume too much feed themselves, such that they are unhealthily large. These dominant sows will also prevent other sows from reaching the feed, such that weaker sows do not receive enough nutrition. In contrast, individual stalls allow me to better care for my sows by providing each sow with the nutrition that fits her needs.

11. Holding sows in group pens is also more dangerous for my farm workers. Sows can reach 400 to 500 pounds—and in some cases, even 600 pounds. It is dangerous for farm workers to enter the pens with these animals, because the workers could easily be stepped on or knocked down. Individual stalls are safer for both the workers and the animals.

12. Moving to a group pen would also make it more difficult for my workers to take care of our sows. In individual stalls, it is easier and safer for us to provide immunizations to our sows, monitor each sow's food intake, and notice if a sow is unwell and needs medical care. In contrast, it is easy to miss that a sow in a group pen has been ill or not eating food for days.

13. For the reasons that it is more difficult to house a sow in a group pen, and because of additional time spent moving the sows between the group pens and stalls for artificial insemination, I expect that compliance with Proposition 12 would require more labor and personnel to operate my farm. I currently hire three employees, and I envision that the group

312a

housing system mandated by Proposition 12 would require that I hire at least one additional employee. This would be difficult: it is already hard to find farm workers. Compliance with Proposition 12 would thus increase my labor and production costs.

14. I expect that productivity on my farm would decrease even more dramatically if I did not house sows in individual stalls after they are bred and, at the least, until they are confirmed pregnant. It is much safer for the insemination process to occur in a stall rather than a group pen. I have learned over the years that it is best to move a sow into an individual pen after weaning the piglets. I then keep them there to recover peacefully and regain weight and strength before breeding through artificial insemination. It is important to ensure that the sow is then kept in an individual stall and not moved from day seven through day thirty or thirty-five after insemination. During that time period, the embryos have not yet attached. If the sow engages in less movement, there is a higher chance that more embryos will properly attach. When a sow is moved to a pen during this timeframe, fewer embryos remain viable. As a result, fewer piglets are born per sow. Thus, on my farm we always ensure that a sow is kept in the same spot and not moved from an individual stall during that timeframe.

15. Apart from the sow welfare issues and labor and productivity costs discussed above, the expense of remodeling my farm to comply with Proposition 12 would be very high. It would require that I reconfigure my current pen system and introduce a new feed and water system.

313a

16.  I would not be able to keep all 600 sows on my farm and comply with Proposition 12 unless I built additional housing. Alternatively, if I kept the same building footprint as I have now, I would need to reduce the number of sows on my farm to meet Proposition 12's housing requirements, and my production would seriously decrease.

17.  If I was required to comply with Proposition 12 and bear these costs, I am not sure that I could stay in the business of producing pigs—something that my family has done for the last 100 years. This is because, even if I received a premium for complying with Proposition 12, I do not believe I would get enough return or payback to recover my costs of conversion and losses from reduced productivity on my farm. I also expect that the changes on my farm that I would be required to make to comply with Proposition 12 would increase my production and labor costs.

18.  Because of these costs and my concern that my business would not be able to absorb them and remain viable, I do not plan to comply with Proposition 12. It is my understanding that because of Proposition 12, my products will lose access to the California market. This loss troubles me, because of the large size of the California market.

19.  This further risks that my business will become less attractive to suppliers who choose to comply with Proposition 12 and may no longer do business with me.

20.  If Proposition 12 stands and mandates how I do things on my family farm, I may be required to exit the industry completely. Proposition 12's dictates, which effectively bar my product from the California market, have been imposed on my farm by citizens of

314a

California who have no understanding of the industry or the reasons for the practices on my farm. I had no vote, no say, and no representation.

21. I am concerned that Proposition 12 is only step one in activists' agenda and that out-of-state legislation will continue to impose draconian and misguided requirements that harm my sows and the business on my Missouri-based farm.

22. My ongoing injuries would be redressed by a decision declaring Proposition 12 unconstitutional and/or vacating Proposition 12.

23. I declare under penalty of perjury that the foregoing is true and correct.

Executed on this <u>3rd</u> day of <u>Dec  2019</u>.

<u>*/s/ Todd Hays*   </u>
Todd Hays

315a

**Exhibit J**

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

[Caption omitted]

**DECLARATION OF PHIL JORDAN**

Pursuant to 28 U.S.C.§ 1746, I hereby declare as follows:

1.  I am over eighteen years of age and suffer from no disability that would preclude me from giving this declaration.

2.  I am a member of the National Pork Producers Council (NPPC), the Ohio Pork Producers Council, and the Indiana Farm Bureau Federation.

3.  I am a hog farmer on my family-owned farm in Ohio, where I have worked as a hog farmer my entire life. Our farm contains a sow herd of approximately 1,600 sows along with 3,000 acres of corn and soybeans. My farm produces between 35,000 and 36,000 market hogs annually, and we are looking for some room to grow.

4.  We sell our market hogs primarily to JBS Swift under a marketing agreement. The contract lasts for two years and is an "Evergreen" contract, meaning that it renews automatically unless one party gives notice. Under the contract, I agree to deliver JBS Swift a certain number of market hogs at a determined price on a roughly quarterly basis.

5.  I first began contracting with JBS Swift about three to four years ago, and I have entered similar contracts with them off and on throughout the years. I also sell some of my product to packers in Indiana.

316a

6.    The majority of my sows are currently housed in individual stalls. Under Ohio regulations, I am required by December 2025 to house all of my sows in group pens, apart from time needed to maximize embryonic welfare and allow for the confirmation of pregnancy. Therefore, I am slowly transitioning to group pens. I currently house around 25-30% of my sows in group pens, but I place all of my sows in individual breeding stalls for the first thirty-five to forty days after weaning until they are confirmed pregnant. I plan to continue to do so, as permitted by Ohio regulations.

7.    I have observed that sows in my group pens will fight each other, which results in increased sow injury and lameness. In my experience, group housing is also a more labor-intensive system that requires greater management and experienced staff. As an example, it is more difficult to properly feed sows in a group pen than in individual stalls. The stronger sows will often prevent the weaker animals from accessing feed.

8.    I am aware that California has recently passed a ballot initiative known as "Proposition 12." I am not currently in compliance with Proposition 12, because I house most of my sows in individual stalls. Even after I complete my planned transition to group housing, I will remain out of compliance with Proposition 12, because I do not plan to construct housing to provide 24 square feet per sow, and I plan to continue to rely on using breeding stalls to help my sows recover peacefully, without the risk of fighting, from their previous pregnancy as they regain strength and weight. Like nearly every other pork producer in the country, I use artificial insemination to breed my sows. I will continue to keep them in the breeding stall following breeding, until I can confirm that a sow is

pregnant, and it is only then that I will move her into a group pen.

9.   I understand that if I do not come into compliance with Proposition 12, my product cannot be sold in California and thus my product will lose access to the California market. I understand that California is the largest market for pork in the United States, and that the lost opportunity to access the California market would be significant.

10.  I have thought about what changes I would need to make to my farming practices come into compliance with Proposition 12. It difficult for me to restructure my farming practices to comply with regulations imposed from outside the state. It is much easier to follow one set of rules that apply in Ohio, the state where I farm.

11.  If I came into compliance with Proposition 12, it is my understanding that I would not be allowed to use breeding stalls and instead would be required to move my sows into a group pen immediately after I have weaned the piglets when the sow is in a weakened state. It is my understanding that Proposition 12 also requires that I keep the sows in a group pen immediately after breeding them, and before the embryos have implanted in the uterine wall and pregnancy can be confirmed. I cannot imagine making this change. It would be a huge issue for my farm that would fundamentally change both how I farm and my farm's operation and would negatively affect sow welfare on my farm.

12.  I place my sows in individual stalls during the first forty days after weaning because I believe this practice is more humane than transitioning them di-

318a

rectly to a group pen. This practice allows me to ensure that my sows can recover from weaning, minimize their stress levels, and feel protected from other sows. I also provide each individual sow with a large amount of feed to maximize her diet during this time. I do not currently have the technology for an electronic sow feeding system to provide sows with individualized feed in a group pen. The cost of these systems is prohibitive for a small farmer such as me.

13. Keeping a sow protected in an individual stall after she is inseminated also protects against the risk that she will lose the embryo in the group pen due to fighting or increased stress levels. Once I move sows back into the group pen after these thirty-five to forty days, there is still some fighting. But waiting for that time period provides a great benefit to the sows and helps protect against the risk of embryo loss.

14. Apart from these sow welfare and productivity issues, coming into compliance with Proposition 12 and providing 24 square feet per sow would require more space than what I currently have on my farm. I would need to either downsize my herd or build more spaces for sow housing. The former would require a significant drop in productivity on my farm. The latter would involve significant construction costs.

15. I currently have planned to transition to group housing before December 2025 as required to come into compliance with Ohio state regulations. I have not prepared to come into compliance with California's additional 24 square foot per sow requirement before the much shorter deadline of December 31, 2021. I would need to expend additional time and costs to comply with Proposition 12.

319a

16.  Because I would require additional construction time to come into compliance with Proposition 12, or else would need to reduce my herd size, I would also be concerned about meeting my delivery requirements under my contract with JBS Swift. The contract sets delivery estimates two years in advance. If my productivity drops because I try to come into compliance with California's requirements and I can only deliver smaller amounts of hogs to JBS Swift, I am worried that my business will be harmed.

17.  My ongoing injuries would be redressed by a decision declaring Proposition 12 unconstitutional and/or vacating Proposition 12.

18.  I declare under penalty of perjury that the foregoing is true and correct.

Executed on this  2  day of December 2019.

*/s/ Phil Jordan*
Phil Jordan

320a

**Exhibit K**

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

[Caption omitted]

**DECLARATION OF CHAD LEMAN**

Pursuant to 28 U.S.C.§ 1746, I hereby declare as follows:

1.    I am over eighteen years of age and suffer from no disability that would preclude me from giving this declaration.

2.    I serve on the Illinois Pork Producers Association's Board of Directors, and am also a member of the National Pork Producers Council and the Illinois Farm Bureau Federation.

3.    I am a third-generation hog farmer in Woodford County, Illinois, and the owner of Leman Farms, Inc. The swine herd at my farm consists of approximately 3,200 sows, and my farm produces between 90,000 and 100,000 market hogs annually.

4.    Leman Farms contains three sow housing units. The day-to-day care of my sows is overseen by two groups: a veterinarian group called Professional Swine Management and a swine management company named Belstra Milling, which is headquartered in Dumont, Indiana.

5.    I currently house roughly two-thirds of my sows in group pens that provide about 19 square feet per sow. When the sows give birth, I move them into a farrowing room. Then, once the piglets are weaned, I move the sows back into individual stalls for approximately thirty-five days prior to returning them back into the group pen. This allows each sow to recover

321a

peacefully from her previous pregnancy. After being rebred, and once confirmed pregnant, I move her back into the group pen.

6.  I house the remaining one-third of my sows in individual stalls throughout gestation.

7.  I started building my farm in 2005. I first modified the farm and constructed a group pen in 2011. While I believe that sows receive better care in individual stalls, the general public which has no experience farming simply does not understand why farmers house sows this way. Because of increasing consumer demand, I was concerned that I would lose business if I did not convert to a group housing system.

8.  I keep piglets, the offspring of my sows, on my farm until they are weaned at about 21 days old. At that point, they are moved to other farms nearby where they are finished. I have long standing contracts with some of my neighboring farmers who provide the labor and buildings to care for the pigs until they are ready to ship off to market. Some of these contracts with my neighbors last from ten to twelve years and require me to provide a certain number of pigs to their farms.

9.  I am also responsible under contracts with both Tyson and JBS to deliver a certain number of market hogs per year to each company. Each contract lasts a period of three years, and both are "Evergreen contracts," meaning they renew automatically unless I give notice. These contracts also require me to comply with all applicable state and federal regulations.

10.  My contract with JBS, entered two years ago, pays me a premium to house my sows in a group pen, but it only requires that we house the sows in the

322a

group pen during gestation, once they are confirmed to be pregnant. The offspring of sows kept in group housing are delivered to a dedicated plant owned by JBS. I may not have received the contract with JBS if I had not converted to this group housing system.

11.  The Illinois Farm Bureau Federation notified me about California's recently-passed ballot initiative referred to as "Proposition 12." I understand that my current practices housing sows either in individual stalls or in group pens with 19 rather than 24 square feet per sow do not comply with Proposition 12. I have thought about the changes I would need to make to my farming practices to comply with Proposition 12, and the damage to my business that non-compliance might cause.

12.  It would be cost prohibitive for me to convert my individual sow housing to group housing, in part because the building is nearly 15 years old. It would also be cost prohibitive for me to remodel my existing group pen to provide 24 square feet per sow, maintaining the same number of sows per pen that I house now.

13.  I would face a serious drop in production during any construction, which would require me to de-populate the entire site being remodeled and shut down for around six months. My other option would be to build entirely anew on bare ground. This construction would be very difficult. I would be required to obtain construction permits, which is nearly impossible in Illinois due to regulations. I expect that it would take around a year and a half to complete permitting and construction before I could resume operations.

323a

14. Based on my experience using both a group pen and individual stalls, I expect that converting the individual housing to group housing would also lower my farm's productivity and negatively impact the welfare of the sows moved from stalls and into pens. I see more injuries and higher mortality rates among sows housed in the group pen. Sows in pens fight each other to establish dominance. Further, group pen gestation prevents sows from receiving feed effectively tailored to their needs. It is also very difficult to provide medical care to a sow in group housing. For example, a sow that needs an injection can be easily treated in a stall. But it is dangerous and difficult for caretakers to enter group pens to provide the same care to a sow in group housing.

15. I also expect increased labor costs if I convert my individual stall housing to group housing. In my experience, the cost of production using group housing rather than individual stalls is higher. This is because housing sows in pens is more labor intensive. These increased costs would require that I pay more to the groups managing the day-to-day care of sows on my farm.

16. It appears that Proposition 12 would also eliminate my use of individual breeding stalls where sows can recover after piglets are weaned. These stalls are also where sows are bred and provide protection to the sows until the embryo attaches to the uterine wall and we can confirm that the sows are pregnant. Losing the use of breeding stalls would be disastrous. Handling sows in this manner would be like not planting a corn crop but expecting for there to be a harvest. Not allowing a sow to use an individual stall and re-

324a

main protected there until she is pregnant would seriously lower conception rates and prove a major hindrance to the operation and profitability of my farm.

17. If my production significantly decreases due to the concerns discussed above, I face additional costs. I am contractually obligated to deliver a certain number of market pigs on an annual basis to Tyson and JBS and would be in breach if I failed to do so. I am also contractually obligated to pay my neighboring farmers who finish my pigs to market weight regardless of whether I actually deliver them weaned pigs.

18. It is my understanding that if l do not comply with Proposition 12, my product cannot be sold in California. Since California is such a large state and has such a large share of the US pork market, I am concerned that I will lose business if I do not convert my farm to be fully compliant with Proposition 12. I am also concerned that legislation or ballot initiatives similar to Proposition 12 driven by activists who do not understand the pork production industry will continue to impose additional demands on producers. I am worried that my pork production business will not be able to survive these increasing demands.

19. My ongoing injuries would be redressed by a decision declaring Proposition 12 unconstitutional and/or vacating Proposition 12.

20. I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 26th day of Nov. 2019.

/s/ Chad Leman
Chad Leman

325a

**Exhibit L**

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

[Caption omitted]

**DECLARATION OF GREG MAHER**

Pursuant to 28 U.S.C.§ 1746, I hereby declare as follows:

1.   I am over eighteen years of age and suffer from no disability that would preclude me from giving this declaration.

2.   I am a member of the American Farm Bureau Federation (AFBF).

3.   I own a small family farm outside of Monroe City, Missouri. My dad raised hogs on the farm for all of my life. My brother and I have operated the farm for the past thirty years. We have grown our farm from a couple hundred sows to about 2,500 sows today.

4.   From these sows, we produce approximately 52,000 pigs annually. Depending on the market price we can obtain at the time for weaned piglets, we sell about two-thirds of the pigs as weaners. We will raise and feed the remaining pigs and sell them as market hogs.

5.   We sell our pigs through a broker. Rather than entering a contract, it is better for us to sell on the open market. I sell many of my pigs to Smithfield, delivering them to a plant in Milan, Missouri. Smithfield is a large company that sells pork in all 50 states, including California, as well as all over the world.

6.   When I took over operations on the farm, I originally held all of my sows in individual stalls.

326a

Then, five to six years ago, a fire took place that required me to rebuild my barn. After the fire, I rebuilt to house my sows in group pens. I did so because, at the time, I was led to believe by different packers that I could receive a premium price and earn more on my hogs if my sows were housed in a group pen. Based on my experience, this turned out not to be true. While a few packers will provide a bit more, it is only a few dollars difference on average. Most packers that I have dealt with do not provide this premium. In either case, it doesn't cover my increased operating costs.

7.  I built my group pens with space for 16 square feet per sow. At the time, I was not aware of any regulatory requirement to provide additional space in order for my product to be sold in any out-of-state market.

8.  I wish I had not converted to group pens. The second I can get rid of my pens and move entirely back to individual stalls, I will. Individual stalls are much cheaper to operate and a lot better for the animals' well-being. As a result, the sows are more content in them. This actually makes them much easier and more efficient to operate as well.

9.  Since moving to a group pen, the sow mortality rate on my farm skyrocketed. I had a 2% sow mortality rate on average per year when I housed sows in individual stalls. Since I moved to group pens, the mortality rate has increased to 10%. That is, on average I have a 10% death loss rate for my sows held in pens. In addition, the move to group housing increased the number of my sows with lameness and other injuries and increased the number of sows I needed to cull, reducing my farm's efficiency.

327a

10.  Right now, I house roughly 40% of my sows in a group pen. The remaining sows I hold in stalls that are two feet by seven feet, providing 14 square feet per sow. My sows housed in the individual stalls continue to have very few lameness issues and a very low death rate compared to the sows held in the pen.

11.  Because of the continuing difference in mortality rates for my sows housed in stalls compared to group pens, I believe this increased mortality rate is caused by housing the sows in pens. The sows in the pen fight each other, causing serious injuries, and have lowered the productivity on my farm.

12.  Housing sows in group pens also raised the cost of production on my farm because it is more labor intensive to raise sows held in a group pen. It takes more time to go through the pen and take care of the sows. It also requires more complicated grouping of sows based on the size and personality of each individual sow which adds more labor, and could lead to higher mortality rates if not done properly. Additionally, it is more difficult to feed sows in a group pen. I previously used an Electronic Sow Feeding (ESF) system for my sows held in the group pen. The system itself was very expensive and operating it was very labor intensive and required a lot of training. This also raised the cost of production.

13.  I have also noticed that sows held in the individual stalls appear to prefer them. If the gates are left open, the sows often will remain in their stall.

14.  I am aware of legislation passed in California called Proposition 12. It is my understanding that my product cannot be sold on the California market unless I comply with its requirements. I believe Proposition 12 requires that, subject to limited exceptions, I

328a

house sows with enough space to lie down, stand up, and turn around and with at least 24 square feet per sow. This would effectively require that I keep all of my sows in a group pen. It is also my understanding that Proposition 12 prohibits the use of individual breeding stalls to house the sows as they recover from their pregnancy and are then re-bred. I keep my sows in the breeding stalls until I am able to confirm that they are pregnant before moving them back into a group pen.

15. I do not plan to comply with Proposition 12. As mentioned, I wish to move back to housing all of my sows in individual stalls as soon as I can. Individual stalls are much easier and less expensive to operate and I believe a lot better for the health and welfare of the animals.

16. Further, I would not move a sow back into a group pen until she has recovered from her pregnancy, been bred, and I can confirm that she is pregnant. I hold my sows in individual breeding stalls until I confirm that they are pregnant. This gives the embryo a chance to attach. Moving the sows into a group pen earlier would risk losing the pregnancy and further lower the productivity rate on my farm.

17. If I was required to move all of my sows back into a pen and reconstruct my barn to provide sows with 24 square feet per sow, I might have to just get out of the hog production business. I spent a million and a half dollars building my pen. The money is not there for me to do that right now.

18. My ongoing injuries would be redressed by a decision declaring Proposition 12 unconstitutional and/or vacating Proposition 12.

329a

19. I declare under penalty of perjury that the foregoing is true and correct.

Executed on this <u>02</u> day of <u>Dec</u> 2019.

<u>*/s/ Greg Maher*</u>
Greg Maher

330a

**Exhibit M**

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

[Caption omitted]

**DECLARATION OF RANDY SPRONK**

Pursuant to 28 U.S.C.§ 1746, I hereby declare as follows:

1.   I am over eighteen years of age and suffer from no disability that would preclude me from giving this declaration.

2.   I am a member of the National Pork Producers Council (NPPC), and the Minnesota Pork Producers Council. I previously served as an officer and President of NPPC, as well as on the Board of Directors for eight years, amongst the longest-ever terms.

3.   I am a third-generation Minnesota farmer. When I was in college, my father operated a hog farm with 80 sows. I am now a managing partner of the Spronk family farm, which I operate in a 50/50 partnership with my brother in Edgerton, Minnesota. We are currently integrating the fourth generation, our children, into operating the farm.

4.   Our sow herd is professionally managed by the Pipestone System. We own about 10,000 sows, held in four different barns. Under the Pipestone System, my brother and I pooled our females with eight other producers into larger sow barns. Some of those barns we own ourselves, and two we own in conjunction with those other farmers.

5.   From our 10,000 sows, we produce around 250,000 market hogs annually. The piglets are weaned at 21 days. We do business with contract

331a

farmers for finishing our hogs, and then sell the resulting market hogs 150 days later under contracts with JBS, and Tyson. We also sell a great deal of our product to Hormel. As a part of a group of farmers, we purchased a packing plant from Hormel, and sell all of the cuts we produce at that plant to Hormel for eventual consumer sale by Hormel.

6.   When we first started Spronk Brothers, my brother and I started out with 300 sows, which we held in group pens with straw bedding. We would hold the sows in individual breeding pens until we confirmed that they were pregnant, and then we would move them into the group pen. I noticed that the smaller sows were often picked on by the dominant sows. Watching this made me heartsick.

7.   Because of this, in 1998 we moved to individual sow housing, and we have housed sows in individual stalls in every barn since that time.

8.   After moving to individual stalls, our production rate increased, our fetal implantation numbers became higher, and the number of fetuses lost in utero decreased. The general health of our sows improved markedly. Our death loss rates decreased, and the body condition scores of our sows went up. The decision we made to move to individual stalls improved the care of our animals across all parameters.

9.   I am aware of a ballot initiative recently passed in California, called Proposition 12. My understanding is that to comply with Proposition 12's sow housing requirements, subject to some limited exceptions, I would need to house my sows with enough space to stand up, turn around, and lie down, and that I would further need to provide 24 square feet per sow as of December 31, 2021. My understanding is that

332a

Proposition 12 bars from the California market covered pork product derived from a sow or its offspring unless the producer complied with its costly restrictions for housing sows—even if the pork was produced entirely out of state. It is also my understanding that the limited exceptions to Proposition 12's strict requirements do not allow producers to keep sows in individual breeding stalls to confirm that they are pregnant prior to moving them back into group pens.

10. For a number of reasons, I do not plan to come into compliance with Proposition 12.

11. First, I expect that if I moved back to a group housing system that Proposition 12 effectively requires, my productivity rates would drop, just as they were lower when I previously group-housed my sows during most of gestation. But eliminating the use of breeding stalls during the first 42 days of pregnancy would cause conception rates to plummet. The female pig is very vulnerable during that time. Individual stalls are especially important for these first 42 days to ensure that the female receives the right nutrition and is not at risk of bullying from a larger sow or other stressors that would cause her to lose her pregnancy.

12. Entirely apart from productivity rates, I do not think that the housing restrictions required under Proposition 12 are in the best interest of the animals. The activists who pressed for them clearly have not seen large sows fighting each other when held together in a pen. It makes me sick to my stomach to see animals not properly cared for. I know that I can most humanely care for my sows by holding them in individual pens.

333a

13.  I am also concerned that expanding to provide 24 square feet per sow might afford too much space, to the point of being detrimental to sow welfare. I am aware of other farms in the Pipestone system that group house their sows. The farmers I am aware of who use group pens are still in the investigatory phase of determining the right space to provide. Farms with large space allowances are providing around 20 or 22 square feet per sow. I have debated whether 24 square feet per sow is too much space. In a pen, sows determine space for bedroom, bathroom, and kitchen. Too much space, such as 24 square feet per sow, could cause sows to defecate or urinate in the wrong spot, which is unsanitary and harms sow health.

14.  Additionally, I would expect my labor costs per pig to increase were I to convert back to group pens. It is easier to give individualized care and treatment to sows when they are held in individual stalls. It is also easier to move them to farrowing stalls when it is time for them to deliver piglets. Pigs require more care when housed in group pens.

15.  Housing sows in group pens would also raise worker safety issues because of the risk inherent in workers entering pens containing aggressive 400 to 500 pound animals.

16.  Construction costs to comply with Proposition 12 would further be incredibly costly for me. Right now, every animal has about 15 to 16 square feet. It would require a great deal more land to expand to provide 24 square feet per sow. This would be possible at some of my sites, but at others I do not have enough space to maintain my existing sow herd and provide 24 square feet per sow. And where I did undergo these significant construction costs to expand my barns, I

334a

would incur increased insurance costs and property taxes.

17. While I am not able to incur these costs and comply with Proposition 12, I am very concerned about losing business because of Proposition 12. I am absolutely positive that some of my product ends up in California through my sales to Hormel, JBS and others, because of California's large market share. But because of Proposition 12, my product can no longer be sold in California.

18. I have not yet received a clear signal from packers regarding whether they will require compliance with Proposition 12 to continue conducting business with me. That alone is troubling, because there is no clear industry signal regarding what is needed to sell my product. Instead, Proposition 12 has generated uncertainty regarding what the industry will require. This is damaging, because sow housing is a decades-long investment. The buildings last forty years. Making a change is wasting part of that investment. I cannot afford to change my housing practices to comply with Proposition 12 when there is as-yet not a clear signal from the industry clarifying what housing practices will be needed. If I incur these compliance costs to meet Proposition 12's restrictions, I risk running out of business if there is not a sufficient market for Proposition 12-compliant pork. And if Proposition 12 stands, there is no certainty that Proposition 12 is the final requirement or that producers such as myself will not later be required to change our practices even more.

19. Further, any increased price consumers in California may pay for Proposition-12 compliant pork would not offset my increased costs of production. This is because my product, like that of all other hogs, is

335a

put into primals, meaning cuts of meat, and then different parts are shipped all over to completely different end users. But these products all come out of just one pig, and producing Proposition-12 compliant pork increases my costs for that *entire* pig. This means that compliance with Proposition 12 would require me to increase my production costs to produce products that are not of higher value to all end consumers. Thus, through Proposition 12, one potential end-user market out of many dictates the method of production for the entire pig and at the same time raises my cost of production for all other markets, including markets that do not value these changes and will not pay an increased price.

20.  During the course of my career as a hog producer, I am aware of multiple other examples of retailers trying to force production to meet specifications championed by activists. I have watched several of these other efforts fail, because they are not consumer-driven, and there is not a market to recoup increased production costs.

21.  I have also learned during the course of my career as a hog producer that there is often a reason why my grandfather or father did things a certain way. If consumers want a change, the market will provide it naturally.

22.  My ongoing injuries would be redressed by a decision declaring Proposition 12 unconstitutional and/or vacating Proposition 12.

23.  I declare under penalty of perjury that the foregoing is true and correct.

Executed on this <u>2nd</u> day of <u>December</u> 2019.

<u>  /s/ Randy Spronk      </u>

336a

**Exhibit N**

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

[Caption omitted]

**DECLARATION OF JOE HOFER**

Pursuant to 28 U.S.C.§ 1746, I hereby declare as follows:

1.    I am over eighteen years of age and suffer from no disability that would preclude me from giving this declaration.

2.    I am the President and Senior Minister of a Hutterite colony located in Montana. Senior Minister is a religious and leadership position in the Hutterite community.

3.    Our community has been subject to longstanding religious persecution, which drove us out of Europe and into Russia generations ago. Over-time, we have settled primarily in Canada, the Dakotas and Montana.

4.    We are a community of conscientious objectors. In part because of the persecution that members of our community endured in the United States during World War 1, the United States began to permit conscientious objection.

5.    There are about thirty pork producing Hutterite colonies in Montana. On each colony, around twenty to thirty families work together and live communally. Members of each colony live and work together engaging a variety of agricultural operations, including pork production. All assets owned by and income produced on a colony are held communally. No

337a

member of the colony owns any interest in the Colony itself or the assets of the Colony.

6.  Many of the Hutterite colonies in Montana raise hogs, and have done so since we settled in Montana in the early 1950s.

7.  All of the Montana hog-producing colonies are members of the National Pork Producers Council (NPPC). Almost all of Montana's pork production is attributable to Hutterite Colonies.

8.  Hog production is a major source of income for Montana colonies.

9.  The colonies' hog farms are generally of about the same size. The colony of which I am Senior Minister is representative. The colony operates a farrow to finish farm. We own about 470 sows and produce about 13,500 market hogs per year.

10. I am aware of a ballot initiative recently passed in California called Proposition 12 that stands to significantly harm hog-producing Hutterite colonies throughout Montana.

11. My understanding is that Proposition 12 excludes from the California market covered pork product derived from a sow or her offspring unless the producer complied with its costly restrictions for housing sows—even if the pork was produced entirely out of state. Specifically, subject to a few exceptions, Proposition 12 requires sows be provided with enough space to lie down, stand up, and turn around, and, as of December 31, 2021, Proposition 12 requires that sows be confined in housing that provides at least 24 square feet per sow.

12. Given harms that Hutterite colonies stand to suffer because of Proposition 12, the Montana pork

producing colonies have asked and authorized me to speak in their support.

13. No individual colony wants to be named in this action, given the fear that we will experience retaliation.

14. Further, our religious beliefs generally prohibit us from engaging ourselves in litigation.

15. Despite these concerns, the serious impact that Proposition 12 will have on our entirely out-of-state production of pork compels us to explain Proposition 12's detrimental impacts on us.

16. Much of the pork product that comes from the Montana colonies' hogs is shipped to the State of California.

17. My individual colony contracts with a packer which we send 220-225 market hogs on a weekly basis. We will sometimes send that packer an additional half-load, and we sell any other overflow product to a few other packers located in Northern California.

18. Eight of our other colonies also contract to regularly ship pork product to this same packer.

19. This packer held a meeting with all of its producers, including our colonies, and demanded that we comply with Proposition 12. If we do not comply, it will disrupt our business relationship with him.

20. I believe that this packer sends about one-third of its product to California, another one-third to other domestic markets, and the last one-third to foreign markets.

21. Despite the fact that this packer sells only about one-third of the product it receives from Montana colonies into California, it demanded that *all*

339a

pork product that we ship to it meet California's specifications under Proposition 12.

22. Regardless, it would not be practical for us to change only one-third of our production to comply with Proposition 12.

23. We were not offered any premium to change our practices to comply with Proposition 12.

24. Changing our practices to comply with Proposition 12 would be incredibly costly.

25. First, it would require almost all of our hog-producing colonies to significantly change their practices.

26. Our colonies typically house sows in individual gestation stalls. We generally place sows in an open pen, or "loose" housing, only to expose them to a boar when they are being bred. We put them back into individual gestation stalls immediately after breeding.

27. To comply with Proposition 12, the majority of our colonies would need to reduce their sow populations by about 20%, which would be a serious drop in production.

28. Alternatively, if colonies built expanded barns with Proposition 12-compliant housing, our compliance costs would be prohibitive. It is very expensive to build a barn.

29. Also to comply with Proposition 12, colonies would need to purchase expensive equipment.

30. If required to bear these costs, many of our colonies would quit raising pigs.

31. Some colonies currently have very old barns which cannot be renovated as required to comply with

340a

Proposition 12. These colonies would instead need to build entirely new barns to meet Proposition 12's requirements. Most do not have the financial resources to do so, because it costs millions of dollars to construct a new barn. Thus, for these barns, it would not be possible for them to continue producing hogs.

32. It is my understanding that Proposition 12 was championed by animal rights' activists. We care for the welfare of our sows on the colony farms. We employ the latest technology in our barns, including ventilation systems, so that our buildings are animal-friendly. And, because we produce antibiotic free product, we are very careful to take care of our animals so that they do not become ill.

33. I believe that the sows are better off in individual stalls. I have seen that sows held in group pens engage in gruesome fights to receive feed, during which they bite at each other's vulvas, and other parts of the sows body.

34. Because of these fights, compliance with Proposition 12 would also require colonies to purchase 20% more replacement gilts to replace sows that are injured in these fights.

35. Our ongoing injuries would be redressed by a decision declaring Proposition 12 unconstitutional and/or vacating Proposition 12.

36. I declare under penalty of perjury that the foregoing is true and correct.

Executed on this <u>6</u> day of <u>Dec</u> 2019

<u>*/s/ Joe Hofer*</u>
Joe Hofer

341a

## Exhibit O

### UNITED STATES DISTRICT COURT

### SOUTHERN DISTRICT OF CALIFORNIA

[Caption omitted]

### DECLARATION OF DR. STEVE R. MEYER

Pursuant to 28 U.S.C.§ 1746, I hereby declare as follows:

### Qualifications

1.   My name is Dr. Steve R. Meyer. I am the Economist at Kerns and Associates, a market analysis and advisory company located in Ames, Iowa. One of my duties is to serve as the consulting economist for the National Pork Producers Council. I have served as an economic advisor to the Council, either as an employee or consultant, since 1993. Prior to that time, I spent three years as an assistant professor at a major land-grant university working on livestock marketing issues. Virtually my entire career has involved observing and researching the pork industry, from live animal production through consumer marketing and consumption, and advising industry participants regarding its economic drivers, relationships and impacts. My resume is attached to this document.

### Assignment

2.   I have been asked by the National Pork Producers Council to estimate the impact of California's Proposition 12 on pork producers. Three aspects of this initiative are of primary concern:

(a)   The requirement that product sold in California be derived from pigs that come from farms where sows are provided 24 square feet of space per sow;

342a

(b)    The elimination of breeding stalls except for short periods for "animal husbandry" purposes;

(c)    The de facto requirement that pork slaughter firms, processors, wholesalers and retailers segregate product that meets the Proposition 12 requirements.

## Findings

3.    All of these aspects will impose costs upon the pork production system. Many of those costs will be borne directly by pig farmers who must deal with items (a) and (b) above with, quite possibly, no certain way to cover or recapture those costs. In addition, producers will incur economic damage from item (c) as it adds cost to delivering pork to California consumers who will, as a consequence, purchase less pork than they otherwise would have. The lower quantity demanded by California consumers will reduce the number of pigs needed and reduce the opportunity to produce those pigs and realize a profit from their sale.

4.    Based on my 30 years of observing the U.S. pork industry, I believe the various economic agents involved in delivering pork to California consumers will react as follows to Propositions 12's requirements:

(a)    Retailers and restaurants will have no choice but to specify Proposition 12-compliant product from their suppliers. Selling pork is too large a part of their businesses to simply allow it to go away due to imposed regulations, regardless of whether those regulations are reasonable.

(b)    Wholesalers, independent processors and pork packer/processors will have no choice but to supply Proposition 12-compliant products if they wish to remain in the California market.

343a

(c)    Pork packers will decide whether to remain in the California market. The ones that do so will buy only pigs from farms that meet Proposition 12's requirements for sow housing for at least as much of their production as is required to supply their California sales.

(d)    Producers will have to choose whether to incur the costs associated with Proposition 12's requirements. Some may be offered pig pricing arrangements that will cover these costs. Others – and perhaps all – will not. Many will be forced to decide whether the prices received will be sufficient to cover additional cost and still provide acceptable returns on invested capital.

5.    I expect some packers and their producer suppliers to decide to continue to serve the California market. The number that do so and the amount of pork supplied remain to be seen.

## Sows needed to provide California's 2018 pork consumption

6.    California's 2018 population was estimated to be 39.866 million, 12.21% of the estimated 2018 U.S. population (Bureau of the Census, 2018). The racial and ethnic composition of California's population implies that Californians, on average, consume more pork than does the average U.S. citizen. Figure 1 shows data from the Nielsen consumer panel for pork expenditure index by racial/ethnic group and the composition of California's population by those same racial/ethnic groups (Bureau of the Census, 2018). California has large shares of Asian and Hispanic consumers that over-index for pork consumption. Computing a weighted average index shows that California's pork

344a

expenditures would be 7.6% higher than the U.S. average.

| Figure 1: California population race/ethnic shares, pork indexes by race/ethnic shares and weighted average pork index. | | | | |
|---|---|---|---|---|
| **Race/Ethnic** | **Share, 2018\*** | **Nielsen Index\*\*** | **Weighted** | **California Index** |
| Black | 6.50 | 122.1 | 793.7 | |
| White | 36.80 | 93.8 | 3,451.8 | |
| Asian | 15.30 | 132.2 | 2,022.7 | |
| N/Amer | 1.60 | 93.8 | 150.1 | |
| Pac. Island | 0.50 | 93.8 | 46.9 | |
| Hispanics (any) | 39.30 | 109.3 | 4,295.5 | |
| Total | 100.0 | | 10,760.6 | 107.6 |

7.   California is estimated to consume 13.139% of the pork consumed in the United States. That estimate is reached by multiplying California's percent of the national population, 12.21%, by an index of 107.6. Americans consumed 21.491 billion pounds of carcass weight pork in 2018, implying that Californians consumed 2.832 billion pounds of pork. More important for these calculations, California's share of the U.S. hog slaughter that went to domestic usage amounts to 13.353 million head of hogs. Assuming 25 pigs per sow per year (a generous number relative to USDA's Hogs and Pigs reports for 2018 which implied 21.2 pigs per breeding animal per year or roughly 23.55 pigs per sow per year) means that at least 534,115 sows were needed for the pigs necessary to provide California's pork consumption in 2018.

8.   To arrive at the number of sows necessary to supply California's pork needs under Proposition 12, that number must be increased due to two factors.

(a)    First, not all cuts will be consumed by Californians in equal proportion. No data are available regarding the mix of cuts purchased and consumed by Californians. Due to California's size and population diversity, it is likely that the state's consumption mix will not differ much from the national mix which, after adjusting for some difference in exports and imports, must be close to the proportion of cuts yielded by a pork carcass.

(b)    Second, selling one cut from a pig to California means the entire pig must be raised according to Proposition 12's requirements, regardless of where the other cuts are sold. This factor may be negligible for a California packer but may be significant for, say, a packer in Iowa or Illinois. No data are available for this proportion.

9.    I assume that 5% more hogs would be required to account for factor (a) and 20% more hogs would be needed to account for factor (b). I believe both of those figures are conservative. The two factors increase the number of sows needed to supply California to 672,984.

## Farm-level costs to meet Proposition 12's requirements

10.    Proposition 12 requires farms to provide 24 square feet of pen space for sows, except for five days prior to farrowing (giving birth) and while lactating. The only exception is a provision for "animal husbandry purposes" for no more than six hours in a 24-hour period, and no more than 24 hours total in any 30-day period.

11.    Current commercial hog farms house sows in gestation stalls, small pens (normally 6-12 head per pen) and large group pens. Square footage allowances

346a

range from 14 in stalls to 16-18 in pen situations. I am not aware of any commercial operations that would, by design, presently provide 24 square feet per sow.

12.  Producers will have to meet Proposition 12's space requirements in one of two ways:

(a)  Reduce sow populations.

(b)  Build additional sow space.

13.  Regarding the first option, going from 14-square-foot gestation stalls to 24 square feet of pen space per sow will drive a 42% reduction in sow inventory and the same percentage increase of average fixed costs. Going from 16 square feet per sow pens to 24 square feet will reduce sow inventories (and increase average fixed costs) by 33%. More importantly, lower sow numbers would create the same percentages of slack space in every nursery, grower and finishing building, increasing average fixed costs there as well. Further, pig output and thus revenues would decrease by those same percentages. The impacts of this action are so severe that I believe it will only be used in areas where facility expansion is impossible. <u>I believe there are enough areas that will allow expansion that this approach will be used only in rare instances</u>.

14.  Regarding the second option, building additional sow space will be the primary approach to meeting Proposition 12's space requirements. According to Wendell Burge at Hog Slat, a major U.S. hog facility builder, sow space can be constructed for $40/square foot. That figure covers everything except land. This course of action would allow producers to maintain pig flows and thus fully utilize downstream structures, labor, etc. and produce the same number of pigs and same level of revenue as they do now.

347a

15.  Figure 2 shows the additional space needed to house the 672,984 Proposition 12-compliant sows and the costs of that space. Note that "costs" have two components of import for producers.

16.  The first is the capital required to make the prescribed changes. Some producers may have the necessary capital or have access to sufficient borrowed capital. Others may not be able to acquire the necessary capital and thus would not be able to become Proposition-12 compliant.

17.  The second facet is the cost that must be covered by each pig. Cash costs and a portion of the initial investment must be covered annually. These costs cover depreciation, interest, repairs, taxes and insurance ("DIRTI items"). A rule of thumb with relatively low interest rates is that those items amount to 20% of total investment. Cost per pig is determined by dividing the resulting annual cost by

| Figure 2: Costs to meet Proposition 12 space requirement of 24 sq. ft. per sow for 672,984 sows. | | |
|---|---|---|
| Current sq. ft./sow | 14 | 16 |
| Prop 12 required space, sq. ft. | 16,151,625 | 16,151,625 |
| Current total sq. ft. | 9,421,781 | 10,767,750 |
| New space needed, sq ft | 6,729,844 | 5,383,875 |
| | | |
| Capital required @ $40/ft | $269,193,754 | $215,355,004 |
| | | |
| Cost per sow | $400.00 | $320.00 |
| Annual cost (DIRTI=20%) | $80.00 | $64.00 |
| Cost per pig @ 25 pigs/sow/yr | $3.20 | $2.56 |

the number of pigs produced per sow per year.

18.  The final costs that must be incurred in order to be Proposition 12-compliant are those necessary to offset the productivity loss associated with no longer

348a

being allowed to use breeding stalls. And this cost is substantial.

19. Proposition 12 contains an exception for the use of stalls outside of pre-farrowing and lactation. The "animal husbandry" exception states that sows can be confined to stalls six hours in a 24-hour period but no more than 24 hours total in a 30-day period. Such confinement would only be sufficient to accomplish the actual act of inseminating sows. It is not sufficient to meet the primary reasons that breeding stalls are used by U.S. producers: protecting sows from one another as they physically recover from lactation and allowing embryos to implant into the sows' uterine walls.

20. I can find no published research on the impact of removing this established practice. Many research projects have compared pen gestation with breeding stalls to complete stall gestation but I can find none that compare pen gestation with breeding stalls to pen gestation without breeding stalls. I believe that lack of information is because the practice is so obviously beneficial that no researcher questioned its value and thus never ran experiments to determine what would happen if it was not used. Industry sources report that, in the few instances they knew of where producers could not or did not use gestation stalls and put sows directly into group housing after weaning, farrowing rates (the percentage of mated sows that actually farrow a litter roughly four months later) declined by 8-10 percent from the levels routinely achieved using stalls for the first 35 to 42 days post weaning. I use the midpoint of that range, 9 percent, to be conservative regarding this cost.

349a

21. To overcome this reduction in farrowing rates, producers wishing to be Proposition 12-compliant will have to add sows to their herds and add facilities to house them. Figure 3 presents the computations to arrive at the number of sows needed, the capital required to add them to the herd and the cost of the new animals and space on a per-pig basis.

22. The total value of $10.49 is much higher than the per-pig cost of additional space because the entire space to house a sow must be added as well as the sow herself. The addition of another 66,559 sows would put the collective Proposition 12-compliant producers just back to the level of production they achieved before breeding stalls were removed.

23. It should be noted that none of the costs listed in Figures 2 and 3 will result in added pig production. They are necessary just to maintain total output and meet Proposition 12 space requirements.

350a

| Figure 3: Costs of adding sows to compensate for reduced farrowing rate due to ban on breeding stalls | |
|---|---|
| Sows needed, Prop-12 space requirements | 672,984 |
| Additional sows to overcome 9% conception rate decline | 66,559 |
| Total Prop-12 compliant sows | 739,543 |
| **Capital requirements** | |
| Building cost per sow space (24 sq ft @ $40/ft) | $960 |
| Gilt cost | $220 |
| Total requirement per sow | $1,180 |
| Total capital requirement | $78,539,451 |
| **Costs per pig for sows to overcome conception rate decline:** | |
| Annual facility (DIRTI=20%) cost/sow | $192.00 |
| Per pig facility cost at 25 pigs/sow/yr | $7.68 |
| Per pig sow cost* | $2.81 |
| Total per pig cost of added sows | $10.49 |

*Assumes 3 litters/sow, $150 salvage value, 5% death loss

## Economic impact of Proposition 12's costs on the U.S. pork industry

24. Assuming that U.S. packers decide to continue supplying pork to the California market, U.S. producers will have to decide whether to incur the costs outlined above. Should they do so, somewhere between $293,894,455 and $347,733,205 of additional capital will have to be accessed and invested into sow units to a) meet the space requirements of Proposition 12 and b) overcome the productivity loss imposed by the banning of breeding stalls.

25. Costs per pig will be increased by $13.05 to $13.69 to pay for additional depreciation, interest, taxes, repairs and insurance on these added facilities. Iowa State University's estimate of average cost of production (including death loss) for Iowa farrow-to-finish operations was $63.81 per hundred pounds

351a

(cwt) carcass weight in 2018 and is $65.05 for January through September 2019. The Iowa State estimates are widely believed to represent the lowest-cost 25 percent or so of U.S. producers. Average producers' average costs are roughly $5/cwt carcass higher than the ISU estimates. Assuming average producers have costs of $69/cwt carcass, total cost for a 210 pound carcass would be $144.90. $13.38 (the midpoint of my cost per pig range) would represent a 9.2 percent cost increase at the farm level.

26. These findings are subject to revision if additional materials or research become available to me.

## References

Department of Economics, Iowa State University, <u>Estimated Costs and Returns—Swine, Farrow to Finish</u>, December 2019, http://www2.econ.iastate.edu/estimated-returns.

United States Census Bureau, Quick Facts: California, https://www.census.gov/quickfacts/CA.

Nielsen Consumer Panel Data 2018, National Pork Board, Des Moines, IA.

United States Department of Agriculture, National Agricultural Statistics Service, <u>Hog and Pigs</u>, December 2017 through September 2018, https://usda.library.cornell.edu/concern/publications/rj430453j?locale=en.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this <u>5th</u> day of <u>December</u> 2019

*/s/ Dr. Steve R. Meyer*

[Dr. Meyer's CV omitted]